# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SEN GAO, CONGLI HUO, RUIBIN WANG, LUXIAO XU, Individually and on behalf of all others similarly situated, | |
|           Plaintiffs, | Case No: 22-cv-07499-BMC |
|    v. | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| SINGULARITY FUTURE TECHNOLOGY, LTD. F/K/A SINO-GLOBAL SHIPPING AMERICA LTD., YANG JIE, LEI CAO, ZHIKANG HUANG, TUO PAN, XIAOHUAN HUANG, JING SHAN, TIELING LIU, JING WANG, LEI NIE, JOHN LEVY, THOR MINER, INC., and GOLDEN MAINLAND, INC. | JURY TRIAL DEMANDED |
|           Defendants. | |

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ................................................................... 1

II.  JURISDICTION AND VENUE ................................................................. 7

III.  PARTIES .................................................................................................... 8

    A.  Lead Plaintiffs ................................................................................ 8

    B.  Defendants ...................................................................................... 8

IV.  BACKGROUND AND NATURE OF THE FRAUD: DEFENDANTS' MATERIALLY
FALSE AND MISLEADING STATEMENTS AND OMISSIONS ............................... 13

    A.  Jie Assumes Control of Singularity and Omits and Misstates Material Facts
Regarding His Background ........................................................... 14

        1.  Misstatements Relating to Jie's Personal and Professional Background........ 14

        2.  Evidence That Statements About Jie's Educational and Professional
Background Were Materially Misleading ......................................... 16

            a.  Jie Committed Fraud as the General Manager of CCC and
Attempted to Conceal the Fraud by Procuring a False Affidavit ........ 17

            b.  Jie's Alleged Criminal History and Legal Troubles in China .............. 21

            c.  Jie Has Represented Multiple Conflicting Accounts of
His Educational History ...................................................... 34

    B.  Jie and Singularity Appoint John Levy as a Director of the Company
|But Omitted He Was a Director of CCC, the Entity at Which Jie
Committed Numerous Financial Improprieties ......................................... 35

    C.  Singularity Claims to Transform Its Ailing Global Shipping and Logistics
Business to a Cryptocurrency Mining and Hardware Development Business ........ 36

    D.  Singularity, Jie, Shan, Pan, and Cao Induce Private Investment
in Singularity Based on False Claims Regarding the Company's
Sham Cryptocurrency Business ................................................... 38

    E.  Singularity Rebrands Itself and Touts the Launch of Its Cryptocurrency
Mining Operations ............................................................... 41

    F.  Singularity and Jie Form a Sham Joint Venture with Golden Mainland
to Become a Leader in Cryptocurrency Mining ...................................... 44

i

G.    Singularity Forms Thor Miner, Inc., a Sham Company, Purporting to Build Proprietary Cryptocurrency Mining Machines Which It Purports to Sell to SOS ........................................................................ 51

    1.    Singularity and Thor Miner Do Not Own the Intellectual Property Rights to Proprietary Mining Machine ............................. 54

    2.    Singularity and Thor Miner Misrepresent Their Ability to Execute on the $200 Million SOS Contract........................................ 56

    3.    Singularity, Cao, Jie, Pan, Liu, Wang, Shan, Levy and Huang Misrepresented or Failed to Correct That Defendant Xiaohuan Huang's Reported Employment History with SOS Information Technology New York, Inc. Was False or, In The Alternative, Defendants Singularity, Thor Miner, Cao, Jie, Levy, Liu, Pan, Shan and Wang Failed to Disclose That the SOS Transaction Was a Related Party Transaction ...................................................... 66

H.    Singularity Knowingly Entered into a Sham Related Party Transaction With Rich Trading Whose Bank Accounts Were Controlled By Singularity's Management ................................................ 68

I.    Singularity Fails to Establish and Maintain Effective Internal Controls ................. 71

V.    THE TRUTH EMERGES ........................................................................ 79

A.    Hindenburg Research and Peabody Street Research Issue Bombshell Reports That Expose Substantial Fraud by Defendants........................................... 80

    1.    Jie's Extensive Criminal Past, Financial Improprieties, and Past Deflections Were Revealed and Debunked................................ 80

        a.    Jie's Criminal Past......................................................... 80

        b.    Jie's Financial Improprieties ............................................. 81

    2.    Director Levy Is Exposed for His Knowledge of Jie's Financial Improprieties and Mismanagement at CCC.................. 81

    3.    Singularity's Thor Miner Proprietary Crypto Mining Machine is Revealed as a Sham.................................................................. 82

    4.    Singularity's Transaction with SOS Is Revealed as a Sham and an Undisclosed Related Party Transaction................................ 82

    5.    Golden Mainland is a Sham.................................................... 84

6.    Singularity's Rich Trading Transaction Is Revealed as a Likely Sham and an Undisclosed Related Party Transaction.................................... 84

7.    The Price of Singularity Shares Decline Sharply in Response to Hindenburg Research and Peabody Reports; Special Committee Formed..... 85

B.    Singularity Admits to Material Weaknesses in Internal Controls .......................... 85

C.    Singularity Discloses the Existence of Governmental Investigations Relating to the Hindenburg Report ........................................................................ 88

D.    Singularity Admitted That It Could Not Deliver on the SOS Transaction ............. 90

E.    Singularity's Unregistered Securities Sales Are Revealed as a Fraud.................... 91

1.    Singularity, Jie, Shan, Pan, and Cao Fraudulently Induced Hexin Global Limited and Viner Total Investments Funds to Purchase $6,124,910.82 in Unregistered Securities Touting Singularity's Cryptocurrency Transformation ................................. 91

2.    Singularity Induced Jinhe Capital Limited to Purchase $10,500,000 in Unregistered Securities ........................................... 94

3.    Singularity, Jie, Cao, Shan, and Pan Induced St. Hudson Group LLC, Imperii Strategies LLC, Isyled Technology Limited, and Hsqynm Family Inc. to Purchase $4,400,000 in Unregistered Securities Touting Singularity's Cryptocurrency Transformation ................................. 95

VI.    POST-CLASS PERIOD DEVELOPMENTS ..................................................... 96

VII.    SUMMARY OF SCIENTER ALLEGATIONS ............................................. 103

A.    Singularity's Failure to Deliver on its Cryptocurrency Ventures ......................... 103

B.    Singularity's Failure to Reveal Jie's Criminal Past, Financial Improprieties and Accurate Educational Background ........................................... 104

C.    Singularity Abandoned Its Transformation to a Cryptocurrency Company .......... 104

D.    Singularity's Settlements With SOS ..................................................................... 104

E.    Singularity's Settlements With Purchasers of Unregistered Shares of Singularity Common Stock ................................................................................ 105

F.    The Criminal and SEC Investigations of Singularity Are Strongly Indicative of Scienter ............................................................................................ 105

G.    Leadership Changes at Singularity Further Support a Strong Inference of Scienter ............................................................................................ 106

VIII.  LOSS CAUSATION ................................................................................. 109

IX.  PRESUMPTION OF RELIANCE ................................................................... 111

X.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR
AND BESPEAKS CAUTION DOCTRINE .................................................. 112

XI.  CLASS ACTION ALLEGATIONS ............................................................... 113

XII.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................... 116

COUNT I For Violations of Section 10(b) And Rule 10b-5
Promulgated Thereunder Against All Defendants ............................................. 116

COUNT II Violations of Section 20(a) of the Exchange Act Against
the Individual Defendants ................................................................. 118

XIII.  PRAYER FOR RELIEF ................................................................................ 119

XIV.  JURY DEMAND ......................................................................................... 119

Lead Plaintiffs Ruibin Wang, Sen Gao, Luxiao Xu, and Congli Huo ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation of Lead Counsel, which includes without limitation: (a) review and analysis of regulatory filings made by Singularity Future Technology Ltd. f/k/a Sino-Global Shipping America Ltd. ("Singularity" or the "Company")[1] with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of regulatory filings made by SOS Information Technology New York, Inc. ("SOS") with the SEC; (c) review and analysis of press releases and media reports issued by and disseminated by Singularity, as well as information on Singularity's website; (d) review and analysis of other publicly available information concerning Singularity, Yang Jie ("Jie"), SOS, Thor Miner, Inc. ("Thor" or "Thor Miner"), and Golden Mainland, Inc. ("Golden Mainland" or "Mainland"), in the U.S. and China; (e) consultation with experts; (f) interviews of confidential witnesses in the U.S. and China; (g) review and analysis of analyst reports regarding Singularity, including but not limited to May 5, 2022 reports by Hindenburg Research ("Hindenburg Report") and Peabody Street Research ("Peabody Report"); and (h) court filings. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      PRELIMINARY STATEMENT

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Singularity securities between February 2, 2021 and February 24, 2023,

---

[1] On January 3, 2022, the Company changed its name from Sino-Global Shipping America, Ltd. ("Sino-Global") to Singularity. For uniformity, the Company is referred to as the "Company" or "Singularity" throughout, unless where Sino-Global appears in an original quotation, regardless of the time period to which the reference relates.

inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      During the Class Period, Singularity and the Individual Defendants, as defined below, failed to disclose to investors that: (a) the Company's transformation into a cryptocurrency company was either a sham or, if it was not a sham, these Defendants knew the transformation was not reasonably achievable (*see* Sections IV.C, IV.F, V.A.3-6, and V.D, *infra*); (b) the Company raised over $21 million through the sale of unregistered securities (through contracts that Singularity was in breach of the very moment that the Company entered into them) on the basis of its sham transformation into a cryptocurrency company (*see* Sections IV.D. and V.E.1-3, *infra*); (c) Singularity and the Individual Defendants made material omissions and materially false misrepresentations regarding the personal and professional backgrounds of Singularity's Chief Executive Officer ("CEO") Jie, Xiaohuan Huang ("Xiaohuan"), and Director John F. Levy ("Levy") (*see* Sections IV.A.1-2, IV.B, IV.G.3, V.A.1-2, V.A.4, *infra*); (d) Defendants entered into related-party transactions with entities such as SOS (*see* Sections IV.G.2 and V.A.4, *infra*) and Rich Trading (*see* Sections VI.H, *infra*); (e) Defendants formed sham companies or entered into joint ventures with sham companies such as Golden Mainland (*see* Sections IV.F and V.A.5, *infra*); and (f) the Company lacked adequate internal controls, one or more of which resulted in investigations by the United States Attorney's Office for the Southern District of New York, the U.S. Financial Industry Regulatory Authority ("FINRA"), and the SEC, as well as a potential delisting by NASDAQ. *See* Sections IV.I, V.B, and V.C.

3.      The Class Period begins on February 2, 2021, when Singularity announced its planned transformation from a shipping and logistics business into a cryptocurrency and bitcoin

mining firm.

4.     Prior to and during the Class Period, Singularity held itself out as a global shipping and freight logistics integrated solution provider that provided tailored solutions and value-added services to its customers to drive efficiency and control throughout the entire shipping and freight logistics chain. Singularity represented that it conducted business primarily through its wholly-owned subsidiaries in the People's Republic of China (the "PRC" or "China") (including Hong Kong) and the U.S., where, according to Singularity, a majority of its clients were located. Singularity also represented that it operated in two segments: (1) shipping agency and management services, operated by Singularity's subsidiaries in the U.S.; and (2) freight logistics services, operated by Singularity's subsidiaries in the PRC.

5.     At the start of the Class Period, Singularity's legacy shipping business had long been in decline, hampered by razor-thin margins and reliance on a small number of clients.

6.     Under the leadership of Lei Cao ("Cao"), the former Singularity CEO who preceded the Company's most recent former CEO – Defendant Jie – Singularity was in substantial decline. Beginning on or about January 28, 2021, under the leadership of Cao as CEO and Jie as Vice President, Singularity embarked on a scheme to create the appearance that it was shifting away from its struggling shipping and logistics business to the emerging and highly unregulated cryptocurrency space. The Company used this operational shift, among other things, as a platform to fraudulently raise tens of millions of dollars from the sale of unregistered securities.

7.     Following Cao's resignation on November 1, 2021, Jie assumed the mantle as Singularity's CEO on that same date, rising from his position as Vice President. As Singularity's new CEO, Jie aggressively continued the course of fraudulent conduct begun under Cao's leadership. Throughout Jie's tenure as CEO, far from delinking from its questionable historical

financial practices and dealings, as set forth herein, Jie and his co-Defendants continued to engage in a series of acts and practices designed to fraudulently inflate the value of Singularity's share price, deceive the investing public, and enrich Singularity and the Individual Defendants.

8.      Singularity's transition from a global logistics company to a crypto company did not just "exhibit[] a company with an identity problem"[2]; rather, it was a platform for fraud. Defendants knew that Singularity's lack of experience in the crypto space, along with the continuing lockdowns in China and the global semiconductor shortage, would make it extremely unlikely, if not impossible, for Singularity to deliver on the transition, particularly because its joint venture partners were shams. Despite that knowledge, Defendants continued to tout the Company's success in the crypto space, and used that purported success to raise tens of millions of dollars based on phony promises on which Singularity and the Individual Defendants knew they could not deliver.

9.      Defendants' misconduct has resulted in investigations of Singularity by the United States Attorney's Office for the Southern District of New York, FINRA, and the SEC, as well as a potential delisting by NASDAQ. *See* Section V.C, *infra*.

10.     During the Class Period, Defendants materially misrepresented and/or omitted to disclose material facts about senior management and its directors' backgrounds, as well as affiliations with corporate partners. Consider the following examples:

- Defendants touted Defendant Jie's business leadership, but omitted that he had an extensive criminal background, was wanted by authorities in the PRC for orchestrating a massive Ponzi scheme and, while an executive at China Commercial Credit ("CCC"), had misappropriated millions of dollars of escrow funds, engaged in a related party transaction to procure a sham fairness opinion, escaped liability based on a false affidavit filed by his attorney in the litigation that followed, and misstated his educational background. *See* Section V.A.1, *infra*.

---

[2] Affirmation of James J. Mahon, *Hexin Glob. Ltd., et al. v Singularity Future Tech. Ltd.*, No. 22-cv-08160 (S.D.N.Y. Feb. 10, 2023) (ECF No. 22, ¶ 66) ("Mahon Aff." or "Mahon Affirmation").

- Defendants failed to disclose that Levy had served as the Director of CCC, and Levy failed to disclose that he was aware of Jie's extensive misconduct at CCC. *See* Section V.A.2, *infra*.

- Defendants either misrepresented the bona fides of Singularity Director Xiaohuan having claimed that she was a Vice President of SOS or failed to disclose that Singularity had engaged in a related party transaction with SOS through its joint venture, Defendant Thor Miner. *See* Section V.A.3, *infra*. Regardless, Defendants failed to disclose that Thor Miner was incapable of manufacturing the cryptocurrency mining machines purchased by SOS, concealed the fact of the Company's inability to delivery those machines, and provided misleading reasons for its failure to do so. *See* Section V.A.4, *infra*.

- Defendants represented that Singularity had entered into a joint venture with Defendant Golden Mainland to supply historic volumes of electrical capacity to power the Company's planned cryptocurrency mining business. *See* Section V.A.5, *infra*.

- Defendants failed to disclose that its joint venture, Rich Trading, was, in fact, a related party entity whose bank accounts were controlled by executives of Singularity. *See* Section V.A.6, *infra*.

- Defendants materially misled investors by downplaying the material weaknesses in the Company's internal control regime. *See* Section V.B, *infra*.

11.     In addition, Defendants Thor Miner and Golden Mainland failed to disclose adverse information to investors. Specifically, during the Class Period, Thor failed to disclose that it was a sham company designed to facilitate the fraud by the Singularity Defendants and that it could not deliver on the promises to develop and produce large quantities of proprietary cryptocurrency mining machines. *See* Section V.A.3, *infra*. Likewise, during the Class Period, Defendant Golden Mainland concealed from investors that it was a sham company designed to facilitate the fraud by the Singularity Defendants and that it could not deliver the necessary power – which it had promised to deliver – to fuel Singularity's purported cryptocurrency mining operations. *See* Section V.A.5, *infra*.

12.     The truth regarding Defendants' omissions and misstatements began to emerge on May 5, 2022, with the publications of the Hindenburg Report and Peabody Report, which partially

revealed that, among other things: Jie had an extensive criminal background and was wanted by authorities in the PRC for his participation in a massive Ponzi scheme; Jie had engaged in extensive fraud and financial improprieties while an executive at CCC; Singularity's transactions with SOS and Rich Trading were improper related party transactions; Defendant Golden Mainland was a sham entity designed to foster the Company's sham cryptocurrency business; and Singularity, Jie, and Levy failed to disclose Defendant Levy's tenure at CCC. Those disclosures caused Singularity's common stock price to fall 28.89%, from a closing price of $6.75 on May 4, 2022 to a closing price of $4.80, on May 5, 2022, and to fall an additional 11.67% on May 6, 2022. *See* Section V, *infra*.

13.     Further, following the publication of the Hindenburg Report and Peabody Report, a series of continuing disclosures, which also corrected Defendants' material misstatements and omissions, caused Singularity's stock price to decline further.

14.     For instance, on September 23, 2022, Singularity was sued in federal court by private investors for securities fraud in connection with improprieties related to its efforts to raise tens of millions of dollars for the sale of unregistered securities based on misrepresentations regarding its sham cryptocurrency business. This caused Singularity's stock price to fall over 4%.

15.     On October 6, 2022, Singularity was sued a second time for improprieties associated with the sale of unregistered securities based on misrepresentations to private investors regarding its sham cryptocurrency business. This caused Singularity's stock price to fall 12.93%.

16.     On October 7, 2022, Singularity disclosed that it faced delisting due to its inability to file the required quarterly and annual reports with the SEC. This announcement caused its stock price to fall 10.55% on October 7, 2022.

17.     On November 16, 2022, Singularity revealed that because of the revelations and

myriad misstatements and omissions alleged herein, as revealed in the Hindenburg Report of May 5, 2022, as well as the Company's lack of internal controls that led to those failures, the Company had received subpoenas from the United States Attorney's Office for the Southern District of New York and the SEC. This news caused Singularity's stock price to fall 56.03% over two trading days.

18.     On December 5, 2022, Singularity was sued for a third time in connection with its sale of unregistered securities based on misrepresentations to private investors regarding its sham cryptocurrency business. In response to this news, Singularity's stock price to fall 2.60%.

19.     Finally, on February 24, 2023, when Singularity announced that it had agreed to settle all of the securities fraud claims against it alleging various misrepresentations in connection with the sale of unregistered securities regarding its sham cryptocurrency business, the price of Singularity shares fell over 13% from a closing price of $0.69 on February 23, 2023 to a closing price of $0.60 on February 24, 2023.

## II.   JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), as the alleged misstatements entered, and the subsequent damages took place in this judicial district.

23.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone

communications, and the facilities of the national securities exchange.

## III.   PARTIES

### A.   Lead Plaintiffs

24.     Court-appointed Lead Plaintiffs Ruibin Wang, Sen Gao, Luxiao Xu, and Congli Huo purchased Singularity securities during the Class Period, as detailed in Lead Plaintiffs' sworn certifications filed previously with the Court (ECF No. 12-1) and suffered damages as a result of the federal securities law violations and materially false and/or misleading statements and/or omissions alleged herein.

### B.   Defendants

25.     Defendant Singularity Future Technology Ltd. f/k/a Sino-Global Shipping America, Ltd. (previously defined as "Singularity" or the "Company") is a Virginia corporation. Singularity's principal place of business is located in, and its operations are performed in, New York. Its headquarters are located at 98 Cutter Mill Road, Suite 322, Great Neck, New York. Singularity is a public company trading on the Nasdaq Global Markets Exchange under the ticker symbol SGLY (formally SINO).

26.     Defendant Yang Jie (previously defined as "Jie") served as Vice President of Singularity beginning on January 1, 2021, and on November 1, 2021 was appointed as the Company's CEO, President, and Executive Chairman. On August 9, 2022, Jie resigned from his positions as CEO and Director of Singularity following an investigation into allegations regarding his alleged extensive criminal past in China.

27.     Defendant Xiaohuan Huang (previously defined as "Xiaohuan"), the wife of Defendant Jie, joined Singularity in 2020 as a member of the Singularity Board of Directors (the "Board") and Chairperson of the Nominating/Corporate Governance Committee, a member of the Audit Committee, and a member of the Compensation Committee. In an October 23, 2020 Form

8-K, Singularity stated that "Ms. Xiaohuan Huang, 37 years old, is presently Vice President of SOS Information Technology New York, Inc. Prior to that, Ms. Huang had been Vice President for China Commercial Credit, Inc. from November 2016 to July 2020 . . . " and that "[o]n October 22, 2020, the Nominating/Corporate Governance Committee of the Board nominated and the Board appointed, Xiaohuan Huang as a Class I director, Chairperson of the Nominating/Corporate Governance Committee, a member of the Audit Committee and a member of the Compensation Committee, to hold office, effective October 23, 2020 until the Company's annual meeting of the shareholders in 2021, and a successor has been duly elected and qualified or until her earlier resignation, removal from office, death or incapacity." On November 1, 2021, Xiaohuan resigned from her positions at Singularity.[3]

28.     Defendant Lei Cao (previously defined as "Cao") served as CEO of Singularity from approximately 2001 to November 1, 2021, when he retired as CEO.[4] Cao's Separation Agreement and General Release states that prior to his resignation, he was interviewed by the Company's Special Committee on several occasions in connection with the Hindenburg Report and subpoenas from the United States Attorney's Office for the Southern District of New York, the SEC, and FINRA. The Agreement also reveals that Cao made a "detailed presentation of his financial condition to counsel for the Special Committee on January 5, 2023 . . . ."[5]

29.     Defendant Zhikang Huang ("Zhikang") served as Singularity's Chief Operating Officer ("COO") beginning in 2010 until January 28, 2021, when he was replaced and named Vice

---

[3] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Nov. 1, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021055789/ea149737-8k_sinoglobal.htm.

[4] Id.

[5] Singularity Future Technology, Ltd., "Separation Agreement and General Release," Annual Report (Form 10-K), Ex. 10.14 (Jan. 9, 2023), https://www.sec.gov/Archives/edgar/data/1422892/000121390023002787/ea171630ex10-1_singularity.htm.

President-Operations. He further served as a Class I director beginning in 2015 until he resigned his Board position on November 1, 2021.

30.     Defendant Tuo Pan ("Pan") served as Chief Financial Officer ("CFO") of Singularity from October 2015 to August 31, 2022, when she was terminated for cause as an employee and as CFO of Singularity.[6]

31.     Defendant Lei Nie ("Nie"), the husband of Defendant Pan, was COO of Singularity from January 28, 2021 until August 5, 2021, when he was promoted to serve as Vice President. Nie resigned as COO on August 5, 2021.[7]

32.     Defendant Jing Shan ("Shan") served as COO of Singularity starting on August 5, 2021. In her capacity as COO, Shan was responsible for implementing Singularity's business initiatives and growth strategies, and approved and authorized all expenditures of Singularity. Shan executed the Purchase and Sale Agreement between Thor Miner and SOS ("SOS Agreement"), dated January 10, 2022. Singularity terminated Shan as COO for cause on July 10, 2023.

33.     Defendant Tieliang Liu ("Liu") served as a Director of Singularity beginning in 2013. On July 3, 2023, Liu resigned as a Director and as a member of the Compensation Committee, the Audit Committee, and the Nominating/Corporate Governance Committee.

34.     Defendant Jing Wang ("Wang") served as a Director of Singularity from 2007 through November 18, 2021, when he retired from his positions as a member of the Board, the Chairperson of the Compensation Committee, a member of the Nominating/Corporate Governance Committee, and a member of the Audit Committee.

---

[6] Singularity Future Technology, Ltd., Current Report (Form 8-K) (Aug. 31, 2022), https://www.sec.gov /ix?doc=/Archives/edgar/data/1422892/000121390022054510/ea165431-8k_singularity.htm.

[7] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Jan. 29, 2021), https://www.sec.gov /edgar/data/1422892/000121390021005183/ea134202-8k_sinoglobal.htm; Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Aug. 9, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390 021041107/ea145482-8k_sinoglobal.htm.

35. Defendant John F. Levy (previously defined as "Levy") served as a Director of Singularity beginning on November 18, 2021, and, during his tenure, as a Chair of the Company's Compensation Committee and a member of its Corporate Governance and Auditing Committees. On February 23, 2023, Levy tendered his resignation from his positions as a member of the Board and the Audit Committee, the Compensation Committee, and the Nominating/Corporate Governance Committee of the Board, effective immediately.

36. Jie, Cao, Zhikang, Pan, Xiaohuan, Nie, Shan, Liu, Levy, and Wang are collectively referred to herein as the "Individual Defendants."

37. Each of the Individual Defendants:

(a)   directly participated in the management of the Company;

(b)   was directly involved in the day-to-day operations of the Company at the highest levels;

(c)   was privy to confidential proprietary information concerning the Company and its business and operations;

(d)   was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(e)   was directly or indirectly involved in Singularity's sham transformation into a cryptocurrency company and the related transactions described herein;

(f)   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(g)   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(h)   approved or ratified these statements in violation of the federal securities laws.

38. Singularity is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of the Individual Defendants'

and the Company's employees' employment.

39.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Singularity under respondeat superior and agency principles.

40.     Defendant Thor Miner, Inc. (previously defined as "Thor" or "Thor Miner") is a joint venture 51% owned by Singularity and 49% owned by HighSharp (Shenzhen Gaorui) Electronic Technology Co., Ltd. ("Highsharp"), with a principal place of business located at 98 Cutter Mill Road, Suite 322, Great Neck, New York.

41.     Defendant Thor:

    (a)     was privy to confidential proprietary information concerning the Company and its business and operations;

    (b)     was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

    (c)     was directly or indirectly involved in Singularity's sham transformation into a cryptocurrency company and the related transactions described herein;

    (d)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

    (e)     approved or ratified these statements in violation of the federal securities laws.

42.     Defendant Golden Mainland, Inc. (previously defined as "Golden Mainland" or "Mainland"), is a Georgia corporation with its principal place of business located at 751 Buford Hwy NE, Suite 404, Atlanta, Georgia, 30324.

43.     Defendant Golden Mainland:

    (a)     was privy to confidential proprietary information concerning the Company and its business and operations;

    (b)     was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(c)    was directly or indirectly involved in Singularity's sham transformation into a cryptocurrency company and the related transactions described herein;

(d)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(e)    approved or ratified these statements in violation of the federal securities laws.

44.    Defendant Singularity and the Individual Defendants are collectively referred to herein as the "Singularity Defendants." The Singularity Defendants, Defendant Thor, and Defendant Mainland are collectively referred to herein as the "Defendants."

## IV.    BACKGROUND AND NATURE OF THE FRAUD: DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

45.    Singularity was founded in 2001 as a global shipping and freight logistics service provider. Singularity became a publicly listed company in 2008, trading on the NASDAQ under the symbol SINO.

46.    According to the sworn Affirmation by New York attorney James J. Mahon (the "Mahon Affirmation"), counsel for Defendants Jie and Xiaohuan in this Action and a separate securities fraud lawsuit:

> Singularity Future Trading f/k/a Sino Global Shipping ("Singularity" or "Sino Global") has long been a troubled company with a historical pattern of its stock being described as nothing less than a "roller coaster" inevitably linked to questionable historical financial practices that predated Mr. Jie's tenure. Singularity, operating under its predecessor name Sino Global, has numerous historical events that can be described as nothing less than a series of "red flags." Exhibit E. The Peabody Report provides a significant roadmap to these red flags and the checkered history of Singularity and/or Sino Global. It should be noted that these events occurred before Defendant Yang Jie commenced his employment at Singularity.

Mahon Aff. ¶ 12.

47.     Jie began his employment with Singularity in January 2021.[8] The conduct detailed in the Peabody Report, as identified in the Mahon Affirmation (as well as in the Hindenburg Report), demonstrates that the "red flags" and, more importantly, the fraudulent conduct, did not cease upon the commencement of Jie's employment at Singularity. Rather, it accelerated, ultimately destroying virtually all of the value of Singularity's common stock.

**A.      Jie Assumes Control of Singularity and Omits and Misstates Material Facts Regarding His Background**

48.     On November 1, 2021, following Cao's resignation as CEO and appointment as Vice President and Head of Research and Development, effective that day, Jie was promoted to CEO of Singularity, and Pan was appointed CFO.

**1.      Misstatements Relating to Jie's Personal and Professional Background**

49.     By misrepresenting and omitting material facts regarding Jie's personal and professional background, Defendants deceived investors regarding his management experience and competence. In addition, Singularity and the Individual Defendants concealed and obscured his extensive history of fraudulent conduct. Specifically, Singularity and the Individual Defendants omitted that Jie was wanted in the PRC for operative a massive Ponzi scheme and, while an executive at CCC, had misappropriated millions of dollars of escrow funds, engaged in related party transaction to procure a sham fairness opinion and escaped liability based on a false affidavit filed by his attorney in the litigation that followed and misstated his educational background.

50.     Singularity announced the management changes referenced above in a Form 8-K signed by Jie and filed with the SEC on November 1, 2021. On this news, Singularity's stock rose from $3.04 per share to a closing price on November 1, 2021 of $3.42 per share on higher-than-

---

[8] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Nov. 1, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021055789/ea149737-8k_sinoglobal.htm.

normal trading volume. Singularity's stock price continued to rise, closing at $3.70 on November 2, 2022, on heavy volume.

51.     Specifically, the November 1, 2021 Form 8-K stated in pertinent part:

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On November 1, 2021, the Nominating/Corporate Governance Committee of the Board nominated and the Board appointed Mr. Yang Jie as the Registrant's new CEO. Mr. Yang Jie, 37 years old, is presently serving as the Vice President of the Registrant. Mr. Yang Jie started his work with the Registrant from January 2021. From November 2016 to June 2021, Mr. Yang Jie served as the General Manager of China Commercial Credit, Inc. Mr. Yang Jie holds a Bachelor's degree in Business Management from Beijing Finance and Trade Technology College. The Compensation Committee approved the terms of the employee agreement between the Registrant and Mr. Yang Jie in substantially the form attached hereto as Exhibit 10.1. The employment agreement between the Registrant and Mr. Yang Jie provides for a five-year term that extends automatically in the absence of notice of non-renewal provided at least 30 days prior to the anniversary of the agreement. Mr. Yang Jie's salary is $500,000 per year. Mr. Yang Jie has no family relationship with any director or executive officer of the Registrant or any person nominated or chosen by the Registrant to become a director or executive officer, but Mr. Yang Jie's wife, Ms. Xiaohuan Huang, was the former independent director of the Registrant. Mr. Yang Jie has had (i) no direct or indirect material interest in any transaction or series of similar transactions contemplated by Item 404(a) of Regulation S-K and, (ii) as of the date of this current report on Form 8-K (this "Report"), Mr. Yang Jie holds no direct ownership in the Registrant's stock or rights to acquire the Registrant's stock, but Mr. Yang Jie's wife, Ms. Xiaohuan Huang, the former independent director of the Registrant, holds 20,000 shares of the Registrant's stock.

52.     Likewise, in an April 22, 2022 Proxy Statement filed with the SEC and signed by Jie, Singularity misrepresented Jie's expertise and omitted that he had a long history of failed businesses, an inconsistent educational history, and allegations of serious financial misconduct and criminal conduct in his past. For example, Singularity represented, in part:[9]

---

[9] Singularity Future Technology, Ltd., Proxy Statement (Schedule 14A Information) (Apr. 22, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390022010809/def14a0322_singularity.htm.

Mr. Yang Jie served as General Manager of China Commercial Credit, Inc. Mr. Yang Jie holds a Bachelor's degree in Business Management from Beijing Finance and Trade Technology College. Mr. Jie has been nominated to serve because of his business management experience.

53.     As discussed below, the foregoing Class Period statements in paragraphs 51, 52, regarding Jie's educational and professional background were materially misleading because they failed to disclose, among other things: Jie's true educational background, that he had an outstanding arrest warrant in China, had committed forgery, and had been the largest shareholder and VP of Finance for a Nasdaq-listed lending company, CCC, at which he engaged in financial misconduct and which failed after reporting massive losses.

### 2.     Evidence That Statements About Jie's Educational and Professional Background Were Materially Misleading

54.     Singularity's website provided no biographical information about Jie and only offered the following cartoon caricature of him – identified by the name "Leo" on Singularity's website.  Furnishing only this illustration obviously made it more difficult for the authorities and aggrieved investors to identify Jie as the fugitive and perpetrator of the alleged financial improprieties at CCC and in China:[10]

---

[10] Home, *Singularity Futures Technology*, https://web.archive.org/web/20220328192817/https://www.singularity.us/ (Last Accessed Oct. 4, 2023).



55.     Despite Jie's status as the CEO of an international publicly traded company, Singularity said little about him publicly. Jie kept a low profile, only speaking publicly about Singularity through press releases and mandatory SEC filings.

56.     However, substantial evidence establishes that Jie: (a) attempted to defraud business partners while serving as a General Manager of CCC and engaged in a variety of financial and other improprieties, including the diversion of $3.5 million of funds and subsequently benefitting from a false affidavit filed in connection with an arbitration to recover those funds, working with insiders of CCC's counterparty to divert funds in the transaction, and procuring a fairness opinion from an entity that he controlled without disclosing the conflict; (b) allegedly orchestrated a $300 million Ponzi scheme in China, variously utilizing forged or otherwise misleading documents in an attempt to convince others that the allegations regarding his criminal conduct were incorrect; and (c) caused or allowed false and/or misleading versions of his educational background to proliferate.

**a.     Jie Committed Fraud as the General Manager of CCC and Attempted to Conceal the Fraud by Procuring a False Affidavit**

57.     Defendants failed to disclose that Jie, as an executive of CCC, had misappropriated

millions of dollars of escrow funds, engaged in a related party transaction to procure a sham fairness opinion, and escaped liability based on a false affidavit filed by his attorney in the litigation that followed.

58.     In October 2016, Jie was appointed Vice President of Finance for CCC.[11] Approximately one month later, Jie's wife, Defendant Xiaohuan, was appointed Vice President of CCC.[12] By December 2017, Jie and Xiaohuan were listed as the largest shareholders of CCC with a 22.5% stake.[13]

59.     CCC posted consistent losses and eventually became financially distressed by the end of 2016.[14]

60.     In August 2017, Shanghai Wheat Asset Management Co., Ltd., a wholly-owned subsidiary of Sorghum Investment Holdings Ltd. ("Sorghum"), entered into an agreement to acquire CCC with the expectation of becoming publicly-listed in the U.S. via a reverse merger. However, Sorghum terminated the transaction several months later, alleging that CCC failed to disclose "all necessary material information."[15]

61.     The deal terms for the transaction between Sorghum and CCC provided that Defendant Jie would receive $3.5 million if the deal closed, and that prior to the close of the

---

[11]  China Commercial Credit, Inc., Annual Report (Form 10-K) (Apr. 6, 2017), https://www.sec.gov/ Archives/edgar/data/1556266/000121390017003456/f10k2016_chinacommercial.htm.

[12]  Sino-Global Shipping America, Ltd., Annual Report (Form 10-K) (Sept. 28, 2021), https://www.sec.gov /Archives/edgar/data/1422892/000121390021050437/f10k2021_sinoglobalship.htm.

[13]  China Commercial Credit, Inc., Amendment No. 3 to Preliminary Proxy Statement (Schedule 14A Information) (Apr. 2017), https://www.sec.gov/Archives/edgar/data/1556266/000121390017012910/prer14a1017a3_chinacomme rcl.htm.

[14]  China Commercial Credit, Inc., Annual Report at 24 (Apr. 6, 2017), https://www.sec.gov/ Archives/edgar/data/1556266/000121390017003456/f10k2016_chinacommercial.htm#a_011.

[15] China Commercial Credit, Inc., Current Report (Form 8-K) (Jan. 3, 2018), https://www.sec.gov/Archives/edgar/data /1556266/000121390018000072/f8k122917_chinacommercial.htm; China Bat Group, Inc., Annual Report (Form 10-K)  (Apr. 5, 2019), https://www.sec.gov/Archives/edgar/data/1556266/000121390019005814/f10k2018_chinabat group.htm.

transaction, the funds would be wired into an escrow account maintained at TD Bank by Jie's counsel, Yi Lin, an attorney in New York. The terms also provided that if the deal did not close, "the $3.5 million in the Lin escrow account would be refunded to NoNoBank, with interest, upon the written consent of Mr. Jie and Nonobank."[16]

62.     Sorghum alleged that, as the transaction was unfolding, it discovered Jie was under criminal investigation for securities fraud in China, a fact that was concealed from it, as well as investors.[17]

63.     In addition to Jie's alleged securities fraud in China, Sorghum discovered that Jie was engaged in a scheme to procure a false fairness opinion to facilitate the transaction through an undisclosed related party transaction. Specifically, according to a May 6, 2019 Opinion and Order in *Sorghum Investment Holdings Ltd. v. China Commercial Credit, Inc.*, Index No. 655372/2018 (N.Y. Sup. Ct., N.Y. County) (NYSCEF No. 62), a subsequent action to vacate an arbitration award in favor of CCC in an action initiated by Sorghum over the failed transaction, Justice Borrok of the New York Supreme Court wrote:

> Sorghum discovered that the advisory firm [Daqin Consulting Service (Shenzhen), Limited][18] that it had retained to render a fairness opinion as to the Transaction was wholly-owed by Mr. Jie. This conflict of interest had not previously been disclosed. Sorghum's investigation also revealed that Mr. Jie had colluded with a rogue

---

[16] Decision and Order, *Shanghai NoNoBank Fin. Info. Serv. Co., Ltd. v. Jie*, Index No. 653834/2018, NYSCEF No. 77 (N.Y. Sup. Ct., N.Y. County, July 12, 2019), *available at*: https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=FFmj40HZ6rta3CAgv_PLUS_3/zg==&system=prod.

[17] *Id.*

[18] Ex. A to Aff. of Jenny Johnson-Sardella, *Sorghum Investment Holdings Ltd. v. China Commercial Credit Inc.*, Index No. 655372/2018, NYSCEF No. 50 (N.Y. Sup. Ct., N.Y. County, Apr. 17, 2019), *available at*: https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=J02ta1rPzEsoSKFAnYtK6w==&system=prod; Final Award, *China Commercial Credit, Inc. v. Sorghum Investment Holdings Ltd.*, ICDR Case No. 01-18-000-4901 (Am. Arb. Ass'n, July 30, 2018), *available at*: https://jusmundi.com/en/document/decision/pdf/en-china-commercial-credit-inc-v-sorghum-investment-holdings-limited-final-award-monday-30th-july-2018.

employee of Nonobank, Xioying Sun, to divert the payment of the $3.5 million escrow funds to Mr. Jie's account.[19]

64.     Pursuant to the parties' deal terms, CCC and Sorghum submitted their dispute to a AAA arbitration. CCC prevailed[20] on the basis that:[21]

> In the course of the arbitration proceedings, Mr. Lin made a declaration as to the events giving rise to the termination of the Transaction. In his declaration, Mr. Lin stated that he never signed any agreement relating to the escrow payment, had no record of any escrow agreement, and had no record of any escrow account (NYSCEF Doc. No. 50 ¶¶ 115-116, 120). Mr. Lin further stated that he had "no direct or indirect" proof that the purported escrow funds were ever deposited (*id.* ¶ 122). Relying on the declaration of Mr. Lin, the Arbitrator concluded that Nonobank never made the escrow payment as required under the Escrow Arrangement and found that Sorghum committed a willful breach of the SEA (*id.* ¶¶ 102, 107, 113-122, 152).

65.     Following the arbitration award in favor of CCC, Justice Borrok presided over *Shanghai NoNoBank Fin. Info. Serv. Co. v. China Commercial Credit Inc.*, Index No. 653834/2014 (N.Y. Sup. Ct., N.Y. County), an action in which NoNoBank attempted to recover the $3.5 million payment in the Sorghum deal.

66.     In the *NoNoBank* litigation, evidence of Jie's and Lin's misconduct ultimately surfaced. As Justice Borrok wrote:[22]

> It later became apparent that Ms. Xiaoying Sun, an employee of Sorghum responsible for overseeing the Reverse Merger, including making arrangements for the transfer of funds into the Lin Escrow Account, was secretly working with Mr. Jie to divert the escrow funds to accounts controlled by Mr. Jie (*id.* ¶ 30). Sorghum subsequently learned that Mr. Jie was under criminal investigation in China in connection with the theft of approximately 2.9 billion RMB, the equivalent of roughly 300 million U.S. dollars, from more than 20,000 investors through fraudulent securities transactions (*id.* ¶ 31).

---

[19] Decision and Order, *Sorghum Investment Holdings Ltd. v. China Commercial Credit, Inc.*, Index No. 655372/2018, NYSCEF No. 62 (N.Y. Sup. Ct., N.Y. County, May 6, 2019), *available at*: https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=YTlBYmx5sRVD9SHQ9FjZjw==&system=prod.

[20] Ex. A to Aff. of Jenny Johnson-Sardella, *Sorghum Investment Holdings Ltd.*, Index No. 655372/2018, NYSCEF No. 50; Final Award, *China Commercial Credit, Inc.*, ICDR Case No. 01-18-000-4901.

[21] Decision and Order, *Sorghum Investment Holdings Ltd.*, Index No. 655372/2018, NYSCEF No. 62.

[22] Decision and Order, *Shanghai NoNoBank Fin. Info. Serv. Co., Ltd.*, Index No. 653834/2018, NYSCEF No. 77.

67.     Armed with evidence from the *NoNobank* litigation, Sorghum filed an action in the New York Supreme Court seeking to vacate the arbitration award in the *Sorghum* action. Recognizing the "high bar" and "limited circumstances where it is appropriate for a court to vacate an arbitration award," Justice Borrok found in favor of Sorghum and granted its petition to vacate the original arbitration award in favor of CCC,[23] finding, in part:[24]

> Discovery in a related action currently pending before this court, *Shanghai NoNoBank Financial Information Service Co. v China Commercial Credit Inc.*, Index No. 653834/2014, revealed that Mr. Jie had in fact wired the escrow payment to the Lin Escrow Account (NYSCEF Doc. Nos. 24, 25). Documents produced by TD Bank confirm that the sum of $3.5 million dollars was wired in two payments from accounts controlled by Mr. Jie to Mr. Lin's attorney escrow account at TD Bank on December 20, 2017 (*id.*).

68.     Relatedly, CCC and Jie failed to disclose the $3.5 million escrow payment in CCC's SEC filings, a material omission.[25]

69.     Defendants Jie, Levy and Singularity never disclosed to investors the material fact that Jie's tenure at CCC was marred by fraud, the misallocation of $3.5 million, the procurement of a false affidavit, the fabrication of evidence regarding his criminal background, and the procurement of a sham "fairness opinion" in an undisclosed related party transaction.

**b.     Jie's Alleged Criminal History and Legal Troubles in China**

70.     Jie has appeared deflect questions about his legal troubles in China, holding himself out as a legitimate business person, not a criminal. For example, an April 19, 2019 article in the

---

[23] Ex. A to Aff. of Jenny Johnson-Sardella, *Sorghum Investment Holdings Ltd.*, Index No. 655372/2018, NYSCEF No. 50; Final Award, *China Commercial Credit, Inc.*, ICDR Case No. 01-18-000-4901.

[24] Decision and Order, *Sorghum Investment Holdings Ltd.*, Index No. 655372/2018, NYSCEF No. 62.

[25] Pet. to Vacate Arbitration Award, *Sorghum Investment Holdings Ltd. v. China Commercial Credit, Inc.*, Index No. 655372/2018, NYSCEF No. 1 (N.Y. Sup. Ct., N.Y. County Oct. 29, 2018), *available at*: https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=aWOGsmBbhxDeJ7SpEaLJrw==& system=prod; Mem. of Law in Supp. of Sorghum Investment Holdings Limited's Pet. to Vacate Arbitration Award, *Sorghum Investment Holdings Ltd., v. China Commerical Credit, Inc.*, Index No. 655372/2018, NYSCEF No. 3 (N.Y. Sup. Ct., N.Y. County Oct. 29, 2018), *available at*: https://iapps.courts.state.ny.us/fbem/Document| DisplayServlet?documentId=NFTC9aKuARUy/uCOEQf0ZA==&system=prod.

Miami Herald entitled "Cindy Yang helped Chinese tech stars get $50K photos with Trump. Who paid?" states:

> Speaking of his legal troubles back home [Jie] said: "The Chinese Communist Party's policies [are] terrible. They always harass businesspeople like me."[26]

71.    Beyond his misconduct at CCC (*China Commercial Credit, Inc. v. Sorghum Investment Holdings Limited*, ICDR Case No. 01-18-0000-4901 (30 July 2018)), as found by Justice Borrok, Singularity, Jie and Levy also failed to disclose Jie's criminal conduct. Such conduct, which numerous sources in China corroborate, consisted of, at a minimum, orchestrating a massive Ponzi scheme for which dozens of individuals have been jailed and for which Jie is still wanted by authorities in the PRC.

72.    For example, during the course of the dispute between CCC and Sorghum, Jie allegedly attempted to prove that he was not the subject of a criminal investigation in China by producing a purportedly official letter from Chinese police purporting to show that they did not intend to pursue charges against him. However, the Hefei Police have confirmed that the document was a fabrication. According to a letter obtained by Chinese media, the Hefei Police stated:[27]

> [Translated] Since we still do not have Yang Jie in custody, the Letter of Decision not to press charges presented by Yang Jie that you submitted to us is clearly fabricated, and Yang Jie is suspected of forging official government documents.

73.    As a result, police in China reportedly added forgery to Jie's list of suspected crimes. Jie resigned from CCC in February 2018, while the litigation with Sorghum was still unfolding.[28]

---

[26] *See* S. Blaskey, N. Nehamas, and C. Ostroff, "Cindy Yang helped Chinese tech stars get $50K photos with Trump. Who paid?," Miami Herald (Apr. 19, 2019), *available at*: https://www.miamiherald.com/latest-news/article227941749.html.

[27] https://zhuanlan.zhihu.com/p/42011489.

[28] China Commercial Credit, Inc., Current Report (Form 8-K) (Feb. 9, 2018), https://www.sec.gov/Archives/edgar/data/1556266/000121390018001606/f8k021218_chinacommercial.htm; China Commercial Credit, Inc., Annual Report (Form 10-K) (Apr. 16, 2018), https://www.sec.gov/Archives/edgar/data/1556266/000121390018004514/f10k2017_chinacommercial.htm.

74.     Upon information and belief, Levy, having served as a director of CCC (where Jie was a General Manager), was aware of the litigation styled, *China Commercial Credit, Inc. v. Sorghum Investment Holdings Limited*, ICDR Case No. 01-18-0000-4901 (30 July 2018), including Jie's alleged improprieties in that action, as alleged herein.

75.     A July 3, 2022 Singularity Form 8-K states: "[o]n May 6, 2022, the Board of Directors of the Company (the "Board") formed a special committee of its Board of Directors (the "Special Committee") to investigate, in part, the allegations in the Hindenburg Report that Jie was a fugitive on the run from the Chinese authorities." In the Form 8-K, Singularity explained:[29]

> As previously disclosed in the Original 10-K, the Original 10-Q and the Original 8-K, on May 5, 2022, an entity named Hindenburg Research issued a report (the "Hindenburg Report") regarding the company alleging, pertinent to this disclosure, that the Company's then CEO, Mr. Yang Jie, was a fugitive on the run from the Chinese authorities for running an alleged $300 million Ponzi scheme that lured in over 20,000 victims. On May 6, 2022, the Board of Directors of the Company (the "Board") formed a special committee of its Board of Directors (the "Special Committee") to investigate, in part, the allegations in the Hindenburg Report that the Mr. Jie was a fugitive on the run from the Chinese authorities. Subsequently, on August 16, 2022, the SEC and attorneys from Blank Rome LLP, counsel for the Special Committee, held a conference call, during which counsel represented that Mr. Jie had provided documentation to the SEC that indicated that the charges against him in the People's Republic of China ('the "PRC") had been dropped, but the Special Committee's investigation raised questions regarding the authenticity of such documents. The Special Committee concluded that a "Red Notice" was issued in the PRC with respect to Mr. Jie. A "Red Notice" is a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action. It is based on an arrest warrant or court order issued by the judicial authorities in the requesting country. After being suspended by the Special Committee on August 8, 2022, Mr. Jie resigned from his positions as CEO and as a director of the Company on August 9, 2022.

76.     As discussed below, the independent investigation by Lead Counsel suggests that Jie's Zonglun W&R Report ("W&D Report") is not reliable and provides a misleading and

---

[29] Singularity Future Technology Ltd., Current Report (Form 8-K) (July 3, 2023), https://www.sec.gov/Archives/edgar/data/1422892/000121390023053742/ea181261-8k_singularity.htm.

inaccurate recitation of the facts regarding Jie's criminal background.

77.     Additional conflicting information exists. For example, in the *Shorghum* action against CCC, Jie's efforts to pass off forged documents were challenged. There, the arbitration decision states, in part:[30]

> hh) On or about January 1, 2018, Mr. Jie sent an email to Respondent, denying that he was part of the Fraud and attached a "No-Prosecution" letter which stated that he had been the victim of the Fraud;
>
> ii) Respondent hired a Chinese lawyer who gave an "authenticity" opinion that the document supplied by Mr. Jie was falsified;

78.     Singularity's July 3, 2022 Form 8-K also discusses a "legal opinion" obtained by Jie which appears to contradict the findings of its own investigation, but makes no mention of the Red Notice, defined above:

> On February 10, 2023, in response to two, now-settled, lawsuits filed by private investors, Mr. Jie filed a motion to dismiss the private investor' suits and provided a copy of a formal legal opinion issued by the Zhonglun W&D Law Firm, PRC ("Zonglun W&D"). The Zonglun W&D legal opinion concluded that Mr. Jie was not charged with a crime in China, the investigation and underlying case had indeed been closed, and Mr. Jie was not formally treated as a criminal suspect in the PRC.

Despite that, the Form 8-K fails to disclose that the scope of the W&D Report is limited to "a criminal case . . . of Anhui Tianhe Union Technology Co., Ltd." *See Hexin Global Limited v. Singularity Future Tech., Ltd.*, No. 22 Civ. 08160 (S.D.N.Y. Feb. 10, 2023) (ECF No. 23-13).

79.     Singularity then states that its initial conclusion, which led its Special Committee to suspend Jie, may be wrong:

> In order to provide more clarity to the issues raised, the Registrant engaged Hebei Mei Dong Law Firm, of Shijiazhuang City, PRC to further investigate the authenticity of the documentation provided by Mr. Jie to the SEC and whether a "Red Notice" had been issued. On June 12, 2023, Hebei Mei Dong Law Firm issued a report to the Registrant with respect to these issues. In their report, the Chinese counsel concluded after conferring with local officials, that investigation of Mr. Jie

---

[30] Final Award, *China Commercial Credit, Inc.*, ICDR Case No. 01-18-000-4901.

conducted by the Baohe District Police Bureau of Hefei City, PRC was completed, that Mr. Jie was never prosecuted and there was no criminal judgment against Mr. Jie as of the date of such report. The Chinese counsel also confirmed that no "Red Notice" was issued for Mr. Jie in the PRC.

80.     Singularity did not provide a copy of the Hebei Mei Dong Report in its 8-K.

81.     Inexplicably, Singularity's Form 8-K dated July 3, 2022, does not address the letter that Jie allegedly fabricated in the *Sorghum* arbitration in an attempt to exonerate himself which the authorities in the PRC reported stated was forged, as alleged above.

82.     Regardless, the W&D's Report[31] is unreliable. The Report states:

> According to our interview with Mr. Ming Gao, the prosecutor of the Case, Mr. Ming Gao said that the Police Office did not transfer Mr. Yang Jie as a criminal suspect to the prosecutorial office for examination and prosecution. Therefore, the request by us to retrieve Mr. Yang Jie's case file cannot be satisfied because it does not exist.

> Among the available materials, only the "Criminal Judgment" and the "Criminal Ruling" issued by the court mentioned Mr. Yang Jie, but no trial or conviction exists. The two instruments above are legal documents that demonstrate that the People's Court convicted and sentenced the defendants. Accordingly, this criminal case has been closed. The contents of these documents were not asserted against Mr. Yang Jie, so the available materials are not sufficient to argue whether Mr. Yang Jie committed a crime.

83.     Despite the representation in the W&D Report, Jie was indeed mentioned in the

---

[31] Ex. RR to Mahon Aff.

criminal judgments/criminal rulings. However, in some of the judgments/rulings, there was a bracketed note after Jie's name, which is (另案处理), indicating that Jie would be treated in a separate case. This suggests that there was a case filed against Jie or that the police were investigating and planning to file such a case.

84.    At least two criminal rulings obtained from authorities in China include entries that support the conclusion that the W&D Report is incorrect or misleading, as shown in the following screenshot excerpts:

| Screenshot showing "(另案处理)" after Jie's name (Jie's full name is reddened below, and (另案处理) highlighted in yellow) | From Memo dated Aug 11, 2023 |
|---|---|
|  | |

浙江省台州市中级人民法院

刑 事 裁 定 书

（2018）浙10刑终1101号

原公诉机关浙江省天台县人民检察院。

上诉人（原审被告人）孙雪玲，女，1964年10月24日出生于浙江省天台县，汉族，小学文化，无业，住天台县。2018年6月5日因本案被天台县公安局刑事拘留，同年7月4日被依法逮捕，现羁押于天台县看守所。

浙江省天台县人民法院审理天台县人民检察院指控原审被告人孙雪玲犯非法吸收公众存款罪一案，于2018年10月11日作出（2018）浙1023刑初344号刑事判决

。原审被告人孙雪玲，提出上诉。本院依法组成合议庭，经阅卷，讯问上诉人孙雪玲，认为本案事实清楚，决定不开庭审理。现已审理终结。

原判认定：

2015年10月，**揭洋（另案处理）**在安徽省六安市注册成立安徽航旅科技有限公司，并指派汪某、邱某（均另案处理）二人来到合肥市发展市场。为了发展集资业务，汪某、邱某二人于**2015年12月3日注册成立安徽天合**联盟科技有限公司**（以下简称"天合联盟"），**以天合联盟控股公司的子公司为名义每日两次在公司经营地举办推广介绍会方式向外公开宣传，吸收投资人投资，宣传公司就是负责吸收群众资金，通过资金循环运转，造成大量的现金流，来拉升天合联盟公司在美国纳斯达克上市股票（股票代码TUAA）**的股**值，再把股票升值挣来的钱回报给投资人

**Translation FYR:**

Taizhou Intermediate People's Court, Zhejiang Province

Criminal ruling

(2018)Zhejiang 10 Criminal Final No. 1101


The original public prosecution organ was the People's Procuratorate of Tiantai County, Zhejiang Province.

The appellant (defendant in the original trial): Sun Xueling, female, born in Tiantai County, Zhejiang Province on October 24, 1964, Han nationality, primary school education, unemployed, living in Tiantai County. On June 5, 2018, Sun Xueling was criminally detained by the Tiantai County Public Security Bureau for this case, and was arrested in accordance with the law on July 4 of the same year. She is currently detained in the Tiantai County Detention Center.


The People's Court of Tiantai County, Zhejiang Province tried the case of Tiantai County People's Procuratorate accusing the defendant Sun Xueling of the crime of illegally absorbing public deposits, and issued a criminal judgment (2018) Zhejiang 1023 Xingchu No. 344 on October 11, 2018. Sun Xueling, the defendant in the original trial, filed an appeal. This court formed a collegial panel in accordance with the law. After reviewing the files and interrogating the appellant Sun Xueling, it was

believed that the facts of the case were clear and decided not to hold a trial. Trial is now over.

The original judgment found:

In October 2015, Jie Yang (handled in another case) registered and established Anhui Hanglv Technology Co., Ltd. in Liu'an City, Anhui Province, and assigned Wang and Qiu (both handled in a separate case) to Hefei City to develop the market. In order to develop fund-raising business, Wang and Qiu registered and established Anhui Tianhe Union Technology Co., Ltd. (hereinafter referred to as "Tianhe Union") on December 3, 2015. Twice a day at the company's place of business, the two held promotional presentations to publicize and attract investors' investment, and promoted the logic that the company was responsible for absorbing funds from the masses, and through the circulation of funds, a large amount of cash flow was generated to enhance the share value of Tianhe Union's NASDAQ-listed stocks (stock code TUAA), and then return the money earned from stock appreciation to the investors.

安徽省合肥市包河区人民法院

刑 事 判 决 书

（2020）皖0111刑初22号

公诉机关合肥市包河区人民检察院。

被告人杨萍，女，1963年9月27日出生，汉族，大学本科文化，户籍所在地安徽省合肥市蜀山区。因涉嫌非法吸收公众存款罪，2019年10月1日被合肥市公安局

包河分局刑事拘留；同年10月16日经合肥市包河区人民检察院批准，并由合肥市公安局包河分局执行逮捕。现羁押于合肥市女子看守所。

辩护人魏帮跃，安徽世邦律师事务所律师。

合肥市包河区人民检察院以包检公诉刑诉[2019]1690号起诉书指控被告人杨萍犯非法吸收公众存款罪，于2020年1月3日向本院提起公诉并建议适用简易程序审理。因存在不适宜简易程序审理的情形，本院依法适用普通程序组成合议庭，公开开庭审理了本案。合肥市包河区人民检察院指派检察员刘某1出庭支持公诉，被告人杨萍及其辩护人到庭参加诉讼。期间因不可抗力中止审理一次。本案现已审理终结。

合肥市包河区人民检察院指控：

经依法审查查明：2015年10月份，揭洋（另案处理）找到汪荣华、邱训涛（另案处理）共同预谋从社会上吸收资金。后汪荣华、邱训涛又找到他人通过成立安徽航旅科技股份有限公司、安徽天合联盟科技有限公司，以天合联盟控股有限公司在美国纳斯达克上市的股票（代码TUAA）进行股权增发众筹的名义，面对社会不特定人员非法吸收资金，直至2016年4月18日资金链断裂。被告人杨萍作为合肥一报单中心负责人，按照下属投资人员每投资一单4000元，获得160元报单费。

**Translation FYR:**

People's Court of Baohe District, Hefei City, Anhui Province

Criminal judgment

(2020) Anhui 0111 Xingchu No. 22

The public prosecution organ is the People's Procuratorate of Baohe District, Hefei City.

Defendant Yang Ping, female, was born on September 27, 1963, Han nationality, with a bachelor's degree, and her domicile is in Shushan District, Hefei City, Anhui Province. On October 1, 2019, Yang Ping was criminally detained by the Baohe Branch of the Hefei Public Security Bureau for being suspected of illegally absorbing public deposits; on October 16 of the same year, with approval from the Baohe District People's Procuratorate of Hefei City, Baohe Branch of the Hefei Public

Security Bureau arrested Yang Ping. She is currently detained in the Hefei Women's Detention Center.

Defender Wei Bangyue, lawyer of Anhui Shibang Law Firm.

The People's Procuratorate of Baohe District, Hefei City accused the defendant Yang Ping of committing the crime of illegally taking deposits from the public in the Baojian Public Prosecution Xingsu [2019] No. 1690 indictment. On January 3, 2020, the People's Procuratorate filed a public prosecution with this court and suggested the application of a simplified procedure for trial. Due to circumstances that were not suitable for a simplified procedure, this court formed a collegial panel by applying the ordinary procedure according to law, and heard the case in public. The People's Procuratorate of Baohe District, Hefei City appointed prosecutor Liu #1 to appear in court to support the public prosecution, and the defendant Yang Ping and her defenders attended the court session. The trial was suspended once due to force majeure. The case hearing is now closed.

The People's Procuratorate of Baohe District, Hefei City accused:

According to the lawful review, it was found that in October 2015, Jie Yang (handled in another case) approached Wang Ronghua and Qiu Xuntao (handled in another case) to conspire together to absorb funds from the society. Afterwards, Wang Ronghua and Qiu Xuntao found other people to establish Anhui Tourism Technology Co., Ltd. and Anhui Tianhe Union Technology Co., Ltd., and absorbed funds from unspecified people in the society in the name of issuing shares of Tianhe Union listed on NASDAQ (code TUAA) in the United States, until April 18, 2016, when the capital chain broke. Defendant Yang Ping, as the person in charge of a billing center in Hefei, received a commission of RMB 160 for every RMB 4,000 investment injected by the investors.

85.    The Zonglum W&D Report asserts that Jie has not been convicted, and, therefore, can only be called a suspect. However, the W&D Report omits that Jie was on the PRC's wanted list. If, as alleged, Jie was on the run and could not be taken into custody, he could not be transferred to the procuratorate and then the court. Hence, the procuratorate could not prosecute and a court would not have the opportunity to review his circumstances, or the potential crime, Jie may have committed. The W&D Report also pointed out that Jie does not meet the conditions for trial in absentia. The foregoing illustrates why Jie has not been (or rather, could not be) convicted yet.

86.    Myriad sources support the conclusion that Jie was (and/or remains) wanted in China

for criminal offenses.

87.    For example, the Final Award in the arbitration *China Commercial Credit, Inc. v. Sorghum Inv. Holdings Ltd.*, ICDR Case No. 01-18-0000-4901 (July 30, 2018), states:[32]

> s) On or about December 17, 2017, China Central Television ("CCTV") announced that Mr. Jie was under criminal investigation by Chinese law enforcement authorities in connection with fraudulent securities transactions [unrelated to the transactions in issue in this Arbitration] (the "Fraud");

> t) On December 15, 2017, the relevant Chinese law enforcement authority issued a press release about the Fraud stating that Mr. Jie was the main suspect;

> u) On December 19, 2017, CCTV issued a press release regarding the criminal investigation which stated that Mr. Jie was a fugitive wanted by law enforcement.

88.    Further, Jie was named as a defendant in *Shanghai NoNobank Fin. Info. Serv. Co., Ltd. v. Jie*, Index No. 653834/2018 (N.Y. Sup. Ct., N.Y. County), in connection with the disappearance of $3.5 million, which Jie allegedly refused to return after the failed reverse merger. The *NoNobank* complaint alleges, in part, that a party to the transaction "received confirmation directly from PRC government authorities that Jie is the main suspect in an ongoing criminal investigation, which remains pending as of the date of this Complaint."[33]

89.    Lead Counsel's investigation corroborates the Hindenburg Report's assertion that Jie is connected to a $300 million Ponzi scheme in China, information arising from his connection to an entity Anhui Tianhe Union Technology Co. Ltd. ("Anhui").

90.    Court proceedings in connection with the Anhui Ponzi scheme resulted in the conviction of all 23 defendants in China. Each defendant was convicted of the charge of illegal absorption of public deposits, except Gao Xinru, who was convicted of fundraising fraud.

---

[32] Final Award, *China Commercial Credit, Inc.*, ICDR Case No. 01-18-000-4901.

[33] Summons and Compl., *Shanghai NoNoBank Fin. Info. Serv. Co., Ltd. v. Jie*, Index No. 653834/2018, NYSCEF No. 1, at 7 (N.Y. Sup. Ct., N.Y. County Aug. 2, 2018).

91.     Most of the judgment records name Jie as the primary actor in the scheme. The records indicate that Jie would be handled separately from the 23 cases that resulted in convictions. One of the judgement records from 2018, identified as Case 皖01刑终658号 with the Judgment Title, 汪荣华、邱训涛非法吸收公众存款二审刑事裁定书, provides a detailed account of how the crime was committed and how Jie manipulated the criminal process.[34] Indeed, several companies registered under Defendant Jie in China are identified in the Anhui criminal judgments as having been involved in the Anhui case for accepting funds or distributing funds to Jie's account or others.

92.     Jie has been described as the beneficial controller behind Anhui, according to media reports and the criminal judgments in China. Documents obtained from authorities in China indicate that Jie exercised control over Anhui. The following is a screenshot of an excerpt of one such document that describes Jie as the person who controls Anhui and is said to have conspired with Ronghua Wang (convicted), Xuntao Qiu (convicted), and others to commit the crimes associated with Anhui:

原判认定：自2015年10月起，被告人汪荣华、邱训涛等人伙同安徽航旅科技有限公司（以下简称安徽天合公司）、安徽天合联盟科技有限公司（以下简称安徽天合公司）实际控制人施培经领导、先后在安徽航旅公司、安徽天合公司，通过现场演示PPT、讲解授课、发放宣传资料、庆功会、口口宣传等方式，向社会不特定人及社会公开宣传"天合联盟控股有限公司"及其董事长施培，虚构安徽航旅公司、安徽天合公司系安徽省六安市政府招商引资项目，属于母公司"天合联盟控股有限公司"的子公司，该母公司是英国注册进入一家上市公司，控股代码TA33，还称为所谓的TA33股票通过后升值前景，待美国基金公司重返A股时，其公司再买空股票赚取双倍利润的，以以时保投资人，从而开展"众筹加盟"业务，向社会公众承诺高额返利（即日利率达3.15%、月利率达90.47%、年利率达1085%），资金安全保障，并赠送股票等，以网站：××、××(河联盟科技的简称)为代号，引诱社会公众投资。

93.     The following statement issued by the Economic Crime Investigation Squad of Hefei Public Security Bureau Baohe District Branch on July 18, 2018, states that the Squad issued a wanted order, also known (as referenced above) as a "Red Notice," against Jie in May 2017, and had applied with the Baohe District People's Procuratorate for the arrest of Jie Yang on suspicion

---

[34] The same record identifies Jie's spouse as Xiaohuan Huang (黄小环) and alleges that she was indirectly involved in Jie's Ponzi scheme and business operations to varying degrees, although Xiaohuan is not named a defendant in that action.

of a fraudulent fund-raising crime (集资诈骗罪). Notably, the following statement was obtained

by independent investigation but references Shanghai Wheat Asset Management Co. Ltd., the

parent of Sorghum, which alleged that it too had obtained a statement that Jie was under

investigation, and in response to which Jie purported to provide evidence that Sorghum's

information was not accurate – it was later alleged that Jie has forged the documents contesting

the police letter obtained by Sorghum.



Statement [TRANSLATION]

July 18, 2018

From: Qu Xiaolong (屈晓隆) of Hefei Public Security Bureau Baohe District Branch
Economic Crime Investigation Squad

To: Shangai Wheat Asset Management Co Ltd (**上海麦子**资产管理有限公司)

In witness whereof, our squad filed the illegal public deposit absorption case of Anhui Tianhe Union Technology Co Ltd (安徽天合联盟科技有限公司) on April 19, 2016. During our investigation, our squad found that the case's main culprit is Jie Yang[35] (揭洋), who orchestrated the whole case. Our squad issued a wanted order against Jie Yang in May 2017, and has applied with Baohe District People's Procuratorate for arrest of Jie Yang on suspicion of the crime of fraudulent fundraising (集资诈骗罪). Since to date Jie Yang has not been brought to justice, the "No Prosecution Decision" document your company produced as provided by Jie Yang is utterly fictitious and Jie Yang's practice is suspected of constituting forgery of official documents of state organs (伪造国家机关公文罪).

94.    In addition to the foregoing, Lead Counsel has identified additional civil lawsuits involving financial misconduct in which Jie was named as a defendant or co-defendant based on Chinese language research.

### c.    Jie Has Represented Multiple Conflicting Accounts of His Educational History

95.    Conflicting information has been publicly reported about Defendant Jie's education. For example, in March 2016, Tianhe Union Holdings Limited reported that Jie had a degree in Marketing from Lv'an Teachers College.[36] In contrast, in a 2017 SEC filing by Tianci International, Inc., it was reported that Jie obtained his bachelor's degree in Business Administration from Beijing College of Finance and Commerce in 2006.[37] Further, in a November 1, 2021 Form 8-K, Singularity reported to the SEC that Jie held a bachelor's degree in Business Management from Beijing Finance and Trade Technology College.[38]

---

[35] This is the direct translation of Jie's name in Chinese.

[36] Tianhe Union Holdings Limited, Current Report (Form 8-K) (Mar. 30, 2016), https://www.sec.gov/Archives/edgar/data/1619870/000121390016012193/f8k033016_tianheunion.htm.

[37] Tianci International, Inc., Annual Report (Form 10-K) (Jan. 13, 2017), https://www.sec.gov/Archives/edgar/data/1557798/000121390017000348/f10k2016_tianciinternational.htm.

[38] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Nov. 1, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021055789/ea149737-8k_sinoglobal.htm.

**B.**     **Jie and Singularity Appoint John Levy as a Director of the Company But Omitted He Was a Director of CCC, the Entity at Which Jie Committed Numerous Financial Improprieties**

96.     Singularity touted Defendant Levy's bona fides as a corporate director. Indeed, Levy operates the Board Advisory,[39] an advisory service for corporate board, touting his personal "commitment to boardroom excellence." Levy was keenly aware of the importance of providing truthful information to the markets, as the Board Advisory states "When you can't trust companies and/or markets, you don't become a shareholder." *Id.*

97.     Despite Defendant Levy's apparent bona fides as a director and board advisor, Singularity omitted Levy's recent role as a director of CCC where Jie served as an executive carrying out myriad frauds, as alleged herein. That omission delinked the association between Levy and Jie and omitted the connection to Jie's prior unlawful conduct. As discussed above, on information and belief, Levy – in his capacity as a CCC director – would have been aware of the litigation styled, *China Commercial Credit, Inc. v. Sorghum Investment Holdings Limited*, ICDR Case No. 01-18-0000-4901 (July 30, 2018). *See* Section IV.A.2.a, *supra.*

98.     Specifically, on November 19, 2021, the Company filed with the SEC its Form 8-K signed by Jie. In relevant part, the Form 8-K stated:

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

(c)     On November 18, 2021, the Registrant elected Mr. John F. Levy as an Independent Director, Chairperson of the Compensation Committee, a member of Nominating/Corporate Governance Committee, and a member of the Audit Committee, effective from November 18, 2021 until the Registrant's annual meeting of the shareholders in 2022, and a successor has been duly elected and qualified or until his earlier resignation, removal from office, death or incapacity.

Mr. Levy, 66 years old, is the Chief Executive Officer, board advisory of Westfield, NJ, a consulting firm. From September 2019 to April 2020, he served as the Chief

---

[39] *See* Home, Board Advisory, *available at*: http://www.boardadvisory.net/.

Executive Officer of Sticky Fingers Restaurants, LLC. Mr. Levy currently serves on the board of directors of two other public companies: Applied Minerals, Inc., New York, NY (AMNL.OB); and Happiness Biotech Group Ltd., which is a company listed on Nasdaq Capital Market (NASDAQ: HAPP). From June 2016 to October 2021, Mr. Levy served as board member and Chair of Audit Committee of Washington Prime Group, Inc. (NYSE: WPG), which filed for protection under Chapter 11 of the United States Bankruptcy Code on June 13, 2021 and emerged from bankruptcy protection on October 21, 2021. He also served as board member and Chair of Governance Committee of Takung Art Co., Ltd. (OTCQB:TKAT), from March 2016 to June 2019. Mr. Levy is a Certified Public Accountant, and Mr. Levy is a graduate of the Wharton School of Business at the University of Pennsylvania, he received his MBA from St. Joseph's University in Philadelphia, Pennsylvania.

The Board has determined Mr. John F. Levy is deemed to be independent under the definition provided by NASDAQ Listing Rule 5605(a)(2).

Mr. Levy has (i) no arrangements or understandings with any other person pursuant to which he was appointed as a director, and (ii) no family relationship with any director or executive officer of the Registrant or any person nominated or chosen by the Registrant to become a director or executive officer.

99.     The statement in paragraph 98 contained in the November 19, 2021 Form 8-K was false and misleading because it failed to disclose Singularity's newly-elected director Defendant John Levy's prior tenure, from January 2013 through December 2016, as a director of CCC, an entity which failed amidst detailed allegations that Jie, as alleged above misappropriated assets when he was an executive and shareholder in CCC and engaged in the fraudulent acts alleged herein.

100.     On February 23, 2023, Defendant Levy tendered his resignation from his positions as a member of the Company's Board, as well as the Audit Committee, the Compensation Committee, and the Nominating/Corporate Governance Committee of the Board, effective immediately.

**C.      Singularity Claims to Transform Its Ailing Global Shipping and Logistics Business to a Cryptocurrency Mining and Hardware Development Business**

101.     Singularity embarked on a sham transformation from a shipping and logistics

company to a cryptocurrency company beginning with a February 3, 2021 announcement by

Singularity.[40] In fact, as alleged below, Singularity did not develop a cryptocurrency business.

Rather, the Company engaged in a series of frauds and sham transactions to create the impression

that it was undertaking the transition, using that purported transition to raise tens of millions of

dollars from the sale of unregistered shares based on the sham cryptocurrency business.

102.    On February 3, 2021, Singularity filed a Form 8-K with the SEC, signed by

Defendant Cao, incorporating a February 2, 2021 press release announcing the Company's

transformation into a cryptocurrency and bitcoin mining firm, stating:[41]

> Sino-Global Shipping America, Ltd. (NASDAQ: SINO) ("Sino-Global", the
> "Company" or "we"), a non-asset based global shipping and freight logistical
> integrated solutions provider, announced today that the newly appointed Chief
> Operating Officer Mr. Lei Nie and Chief Technology Officer Mr. Xintang You will
> spearhead the Company's effort to enter Bitcoin mining.
>
> As Sino-Global evaluates its strategy for 2021 and beyond, the planned Bitcoin
> mining expansion follows a series of steps in preparation. The plan utilizes
> leadership team members who specialize in information technology, Blockchain,
> cryptocurrency mining operations and more. Given the Company's plan to enhance
> the traditional logistics service platform through leveraging innovative
> technologies, the Company is excited to explore opportunities created by current
> market conditions and enter the cryptocurrency sector.
>
> We are thrilled to expand to Bitcoin mining," commented Mr. Lei Cao, Chief
> Executive Officer of Sino-Global. "The management team is ready to take our
> business to the next level by executing this expansion strategy. We believe that
> Sino-Global is well-positioned to continue growing its core business while
> expanding to Bitcoin mining operations.

103.    On this news, the price of Singularity's stock rose from $5.58 to $5.93, on

significant volume.

104.    On February 9, 2021, Singularity issued a press release, incorporated into a Form 8-

---

[40] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Feb. 3, 2021), https://www.sec.gov/Archives
/edgar/data/1422892/000121390021006399/ea134547-8k_sino.htm.

[41] *Id*.

K filed with the SEC, signed by Defendant Cao, announcing that the Company had:[42]

> [E]ntered into a securities purchase agreement (the "Purchase Agreement") with the investors specified on the signature page thereto (the "Investors") pursuant to which the Company agreed to sell to the Investors, and the Investors agreed to purchase from the Company, in a registered direct offering, an aggregate of 3,655,000 shares (the "Shares") of the common stock of the Company, no par value per share ("Common Stock"), at a purchase price of $7.80 per Share, for aggregate gross proceeds to the Company of $28,509,000.

105.    As discussed herein, the statements in paragraphs 102 and 104 were materially false and misleading because they failed to disclose that Singularity's cryptocurrency transformation was little more than a series of sham transactions, such as those with Thor Minor (*see* Section IV.6, *infra*) and Golden Mainland (*see* Section IV.F, *infra*), designed to create the appearance of a transition. Thus, Singularity's announcement regarding the Purchase Agreement was false and misleading because the investments had been procured through false and misleading statements that the transactions were valid, and the investments were procured on false representations regarding the Company's sham cryptocurrency transition. Singularity was in per se breach at the time that it entered those transactions, and they were based on false representations regarding the Company's purported cryptocurrency business.

**D.    Singularity, Jie, Shan, Pan, and Cao Induce Private Investment in Singularity Based on False Claims Regarding the Company's Sham Cryptocurrency Business**

106.    On February 10, 2021, Singularity filed a Prospectus with the SEC in which it announced that it planned to capitalize on its purported shift to cryptocurrency by selling unregistered shares of its common stock to investors. Specifically, Defendant Cao announced that the Company had entered into agreements to sell 3,655,000 unregistered shares of Singularity

---

[42] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Feb. 10, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021008047/ea135111-8k_sinoglobal.htm.

stock, raising $28,5000,000 with the express purpose of "investment in information technology and software and hardware in connection with our new cryptocurrency initiative."[43] However, that announcement was misleading because the investments were procured through false and misleading statements regarding the Company's sham cryptocurrency business.

107.    On February 10, 2021, Singularity also filed a Form 8-K with the SEC, signed by Cao, in which it announced the "closing of its previously announced registered direct offering and concurrent private placement with certain accredited investors to purchase a total of $13,599,792.50 of its common stock and warrants."[44]

108.    On February 11, 2021, Singularity filed a Form 8-K with the SEC, signed by Cao, in which it "announc[ed] the closing of its previously announced registered direct offering and concurrent private placement with certain accredited investors to purchase a total of $28,509,000 of its common stock and warrants."[45]

109.    Upon information and belief, the "accredited investors" referred to in the February 10 and 11, 2021 Form 8-Ks included Hexin Global Limited, Viner Total Investments Funds, Jinhe Capital Limited, St. Hudson Group LLC, Imperii Strategies LLC, Isyled Technology Limited, and Hsqynm Family Inc. Singularity's announcement regarding the private investments was false and misleading and omitted the fact that Defendants Singularity, Jie, Shan, Pan, and Cao had induced the accredited investors to make the investments on the basis of false claims that Singularity expected substantial growth based on its new cryptocurrency business which, as alleged herein, the Singularity Defendants knew was untrue and that the underlying investment contracts were

---

[43] Sino-Global Shipping America, Ltd., Prospectus Supplement (Feb. 16, 2018), https://www.sec.gov/Archives/edgar/data/1422892/000121390021008067/ea135095-424b5_sinoglobal.htm.

[44] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Feb. 10, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021008047/ea135111-8k_sinoglobal.htm.

[45] *Id*.

invalid and that Singularity was in breach of them at the time it entered into those contracts.

110.    On this news, the price of Singularity's common stock rose substantially from an opening price of $7.40 on February 10, 2021, to close at $7.78, and continued to rise daily thereafter, closing at $10.81 per share on February 22, 2021.

111.    On February 16, 2021, Singularity filed a Registration Statement with the SEC seeking to vastly accelerate its efforts to raise cash based on its cryptocurrency transformation and sell "any combination of debt securities, shares of common stock, preferred stock, warrants, rights, share purchase contracts, share purchase units or units having an aggregate initial offering price not exceeding $200,000,000."[46]

112.    On this news, during the period from February 9, 2021 to February 17, 2021, the Company's common stock price rose from $9.10 to $9.47.

113.    The statements in paragraphs 102, 104 and 111 concerning Singularity's plan to sell unregistered shares of common stock based on its "new cryptocurrency initiative" were materially false and misleading because the Company's cryptocurrency transition (i) was a sham designed to inflate its stock and facilitate related party transactions, (ii) was based on related party transactions and other fictious transactions and companies, and (iii) could not execute on its cryptocurrency initiatives. Likewise, the statements in paragraphs 106, 109 and 111 concerning the related proposed sales of unregistered securities, common stock, preferred stock, warrants, rights, share purchase contracts, share purchase units, or units announced between February 9 through 16, 2021, were false and misleading for the same reasons.

---

[46] Sino-Global Shipping America, Ltd., Registration Statement (Form S-3) (Feb. 16, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021009665/ea135668-s3_sinoglobal.htm.

E.   **Singularity Rebrands Itself and Touts the Launch of Its Cryptocurrency Mining Operations**

114.   On March 3, 2021, Singularity filed a Form 8-K with the SEC, signed by Cao, which stated that the Company had entered into an agreement to purchase 2,783 digital currency operation servers for $4.6 million. In a press release incorporated into the 8-K, Cao stated:[47]

> We are excited to announce the purchase order, which demonstrates the efficiency of our management team's ability to pivot and execute a new venture into cryptocurrencies. To provide transparency on the mining operations and daily probabilities to our shareholders, the Company will disclose the digital currency wallet addresses once they are available. We are confident with the opportunity presented to us from the digital currency industry and our capability to capture the growth in furtherance of our strategy to maximize our shareholder value.

115.   On this news, Singularity's common stock price rose from $5.40 on March 2, 2021, to $5.93 on March 3, 2021 on heavy volume.

116.   On September 21, 2021, Singularity filed a Form 8-K with the SEC and issued a press release in which it announced that it had restructured its March 2, 2021 agreement with Hebei Yanghuai Technology Co., Ltd. to buy 2,783 digital currency (*i.e.*, crypto) mining servers from Yanghuai. The press release stated that "[t]he deal was part of Sino-Global's expansion into the cryptocurrency market." In addition, Defendant Cao stated that Singularity "plan[s] to switch to a direct mining business rather than contracting with third parties in order to have greater control over this growth segment and to optimize our gross margin."[48]

117.   On this news, Singularity's common stock price rose from an opening price of $2.47 on September 21, 2021 to close at $2.58 on September 22, 2021.

118.   Singularity continued to mislead the market by purporting to effect a full-scale

---

[47] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Mar. 3, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021013073/ea136933-8k_sinoglob.htm.

[48] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Sept. 21, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021048996/ea147738-8k_sinoglobal.htm.

transformation of the Company to a cryptocurrency business, including changing its name and business model.

119.    For example, on January 5, 2022, the Company issued a Form 8-K, filed with the SEC, in which it disclosed that it had changed its name from Sino-Global Shipping America, Ltd. to Singularity Future Technology Ltd. in order to align the Company with the cryptocurrency markets.[49]

120.    On March 28, 2022, Singularity announced the launch of its new website to highlight its transition to cryptocurrency:[50]

> Great Neck, N.Y., March 28, 2022 /PRNewswire/ -- Singularity Future Technology Ltd. (the "Company") (NASDAQ: SGLY) today announced the formal launch of its new corporate website. Singularity Future Technology's website is designed to better highlight the Company's successful growth and momentum in cryptocurrency, Blockchain and other new markets. In addition to providing resources to customers, partners and investors, the website is designed to showcase the Company's expanding business portfolio, services and solutions whilst highlighting its long-term strategy and leadership vision.
>
> Singularity Future Technology, a Nasdaq-listed company, is revolutionizing cryptocurrency, Blockchain and other new markets by focusing on innovative solutions for globally interconnected networks and establishing state-of-the-art crypto mining pools. As the technology landscape constantly shifts, the Company strives to provide its clients frictionless involvement and a growth-enabling ecosystem in this ever-changing space.
>
> Chief Executive Officer, Mr. Yang "Leo" Jie, commented, "We have been aggressively expanding in rapid growth areas and are excited with the launch of our new corporate website, which aligns with our business strategy and leadership vision for the fast evolving cryptocurrency, Blockchain and other new markets we serve. Our team designed the sleek new site to be informative and scalable as we continue to drive growth. The timing made sense for us to formally launch now given our recent high profile announcement to enter the greenfield distributed storage market, which we expect will build on our successful bitcoin mining asset and Blockchain

---

[49] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Jan. 3, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390022000636/ea153497-8k_sinoglobal.htm.

[50] Press Release, Singularity Future Technology Ltd., Singularity Future Technology Formally Launches New Website (Mar. 28, 2022), https://www.prnewswire.com/news-releases/singularity-future-technology-formally-launches-new-website-301511368.html. A review of the SEC's website did not reveal the filing of an accompanying Form 8-K incorporating the Company's March 28, 2022 press release.

businesses. We expect our new corporate website will also serve as an excellent resource to help customers and partners better understand the breadth of our capabilities, while also serving as a powerful sales engine for our team."[51]

121.    On this news, Singularity's common stock price rose from an opening price of $11.53 on March 28, 2022 to close at $11.90. In the days that followed, the stock continued to climb steadily, closing at $14.02 on March 31, 2022.

122.    Singularity's announcement, description, and the content of its newly launched website as of March 28, 2022 in paragraph 120 were false and misleading because the Company neither intended nor had the capability to meaningfully engage in a direct cryptocurrency mining business.

123.    Singularity has since abandoned entirely its foray into cryptocurrency and no longer refers to any crypto-related business, instead describing its business on its current website as:[52]

> We are a Nasdaq listed company committed to creating an eco-friendly environment in the shipping industry. Our focus is on developing sustainable practices in our shipping operations, with our warehouse located in Houston, Texas for efficient shipping and timely delivery to our clients. As the shipping industry is constantly evolving, we are dedicated to providing our clients with a seamless and growth-oriented ecosystem. Our aim is to facilitate frictionless involvement and to remain at the forefront of industry changes while implementing eco-friendly practices in our operations.

124.    Singularity's Form 10-Q for the period ended Q1 2023 confirms that it has exited the cryptocurrency business stating: "The Company ceased to sell crypto-mining equipment since January 1, 2023. For the three months ended March 31, 2023, the Company did not sell crypto-mining machines."[53]

---

[51] Archived captures of Singularity's newly launched website as it existed on March 28, 2022 can be viewed at: https://web.archive.org/web/20220328192817/https://www.singularity.us/.

[52] About us, *Singularity Future Technology Ltd.*, https://www.singularity.us/about (Last Accessed Oct. 4, 2023).

[53] Singularity Future Technology Ltd., Quarterly Report (Form 10-Q) (May 15, 2023), https://www.sec.gov/Archives/edgar/data/1422892/000121390023039819/f10q0323_singularity.htm.

**F.      Singularity and Jie Form a Sham Joint Venture with Golden Mainland to Become a Leader in Cryptocurrency Mining**

125.    To continue to perpetuate its sham transformation, Singularity announced a joint venture with Golden Mainland for the provision of historic volumes of electricity that would be required to power its purported cryptocurrency mining business. In fact, Golden Mainland is a sham entity formed to continue to perpetuate Singularity's fraud.

126.    On April 11, 2022, Singularity and Golden Mainland[54] issued a press release announcing the formation of a Bitcoin mining site joint venture ("Mainland JV"),[55] stating, in part:

> The joint venture (the "Joint Venture") plans to invest up to $250 million over time to build a total of 1GW of mining sites in Texas, Ohio, and other states, with capacity for up to 300,000 miners, each with 3,400 watts/hour in energy consumption. Singularity is a global logistics and blockchain technology company engaged in shipping, chartering, logistics services and technology services. Golden Mainland is a company engaged in the provision of electricity services in North America.

127.    In a Form 8-K, signed by Jie, filed with the SEC on April 14, 2022, Singularity represented that:[56]

> The joint venture (the "Joint Venture") plans to invest up to $250 million over time to build a total of 1GW of mining sites in Texas, Ohio, and other states, with capacity for up to 300,000 Bitcoin miners, each with 3,400 watts/hour in energy consumption. Singularity is a global logistics and blockchain technology company engaged in shipping, chartering, logistics services and technology services. Golden Mainland is a company engaged in the provision of electricity services in North America.

> Under the terms of the Joint Venture, Singularity will own 51%, and Golden Mainland will own 49%, with each party contributing capital in accordance with its ownership interest. Singularity expects to make its initial capital contribution of approximately $10 million to the Joint Venture from available cash.

---

[54] Home – Our Services, *Golden Mainland*, http://www.globalmainland.com/index.html (Last Accessed Oct. 4, 2023).

[55] Press Release, Singularity Future Technology Ltd., Singularity Future Technology and Golden Mainland Form Bitcoin Mining Joint-Venture (Apr. 11, 2022), https://www.sec.gov/Archives/edgar/data/1422892/0001213900 22019821/ea158458ex99-1_singularity.htm.

[56] Singularity Future Technology Ltd., Current Report (Form 8-K) (Apr. 14, 2022), https://www.sec.gov/Archives/ edgar/data/1422892/000121390022019821/ea158458-8k_singularity.htm.

128.    Defendant Jie, then CEO of Singularity, touted the Mainland JV, stating: "We are excited to partner with Golden Mainland in this Joint Venture. We believe that investing in and building out sites with Bitcoin mining capacity will provide a platform with the scale to support the demand levels in the industry."[57]

129.    For the reasons discussed below, the statements regarding Singularity's purported joint venture with Golden Mainland described in paragraphs 126 and 127 were materially false and misleading because Golden Mainland does not appear to exist and, therefore, the representations of Jie and Singularity regarding the Mainland JV were materially false and misleading.

130.    The Mainland JV does not withstand scrutiny when viewed in comparison to other cryptocurrency mining operations. For example, Riot Platforms, Inc. ("Riot"), which is a publicly traded company that purports to operate the largest Bitcoin mining facility in the United States, states:[58]

> Riot's Rockdale Facility has a total power capacity of 750 MW, with 450 MW currently developed. This facility is believed to be the largest single facility, as measured by developed capacity, in North America for Bitcoin mining. The Rockdale Facility is currently undergoing a substantial expansion project that is nearly doubling the site's Bitcoin mining capacity to 700 MW. This expansion includes four new buildings, totaling approximately 240,000 sq ft. and adding 400 MW of capacity. Once this expansion is complete, it is expected that Riot's Rockdale Facility will be the largest Bitcoin mining facility in the world, as measured by developed capacity.

131.    Riot reports that it operates approximately 96,000 bitcoin miners. In stark, comparison, the Joint Venture Agreement for the Mainland JV stated that "the general purposes of the Joint Venture is a total investment of over $250 million to build a total of 1GW of mining

---

[57] Press Release, Singularity Future Technology Ltd., Singularity Future Technology and Golden Mainland Form Bitcoin Mining Joint-Venture.

[58] Bitcoin Mining – Rockdale, *Riot Platforms*, https://www.riotplatforms.com/bitcoin-mining/whinstone-u-s.

sites in Texas, Ohio, and other states, with a full load of 300,000 bitcoin miners in 3400 watt."[59] To be exact, 300,000 bitcoin miners at 3400 watts would require 1020 MW, just over 1 GW. As such, even after Riot's planned expansion, the Mainland JV would be – by a significant margin – the largest Bitcoin mining facility in the world.

132.   Further undermining the legitimacy of the Mainland JV is the fact that, as with Singularity's other joint ventures, according to the April 10, 2022 Joint Venture Agreement between Singularity and Golden Mainland, the address of the Joint Venture was Singularity's headquarters: 98 Cutter Mill Road, Suite 322, Great Neck, New York 11021.[60]

133.   The Mainland JV Agreement was executed by Defendant Jie (with notice to Singularity to Defendant Shan) and Haiyao Jiang whom Georgia Secretary of State records suggest had formed Golden Mainland just six months before and used a gmail.com address:[61]

> Attn: Ms. Jing Shan
> Address: 98 Cutter Mill Rd Suit 322, Great Neck, NY11021
> Tel: +1 718-888-1814
> Email: angelashan@singularity.us

Golden Mainland

> Attn: Haiyao Jiang
> Address: 2757 Buford HWY NE STE 404 Atlanta, GA 30324 USA
> Tel:
> Email: haiyao2022@gmail.com

134.   Golden Mainland purports to "own[] nuclear power, hydropower, wind energy, solar energy, geothermal energy, biomass energy, etc." with "access to 10+GW of power resources, and

---

[59] Singularity Future Technology, Ltd., "Joint Venture Agreement," Quarterly Report (Form 10-Q), Ex. 10.1 (Apr. 10, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390022019821/ea158458ex10-1_singularity.htm.

[60] *Id.*

[61] *Id.*

has diversified investment portfolios in the United States, Canada and other countries."[62] 1 GW alone is potentially enough to power 876,000 households for one year if they collectively consume 10,000 kWh each or a medium sized city. Despite is purportedly massive energy resources, the Mainland JV Agreement listed a gmail address (haiyao2022@gmail.com), though the company's website lists a single email address: contact@globalmainland.com.[63] And its physical location listed in the Mainland Joint Venture Agreement does not exist according to Google Maps and a search of the Fulton County Board of Assessors.[64]



135.     Based on the foregoing, the Mainland JV appears to be no more than a sham. However, Singularity's attempts to paper over the sham joint venture also appears to be ill-conceived.

136.     According to the "Whois" database, a clearinghouse for Internet domain registration, the Golden Mainland's website, goldenmainland.com, was registered on April 9, 2022, two days before Singularity's announcement of the Mainland JV:[65]

---

[62] Home – Our Services, *Golden Mainland*, http://www.globalmainland.com/index.html.

[63] Contact Us, *Golden Mainland*, http://www.globalmainland.com/contactUs.html.

[64] Property Records Search – Address Search, *Fulton County Board of Assessors*, https://iaspublicaccess .fultoncountyga.gov/search/commonsearch.aspx?mode=address.

[65] Search the WHOIS Database, *GoDaddy*, https://www.godaddy.com/whois/results.aspx?itc=dlp_domain_whois &domain=globalmainland.com.

# WHOIS search results

Domain Name: globalmainland.com
Registry Domain ID: 2688158816_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.godaddy.com
Registrar URL: https://www.godaddy.com
Updated Date: 2023-01-17T06:03:25Z
Creation Date: 2022-04-09T22:37:19Z
Registrar Registration Expiration Date: 2024-04-09T22:37:19Z
Registrar: GoDaddy.com, LLC
Registrar IANA ID: 146
Registrar Abuse Contact Email: abuse@godaddy.com
Registrar Abuse Contact Phone: +1.4806242505
Domain Status: clientTransferProhibited https://icann.org/epp#clientTransferProhibited
Domain Status: clientUpdateProhibited https://icann.org/epp#clientUpdateProhibited
Domain Status: clientRenewProhibited https://icann.org/epp#clientRenewProhibited
Domain Status: clientDeleteProhibited https://icann.org/epp#clientDeleteProhibited
Registry Registrant ID: Not Available From Registry
Registrant Name: Registration Private
Registrant Organization: Domains By Proxy, LLC
Registrant Street: DomainsByProxy.com
Registrant Street: 2155 E Warner Rd
Registrant City: Tempe
Registrant State/Province: Arizona
Registrant Postal Code: 85284
Registrant Country: US
Registrant Phone: +1.4806242599
Registrant Phone Ext:
Registrant Fax: +1.4806242598
Registrant Fax Ext:
Registrant Email: Select Contact Domain Holder link at https://www.godaddy.com/whois
/results.aspx?domain=globalmainland.com
Registry Admin ID: Not Available From Registry
Admin Name: Registration Private
Admin Organization: Domains By Proxy, LLC
Admin Street: DomainsByProxy.com
Admin Street: 2155 E Warner Rd
Admin City: Tempe
Admin State/Province: Arizona
Admin Postal Code: 85284
Admin Country: US
Admin Phone: +1.4806242599

137.   Analysis of the "Whois" results above reveal that Golden Mainland's website was registered by Domains By Proxy LLC (https://www.domainsbyproxy.com/), a service that is designed to mask the identity of the person or entity who owns and operates a particular website.

138.   Golden Mainland's business was registered with the Georgia Secretary of State on October 25, 2021, approximately six months before the joint venture with Singularity was announced.

139.   The May 5, 2022 Peabody Report, which, according to the Mahon Affirmation, provides a significant roadmap to the red flags and the checkered history of Singularity, also provides the results of its search of the Georgia Secretary of State's records for Golden Mainland. That search identified Haiyao Jiang as the CEO, CFO, and Secretary of Global Mainland, but could not locate him. Peabody reported:

> Even after significant effort, we were not able to find a trace of Haiyao Jiang. We find it interesting that Jiang is able to serve as CEO, CFO, and Secretary of the company.

| Name | Title | Business Address |
|------|-------|------------------|
| HAIYAO JIANG | CEO | 2751 BUFORD HWY NE STE 404, ATLANTA, GA, 30324, USA |
| HAIYAO JIANG | CFO | 2751 BUFORD HWY NE STE 404, ATLANTA, GA, 30324, USA |
| HAIYAO JIANG | Secretary | 2751 BUFORD HWY NE STE 404, ATLANTA, GA, 30324, USA |

140.   As of August 2023, Global Mainland's CEO, CFO, and Secretary have all changed from Haiyao Jiang to Myles Reeves with no announcement or explanation by Global Mainland, no comment by Singularity, or any other announcement or discussion that could be identified through reasonable investigation:



141.     Golden Mainland lists as its "principal office address" with the Georgia Secretary of State, 2751 Buford Hwy NE, Suite 404, Atlanta, Georgia, 30324. However, that address belongs to the Dulce M. Garcia State Farm Agency.[66]

142.     Golden Mainland's website provides a different address, 9040 Roswell Road, Suite 500, Atlanta, Georgia, 30350.[67] However, that too is not Golden Mainland's address. Rather, it is the address of the law firm of O'Daniel McDonald, which appears to serve as Golden Mainland's Registered Agent on behalf of InCorp Services, Inc., as listed on Golden Mainland's business search results on the Georgia Secretary of State website above:

---

[66] *See* https://www.dulceginsurance.com/.

[67] Contact Us, *Golden Mainland*, http://www.globalmainland.com/contactUs.html.



143.    Golden Mainland's website states that the company "owns nuclear power, hydropower, wind energy, solar energy, geothermal energy, biomass energy, etc. The company has access to 10+GW of power resources and has diversified investment portfolios in the United States, Canada and other countries." Searches in the United States and Canada for proof that Golden Mainland owns any of the energy assets claimed on its website or that it or Singularity have registered to do business in Texas or Ohio yielded no results.

**G.      Singularity Forms Thor Miner, Inc., a Sham Company, Purporting to Build Proprietary Cryptocurrency Mining Machines Which It Purports to Sell to SOS**

144.    Defendants falsely represented that it had secured a $200 million contract to sell its proprietary cryptocurrency mining machines to SOS. In fact, the joint venture was a sham: the proprietary machines were simply procured from an independent manufacturer, and Singularity and Thor Miner knew that they could not deliver on the purported $200 million contract.

145.    In the fall of 2021, Singularity embarked on a scheme to generate the appearance of a massive success just months after announcing its abrupt shift to cryptocurrency. Specifically, it purported to have entered into a $200,000,000 contract for the sale of its "proprietary" crypto mining computers or "rigs" with HighSharp as the exclusive designated supplier of high-performance

computing chips for a joint venture named Thor Miner, Inc.

146.     The Thor Agreement established the Thor Joint Venture for the purpose of manufacturing, marketing, and selling a bitcoin mining machine under brand name "Thor."[68]

147.     More specifically, on October 4, 2021, in connection with its name change from Sino-Global Shipping America, Ltd. to Singularity Future Technology Ltd., as well as its expansion into the bitcoin mining industry, the Company issued a press release in which it announced that Singularity had entered into a Strategic Alliance Agreement (the "Thor Agreement") with HighSharp to establish a joint venture for collaborative engineering, technical development, and commercialization of a proprietary cryptocurrency mining machine under the brand name Thor, with exclusive rights covering design production, intellectual property, branding, marketing, and sales. The joint venture, named Thor Miner, Inc. ("Thor Joint Venture"), was 51% owned by the Singularity and 49% owned by HighSharp, a fabless integrated circuit designer that provides advanced semiconductor solutions for supercomputing hardware, based in China. In the press release, Defendant Cao represented:[69]

> This is a major strategic development for Sino-Global with the potential for significant long-term financial benefit. The name we chose underscores our JV's considerable combined resources, market knowledge and capacity to address unmet demand for high-quality, reliable digital mining machines. Recent crypto policy changes combined with ongoing global component shortages have served to remove valuable digital mining production capacity. We intend to fill that vacuum and plan to move aggressively as we build greater value for Sino-Global and all shareholders.

148.     Singularity's October 4, 2021 press release was incorporated into an October 4, 2021

---

[68] Aff. of Jing Shan in Opp. to Pl.'s Order to Show Cause for Prejudgment Attachment, *SOS Info. Tech. N.Y., Inc. v. Thor Miner Inc.*, Index No. 654735/2022, NYSCEF No. 34 (N.Y. Sup. Ct., N.Y. County Dec. 12, 2022), https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=BlBuo9tadJxal0nxTsFFcg==&system=prod.

[69] Press Release, Sino-Global Shipping America, Ltd., Sino-Global Enters Bitcoin Mining Machine Joint-Venture with Highsharp; Will Make Investment to Drive Product Development and Expansion (Oct. 4, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000101376221000102/ea148358ex99-1_sinoglobal.htm.

Form 8-K, signed by Cao, filed with the SEC.[70] In the press release, Singularity announced the formation of the Thor Joint Venture to the public. The Company explained, in part, that "The JV's scope will encompass collaborative engineering, technical development and commercialization of a proprietary bitcoin mining machine under the name Thor, with exclusive rights covering design production, intellectual property, branding, marketing and sales."[71]

149.    Defendant Cao, then-CEO of Singularity, stated: "This is a major strategic development for Sino-Global with the potential for significant long-term financial benefit. The name we chose underscores our JV's considerable combined resources, market knowledge and capacity to address unmet demand for high-quality, reliable digital mining machines."[72]

150.    On this news, Singularity's common stock price rose from $2.31 on October 3, 2021, to close at $2.41 on October 4, 2021, on extremely high volume of 1,513,879 shares. By contrast, up to that time, Singularity's common stock had not traded more than 1 million shares in a single trading day since August 26, 2021. The stock continued to climb in the following days, closing at $2.73 on October 13, 2021.

151.    As discussed below, the statements regarding Thor Miner in paragraphs 147-49 were materially false and misleading because they failed to disclose that (i) Singularity and Thor had not developed a proprietary cryptocurrency mining machine for which they held intellectual property rights; and (ii) even if Singularity and Thor Miner had developed such a machine, they were aware that the effects of COVID-19 and the global semiconductor shortage would make it impossible for them to provide such machines in sufficient quantity and in a commercially reasonable time,

---

[70] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Oct. 4, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000101376221000102/ea148358-8k_sinoglobal.htm.

[71] Press Release, Sino-Global Shipping America, Ltd., Sino-Global Enters Bitcoin Mining Machine Joint-Venture with Highsharp; Will Make Investment to Drive Product Development and Expansion.

[72] *Id.*

including but not limited to SOS.

>**1.** **Singularity and Thor Miner Do Not Own the Intellectual Property Rights to Proprietary Mining Machine**

152.    According to Defendant Shan, HighSharp purported to be in the business of block-chain technology, hardware, software technology management, and cloud computing.[73]

153.    Singularity and HighSharp agreed that Thor Miner would have its principal place of business at 98 Cutter Mill Road, Suite 322, Great Neck, New York 11021, the headquarters of Singularity.[74] The COO of Thor Miner is Defendant Shan, who simultaneously served as the COO of Singularity.

154.    At that time, Cao and Singularity specifically identified their awareness of the world-wide chip shortage and touted their ability to overcome it. A Singularity 8-K dated October 4, 2021 states, "Recent crypto policy changes combined with ongoing global component shortages have served to remove valuable digital mining production capacity. We intend to fill that vacuum and plan to move aggressively as we build greater value for Sino-Global and all shareholders." Singularity implied that it could overcome the chip shortage because: "Highsharp will be the exclusive designated supplier of high-performance computing chips for the JV."[75]

155.    In the October 4, 2021 press release, Singularity explained that "[t]he JV will

---

[73] Aff. of Jing Shan in Opp. to Pl.'s Order to Show Cause for Prejudgment Attachment, *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 34.

[74] *Id.*

[75] Singularity stated:

>The JV will develop, and be exclusively licensed to manufacture, market and sell the Thor Bitcoin Mining Machine worldwide. The JV will own all intellectual property rights related to the Thor Bitcoin Mining Machine, including without limitation any modifications and improvements thereof. The JV plans to file a utility patent application with the United States Patent and Trademark Office pursuant to United States' patent laws and the Patent Cooperation Treaty ("PCT") for its planned Thor Bitcoin Mining Machine.

Press Release, Sino-Global Shipping America, Ltd., Sino-Global Enters Bitcoin Mining Machine Joint-Venture with Highsharp; Will Make Investment to Drive Product Development and Expansion.

develop, and be exclusively licensed to manufacture, market and sell the Thor Bitcoin Mining Machine worldwide. The JV will own all intellectual property rights related to the Thor Bitcoin Mining Machine, including, without limitation, any modifications and improvements thereof. The JV plans to file a utility patent application with the United States Patent and Trademark Office pursuant to United States' patent laws and the Patent Cooperation Treaty ("PCT") for its planned Thor Bitcoin Mining Machine."[76]

156.    Lead Counsel's investigation yielded no evidence of the purported utility patent. Because Singularity's press release listed both an international (PCT) application and a U.S. application, a search of the World Intellectual Property Organization ("WIPO") patent search engine PATENTSCOPE (https://www.wipo.int/patentscope/en/), which indexes both U.S. and international applications, was conducted. The reasonable search yielded the following null result:



---

[76] *Id.*

2. **Singularity and Thor Miner Misrepresent Their Ability to Execute on the $200 Million SOS Contract**

157.    Barely three months after announcing the formation of the Thor Joint Venture, in a January 14, 2022 Form 8-K, Singularity indicated that it had achieved massive success, having secured a $200,000,000 contract with SOS:

> On January 11, 2022, the Company filed a Current Report on Form 8-K to report that the Company's joint venture, Thor Miner Inc ("Thor"), entered into a Purchase and Sale Agreement with SOS Information Technology New York Inc. (the "Buyer"). Pursuant to the Purchase and Sale Agreement, Thor agreed to sell and the Buyer agreed to purchase certain cryptocurrency mining hardware and other equipment. The aggregate amount of the Purchase and Sale Agreement is $200,000,000, which is expected to be completed under separate purchase orders. Thor and the Buyer agreed that the Buyer shall make payment equal to 50% of the total purchase price within 5 days after the execution of the Purchase and Sale Agreement, and the remaining 50% for each order shall be paid at least seven (7) calendar days before the shipment.
>
> Subsequently, Thor and the Buyer agreed that the Buyer shall make payment equal to 50% of the total purchase price of each order within 5 days, and the remaining 50% for each order shall be paid at least seven (7) calendar days before the shipment. The first order under the Purchase and Sale Agreement Thor received was a $80,000,000 order placed on January 10, 2022. As of the date of this report, Thor has already received the $40,000,000 for the first order.[77]

158.    The SOS Agreement with Thor Miner provided that SOS would purchase up to approximately 44,792 rigs for $200,000,000 (approximately $4,465.08/rig). The purchase was agreed to be made in installments, which would be based upon orders made by SOS and agreed to by Singularity. Signing the SOS Agreement on behalf of Defendant Thor Miner was Defendant Shan, with her title indicated as "COO."[78] Defendant Shan was listed as the Thor Miner contact on a purchase order, with her "Sino-Global" email address.

---

[77] Singularity Future Technology Ltd., Current Report (Form 8-K/A) (Jan. 14, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390022002157/ea154045-8ka1_singul.htm.

[78] Ex. 1 to Compl., *SOS Info. Tech. N.Y., Inc. v. Thor Miner, Inc.*, Index No. 654735/2022, NYSCEF No. 2 (N.Y. Sup. Ct., N.Y. County Dec. 9, 2022), https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=jqqLRgjOs9gMerCNGP85bw==&system=prod.

159.    On January 10, 2022, SOS transmitted its first purchase order pursuant to the SOS Agreement to purchase 17,917 Thor Mining Machines for $80,000,000.[79]

160.    On January 11, 2022, SOS wired Thor $40,000,000 pursuant to the terms of the SOS Agreement, which represented its obligation to pay 50% of the full payment of the first order within five days.[80]

161.    On January 14, 2022, Singularity amended its Form 8-K filing, attaching the SOS Agreement (without its accompanying exhibits) as Exhibit 10.1 and reported:

**Amendment to the Current Report on Form 8-K filed on January 11, 2022**

As previously disclosed, on January 11, 2022, the Company filed a Current Report on Form 8-K to report that the Company's joint venture, Thor Miner Inc ("Thor"), entered into a Purchase and Sale Agreement with SOS Information Technology New York Inc. (the "Buyer"). Pursuant to the Purchase and Sale Agreement, Thor agreed to sell and the Buyer agreed to purchase certain cryptocurrency mining hardware and other equipment. The aggregate amount of the Purchase and Sale Agreement is $200,000,000, which is expected to be completed under separate purchase orders. Thor and the Buyer agreed that the Buyer shall make payment equal to 50% of the total purchase price within 5 days after the execution of the Purchase and Sale Agreement, and the remaining 50% for each order shall be paid at least seven (7) calendar days before the shipment.

Subsequently, Thor and the Buyer agreed that the Buyer shall make payment equal to 50% of the total purchase price of each order within 5 days, and the remaining 50% for each order shall be paid at least seven (7) calendar days before the shipment. The first order under the Purchase and Sale Agreement Thor received was a $80,000,000 order placed on January 10, 2022. As of the date of this report, Thor has already received the $40,000,000 for the first order.[81]

162.    On April 5, 2022, Defendant Shan sent a debit notice to SOS which provided that 4,000 mining machines would be available to ship in one month, and instructed SOS to wire the

---

[79] Aff. of Jing Shan in Opp. to Pl.'s Order to Show Cause for Prejudgment Attachment, *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 34.

[80] *Id*.

[81] Singularity Future Technology Ltd., Current Report (Form 8-K/A) (Jan. 14, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390022002157/ea154045-8ka1_singul.htm.

balance of funds in the amount of $8,930,000 to Thor.[82] On April 11, 2022, SOS wired the $8,930,000 to Thor's bank account.[83] Therefore, by April 11, 2022, SOS had fully paid for 4,000 of the 17,917 rigs in its January 10, 2022 order.

163.    Thor Miner represented that the first 4,000 rigs would be delivered to SOS between May 27, 2022 and June 18, 2022.[84]

164.    On May 5, 2022, Hindenburg Research and Peabody Street Research issued their Reports to the public, indicating, among other things, that Singularity's Thor Joint Venture was a sham.

165.    On May 6, 2022, alarmed by the contents of the Hindenburg Report, counsel for SOS contacted Defendant Shan to request assurances regarding Thor's ability to perform the SOS Agreement and to deliver the promised 4,000 units.[85]

166.    On May 8, 2022, Defendant Shan assured counsel for SOS that Thor believed that it would perform the original agreement between the parties.

167.    On May 20, 2022, SOS requested a further update on the status of delivery. On May 23, 2022, Defendant Shan promised that Thor would deliver 120 of the 4,000 rigs over the coming weekend. No rigs were delivered as promised. Between January 2022 and June 6, 2022, Thor Miner delivered just five machines.

168.    Ultimately, after a series of unfulfilled promises and missed deliveries, Thor

---

[82] Aff. of Jing Shan in Opp. to Pl.'s Order to Show Cause for Prejudgment Attachment, *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 34.

[83] Ex. 6 to Compl., *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 7, https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=9XfrsEQyWNtKFMQLaQhRVQ==&system=prod.

[84] Ex. 7 to Compl., *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 8, https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=rA6avAECKTjUBWkYnujtcg==&system=prod.

[85] Aff. of Jing Shan in Opp. to Pl.'s Order to Show Cause for Prejudgment Attachment, *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 34.

delivered just 120 rigs to SOS on June 6, 2022, shortly before the deadline by which it was to deliver *4,000* units. On or about June 10, 2022, Thor delivered 216 rigs to SOS. On or about July 7, 2022, SOS received 700 rigs. On August 8, 2022, Thor delivered 208 rigs. On August 9, 2023, Jie resigned from his position as CEO and Director of Singularity and the Board after the Board recommended that he be suspended immediately. On or about August 11, 2022, Thor delivered 192 rigs to SOS. On or about October 28, 2022, SOS received its last ever shipment from Thor, consisting of 512 rigs, for a total of 1,948 rigs delivered – less than half of the original order.

169.   Notwithstanding repeated demands for delivery of the remaining rigs to fulfill the 4,000 rigs promised to be delivered within a month of the April 5, 2022 debit notice, and for which SOS had paid in full, no additional rigs were delivered, and the Singularity Defendants failed to cause Singularity or Defendant Thor to refund SOS's previous payments.

170.   On December 9, 2022, SOS sued Thor and Singularity, alleging that, as of that time, Thor had "not completed delivery of the remaining 2,052 rigs to complete the 4,000 rigs it promised to deliver in its April 15, 2022" notice, and Thor had failed to return to "SOS the $40,232,180 excess payment" made to Thor for the rigs that were never delivered.[86] Of the 1,948 rigs that Thor delivered to SOS, 1,522 did not meet the technical specifications set forth in the SOS Agreement.

171.   On December 12, 2022, Defendant Shan, then-COO of Singularity, acknowledged that nearly ten months after SOS placed its first order, between April 2022 and October 28, 2022, Thor Miner had only managed to fulfill just over 10% of SOS's order, having delivered "1,960 bitcoin mining machines on a rolling basis"[87] of the 17,917 in the SOS Agreement and less than half

[86] Summons and Compl., *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 1.

[87] Mem. of Law in Opp'n to Pl.'s Order to Show Cause For a Temporary Restraining Order and Pre-Judgment Order of Attach., *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 33 (N.Y. Sup. Ct., N.Y. County Dec. 12, 2022), https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=SjKiBE1BTj0wBFsrbLvKDQ==&system=prod.

in the initial order of January 11, 2022. In support of its Memorandum of Law in Opposition to Plaintiff's Order to Show Cause for a Temporary Restraining Order, and Pre-Judgment Order of Attachment ("TRO Memorandum") filed in *SOS Info. Tech. N.Y., Inc. v. Thor Miner Inc.*, Index No. 65735/2002 (N.Y. Sup. Ct., N.Y. County), Defendant Shan, then-COO of Singularity and Thor, submitted the sworn Affidavit of Jing Shan in Opposition to Plaintiff's Order to Show Cause for Prejudgment Interest, in which she blamed Thor's inability to deliver the promised bitcoin mining machines prior to June 2022 on the global semiconductor shortage and COVID-19 lockdowns in China:[88]

> 18. I understand that due to a worldwide chip shortage and difficulty in obtaining the necessary parts, there were delays in manufacturing the bitcoin mining machines. For example, see Understanding the Current Global Semiconductor Shortage, Preparing for the Future, S&P Global (Aug. 19, 2022), https://www.spglobal.com/engineering/en/research analysis/understanding-the-current-global-semiconductor-shortage.html.
>
> 19. In addition to the chip shortage, I understand that there also were also delays in manufacturing and shipping the machines due to the strict COVID-19 lockdowns in China, where the machines are manufactured.

172.    Singularity adopted the contents of Shan's Affidavit, which represented that "due to a worldwide chip shortage and difficulty in obtaining the necessary parts amid COVID lockdowns in China, there were delays in manufacturing the bitcoin machines."[89]

173.    The S&P Global research analysis cited by Defendant Shan explains that the factors that contributed to the chip shortage were well known by no later than March 2021 and that most extend back to 2019.

174.    In addition, on September 27, 2021, just days before Singularity announced the Thor

---

[88] Aff. of Jing Shan in Opp. to Pl.'s Order to Show Cause for Prejudgment Attachment, *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 34.

[89] *Id.*

Joint Venture with HighSharp, AGM Group Holdings, Inc. ("AGM"), an integrated technology company focusing on high-performance chip solutions, computing equipment, and fintech software services, announced that it had entered into a joint venture with HighSharp. The HighSharp/AGM joint venture provided that "for the six months period until March 25 [sic] 2022, HighSharp was obligated to provide the latest ASIC chip technology and manufacturing services to AGMH as a top priority."[90] Thus, just weeks before the Thor Joint Venture, HighSharp had obligated itself to provide to AGM, as a "top priority," the chips necessary to build the Thor machines, which rendered Thor unable to manufacture the machines that it had obligated itself to deliver to SOS by early to mid-2022. Specifically, the SOS Agreement provides that Thor must deliver to SOS its purchased Bitcoin miners within 120 days. Singularity's January 10, 2022, press release stated that SOS had already paid Thor $40 million up front with another $40 million to be paid upon completion of the order. Thus, Thor would have been obligated to complete the order in or about early May 2022.

175.    As of December 12, 2022, Thor had delivered only 1,960 of the original 4,000 machines and continued to blame conditions in China for its inability to deliver more, stating, in part, "Thor Miner fully intends to deliver the remaining bitcoin mining machines to SOS promptly once the force majeure conditions in China will allow for it."[91]

176.    That Singularity and Thor failed to deliver as promised – regardless of the well-known impacts of COVID-19 and the global chip shortage – was not unexpected. It is likely that Thor never developed its own bitcoin mining machine because AGM had entered into a deal with HighSharp that required priority over HighSharp's purported deal with Thor Miner, and Singularity

---

[90] Press Release, AGM Group Holdings Inc., AGM Group Holdings, Inc. and HighSharp (Shenzhen Gaorui) Electronic Technology Co., Ltd enter into a Strategic Partnership (Sept. 27, 2021), https://www.sec.gov/Archives/edgar/data/1705402/000121390021050068/ea147955ex99-1_agmgroup.htm.

[91] Aff. of Jing Shan in Opp. to Pl.'s Order to Show Cause for Prejudgment Attachment, *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 34.

had only recently entered the cryptocurrency space and possessed little manufacturing know-how or the capacity to produce tens or hundreds of thousands of crypto mining machines.

177.    For example, AGM's website displayed a Koi crypto mining machine, as follows:



178.    Thor Miner's website, Thorminer.com, cannot be accessed without an archive. However, the Peabody Report contains images that depict the stats and images of the Thor machine and states "miner stats and photos are shockingly similar between Singularity's joint venture (Thor) & AGM." By using arhive.org/web, also known as the "Wayback Machine," images taken from Thorminer.com show that it was advertising some Thor machines that bore the Koi logo for AGM's machines. *See* https://web.archive.org/web/20220518032433/https://thorminer.com/.[92]

---

[92] Thorminer.com appears to date back to at least August 2018. *See* https://web.archive.org/web/20180816010551/http://thorminer.com/en/about. A capture of Thorminer.com from August 16, 2018 states that "Thor is a technical corporation focusing on design and development of high-speed and low-energy chips" and includes images of an entirely different bitcoin mining machine that does not appear on captures of Thorminer.com in 2021 and 2022.



179.   Various sources, including the Hindenburg Report and the Peabody Report, have asserted that Singularity's joint venture, Thor, was not manufacturing proprietary crypto mining machines but rather reselling the small number of AGM Koi machines that it was able to import. Singularity's Form 10-Q for Q1 2023, prepared under new management, further supports this conclusion, as it acknowledges that "For the nine months ended March 31, 2023, the Company engaged in resale of cryptocurrency mining equipment. For the three months ended March 31, 2023,

the Company did not sell crypto-mining machines."[93]

180.    On December 9, 2022, SOS sued Singularity, Thor Miner, Lei Cao, Yang Jie, John F. Levy, Tieliang Liu, Tuo Pan, Shi Qiu, Jing Shan, and Heng Wang in an action styled *SOS Info. Tech. N.Y., Inc. v. Thor Miner, Inc.*, Index No. 654735/2022 (N.Y. Sup. Ct., N.Y. County), alleging that Thor Miner had failed to deliver the promised proprietary crypto mining machines.

181.    Within two weeks of the filing of SOS's lawsuit, on or about December 23, 2022, the SOS litigation was settled. On December 30, 2022, SOS filed a Form 6-K in which it reported a material transaction with Singularity and summarizing the settlement as follows:

> SOS Information Technology New York, Inc. ("**SOSNY**"), a company incorporated under the laws of state of New York and a wholly owned subsidiary of SOS Ltd., filed a lawsuit on December 9, 2022, against Thor Miner, Inc. ("**Thor Miner**"), Singularity Future Technology Ltd. ("**Singularity**," and, together with Thor Miner, referred to as the "**Corporate Defendants**"), Lei Cao, Yang Jie, John F. Levy, Tieliang Liu, Tuo Pan, Shi Qiu, Jing Shan, and Heng Wang (jointly referred to as the "**Individual Defendants**") (collectively, the Individual Defendants and the Corporate Defendants are the "**Defendants**"). A. SOSNY and Thor Miner entered into a January 10,2022 Purchase and Sale Agreement (the "**PSA**") for the purchase of $200,000,000 in crypto mining rigs, which SOS claims was breached by Thor Miner and Singularity
>
> SOSNY and Defendants entered into a certain settlement agreement and general mutual release Effective Date December 28, 2022("**Settlement Agreement**"). Pursuant to the Settlement Agreement, Thor Miner agreed to pay a sum of thirteen million in U.S. dollars ($13,000,000) (the "**Settlement Payment**") to SOSNY on or before December 23, 2022, and SOSNY agreed that subsequent to its receipt of the Settlement Payment, SOSNY shall cause the lawsuit to be dismissed with prejudice as to the settling defendants and without prejudice as to all others.
>
> Singularity and Thor Miner further covenanted and agreed that if they receive additional funds from HighSharp (Shenzhen Gaorui) Electronic Technology Co., Ltd. ("**HighSharp**") related to the PSA, they will promptly transfer such funds to SOSNY in an amount not to exceed forty million five hundred sixty thousand five hundred sixty-nine dollars ($40,560,569.00) (which is the total amount paid by SOSNY pursuant to the PSA less the price of the machines actually received by SOSNY pursuant to the PSA). The Settlement Payment and any payments

---

[93] Singularity Future Technology Ltd., Quarterly Report (Form 10-Q) (May 15, 2023), https://www.sec.gov/Archives/edgar/data/1422892/000121390023039819/f10q0323_singularity.htm.

subsequently received by SOSNY from HighSharp shall be deducted from the total amount of forty million five hundred sixty thousand five hundred sixty-nine dollars ($40,560,569.00) previously paid by, and now due and owing to SOSNY. In further consideration of this Settlement Agreement, Thor Miner agreed to execute and provide to SOSNY, within seven (7) business days after the Effective Date (as defined in the Settlement Agreement), an assignment of all claims it may have against HighSharp. (Emphasis in original.)

182.    Under its current management, with all of the Individual Defendants no longer employed by Singularity, in the Company's Form 10-Q for the Q1 2023, it again acknowledged that it was aware of the impact of COVID-19 on its ability to operate long before it entered into the Thor Joint Venture, stating:[94]

The outbreak of the novel coronavirus (COVID-19) starting in late January 2020 in the PRC spread rapidly to many parts of the world. In March 2020, the World Health Organization declared the COVID-19 as a pandemic and has resulted in quarantines, travel restrictions, and the temporary closure of stores and business facilities in China and the U.S. Given the rapidly expanding nature of the COVID-19 pandemic, and because substantially all of the Company's business operations and its workforce are concentrated in China and the U.S., the Company's business, results of operations, and financial condition have been adversely affected.

183.    Other aspects of Singularity's explanation for its failure to fulfill the SOS order have evolved, notwithstanding Defendant Shan's Affidavit. For example, under new management, in its Form 10-Q for Q1 2023, the Company stated: "Due to production issues from HighSharp, Thor Miner was not able to timely deliver the full quantity of cryptocurrency mining machines to SOSNY under the PSA and was sued by SOSNY for breach of contract on December 9, 2022."[95]

184.    Despite Singularity's representation that it is no longer in the cryptocurrency business, a version of the Thor Miner website – using the word "miners" versus "miner" –

---

[94] *Id.*

[95] *Id.*

https://Thorminers.com/,[96] remains active and claims that "Endorsed by its headquarter company, Singularity Future Technology Ltd, THOR has become the world leading ASIC mining brand." The current site, thorminers.com, appears to differ from two earlier iterations of thorminer.com captures which remain on web.archive.org and date back to 2018, three years before Singularity's Thor Joint Venture existed. The Thorminers.com site lists its address as 98 Cutter Mill Road Suite 322, Great Neck, New York 11021, the current corporate address of Singularity.[97]

> **3.    Singularity, Cao, Jie, Pan, Liu, Wang, Shan, Levy and Huang Misrepresented or Failed to Correct That Defendant Xiaohuan Huang's Reported Employment History with SOS Information Technology New York, Inc. Was False or, In The Alternative, Defendants Singularity, Thor Miner, Cao, Jie, Levy, Liu, Pan, Shan and Wang Failed to Disclose That the SOS Transaction Was a Related Party Transaction**

185.    If the SOS deal was not a related party transaction, Singularity affirmatively misrepresented Xiaohuan Huang's bona fides as a Vice President of SOS because she was never employed by the company and Xiaohuan, and each of the other Individual Defendants named in the SOS litigation, Cao, Jie, Levy, Liu, Pan, and Wang knew, but failed to correct the misstatement.

186.    On October 23, 2020, Singularity filed a Form 8-K with the SEC, signed by Defendant Cao, which announced the appointment of Defendant Jie's wife, Defendant Xiaohuan Huang, and stated, in part:

> On October 22, 2020, the Nominating/Corporate Governance Committee of the Board nominated and the Board appointed, Xiaohuan Huang as a Class I director, Chairperson of the Nominating/Corporate Governance Committee, a member of the

---

[96] The website "thorminers.com" is currently active and refers to a relationship with Singularity. The Wayback machine or webarchive.org provides historical captures of https://web.archive.org/web/20180816010551/ http://thorminer.com/en/about, which states that "Thor is a technical corporation focusing on design and development of high-speed and low-energy chips" and includes images of entirely different bitcoin mining machine that does not appear on captures of thorminer.com in 2021 and 2022; and a third version of thorminer.com at https://web.archive.org/web/20220406060902/https://www.thorminer.com/., which states "8 years blockchain chip&mining business Who we are Thor Miner Inc. ('THOR') is a semiconductor company founded in New York."

[97] Singularity Future Technology Ltd., Current Report (Form 8-K) (July 31, 2023), https://www.sec.gov/Archives/ edgar/data/1422892/000121390023061920/ea182632-8k_singularity.htm.

Audit Committee and a member of the Compensation Committee, to hold office, effective October 23, 2020 until the Company's annual meeting of the shareholders in 2021, and a successor has been duly elected and qualified or until her earlier resignation, removal from office, death or incapacity.

Ms. Xiaohuan Huang, 37 years old, ***is presently Vice President of SOS Information Technology New York, Inc.*** Prior to that, Ms. Huang had been Vice President for China Commercial Credit, Inc. from November 2016 to July 2020, President of Shenzhen Yi Le Gou Mobile Internet Co., Ltd since February 2014 and a Consultant till present, Vice President of Shenzhen Hang Lu Technology Co., Ltd from March 2009 to February 2014 and Channel Manager from August 2007 to March 2009. Ms. Huang holds a Bachelor's degree in Business Management from Hunan Normal University.

187.    Alternatively, if Xiaohuan was not a Vice President of SOS, Defendants Singularity, Xiaohuan, Jie, and Cao misrepresented Defendant Xiaohuan's employment history.

188.    On May 6, 2022, during course of the *SOS Litigation*, counsel for SOS sent a letter to Defendant Shan in which SOS contended that Defendant Huang had never been employee of SOS, stating, in part:[98]

Additionally, it has come to our attention through the Hindenburg Research report that Xiaohuan Huang, reported to be the wife of Singularity CEO Yang Jie, has represented herself to be an employee or officer of SOS. Ms. Huang has never, in fact, been an employee or officer of SOS. You must please instruct Ms. Huang to withdraw any and all representations that she is or even was an employee or officer of SOS. SOS further reserves all rights with respect to these misrepresentations.

189.    Defendants in this action, Singularity, Thor Miner, Cao, Jie, Levy, Liu, Pan, and Wang were also defendants in the *SOS Litigation*. Accordingly, SOS's May 6, 2022 letter to Defendant Shan, at a minimum, put each of these Defendants on notice that Defendant Xiaohuan Huang was never an employee of SOS. In the Shan Affidavit, Defendant Shan stated that she responded to SOS's May 5, 2022 letter, but apparently failed to address or correct the

---

[98] Ex. 8 to Compl., *SOS Info. Tech. N.Y., Inc. v. Thor Miner, Inc.*, Index No. 654735/2022, NYSCEF No. 9 (N.Y. Sup. Ct., N.Y. County Dec. 9, 2022), https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=GRI_PLUS_Q0LMRKoirkt8BJkXHw==&system=prod.

misrepresentations regarding Xiaohuan Huang's employment history.[99]

**H.     Singularity Knowingly Entered into a Sham Related Party Transaction With Rich Trading Whose Bank Accounts Were Controlled By Singularity's Management**

190.    Singularity engaged in but failed to disclose material related party transactions with Rich Trading that were designed to fraudulently transfer corporate funds to insiders or related parties.

191.    In its Form 10-Q for the period ended December 31, 2021, filed on February 14, 2022, signed by Defendants Jie and Pan, Singularity disclosed that it agreed to invest $4.5 million into an entity called Rich Trading, which would trade computer equipment and direct 90% of the profits back to Singularity. On December 31, 2021, shortly after Yang Jie took over as CEO, Singularity simultaneously entered into the agreement and advanced $3,299,815 million to Rich Trading.[100] These transactions were indicative of the Company's technological transformation: in fact, they were simply yet another platform for fraud and self-enrichment.

192.    Singularity's Form 10-Q disclosed only the following regarding the Rich Trading transaction:[101]

> As of December 31, 2021, the Company entered into a project cooperation agreement with Rich Trading Co. Ltd USA ("Rich Trading") for trading of computer equipment. According to the agreement, the Company is to invest $4.5 million in the trading business operated by Rich Trading and the Company will be entitled to 90% of profit generated by the trading business. As of December 31, 2021, the Company has advanced $3,299,815 for this project.

193.    Singularity's February 14, 2022 Form 10-Q failed to disclose a material related party transaction with Rich Trading, whose CEO was Nie and whose wife Pan was Singularity's CFO, by

---

[99] Aff. of Jing Shan in Opp. to Pl.'s Order to Show Cause for Prejudgment Attachment, *SOS Info. Tech. N.Y., Inc.*, Index No. 654735/2022, NYSCEF No. 34.

[100] Singularity Future Technology Ltd., Quarterly Report (Form 10-Q) (Feb. 14, 2022), https://www.sec.gov/ix?doc=/ Archives/edgar/data/1422892/000121390022007553/f10q1221_singularity.htm.

[101] *Id.*

stating the following, in pertinent part:[102]

**Note 5. OTHER RECEIVABLES, NET**

The Company's other receivables are as follows:

As of December 31, 2021, the Company entered into a project cooperation agreement with Rich Trading Co. Ltd USA ("Rich Trading") for trading of computer equipment. According to the agreement, the Company is to invest $4.5 million in the trading business operated by Rich Trading and the Company will be entitled to 90% of profit generated by the trading business. As of December 31, 2021, the Company has advanced $3,299,815 for this project.

194.    As discussed below, the statements in paragraphs 191-193 were materially false and misleading insofar as Singularity omitted that: (i) the Rich Trading transaction was a related party transaction as the Company admitted in its 10-Q for Q1 2023; (ii) Rich Trading's bank accounts were controlled by members of Singularity's management; and (iii) Rich Trading was not an entity that could or did engage in the trading of computer equipment.

195.    According to New York corporate registry records, Rich Trading's principal office is 1044 Northern Boulevard, Suite 305, Roslyn, New York:[103]

---

[102] *Id.*

[103] *See also* Sino-Global Shipping New York Inc., *OpenCorporates* (Oct. 1, 2023), https://opencorporates.com /companies/us_ny/4398492.



196.    The address listed by Rich Trading is the address that Singularity listed as its headquarters. Singularity changed its address from 1044 Northern Boulevard, Suite 305, Roslyn, New York to 98 Cutter Mill Road, Suite 322, Great Neck, New York 11021 between October 4, 2021 and October 22, 2021.[104]

197.    Notably, Singularity later revealed that the Rich Trading transaction was entered into on November 16, 2021, just weeks after Singularity stopped using the Roslyn, New York address.

198.    Rich Trading's CEO is Lei Nie, who is the husband of Tuo Pan, Singularity's CFO at the time that Singularity announced the transaction.[105] Pan, along with Jie, signed Singularity's Form 10-Q for the period ended December 31, 2021, filed on February 14, 2022, and, therefore, knew that the transaction with Rich Trading was an undisclosed related party transaction.[106]

---

[104] *Compare* Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Oct. 4, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000101376221000102/ea148358-8k_sinoglobal.htm, *with* Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Oct. 22, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021054093/ea149267-8k_sinoglobal.htm.

[105] Singularity Future Technology, Ltd., Proxy Statement (Schedule 14A Information) (Apr. 22, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390022010809/def14a0322_singularity.htm .

[106] Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Nov. 1, 2021), https://www.sec.gov/ix?doc=/Archives/edgar/data/1422892/000121390021055789/ea149737-8k_sinoglobal.htm.

I.      **Singularity Fails to Establish and Maintain Effective Internal Controls**

199.    Throughout the Class Period, Singularity represented that it maintained an effective internal control regime.

200.    For example, on February 12, 2021, the Company filed its Form 10-Q for the quarter ended December 31, 2020 with the SEC. The Form 10-Q was signed and separately certified by both Cao and Pan pursuant to the Sarbanes-Oxley Act of 2002 attesting to the accuracy and truthfulness of the information contained therein.

201.    The February 12, 2021 Form 10-Q downplayed the serious issues with the Company's internal controls, stating in pertinent part:

**Item 4. Controls and Procedures**

Evaluation of Disclosure Controls and Procedures

We maintain controls and procedures designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

As of December 31, 2020, we carried out an evaluation, under the supervision of and with the participation of its management, including our Chief Executive Officer and Acting Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing evaluation, Chief Executive Officer and Acting Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) were not effective and adequately designed to ensure that the information required to be disclosed by us in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the applicable rules and forms, and that such information was accumulated and communicated to the management, including Chief Executive Officer and Acting Chief Financial Officer, in a manner that

71

allowed for timely decisions regarding required disclosure. The assessment stemmed from the following material weaknesses –

- Lack of segregation of duties for accounting personnel who prepared and reviewed the journal entries; and

- Lack of a full time U.S. GAAP personnel in the accounting department to monitor the recording of the transactions.

Changes in Internal Control over Financial Reporting.

There were no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) during the three months ended December 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

202.    On May 13, 2021, the Company filed its Form 10-Q for the quarter ended March 31, 2021 with the SEC. The Form 10-Q was signed and separately certified by both Cao and Pan pursuant to the Sarbanes-Oxley Act of 2002, attesting to the accuracy and truthfulness of the information contained therein.

203.    The May 13, 2021 Form 10-Q downplayed the serious issues with the Company's internal controls, stating in pertinent part:

**Item 4. Controls and Procedures**

Evaluation of Disclosure Controls and Procedures

We maintain controls and procedures designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

As of March 31, 2021, we carried out an evaluation, under the supervision of and with the participation of its management, including our Chief Executive Officer and Acting Chief Financial Officer, of the effectiveness of the design and

operation of our disclosure controls and procedures. Based on the foregoing evaluation, Chief Executive Officer and Acting Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) were not effective and adequately designed to ensure that the information required to be disclosed by us in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the applicable rules and forms, and that such information was accumulated and communicated to the management, including Chief Executive Officer and Acting Chief Financial Officer, in a manner that allowed for timely decisions regarding required disclosure. The assessment stemmed from the following material weaknesses –

•      Lack of segregation of duties for accounting personnel who prepared and reviewed the journal entries; and

•      Lack of a full time U.S. GAAP personnel in the accounting department to monitor the recording of the transactions.

Changes in Internal Control over Financial Reporting.

There were no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) during the three months ended March 31, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

204.    On September 29, 2021, the Company filed with the SEC its Form 10-K for the fiscal year ended June 30, 2021 (the "2021 Annual Report") which was signed and separately certified by both Cao and Pan pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein. The 2021 Annual Report was also signed by Cao, Pan, Shan, Wang, Xiaohuan, Liu, and Zhikang attesting to the accuracy and truthfulness of the information contained therein.

205.    The 2021 Annual Report downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part:

## Item 9A. Controls and Procedures

### Management's Annual Report on Internal Control over Financial Reporting

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Securities and Exchange Act of 1934, as amended. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that the Company's receipts and expenditures are being made only in accordance with the authorization of its management and directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

As of June 30, 2021, the Company carried out an evaluation, under the supervision of and with the participation of its management, including the Company's Chief Executive Officer and Acting Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based on the foregoing evaluation, Chief Executive Officer and Acting Chief Financial Officer concluded that the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act were not effective to ensure that the information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the applicable rules and forms due to ineffective internal controls over financial reporting that stemmed from the following material weaknesses for the year ended and as of June 30, 2021:

- Lack of segregation of duties for accounting personnel who prepared and reviewed the journal entries in some of the subsidiaries within the consolidation, lack of supervision, coordination and communication of financial information between different entities within the Group;

- Lack of a full time U.S. GAAP personnel in the accounting department to monitor the recording of the transactions;

- Lack of resources with technical competency to address, review and record non- routine or complex transactions under U.S. GAAP; and

- Lack of management control reviews of the budget against actual with analysis of the variance with a precision that can be explained through the analysis of the accounts.

A material weakness is a deficiency, or a combination of deficiencies, within the meaning of PCAOB Auditing Standard AS 2201, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

In order to remediate the material weaknesses stated above, we intend to explore implementing additional policies and procedures, which may include:

- Hiring additional accounting staff to report the internal financial timely;

- Reporting other material and non-routine transactions to the Board and obtain proper approval;

- Recruiting additional qualified professionals with appropriate levels of U.S. GAAP knowledge and experience to assist in resolving accounting issues in non-routine or complex transactions;

- Improving internal audit function, internal control policies and monitoring controls including but not limit to the review and supervision of common stock issuance procedures;

- Developing and conducting U.S. GAAP knowledge, SEC reporting and internal control training to senior executives, management personnel, accounting departments and the IT staff, so that management and key personnel understand the requirements and elements of internal control over financial reporting mandated by the U.S. securities laws; and

- Setting up budgets and developing expectations based on understanding of the business operations, compare the actual results with the expectations periodically and document the reasons of the fluctuations with further analysis. This should be done by CFO and reviewed by CEO, communicated with the Board.

**Changes in Internal Control over Financial Reporting**

There has been no change in our internal control over financial reporting that occurred during the year ended June 30, 2021 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

206.    On November 12, 2021, the Company filed with the SEC its periodic report on Form 10-Q for the quarter ended September 30, 2021. The Form 10-Q was signed and separately certified by both Cao and Pan pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

207.    The November 12, 2021 10-Q downplayed the serious issues with the Company's internal control by stating the following, in pertinent part:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain controls and procedures designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

As of September 30, 2021, we carried out an evaluation, under the supervision of and with the participation of its management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing evaluation, Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) were not effective and adequately designed to ensure that the information required to be disclosed by us in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the applicable rules and forms, and that such information was accumulated and communicated to the management, including Chief Executive Officer and Chief Financial Officer, in a manner that allowed for timely decisions

regarding required disclosure. The assessment stemmed from the following material weaknesses

- Lack of segregation of duties for accounting personnel who prepared and reviewed the journal entries; and

- Lack of a full time U.S. GAAP personnel in the accounting department to monitor the recording of the transactions.

**Changes in Internal Control over Financial Reporting.**

There were no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) during the three months ended September 30, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

208.    On February 14, 2022, Singularity filed its Form 10-Q results for the quarter ended December 31, 2021. The Form 10-Q was signed and separately certified by Defendants Jie and Pan pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.[107]

209.    The February 14, 2022 Form 10-Q downplayed the serious issues with the Company's internal controls, stating in pertinent part:

**Item 4. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain controls and procedures designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

---

[107] Singularity Future Technology Ltd., Quarterly Report (Form 10-Q) (Dec. 31, 2021), https://www.sec.gov /Archives/edgar/data/1422892/000121390022007553/f10q1221_singularity.htm.

As of December 31, 2021, we carried out an evaluation, under the supervision of and with the participation of its management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures. Based on the foregoing evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) were not effective and adequately designed to ensure that the information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the applicable rules and forms, and that such information was accumulated and communicated to the management, including Chief Executive Officer and Chief Financial Officer, in a manner that allowed for timely decisions regarding required disclosure. The assessment stemmed from the following material weaknesses –

- Lack of segregation of duties for accounting personnel who prepared and reviewed the journal entries; and

- Lack of a full time U.S. GAAP personnel in the accounting department to monitor the recording of the transactions.

We have taken certain actions to remediate the material weakness related to our lack of U.S. GAAP experience. We have engaged an outside CPA firm with U.S. GAAP knowledge and SEC reporting experience to supplement our current internal accounting personnel and assist us in the preparation of our financial statements to ensure that our financial statements are prepared in accordance with U.S. GAAP.

**Changes in Internal Control over Financial Reporting.**

There were no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) during the three months ended December 31, 2021 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

210.    The statements contained in paragraphs 201-209 were materially false and/or misleading because they misrepresented and failed to disclose that the Company lacked adequate internal controls. As discussed herein (*see* Section V.5, VI, *infra*), Singularity subsequently admitted that the Company's disclosure controls and procedures were not effective as of June 30, 2021, September 30, 2021, December 31, 2021, June 30, 2022, and June 30, 2023, and as a result had a

heightened risk of scrutiny and ultimately was subject to investigation and action by the United States Attorney's Office for the Southern District of New York and the SEC, as well as a potential delisting by NASDAQ.

211.   For reasons set forth above, the statements contained in Section IV, were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Singularity's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, the Singularity Defendants made false and/or misleading statements and/or failed to disclose, among other things:

- Jie's true educational background, alleged criminal background and misconduct associated with CCC. *See* Section V.A.1, *supra.*

- Director John Levy's prior tenure from January 2013 through December 2016 as a director of CCC, which failed amidst detailed allegations that Defendant Jie, when he was an executive and shareholder in CCC, misappropriated assets. *See* Section V.A.2, *supra.*

- Singularity's transition to a cryptocurrency company and associated ventures were fabrications or ventures that the Defendants knew could not be accomplished. *See* Section V.A.3-7, *supra.*

- Singularity engaged in material related party transactions with SOS and Rich Trading. *See* Sections V.A.4, 6 and V.D, *supra.*

- Singularity lacked adequate internal controls and as a result had a heightened risk of scrutiny and ultimately was subject to a United States Attorney's Office for the Southern District of New York and SEC investigation and action as well as a potential delisting by NASDAQ. *See* Section V.B, *supra.*

- Defendant Thor Miner omitted that it and Singularity lacked the ability, resources, or intention to develop, manufacture, and deliver proprietary crypto mining machines in any meaningful quantity. *See* Section V.A.3, *supra.* And, Defendant Mainland omitted that it was a sham and that it did not possess or could not deliver the promised energy necessary to power Singularity's purported cryptocurrency mining venture. *See* Section V.A.5, *supra.*

## V.   THE TRUTH EMERGES

212.   Between May 5, 2022 and February 24, 2023, Singularity investors learned the

shocking truth about Singularity's brazen, pervasive, and widespread fraud.

**A.    Hindenburg Research and Peabody Street Research Issue Bombshell Reports That Expose Substantial Fraud by Defendants**

213.    As referenced above, on May 5, 2022, Hindenburg Research issued the Hindenburg Report about Singularity entitled "Singularity Future Technology: This Nasdaq-Listed Company's CEO Is A Fugitive, On The Run For Allegedly Operating A Massive Ponzi Scheme."[108]

214.    On that same day, Peabody Street Research issued the Peabody Report regarding Singularity entitled "How Did A Chinese Fugitive Wind Up As The CEO Of A Publicly Traded Company?"[109]

215.    The Hindenburg Report and the Peabody Report similarly revealed myriad aspects of the fraud by the Individual Defendants, as follows.

**1.    Jie's Extensive Criminal Past, Financial Improprieties, and Past Deflections Were Revealed and Debunked**

**a.    Jie's Criminal Past**

216.    The Hindenburg Report extensively detailed that: (a) Jie is a fugitive on the run from Chinese authorities for operating an alleged $300 million Ponzi scheme that lured in over 20,000 victims; (b) Chinese media and its own checks with local authorities confirm that Yang Jie still has an outstanding arrest warrant in China; (c) Jie allegedly forged Chinese state documents in an attempt to demonstrate his innocence, and as a result, and according to a police document cited by local media, Chinese police have added forgery to his list of suspected crimes; and (d) Jie is the subject of an active "Red Notice" (the U.S. equivalent of an arrest warrant) in China for his role in the Ponzi

---

[108] *Singularity Future Technology: This Nasdaq-Listed Company's CEO Is A Fugitive, On The Run For Allegedly Operating A Massive Ponzi Scheme*, HINDENBURG RESEARCH (May 5, 2022), https://hindenburgresearch.com/singularity/#_ftnref10.

[109] *How Did A Chinese Fugitive Wind Up As The CEO Of A Publicly Traded Company?*, PEABODY STREET RESEARCH (May 5, 2022), https://peabodystreet.substack.com/p/how-did-a-chinese-fugitive-wind-up?utm_source=%2Fsearch%2Fsingularity&utm_medium=reader2.

scheme. The Hindenburg Report also provided evidence that multiple Chinese media articles make it clear that Yang Jie was both behind the Ponzi scheme and the eventually failed Nasdaq-listed CCC.

217.    The Peabody Report provided sourced allegations from a lawsuit in the New York Supreme Court that alleged that "Mr. Jie was under criminal investigation in China in connection with the theft of approximately 2.9 billion RMB, the equivalent of roughly 300 million U.S. dollars, from more than 20,000 investors through fraudulent securities transactions."

### b.    Jie's Financial Improprieties

218.    The Hindenburg Report and the Peabody Report detailed Jie's involvement in significant financial improprieties while he served as a General Manager of CCC at the same time that Singularity Director John Levy served as a Director of CCC – suggesting that Levy was fully aware of Jie's sordid past. Relatedly, the Peabody Report revealed that "Levy has previously served on boards where catastrophic results such as bankruptcy and severe losses of shareholder capital have happened."

219.    The Hindenburg Report and the Peabody Report revealed that CCC was sued as a result of a failed reverse merger in which Jie was revealed to have: (a) proffered a forged "no prosecution" letter in an attempt to conceal his role in a prior $300 million Ponzi scheme for which he is a wanted criminal in China; (b) retained an entity to render a fairness opinion on the reverse merger that was entirely owned by Jie; and (c) been named in a lawsuit over the failed reverse merger alleged, and it was later proved that he stole $3.5 million from an escrow account, initially escaping liability through a false affidavit.

### 2.    Director Levy Is Exposed for His Knowledge of Jie's Financial Improprieties and Mismanagement at CCC

220.    The Hindenburg Report revealed that Defendant Levy's Singularity biography omitted his long tenure as a Director of CCC. As alleged, Jie would have been known to Levy for

his involvement in significant financial improprieties while he served as a General Manager of CCC at the same time Singularity Director John Levy served as a Director of CCC, suggesting that Levy was fully aware of Jie's sordid past and financial improprieties at CCC.

221.    On February 23, 2023, Levy tendered his resignation from his positions as a member of the Board and the Audit Committee, the Compensation Committee, and the Nominating/Corporate Governance Committee of the Board, effective immediately.

### 3.    Singularity's Thor Miner Proprietary Crypto Mining Machine is Revealed as a Sham

222.    The Hindenburg Report and the Peabody Report concluded that Singularity's purported proprietary bitcoin mining machine was likely not real because "Singularity [Thor Miner] is selling a Bitcoin miner that is almost identical to a competitor's" and provided detailed proof that the Thor Miner machine pictured on Thor Miner's website was just a picture of a competing product. Peabody also revealed that a competitor to Thor Miner, AGM, had entered into a contract with Thor's joint venture partner that took precedence over and adversely impacted performance of obligations under the Thor Miner deal.

### 4.    Singularity's Transaction with SOS Is Revealed as a Sham and an Undisclosed Related Party Transaction

223.    According to the Hindenburg Report, Jie's connection to SOS may be longstanding and more complex than just his marriage to an (possible) SOS Vice President. For example, the Hindenburg Report states:

> [W]e found that an entity called "Jie's Enterprise and Development" uses the same exact address as SOS New York, per New York corporate records.



(SOS Information Technology New York Inc. corporate records. Source: New York Corporate Registry)



(Jie's Enterprise and Development Ltd corporate records. Source: New York Corporate Registry)

224.   According to the Hindenburg Report, Nassau County real estate records[110] show that

---

[110] Hindenburg Research, Yang Jie Real Estate Records, SlideShare (Apr. 22, 2022), https://www.slideshare.net/HindenburgResearch/yang-jie-real-estate-records.

Yang Jie's personal residence is owned by "Jie's Enterprise and Development."[111]

225.   The Peabody Report further detailed that Jie's wife, Xiaohuan Huang, a former Board member of Singularity, was also a Vice President of SOS which, if true, makes the transaction a related party transaction.

### 5.   Golden Mainland is a Sham

226.   The Hindenburg Report and the Peabody Report provided extensive evidence that Singularity's $250 million deal with Golden Mainland was also a sham. First, it determined that the company had been formed only months before the transaction was announced, had non-existent officers, and that its office address was a State Farm Insurance office. Further, Peabody developed evidence indicating that Golden Mainland appeared to be a sham company established months before the transaction was disclosed and that the company cannot own and operate the massive power resources that it claimed to have at its disposal.

### 6.   Singularity's Rich Trading Transaction Is Revealed as a Likely Sham and an Undisclosed Related Party Transaction

227.   The Hindenburg Report revealed evidence suggesting that Singularity may be siphoning cash into an entity controlled by the husband of its CFO, and that Rich Trading used Singularity's former corporate address. Hindenburg Research found no evidence that Rich Trading engaged in the trading of computers or virtually any trading at all. Rather, the only thing that Rich Trading appears to have imported are cotton towels. Hindenburg published the following results of its search:

---

[111] Statement of Changes in Beneficial Ownership – Jie Yang (Form 4) (Oct. 22, 2018), https://www.sec.gov/Archives /edgar/data/1556266/000121390018014247/xslF345X03/ownership.xml.

| PRODUCT DESCRIPTION | CONSIGNEE | SHIPPER | ARRIVAL DATE | GROSS WEIGHT (LB) | FOREIGN PORT |
|---|---|---|---|---|---|
| 100% COTTON TOWELS | RICH TRADING CO. LTD U.S.A. | SUNVIM GROUP CO., LTD. | 01/06/2018 | 7361 | Ching Tao |
| 100% COTTON TOWELS | RICH TRADING CO. LTD USA | -NOT AVAILABLE- | 08/16/2017 | 5669 | Ningpo |

ImportGenius.com
info@importgenius.com
Toll Free: 855-573-9976
International: +1 480-745-3396

### 7.    The Price of Singularity Shares Decline Sharply in Response to Hindenburg Research and Peabody Reports; Special Committee Formed

228.    Following the publication of the Hindenburg Report, the price of Singularity shares fell 28.89%, from a closing price of $6.75 on May 4, 2022, to close at $4.80 per share on May 5, 2022, on unusually heavy trading volume, damaging investors. The price of Singularity shares fell further on May 6, 2022, approximately 11.67%, to close at $4.24 per share.

229.    In response to the Hindenburg Report, on May 6, 2022, the Board formed a Special Committee to investigate claims raised in the Hindenburg Report. The Special Committee retained Blank Rome LLP as counsel to investigate the allegations in the Hindenburg Report and any related matters.[112]

### B.    Singularity Admits to Material Weaknesses in Internal Controls

230.    On May 25, 2022, Singularity filed with the SEC its Form 8-K signed by Defendant Pan.[113]

231.    The May 25, 2022 Form 8-K downplayed the serious issues with the Company's internal controls by stating the following, in pertinent part:

---

[112] Aff. of Jing Shan in Opp. to Pls.' Order to Show Cause for Prejudgment Attachment, *SOS Info. Tech. N.Y., Inc. v. Thor Miner Inc.*, Index No. 654735/2022, NYSCEF No. 34.

[113] Singularity Future Technology Ltd., Current Report (Form 8-K) (May 24, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390022029555/ea160633-8k_singular.htm.

**Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

On May 24, 2022, Singularity Future Technology Ltd. (the "Company") received a delinquency notification letter (the "Letter") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that due to the delay in filing the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2022 (the "Form 10-Q"), the Company is not in compliance with Nasdaq Listing Rule 5250(c)(1), which requires listed companies to timely file all periodic financial reports with the Securities and Exchange Commission (the "SEC").

The Letter states that, the Company has 60 calendar days to submit a plan addressing how it intends to regain compliance with Nasdaq's listing rules and, if Nasdaq accepts the Company's plan, it may grant an extension of up to 180 calendar days from the original filing due date of the Form 10-Q, or until November 21, 2022, to regain compliance.

The Company's management is working diligently to complete the Form 10-Q and intends to file the Form 10-Q as soon as practicable to regain compliance with the Nasdaq Listing Rule.

232.    On October 7, 2022, Singularity filed with the SEC its Form 8-K signed by Defendant Shan.

233.    The October 7, 2022 Form 8-K provided a partial disclosure of issues with the Company's internal controls by reporting a potential delisting by NASDAQ, stating the following, in pertinent part:

**Item 3.01. Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

On October 3, 2022, Singularity Future Technology Ltd. (the "Company") received a notice (the "Notice") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq"), advising that the Company's securities would be subject to delisting unless the Company timely requests a hearing before a Nasdaq Hearings Panel (the "Panel"). Accordingly, the Company intends to timely request a hearing before the Panel. The hearing request will stay any delisting or suspension action through October 25, 2022. Pursuant to the Nasdaq Listing Rules, in connection with the hearing request, the Company will request that the automatic stay be extended through the conclusion of the hearings process and the expiration of any additional extension period granted by the Panel following the hearing.

As previously disclosed in the Company's Form 8-K filed with the SEC on May 25, 2022, on May 24, 2022, the Company received a delinquency notice from Nasdaq indicating that the Company was not in compliance with Nasdaq Listing Rule 5250(c)(1) due to the delay in filing its Quarterly Report on Form 10-Q for the quarter ended March 31, 2022, and was provided 60 days to submit a plan to regain compliance. On July 25, 2022, and September 14, 2022, the Company submitted its plan to regain compliance and supplementary information related to the plan, respectively (collectively, the "Compliance Plan").

Based on the review of the Compliance Plan as well as telephone conversations with outside counsel to the Company and counsel to the Company's special committee of the board of directors, the Staff has determined that the Company did not provide a definitive plan evidencing its ability to file the Quarterly Report on Form 10-Q for the quarter ended March 31, 2022 and the Annual Report on Form 10-K for the fiscal year ended June 30, 2022 (collectively, the "Reports") within the 180 calendar day period available to the Staff under the Nasdaq Listing Rules.

Specifically, the delisting determination referenced several aspects of the Compliance Plan that raise substantial doubts about the Company's ability to regain compliance: (i) the unreasonably short timeframe for the Company to file the Reports based on the anticipated timeframe the Company's special committee of the board of directors needs to substantially complete its investigation; (ii) the Company's ability to engage a new independent registered public accounting firm; and (iii) the departure of both the Company's Chief Executive Officer and Chief Financial Officer.

While the Company intends to make every effort to maintain its listing, there can be no assurance that the Panel will grant the Company's request for an extended stay or request for continued listing, nor can there be any assurance that the Company will ultimately regain compliance with all applicable requirements for continued listing.

234.    On this news, on October 7, 2022, the price of Singularity shares fell 10.55%, from a closing price of $2.56 on October 6, 2022, to close at $2.29 per share, damaging investors.

235.    On February 27, 2023, Singularity filed a Form 8-K with the SEC in which it announced that:

> On February 21, 2023, Singularity Future Technology Ltd. (the "Company") received an additional staff determination notice (the "Notice") from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq"), advising that it had not received the Company's Form 10-Q for the quarterly period ended December 31, 2022, which served as an additional basis for delisting the Company's securities and that the Nasdaq Hearings Panel (the "Panel") will consider the additional deficiency

in rendering a determination regarding the Company's continued listing on Nasdaq. The Company has submitted to the Panel a plan to regain compliance with the continued listing requirements and has been granted a grace period to file all the delinquent reports, including the filing of the Form 10-Q for the quarterly period ended December 31, 2022, on or before February 28, 2023.

### C.   Singularity Discloses the Existence of Governmental Investigations Relating to the Hindenburg Report

236.   On November 16, 2022, Singularity filed with the SEC its Form 8-K signed by Defendant Shan.

237.   The November 16, 2022 Form 8-K disclosed governmental investigations of Singularity related to the claims raised by Hindenburg Research on May 5, 2022, and other related matters. It stated, in pertinent part:

**Item 8.01 Other Events.**

**Press Release:**

Singularity Future Technology Announces Update Related to Special Committee Investigation

Great Neck, N.Y., November 16, 2022 – Singularity Future Technology Ltd. ("Singularity" or the "Company") (Nasdaq: SGLY) announced an update with respect to the Company's business and other matters.

The Company has received subpoenas from the United States Attorney's Office for the Southern District of New York and the United States Securities and Exchange Commission. The Company is complying with these subpoenas and fully cooperating with these governmental entities. Additionally, the special Committee of the Company's Board of Directors is continuing to investigate the claims raised by Hindenburg Research on May 5, 2022 and other related matters.

The special committee anticipates that the fact-finding portion of investigation will be completed on or before December 31, 2022.

238.   On this news, on November 16, 2022, the price of Singularity shares fell 18.68%, from a closing price of $2.57 on November 15, 2022, to close at $2.09 per share, on unusually heavy trading volume, damaging investors. On November 17, 2022, the price of Singularity shares fell an additional 45.93% to close at $1.13 per share.

239.     On January 5, 2023, in a Form 8-K filed with the SEC, Singularity disclosed that it was the subject of numerous investigations:[114]

**Government Investigations**

Following a publication issued by Hindenburg Research dated May 5, 2022, the Company received subpoenas from the United States Attorney's Office for the Southern District of New York and the United States Securities and Exchange Commission. The Company is cooperating with the government regarding these matters. At this early stage, the Company is not able to estimate the outcome or duration of the government investigations.

240.     In a Form 8-K, filed with the SEC on January 9, 2023, Singularity filed its Separation Agreement with Defendant Cao which referenced that the Company was also under investigation by FINRA.[115]

241.     On January 13, 2023, Singularity announced:

On January 9, 2023, Singularity Future Technology Ltd.(the "Company"), entered into an Executive Separation Agreement and General Release (the "Separation Agreement"), with Lei Cao, an employee of the Company and a member of the Board of Directors of the Company (the "Board"), setting forth the terms and conditions related to (1) the termination of Mr. Cao's employment with the Company and the termination of the employment agreement dated as of November 1, 2021 as well as cancellation and/or termination of certain other agreements relating to Mr. Cao's employment with the Company; and (2) Mr. Cao's resignation from the Board, effective as of January 9, 2023.

Pursuant to the Separation Agreement, Mr. Cao submitted a letter of resignation from the Board on January 9, 2023. In addition, he agreed to forfeit and return to the Company the 600,000 shares of common stock of the Company granted to him on August 13, 2021 under the terms of the 2014 Equity Incentive Plan of the Company (the "2021 Shares"). Mr. Cao also agreed to cooperate with the Company regarding certain investigations and proceedings set forth in the Separation Agreement, and/or any other matters arising out of or related to Mr. Cao's relationship with or service to the Company. In consideration, the Company agreed to provide the following benefits to which Mr. Cao was not otherwise entitled: (1) payment of reasonable attorneys' fees and costs incurred by Mr. Cao up through

---

[114]  Singularity Future Technology Ltd., Current Report (Form 8-K) (Dec. 28, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390023000926/ea171208-8k_singularity.htm.

[115]  Singularity Future Technology Ltd., Current Report (Form 8-K) (Jan. 9, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390023002787/ea171630-8k_singularity.htm.

January 9, 2023 associated with Mr. Cao's personal legal representation in matters relating to Mr. Cao's tenure with the Company, the investigations and proceedings set forth in the Separation Agreement, and the negotiation and drafting of the Separation Agreement; (2) the release of claims in Mr. Cao's favor contained in the Separation Agreement; and (3) payment of Mr. Cao's reasonable and necessary legal fees to the extent incurred by Mr. Cao as a result of his cooperation as required by the Company under the terms of the Separation Agreement. Additionally, the Separation Agreement contains mutual general releases and waiver of claims from Mr. Cao and the Company.

The foregoing description of the Separation Agreement is a summary of the material terms of such agreement, does not purport to be complete and is qualified in its entirety by reference to the Separation Agreement, which is filed hereto as Exhibit 10.1.

### D.     Singularity Admitted That It Could Not Deliver on the SOS Transaction

242.    On January 5, 2023, Singularity filed a Form 8-K with the SEC in which it announced that:

SOS Information Technology New York, Inc. ("SOSNY"), a company incorporated under the laws of state of New York and a wholly owned subsidiary of SOS Ltd. filed a December 9, 2022 lawsuit in the New York State Supreme Court against Thor Miner, Inc., which is Singularity's joint venture ("Thor Miner"), Singularity Future Technology Ltd. ("Singularity" or the "Company," and, together with Thor Miner, referred to as the "Corporate Defendants"), Lei Cao, Jing Jie, John F. Levy, Tieliang Liu, Tuo Pan, Shi Qiu, Jing Shan, and Heng Wang (jointly referred to as the "Individual Defendants") (collectively, the Individual Defendants and the Corporate Defendants are the "Defendants"). SOSNY and Thor Miner entered into a January 10, 2022 Purchase and Sale Agreement (the "PSA") for the purchase of $200,000,000 in crypto mining rigs, which SOSNY claims was breached by the Defendants.

SOSNY and Defendants entered into a certain settlement agreement and general mutual release with an Effective Date of December 28, 2022 ("Settlement Agreement"). Pursuant to the Settlement Agreement, Thor Miner agreed to pay a sum of thirteen million in U.S. dollars ($13,000,000) (the "Settlement Payment") to SOSNY in exchange for SOSNY dismissing the lawsuit with prejudice as to the settling Defendants and without prejudice as to all others. The full Settlement Payment was received by SOSNY on December 28, 2022. SOSNY dismissed the lawsuit with prejudice against Singularity (and other Defendants) on December 28, 2022.

Singularity and Thor Miner further covenanted and agreed that if they receive additional funds from HighSharp (Shenzhen Gaorui) Electronic Technology Co., Ltd. ("HighSharp") related to the PSA, they will promptly transfer such funds to

SOSNY in an amount not to exceed forty million, five hundred sixty thousand, five hundred sixty-nine dollars ($40,560,569.00) (which is the total amount paid by SOSNY pursuant to the PSA less the price of the machines actually received by SOSNY pursuant to the PSA). The Settlement Payment and any payments subsequently received by SOSNY from HighSharp shall be deducted from the total amount of forty million, five hundred sixty thousand, five hundred sixty-nine dollars ($40,560,569.00) previously paid by, and now due and owing to SOSNY. In further consideration of the Settlement Agreement, Thor Miner agreed to execute and provide to SOSNY, within seven (7) business days after SOSNY's receipt of the Settlement Payment, an assignment of all claims it may have against HighSharp or otherwise to the proceeds of the PSA.

**E.      Singularity's Unregistered Securities Sales Are Revealed as a Fraud**

243.    Singularity, Jie, Shan, Pan, Cao, Thor Miner and Golden Mainland utilized Singularity's sham transition into a cryptocurrency company to fraudulently raise tens of millions of dollars through the sale of unregistered securities. At least three of those transactions were alleged to have been fraudulent, resulting in three separate lawsuits against Singularity and certain of the Individual Defendants, which resulted in the Company repaying $10.5 million to aggrieved investors.

**1.      Singularity, Jie, Shan, Pan, and Cao Fraudulently Induced Hexin Global Limited and Viner Total Investments Funds to Purchase $6,124,910.82 in Unregistered Securities Touting Singularity's Cryptocurrency Transformation**

244.    On September 23, 2022, Hexin Global Limited and Viner Total Investments Fund sued Singularity, Jie, Shan, Pan, and Cao to recover $6,124,910.82 in damages caused by their alleged common law fraud and statutory violations of the federal securities laws as well as breaches of contract arising from a Securities Purchase Agreement ("SPA") between Helix, Viner, and Singularity, entered into on December 14, 2021.[116]

245.    On this news, on September 23, 2022, the price of Singularity shares fell over 4%,

---

[116] *Hexin Global Ltd. v. Singularity Future Tech., Ltd.*, No. 22 Civ. 08160 (S.D.N.Y. Sept. 23, 2022).

from a closing price of $2.98 on September 22, 2022, to close at $2.86 per share and continued to slide the days that followed, damaging investors.

246.    In their lawsuit, Hexin and Viner alleged that in September 2021, they were introduced to Cao and Jie to discuss potential investments in Singularity. According to Hexin and Viner, Cao and Jie told their representatives that Singularity was on the verge of incredible growth because it was about to pursue a new line of business focusing on blockchain technologies.

247.    Hexin and Viner alleged that on December 14, 2021, in reliance on the representations made by Cao and Jie, Hexin and Viner entered into the SPA with Singularity, pursuant to which Hexin and Viner agreed to collectively purchase 1,878,807 restricted shares of Singularity common stock at $3.26 per share. Restricted shares are, by definition, unregistered and do not require a public capital raise. Among other things, the restricted shares could only be sold if Singularity was compliant with its public reporting requirements.

248.    Hexin alleged that Singularity's misrepresentations, which led it to purchase unregistered securities from Singularity, were directly related to and based on the Company's phony cryptocurrency business, stating:

> Since the Company received the investment from our party, it did not carry out cryptocurrency-related business in accordance with the agreement between the two parties and did not invest the fixed-investment amount into blockchain business development, which seriously violated the intention of the investors, resulting in the lack of effective growth for the Company's performance, and the share price fluctuated significantly and returned to the lower point.

249.    In the SPA, Singularity represented and warranted that it shall comply with specific SEC reporting requirements, absent which the restrictive legends could not be removed, including, among many others:

- Section 2.1 Representations and Warranties of the Company and its Subsidiaries. (C) Capitalization. (i) . . . no Common Stock are entitled to preemptive, conversion or other rights and *there are no outstanding options,*

*warrants*, scrip, rights to subscribe to, call or commitments *of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company*[];

- Section 2.1 Representations and Warranties of the Company and its Subsidiaries. (C) Capitalization. (ii) *there are no contracts*, commitments, understandings, or arrangements by which the Company is or may become bound to issue additional shares of capital stock of the Company *or options, securities or rights convertible into shares of capital stock of the Company*;

- Section 3.9 Use of Proceeds. The Company shall use the net proceeds from the sale of the Securities hereunder *for working capital and general corporate purposes* and shall not use such proceeds: (a) for the redemption of any Common Stock or Common Stock Equivalents, or (b) in violation of FCPA or OF AC regulations.[117]

250.    Based on Cao's and Jie's representations, as well as the representations articulated in the SPA, Hexin and Viner collectively wired Singularity $6,124,910.82 in exchange for 1,878,807 restricted shares of Singularity.

251.    Helix and Viner alleged that Singularity breached the SPA almost immediately. Despite expressly representing that there were no "outstanding options, warrants, scrip, rights to subscribe to, call or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company," on or about January 6, 2022, just weeks after executing the SPA and days after receipt of Helix's and Viner's funds, Singularity announced in a Form 8-K that it had entered into a Warrant Purchase Agreement with previous investors "pursuant to which the Company agreed to buy back an aggregate of 3,870,800 warrants (the 'Warrants') from the Sellers, and the Sellers agreed to sell the Warrants back to the Company. These Warrants were sold to these Sellers in three previous transactions that closed on February 11, 2021, February 10, 2021, and March 14, 2018. The purchase price for each Warrant is $2.00 . . . ."

---

[117] All italics added for emphasis.

252.     Helix and Viner alleged that Singularity, Jie, and Cao neither disclosed the Warrants to them prior to executing the SPA nor excluded them from the explicit representation that no warrants were outstanding in Sections 2.1(c)(i) and (ii) of the SPA. In other words, one day after Singularity received an aggregate payment of over $6.1 million, it conspired to use the funds to buy back millions of shares exercisable by Warrants in a transaction valued at $7,741,600. They did so despite Singularity and Jie representing in: (a) Sections 2.1(c)(i) and (ii) of the SPA that no warrants were outstanding; and (b) Section 3.9 that the "Company shall use the net proceeds from the sale of the Securities hereunder for working capital and general corporate purposes" and not to eliminate outstanding obligations such as the Warrants.

### 2.     Singularity Induced Jinhe Capital Limited to Purchase $10,500,000 in Unregistered Securities

253.     On October 6, 2022, Jinhe Capital Limited ("Jinhe") filed a lawsuit against Singularity alleging that the Company violated a November 2021 financial advisory services agreement between them ("Jinhe Agreement").[118]

254.     On this news, Singularity's common stock price declined 12.93%, from a closing price of $2.94 on October 5, 2022, to close at $2.56 on October 6, 2022, and continued to decline in the following days, closing at $2.29 on October 7, 2022 and $2.15 on October 10, 2022.

255.     Jinhe alleged that, pursuant to the Jinhe Agreement, it introduced Singularity to six investors who invested over $10.5 million into Singularity pursuant to a Securities Purchase Agreement dated December 14, 2021. In consideration for these services, Singularity was to pay Jinhe 500,000 restricted shares of Singularity common stock. On or about January 24, 2022, Singularity's transfer agent TranShare issued 500,000 shares of restricted stock to Jinhe. However,

---

[118] *Jinhe Cap. Ltd v. Singularity Future Tech., Ltd.*, No. 22 Civ. 08538 (S.D.N.Y.).

thereafter, Singularity failed to continue filing reports with the SEC which rendered it impossible to lift the restriction on Jinhe's shares, effectively rendering them worthless. Despite Jinhe's request, Singularity refused to assist Jinhe to remove the restricted legend.

> **3.      Singularity, Jie, Cao, Shan, and Pan Induced St. Hudson Group LLC, Imperii Strategies LLC, Isyled Technology Limited, and Hsqynm Family Inc. to Purchase $4,400,000 in Unregistered Securities Touting Singularity's Cryptocurrency Transformation**

256.    On December 5, 2022, St. Hudson Group LLC, Imperii Strategies LLC, Isyled Technology Limited, and HS-QYNM Family Inc. sued Singularity, Jie, Cao, Shan, and Pan, alleging that they invested $4,400,000 to purchase unregistered shares of Singularity based on the representations of Singularity, Jie, Cao, Shan, and Pan regarding Singularity's cryptocurrency business. Specifically, the plaintiffs in this action alleged that: "Between September and December of 2021, Defendants—including Jie who was later revealed to be a convicted fraudster on the run from Chinese authorities—engaged in a scheme of material misrepresentations and omissions to convince the St. Hudson plaintiffs to invest millions of dollars in Singularity's purported cryptocurrency business that Defendants falsely claimed would earn Plaintiffs '10x' investment returns in a short period of time."

257.    On this news, Singularity's common stock price declined 2.60%, from a closing price of $0.77 on December 5, 2022, to close at $0.75 on December 6, 2022.

258.    Finally, on February 24, 2023, Singularity informed the Court that it had agreed to settle the claims of Hexin Global Limited, Viner Total Investments Fund, Jinhe Capital Limited, St. Hudson Group LLC, Imperii Strategies LLC, Isyled Technology Limited, and HS-QYNM Family Inc. in each of the three lawsuit. On this news, the price of Singularity shares fell over 13%, from a closing price of $0.69 on February 23, 2023, to close at $0.60 on February 24, 2023. On March 10, 2023, the parties entered into a Settlement Agreement and Release pursuant to which Singularity

paid $10,525,910.82 to settle the claims.

## VI.    POST-CLASS PERIOD DEVELOPMENTS

259.    On February 27, 2023, Singularity filed a Form 8-K with the SEC in which it

announced that:

> As previously reported, on May 6, 2022, the Board formed a special committee to investigate claims of alleged fraud, misrepresentation, inadequate disclosure, and other related matters related to the Company and certain of its management personnel raised in the report of Hindenburg Research dated May 5, 2022 and other related matters. On February 23, 2023, the Board approved the dissolution of the special committee upon conclusion of the committee's investigation.

260.    On March 1, 2023, Singularity filed a Form 8-K with the SEC in which it announced:

**Item 4.02.       Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On February 28, 2023, the audit committee of Singularity Future Technology Ltd.(the "Company"), after discussion with the management of the Company, and in consultation with the Company's independent registered public accounting firm, concluded that the Company's previously issued financial statements for the fiscal year ended June 30, 2021 included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (the "SEC") on November 29, 2021 (the "2021 Form 10-K") should no longer be relied upon as a result of incorrect accounting treatment of approximately $4.5 million of accounts receivable. During the fiscal year ended June 30, 2019, Trans Pacific Logistic Shanghai Ltd ("TP Shanghai"), a subsidiary of the Company, received approximately $4.5 million (Renminbi ("RMB") 30 million) from a related party, Shanghai Baoyin Industrial Co., Ltd.("Shanghai Baoyin") which is 30% owned by Wang Qinggang, CEO and legal representative of TP Shanghai, to pay for accounts receivable of six different customers totaling RMB 30 million. TP Shanghai then paid the same amount to Zhangjiakou Baoyu Trading Co. Ltd.("Baoyu"), a third party and recorded the amount as an advance to the supplier. As such, for the fiscal year 2019, accounts receivable was understated by RMB 30 million, and prepayment was overstated by RMB 30 million. There was no effect on total assets. During the fiscal year ended June 30, 2020, the advance to Baoyu was reclassified to other receivable and the Company provided a full allowance for the RMB 30 million. The Company evaluated this transaction and determined there is no cumulative effect on the Company's retained earnings as of June 30, 2020.

During the fiscal year ended June 30, 2021, Baoyu repaid a total of RMB 30 million to TP Shanghai, and TP Shanghai loaned the same amount to Shanghai Baoyin and Wang Qinggang. The RMB 30 million received was recorded as recovery of bad debt and a related party loan receivable, respectively. Shanghai Baoying

subsequently repaid RMB 4 million, which was subsequently loaned to Wang Qinggang.

The Company analyzed the transactions and determined the funds were originally from Shanghai Baoyin and eventually paid back to the same related parties. Recovery of bad debt and related party loan receivable was overstated by RMB 30 million for the fiscal year 2021.

The Company intends to amend its financial statements for the fiscal year 2021 to restate loans receivable – related parties and bad debt recovery. The impact of the restatement on the Company's consolidated statement of operations for the fiscal year ended June 30, 2021 is expected to include the following:

·        recovery for doubtful accounts decreased by approximately $4.6 million from $321,168 to a provision for doubtful accounts of $4.2 million;

·        net loss increased by approximately $4.6 million from $6.7 million to $11.3 million; and

·        related party loans receivable decreased by $4.6 million from $4.6 million to nil.

The audit committee also concluded that the financial statements for the quarters ended September 30, 2021 and December 31, 2021 included in the Company's Quarterly Reports on Form 10-Q (the "2021 Form 10-Qs," collectively with the 2021 Form 10-K, the "Affected Reports"), filed with the SEC on November 12, 2021 and February 14, 2022, respectively, should no longer be relied upon as a result of incorrect recognition of revenue from freight shipping services in the amount of $980,200 for the three months ended September 30, 2021 and six months ended December 31, 2021.

During the audit for the fiscal year ended June 30, 2022, the Company discovered the error in revenue recognition by its subsidiary, SGS NY Sino-Global Shipping New York Inc., that $980,200 of revenue recognized in freight logistics did not meet revenue recognition criteria for the three months ended September 30, 2021 and six months ended December 31, 2021.

*In addition, due to a lack of proper procedures in identifying and recording related party transactions. there was an error in the accounting treatment of the Company's recovery (provision) for doubtful accounts, net related to its other receivables.*

The impact of the restatement of recovery (provision) for doubtful accounts includes the following:

· recovery for doubtful accounts decreased by approximately $1.9 million from approximately $1.9 million to a provision for doubtful accounts of approximately $34,000 for the three months ended September 30, 2021 and the six months ended December 31, 2021;

· net loss increased by approximately $2.2 million from approximately $3.0 million to approximately $5.2 million for the three months ended September 30, 2021; and

· net loss increased by approximately $2.2 million from approximately $11.8 million to approximately $14.0 million for the six months ended December 31, 2021.

The Company intends to correct the errors referenced above in an amendment to (1) the 2021 Form 10-K (the "Amended Form 10-K") and (2) each of the 2021 Form 10-Qs (the "Amended Form 10-Qs"). The Company's management has concluded that in light of the accounting errors described above, a material weakness exists in the Company's internal control over financial reporting and that the Company's disclosure controls and procedures were not effective as of June 30, 2021, September 30, 2021, December 31, 2021, and June 30, 2022. The Company's remediation plan with respect to such material weakness will be described in more detail in the Amended Form 10-K and the Amended Form 10-Qs.

The Company's management and the audit committee have discussed the matters disclosed in this Current Report on Form 8-K pursuant to this Item 4.02 with Audit Alliance LLP, the Company's independent registered public accounting firm.

261.    On March 6, 2023, Singularity issued an amended 8-K/A in which it announced that:

On March 3, 2023, Singularity Future Technology Ltd.(the "Company") discovered errors in the disclosure related to certain transactions in 2019 in its Current Report on Form 8-K (the "Form 8-K") filed with the Securities and Exchange Commission (the "SEC") on February 28, 2023. This Amendment No. 1 to the Form 8-K is being filed by the Company solely to amend the incorrect disclosure. For easy of reference the Form 8-K is hereby amended and restated in its entirety as set forth below.

**Item 4.02.    Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On February 28, 2023 , the audit committee of Singularity Future Technology Ltd.(the "Company"), after discussion with the management of the Company, and in consultation with the Company's independent registered public accounting firm, concluded that the Company's previously issued financial statements for the fiscal year ended June 30, 2021 included in the Company's Annual Report on Form 10-K filed with the Securities and Exchange Commission (the "SEC") on November

29, 2021 (the "2021 Form 10-K") should no longer be relied upon as a result of incorrect accounting treatment of approximately $4.6 million of related party loan receivable.

From March to June 2019, Trans Pacific Logistic Shanghai Ltd.("Trans Pacific Shanghai"), a subsidiary of the Company, received approximately $6.2 million (RMB 40 million) from a related party, Shanghai Baoyin Industrial Co., Ltd.("Shanghai Baoyin"), to pay for accounts receivable of six different customers totaling RMB 40 million. Shanghai Baoyin is 30% owned by Wang Qinggang, the CEO and legal representative of Trans Pacific Shanghai. Trans Pacific Shanghai subsequently paid RMB 20 million and RMB 10 million to Zhangjiakou Baoyu Trading Co. Ltd.("Baoyu"), a third party, in April 2019 and July 2019, respectively, and it made an additional payment of RMB 10 million to Hebei Baoxie Trading Co., Ltd.("Hebei Baoxie"), a third party, in July 2019.

As such, for the fiscal year ended June 30, 2019, accounts receivable was understated by RMB 40 million, advance to supplier was overstated by RMB 20 million, and other payables from Shanghai Baoyin, a related party, were understated by RMB 20 million. There was an overstatement of RMB 20 million in total assets and an understatement of total liabilities of RMB 20 million.

During the fiscal year ended June 30, 2020, Baoxie repaid a total of RMB 10 million to Trans Pacific Shanghai, and Trans Pacific Shanghai advanced the RMB 10 million to Shanghai Baoyin. The RMB 10 million paid to Shanghai Baoyin was recorded as other receivable, and the RMB 30 million advance to Baoyu was reclassified from an advance to supplier to other receivable. The Company provided a full allowance of its receivables totaling RMB 40 million. The Company evaluated this transaction and determined there is no cumulative effect on the Company's total assets, liabilities, or retained earnings as of June 30, 2020.

During the fiscal year ended June 30, 2021, Baoyu repaid RMB 30 million to Trans Pacific Shanghai. The RMB 30 million received was recorded as recovery of bad debt. Trans Pacific Shanghai then loaned the same amount to Shanghai Baoyin. Shanghai Baoyin subsequently repaid RMB 4 million to Trans Pacific Shanghai, and Trans Pacific Shanghai loaned the same amount to Wang Qinggang. The RMB 30 million received was recorded as recovery of bad debt for other receivable and the RMB 30 million paid was recorded as a related party loan receivable.

The Company analyzed the transactions and determined the RMB 30 million was originally from Shanghai Baoyin and eventually paid back to the same related parties. Recovery of bad debt and related party loan receivable was overstated by RMB 30 million for the fiscal year 2021.

262. Singularity's Form 10-Q for the quarter ended December 31, 2022, filed with the

SEC on March 7, 2023, admitted that the Company's November 16, 2021 Rich Trading transaction

was an improper related party transaction and that Rich Trading's bank accounts were controlled by

Singularity's management, stating:[119]

> On November 16, 2021, the Company entered into a project cooperation agreement with Rich Trading Co. Ltd USA ("Rich Trading") for the trading of computer equipment. Rich Trading's bank account was controlled by now-terminated members of the Company's management and was, at the time, an undisclosed related party. According to the agreement, the Company was to invest $4.5 million in the trading business operated by Rich Trading and the Company would be entitled to 90% of profits generated by the trading business. The Company advanced $3,303,424 for this project. $3,200,000 has been returned to the Company. The Company provided allowance of $103,424 for the year ended June 30, 2022.

263.    Singularity's Form 10-Q for Q1 2023 acknowledged that the Company's Rich

Trading transaction was a related party transaction – which, as alleged above, was not disclosed as

a related party transaction:[120]

> We also made related party advances of approximately $5.1 million, including approximately $3.2 million of advances to Rich Trading Co. Ltd., a related party. $1.3 million to Shanghai Baoyin Industrial Co., Ltd. ("Baoyin") which is 30% owned by Qinggang Wang, a related party and approximately $0.6 million of advances to our equity investee, LSM Trading Ltd. These advances are non-interest bearing and due on demand.

264.    On March 10, 2023, Singularity announced that:

> On March 8, 2023, Singularity Future Technology Ltd. (the "Company") received a notice from Nasdaq Listing Qualifications department of The Nasdaq Stock Market LLC ("Nasdaq") stating that the Company no longer complies with Nasdaq's audit committee requirement under Nasdaq's Listing Rule 5605 following the resignation of John Levy from the Company's board of directors and audit committee effective February 23, 2023. Nasdaq advised the Company that in accordance with Nasdaq's Listing Rule 5605(c)(4), the Company has a cure period to regain compliance (i) until the earlier of the Company's next annual shareholders' meeting or February 23, 2024; or (ii) if the next annual shareholders' meeting is held before August 22, 2023, then the Company must evidence compliance no later than August 22, 2023 (the "Cure Period"). The Company

---

[119] Singularity Future Technology Ltd., Quarterly Report (Form 10-Q) (Dec. 31, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390023017863/f10q1222_singularity.htm.

[120] Singularity Future Technology Ltd., Quarterly Report (Form 10-Q) (Mar. 31, 2023), https://www.sec.gov/Archives/edgar/data/1422892/000121390023039819/f10q0323_singularity.htm.

intends to regain compliance with Nasdaq's Listing Rule 5605 prior to the end of the Cure Period.

265.    On March 22, 2023, Singularity filed a Form 8-K with the SEC in which it announced

that:

On March 16, 2023, Singularity Future Technology Ltd. (the "Company") received a formal notification from the Nasdaq Stock Market LLC confirming that the Company had regained compliance with the Nasdaq Listing Rule 5250(c)(1), which requires the Company to timely file all required periodic financial reports with the Securities and Exchange Commission, and that the matter is now closed.

266.    On July 12, 2023, Singularity announced in a Form 8-K filed with the SEC that:

On July 7, 2023, Singularity Future Technology Ltd. (the "Company" or "Registrant") received an Notice of Noncompliance Letter (the "Letter") from The Nasdaq Stock Market LLC ("Nasdaq") stating that the Company was not in compliance with Nasdaq Listing Rules due to its failure to timely hold an annual meeting of shareholders for the fiscal year ended June 30, 2022 (the "Annual Meeting"), which is required to be held within twelve months of the Company's fiscal year end under Nasdaq Listing Rule 5620(a) and 5810(c)(2)(G).

The Letter also states that the Company has 45 calendar days to submit a plan to regain compliance (the "Plan") and if Nasdaq accepts the Plan, it can grant the Company an exception of up to 180 calendar days from the fiscal year end, or until December 27, 2023, to regain compliance. Nasdaq requires the Plan to be submitted no later than August 21, 2023.

267.    On July 14, 2023, Singularity announced in a Form 8-K filed with the SEC that:

**Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

On July 13, 2023, Singularity Future Technology Ltd. (the "Company" or the "Registrant") received a notice from The Nasdaq Stock Market LLC ("Nasdaq") stating that the Company no longer complies with Nasdaq's independent director and audit committee requirements under Nasdaq's Listing Rule 5605 following the resignation of Tieliang Liu from the Company's board of directors and audit committee effective July 3, 2023. Nasdaq advised the Company that in accordance with Nasdaq's Listing Rule 5605(c)(4), the Company has a cure period to regain compliance (1) until the earlier of the Company's next annual shareholders' meeting or July 3, 2024; or (2) if the next annual shareholders' meeting is held before January 2, 2024, then the Company must evidence compliance no later than January 2, 2024 (the "Cure Period"). The Company intends to regain compliance with Nasdaq's Listing Rule 5605 prior to the end of the Cure Period.

On July 13, 2023, the Company received a notice from Nasdaq stating that the Company failed to regain compliance with respect to the minimum $1 bid price per share requirement under Nasdaq Listing Rules during the 180 calendar days given by Nasdaq for the Company to regain compliance, which ended on July 5, 2023. However, Nasdaq has determined that the Company is eligible for an additional 180 calendar day period, or until January 2, 2024, to regain compliance. Such determination is based on the Company meeting the continued listing requirement for market value of publicly held shares and all other applicable requirements for initial listing on the Capital Market with the exception of the bid price requirement, and the Company's written notice of its intention to cure the deficiency during the second compliance period by effecting a reverse stock split, if necessary. The Company intends to regain compliance with Nasdaq's bid price requirement prior to the end of the second bid price extension.

268.    In a Form 10-K filed with the SEC on September 29, 2023, Singularity admitted that the scope of the Company's planned financial restatements would "increase[] possibility of litigation and regulatory inquiries" and "affect investor confidence." Specifically, Singularity disclosed that:

The restatement of our prior financial statements may affect investor confidence and raise reputational issues and may subject us to additional risks and uncertainties, including increased professional costs and the increased possibility of legal proceedings and regulatory inquiries.

***

As a result of these errors and the resulting restatements of our financial statements for the impacted periods, we have incurred, and may continue to incur, unanticipated costs for accounting and legal fees in connection with or related to the restatements, and have become subject to a number of additional risks and uncertainties, including the increased possibility of litigation and regulatory inquiries. Any of the foregoing may affect investor confidence in the accuracy of our financial disclosures and may raise reputational risks for our business, both of which could harm our business and financial results.

*See* Form 10-K at 21.

269.    In the same Form 10-K filed with the SEC on September 29, 2023, Singularity also admitted that the Company still had not finished remediating its internal weaknesses in internal controls and that material weaknesses in the internal regime existed for the period ending June 30, 2023. As a result, the Company disclosed in relevant part:

We cannot provide assurance that these or other measures will fully remediate our material weaknesses in a timely manner. If our remediation of these material weaknesses is not effective, it may cause our Company to become subject to investigation or sanctions by the SEC. It may also adversely affect investor confidence in our Company and, as a result, the value of our common stock. There can be no assurance that all existing material weaknesses have been identified, or that additional material weaknesses will not be identified in the future. In addition, if we are unable to continue to meet our financial reporting obligations, we may not be able to remain listed on Nasdaq.

*See* Form 10-K at 23.

## VII.    SUMMARY OF SCIENTER ALLEGATIONS

270.    The facts detailed above and summarized below, when viewed holistically and together with the other allegations in this Second Amended Class Action Complaint, establish a strong inference that each of the Singularity Defendants knew or were severely reckless in not knowing that each of the misrepresentations and omissions alleged herein would be, and were, false or misleading to investors at the time they were made.

271.    At all relevant times, each of the Singularity Defendants knew or recklessly disregarded that their statements and omissions concerning Defendant Jie's criminal past and history of financial improprieties, undisclosed related party transactions, sham joint ventures and contracts with sham entities, Singularity's sale of unregistered securities on the basis of its sham transformation into a cryptocurrency company and inability to engage in meaningful cryptocurrency mining and to develop a proprietary cryptocurrency mining machine during the Class Period, were false or misleading to investors at the time they were made. In summary of and in addition to the facts more fully discussed above, Defendants' scienter is evidenced by the following facts.

### A.    Singularity's Failure to Deliver on its Cryptocurrency Ventures

272.    Singularity's senior management's actual knowledge, and access to information, concerning the inability to transform into a cryptocurrency company (including manufacture crypto mining machines and build mining operations) further gives rise to a strong inference of scienter.

Directors and senior management had actual knowledge that Singularity could not and would not deliver on its myriad promises to transform into a successful cryptocurrency business because the Company was engaged in related party transactions, did not engage in meaningful cryptocurrency mining, had not developed a proprietary cryptocurrency mining machine, entered into joint ventures with sham companies, and was aware that COVID-19 and the worldwide chip shortage would render it impossible to deliver on its promise to develop and deliver a proprietary cryptocurrency mining machine. *See* Sections V.A.3-7 and V.D, *supra.*

### B. Singularity's Failure to Reveal Jie's Criminal Past, Financial Improprieties and Accurate Educational Background

273.    As alleged above, Singularity touted senior management's actual knowledge and access to information, which further gives rise to a strong inference of scienter. Senior management and Directors, including Jie, Zhikang, and Levy, knew that Jie had been accused of extensive criminal conduct and found to have participated in financial improprieties during his tenure at CCC. *See* Section V.A.1, 2, *supra.*

### C. Singularity Abandoned Its Transformation to a Cryptocurrency Company

274.    As alleged above, Singularity's Form 10-Q for the period ended Q1 2023 confirms that it has exited the cryptocurrency business stating: "The Company ceased to sell crypto-mining equipment since January 1, 2023. For the three months ended March 31, 2023, the Company did not sell crypto-mining machines."[121] *See* paragraph 124, *supra.*

### D. Singularity's Settlements With SOS

275.    As alleged above, SOS sued Singularity, Thor Miner, Cao, Jie, Levy, Liu, Pan, Qiu, Shan, and Wang for the failure to deliver proprietary cryptocurrency machines pursuant to the

---

[121] Singularity Future Technology Ltd., Quarterly Report (Form 10-Q) (Mar. 31, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001422892/000121390023039819/f10q0323_singularity.htm.

Company's $200 million contract with SOS. During the litigation, Singularity offered inconsistent and unavailing explanations for its failure to perform. As alleged below, Singularity and Thor Miner failed to perform because Thor Miner was a sham and its purported proprietary cryptocurrency machines were nothing more than machines manufactured by a competitor. As a result, in December 2022, shortly after the lawsuit was filed, Singularity promptly settled the *SOS* lawsuit for $13,000,000 and the return to SOS of future recoveries. *See* Section V.A.4, *supra.*

### E.    Singularity's Settlements With Purchasers of Unregistered Shares of Singularity Common Stock

276.    As alleged above, on or about February 24, 2023, Singularity paid $10,525,910.82 to settle the claims of Hexin Global Limited, Viner Total Investments Fund, Jinhe Capital Limited, St. Hudson Group LLC, Imperii Strategies LLC, Isyled Technology Limited, and HS-QYNM Family Inc., alleging misrepresentations by Singularity, Jie, Shan, Pan, and Cao regarding Singularity's cryptocurrency business to induce private investments in the Company. *See* Section V.E, *supra.*

### F.    The Criminal and SEC Investigations of Singularity Are Strongly Indicative of Scienter

277.    Singularity has confirmed the existence of multiple investigations. For example, Singularity disclosed that the "Board of Directors of the Employer formed a special committee of the Board (the 'Special Committee') to review and investigate claims raised in the Hindenburg Report, and to respond to subpoenas from the United States Attorney's Office for the Southern District of New York, the SEC, and FINRA (the "Investigation")."[122] *See* Section V.C, *supra.*

278.    The governmental scrutiny of the improper practices in question further contributes to a strong inference of Defendants' scienter.

---

[122] Separation Agreement and General Release, Exhibit 10.1 (Jan. 9, 2023), https://www.sec.gov/Archives/edgar/data/1422892/000121390023002787/ea171630ex10-1_singularity.htm.

### G. Leadership Changes at Singularity Further Support a Strong Inference of Scienter

279.     During and following the Class Period, Defendants Cao, Shan, Pan, and Jie were all terminated, resigned, or found to have engaged in improper conduct during the Class Period and while in the employ of Singularity. Such remedial measures and findings further support a strong inference of scienter. This type of "house-cleaning" does not typically follow innocent instances of mismanagement.

280.     In its Form 10-Q for the period ending December 31, 2022, Singularity acknowledged that its former CEO, Defendant Cao, was terminated and forfeited 600,000 shares of common stock:

**Note 20. SUBSEQUENT EVENTS**

On January 9, 2023, the Company entered into an Executive Separation Agreement and General Release (the "Separation Agreement"), with Lei Cao, an employee of the Company and a member of the Board of Directors of the Company (the "Board"), setting forth the terms and conditions related to (1) the termination of Mr. Cao's employment with the Company and the termination of the employment agreement dated as of November 1, 2021 as well as cancellation and/or termination of certain other agreements relating to Mr. Cao's employment with the Company; and (2) Mr. Cao's resignation from the Board, effective as of January 9, 2023.

Pursuant to the Separation Agreement, Mr. Cao submitted a letter of resignation from the Board on January 9, 2023. In addition, he agreed to forfeit and return to the Company the 600,000 shares of common stock of the Company granted to him on August 13, 2021 under the terms of the 2014 Equity Incentive Plan of the Company (the "2021 Shares"). Mr. Cao also agreed to cooperate with the Company regarding certain investigations and proceedings set forth in the Separation Agreement, and/or any other matters arising out of or related to Mr. Cao's relationship with or service to the Company. In consideration, the Company agreed to provide the following benefits to which Mr. Cao was not otherwise entitled: (1) payment of reasonable attorneys' fees and costs incurred by Mr. Cao up through January 9, 2023 associated with Mr. Cao's personal legal representation in matters relating to Mr. Cao's tenure with the Company, the investigations and proceedings set forth in the Separation Agreement, and the negotiation and drafting of the Separation Agreement; (2) the release of claims in Mr. Cao's favor contained in the Separation Agreement; and (3) payment of Mr. Cao's reasonable and necessary legal fees to the extent incurred by Mr. Cao as a result of his cooperation as required by the Company under the terms of the Separation Agreement. Additionally, the

Separation Agreement contains mutual general releases and waiver of claims from Mr. Cao and the Company.[123]

281.    On June 24, 2022, Singularity filed a Form 8-K with the SEC, signed by Defendant Shan, in which it announced that:[124]

> Effective June 20, 2022, Ms. Tuo Pan, Chief Financial Officer of Singularity Future Technology Ltd. (the "Company"), was suspended by the Board of Directors for cause and without pay. On June 16, 2022, Ms. Pan, without proper authorization by the Company's Board of Directors, directed that funds be wired to satisfy an invoice for legal services that were rendered or to be rendered to Ms. Pan personally.

> It is anticipated that Ms. Pan's compensation will resume if she cooperates fully in the investigation by the Special Committee of the Company, which was formed to investigate allegations raised in the report of Hindenburg Research dated May 5, 2022 and other related matters.

282.    Defendant Shan had personal knowledge of and approved Defendant Pan's improper and unauthorized direction of Singularity's funds to pay Defendant Pan's personal expenses on June 16, 2022. According to the Shan Affidavit, filed in the New York Supreme Court on December 12, 2022, "Since the May 5, 2022 Hindenburg Report (referred to repeatedly by Plaintiff to support its allegations of "crisis" surrounding Singularity), I approve and authorize all Company expenditures."[125] As alleged below, shortly thereafter, Defendant Shan was terminated for cause.

283.    On September 7, 2022, Singularity filed a Form 8-K with the SEC, signed by Defendant Shan, in which it announced that:[126]

> On August 31, 2022, Ms. Tuo Pan was terminated for cause as an employee and Chief Financial Officer of Singularity Future Technology Ltd. (the "Company") and from any other position at any subsidiary of the Company to which she has been

---

[123] Singularity Future Technology Ltd., Quarterly Report (Form 10-Q) (Dec. 31, 2022), https://www.sec.gov /ix?doc=/Archives/edgar/data/0001422892/000121390023017863/f10q1222_singularity.htm.

[124] Singularity Future Technology Ltd., Current Report (Form 8-K) (June 20, 2022), https://www.sec.gov/ Archives/edgar/data/1422892/000121390022034915/ea162042-8k_singular.htm.

[125] Aff. of Jing Shan in Opp. to Pls.' Order to Show Cause for Prejudgment Attachment, *SOS Info. Tech. N.Y., Inc. v. Thor Miner Inc.*, Index No. 654735/2022, NYSCEF No. 34.

[126] Singularity Future Technology Ltd., Current Report (Form 8-K) (Aug. 31, 2022), https://www.sec.gov/ Archives/edgar/data/1422892/000121390022054510/ea165431-8k_singularity.htm.

appointed. Ms. Pan was terminated for cause in accordance with the terms of her Employment Agreement dated November 9, 2021 and will not receive any salary or benefits from the Company except those earned through August 31, 2022.

284.    On August 12, 2022, Singularity filed a Form 8-K with the SEC, signed by Defendant Shan, in which it announced that:[127]

> On August 9, 2022, Mr. Yang Jie tendered his resignation from his positions as the Chief Executive Officer ("CEO") and director of Singularity Future Technology Ltd. (the "Company") to the board of directors of the Company (the "Board"), following the Board's decision on August 8, 2022, which adopted the Special Committee's recommendation that Mr. Jie be suspended immediately as the Company's CEO, pending the Special Committee's further investigation into allegations raised in the report of Hindenburg Research dated May 5, 2022 and other related matters.

285.    On November 22, 2022, Singularity filed a Form 8-K with the SEC, signed by Defendant Shan, in which it announced that on November 18, 2022, Shi Qiu tendered his resignation as Chief Technology Officer of the Company, effective immediately.[128]

286.    On July 14, 2023, Singularity announced that "[o]n July 10, 2023, Company terminated the employment of its COO Jing with cause. The termination was effective immediately."[129]

287.    On July 3, 2023, Mr. Tieliang Liu resigned as a director of the Company and a member of the Compensation Committee, the Audit Committee, and the Nominating and Corporate Governance Committee.

288.    On September 21, 2023, Mr. Heng Wang resigned as a director of the Company and a member of the Compensation Committee, the Audit Committee, and the Nominating and

---

[127] Singularity Future Technology Ltd., Current Report (Form 8-K) (Aug. 9, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390022047378/ea164278-8k_singularity.htm.

[128] Singularity Future Technology Ltd., Current Report (Form 8-K) (Nov. 16, 2022), https://www.sec.gov/Archives/edgar/data/1422892/000121390022074586/ea169146-8k_singularity.htm.

[129] Singularity Future Technology Ltd., Current Report (Form 8-K) (July 10, 2023), https://www.sec.gov/Archives/edgar/data/1422892/000121390023057078/ea181819-8k_singularity.htm.

Corporate Governance Committee.

289.     On September 28, 2023, Ms. Ling Jiang resigned as a director of the Company and a member of the Compensation Committee, the Audit Committee, and the Nominating and Corporate Governance Committee.

## VIII.   LOSS CAUSATION

290.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the putative Class.

291.     During the Class Period, Plaintiffs and the putative Class purchased or otherwise acquired shares of Singularity common stock at artificially inflated prices and were damaged thereby when the price of Singularity common stock declined after the truth was gradually revealed through partial disclosures during the Class Period. Throughout the Class Period, the price of Singularity's common stock was artificially inflated as a result of Defendants' materially false or misleading statements and omissions and Defendants' scheme to deceive the market. The price of Singularity common stock significantly declined (causing investors to suffer losses) when Defendants' materially false or misleading statements and omissions, alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the risks that had been fraudulently concealed by Defendants materialized.

292.     Specifically, Defendants' materially false or misleading misstatements and omissions misrepresented or omitted material facts regarding: (a) the Company's transformation to a cryptocurrency company was either a sham or not reasonably achievable; (b) the Company's raise of over $21 million through the sale of unregistered securities (through contracts that Singularity was in breach of at the moment that the Company entered into them) on the basis of its sham transformation into a cryptocurrency company; (c) the personal and professional backgrounds of Defendants Jie and Levy; (d) related-party transactions with entities such as SOS

and Rich Trading; (e) the formation of sham companies with which it entered into joint ventures or entered joint ventures with sham companies such as Golden Mainland; and (f) the Company's inadequate internal controls, one or more of which resulted in investigations by the United States Attorney's Office for the Southern District of New York, FINRA, and the SEC, as well as a potential delisting by NASDAQ. When those materially false or misleading misstatements and omissions were corrected, and the risk concealed by them materialized, investors suffered losses as the price of Singularity's common stock declined, net of industry and market movements.

293.   It was entirely foreseeable that Defendants' materially false or misleading statements and omissions discussed herein would artificially inflate or maintain the price of Singularity's common stock. It was also foreseeable to Defendants that the revelation of the truth about: (a) the fact that Company's transformation to a cryptocurrency company was either a sham or not reasonably achievable; (b) the fact that the Company's raise of over $21 million through the sale of unregistered securities (through contracts that Singularity was in breach of at the moment that the Company entered into them) on the basis of its sham transformation into a cryptocurrency company; (c) the personal and professional backgrounds of Jie and Levy; (d) related-party transactions with entities such as SOS and Rich Trading; (e) Singularity had formed sham companies with which it entered into join ventures or entered joint ventures with sham companies such as Golden Mainland; and (f) Singularity had inadequate internal controls, one or more of which resulted in investigations by the United States Attorney's Office for the Southern District of New York, FINRA, and the SEC, as well as a potential delisting by NASDAQ, would cause the price of the Company's stock to fall as the artificial inflation caused or maintained by Defendants' misstatements and omissions was removed.

294.   As a result of the foregoing, on May 5, 2022, the price of Singularity shares fell

28.89%, from $6.75 to $4.80, and fell an additional 11.67% on May 6, 2022, following the publication of the Hindenburg Report and Peabody Report. On September 23, 2022, the price of Singularity shares fell over 4% after it was sued in federal court for securities fraud in connection with improprieties related to its efforts to raise tens of millions of dollars for the sale of unregistered securities based on misrepresentations to private investors regarding its sham cryptocurrency. On October 6, 2022, the price of Singularity shares fell an additional 12.93% after it was sued a second time for improprieties associated with the sale of unregistered securities based on misrepresentations to private investors regarding its sham cryptocurrency business. The price of Singularity shares fell 10.55% on October 7, 2022, following the announcement that it faced delisting due to its inability to file the required quarterly and annual reports with the SEC. On November 16, 2022, the price of Singularity shares fell 56.03% over two trading days after it revealed that the Company had received subpoenas from the United States Attorney's Office for the Southern District of New York and the SEC who were investigating the allegations in the Hindenburg Report and Peabody Report. On December 5, 2022, the price of Singularity shares fell 3% after it was sued for a third time in connection with its sale of unregistered securities based on misrepresentations to private investors regarding its sham cryptocurrency business causing the stock to decline 2.60%. Finally, on February 24, 2023, when Singularity announced that it agreed to settle all of the securities fraud claims against it alleging various misrepresentations in connection with the sale of unregistered securities regarding its sham cryptocurrency business, the price of Singularity shares fell over 13% from $0.69 to $0.60.

295.    Thus, the stock price declines described herein were directly and proximately caused by Defendants' materially false or misleading statements and omissions and Defendants' scheme to deceive the market.

## IX.    PRESUMPTION OF RELIANCE

296.    At all relevant times, the market for Singularity's common stock was efficient for the

following reasons, among others:

    a.    Singularity's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient market, with an average daily trading volume of hundreds of thousands or more than one million shares;

    b.    as a regulated issuer, Singularity filed periodic reports with the SEC;

    c.    Singularity regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.    Singularity was followed by numerous analysts employed by brokerage firms, including, but not limited to Wright Reports, Sadif Investment Analytics, Markeline, Price Target Research, BuySellSignals, Validea and CFRA, who wrote reports that were publicly available and entered the public marketplace.

297.    As a result of the foregoing, the market for Singularity common stock promptly digested current information regarding Singularity from all publicly available sources and reflected such information in Singularity's stock price. Under these circumstances, purchasers of Singularity common stock at artificially inflated prices during the Class Period suffered similar injury through their transactions and a presumption of reliance applies.

## X.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

298.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements described in this Complaint. Many of the specific statements described herein were not identified as "forward-looking" when

made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or that the forward-looking statement was authorized and/or approved by an executive officer of Singularity who knew that those statements were false or misleading when made.

## XI.     CLASS ACTION ALLEGATIONS

299.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a proposed Class consisting of all persons other than Defendants who acquired Singularity securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Singularity, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

300.    The members of the putative Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Singularity securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

301.    Plaintiffs' claims are typical of the claims of the members of the proposed Class as all members of the proposed Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

302.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the putative Class.

303.     Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. Among the questions of law and fact common to the putative Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of Singularity;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether Defendants omitted to state material facts necessary to make their statements or the statements of their Co-Defendants not misleading;

- whether Defendants caused Singularity to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Singularity securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

304.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the proposed Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a

class action.

305.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Singularity shares met the requirements for listing, and were listed and actively traded on NASDAQ, an efficient market;

- As a public issuer, Singularity filed periodic public reports;

- Singularity regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- Singularity securities were liquid and traded with moderate to heavy volume during the Class Period; and

- Singularity was followed by securities analysts employed by reputable brokerage firms who wrote reports that were widely distributed and publicly available.

306.    Based on the foregoing, the market for Singularity securities promptly digested current information regarding Singularity from all publicly available sources and reflected such information in the prices of the shares, and Plaintiffs and members of the proposed Class are entitled to a presumption of reliance upon the integrity of the market.

307.    Alternatively, Plaintiffs and members of the proposed Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## XII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated
### Thereunder Against All Defendants

308.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

309.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

310.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

311.   Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Singularity securities during the Class Period.

312.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Singularity were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of Singularity, their control over, and/or receipt

116

and/or modification of Singularity's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Singularity, participated in the fraudulent scheme alleged herein.

313.    Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the proposed Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Singularity personnel to members of the investing public, including Plaintiffs and the putative Class.

314.    As a result of the foregoing, the market price of Singularity securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Singularity securities during the Class Period in purchasing Singularity securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

315.    Had Plaintiffs and other members of the proposed Class been aware that the market price of Singularity securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information, which Defendants did not disclose, they would not have purchased Singularity securities at the artificially inflated prices that they did, or at all.

316.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the proposed Class have suffered damages in an amount to be established at trial.

317.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and other members of the proposed Class for substantial damages which they suffered in connection with their purchase of

Singularity securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

318.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

319.    During the Class Period, the Individual Defendants participated in the operation and management of Singularity, and conducted and participated, directly and indirectly, in the conduct of Singularity's business affairs. Because of their senior positions, they knew the adverse non-public information about Singularity's false financial statements.

320.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Singularity's financial condition and results of operations, and to correct promptly any public statements issued by Singularity which had become materially false or misleading.

321.    Because of their positions of control and authority as senior officers or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Singularity disseminated in the marketplace during the Class Period concerning Singularity's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Singularity to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Singularity within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Singularity securities.

322.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Singularity.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the putative Class, pray for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiffs and other proposed Class members against all Defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiffs and the proposed Class reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)     awarding Plaintiffs and other members of the proposed Class such other and further relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action and all issues so triable.

Dated: October 6, 2023                     Respectfully submitted,

**BERGER MONTAGUE PC**

/s/ *Michael Dell'Angelo*
Michael Dell'Angelo (*pro hac vice*)
Andrew D. Abramowitz (*pro hac vice forthcoming*)
James A. Maro (*pro hac vice forthcoming*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bm.net
         aabramowitz@bm.net
         jmaro@bm.net

*Lead Counsel for Lead Plaintiffs Ruibin Wang, Sen Gao, Luxiao Xu, and Congli Huo, and Lead Counsel for the proposed Class*

**KIRBY McINERNEY LLP**
Ira M. Press
Sarah E. Flohr
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
Email: ipress@kmllp.com
      sflohr@kmllp.com

*Local Counsel for Lead Plaintiffs Ruibin Wang, Sen Gao, Luxiao Xu, and Congli Huo, and Local Counsel for the proposed Class*

**SCHALL LAW FIRM**
Brian Schall (*pro hac vice forthcoming*)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel: (310) 301-3335
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiffs Ruibin Wang, Sen Gao, Luxiao Xu, and Congli Huo*