**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| SEN GAO, CONGLI HUO, RUIBIN WANG, LUXIAO XU, Individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>SINGULARITY FUTURE TECHNOLOGY, LTD. F/K/A SINO-GLOBAL SHIPPING AMERICA LTD., YANG JIE, LEI CAO, ZHIKANG HUANG, TUO PAN, XIAOHUAN HUANG, JING SHAN, TIELING LIU, JING WANG, LEI NIE, JOHN LEVY, THOR MINER, INC., and GOLDEN MAINLAND, INC.,<br><br>     Defendants. | Case No: 22-cv-07499-BMC |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS SINGULARITY FUTURE TECHNOLOGY, LTD.'S AND ZHIKANG HUANG'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

11238090.19

**TABLE OF CONTENTS**

**Page(s)**

STATEMENT OF FACTS .................................................................................................. 2

    A.    Singularity's Attempted Pivot Into Crypto Mining ................................................ 2

    B.    Defendant Jie's Alleged Troubles Were Well Publicized Prior To The
        Class Period ........................................................................................................... 4

    C.    The Hindenburg and Peabody Reports Merely Re-Packaged Public
        Information ............................................................................................................. 5

STANDARD OF REVIEW .............................................................................................. 6

ARGUMENT .................................................................................................................... 7

POINT I - PLAINTIFFS DO NOT PLAUSIBLY ALLEGE LOSS CAUSATION ..................... 7

    A.    Plaintiffs Fail To Account For Stock Price Volatility During The Class
        Period .................................................................................................................... 8

    B.    Failure To Disaggregate Intervening Causes Is Fatal To Loss Causation ........... 17

    C.    The Disclosures That Uncovered Alleged Omissions Did Not Reveal Non-
        Public Information ................................................................................................ 18

POINT II - PLAINTIFFS IMPERMISSIBLY RELY ON GROUP PLEADING TO
ALLEGE DEFENDANT ZHIKANG'S INDIVIDUAL LIABILITY ............................. 23

POINT III - PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION
20(A) AS TO DEFENDANT ZHIKANG ................................................................... 25

CONCLUSION ................................................................................................................ 25

11238090.19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*60223 Trust v. Goldman Sachs & Co.*,
　540 F.Supp.2d 449 (S.D.N.Y. 2007)..................................................................9, 17

*In re Am. Int'l Grp. Inc. 2008 Sec. Litig.*,
　741 F.Supp.2d 511 (S.D.N.Y. 2010)......................................................................19

*Anschutz Corp. v. Merrill Lynch & Co.*,
　690 F.3d 98 (2d Cir. 2012).......................................................................................6

*In re Arcimoto Inc.*,
　2022 WL 17851834 (E.D.N.Y. Dec. 22, 2022) ....................................................20

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)..................................................................................................6

*In re AstraZeneca Securities Litig.*,
　559 F.Supp.2d 453 (S.D.N.Y. 2008)......................................................................24

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
　493 F.3d 87 (2d Cir. 2007)..................................................................................6, 25

*Basic, Inc. v. Levinson*,
　485 U.S. 224 (1988)................................................................................................18

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
　543 Fed. Appx. 72 (2d Cir. 2013).........................................................9, 14, 17, 18

*In re China Organic Securities Litig.*,
　2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013)................................................10, 19

*In re Citigroup, Inc. Securities Litig.*,
　330 F.Supp.2d 367 (S.D.N.Y. 2004)......................................................................23

*DoubleLine Capital LP v. Odebrecht Finance Ltd.*,
　323 F.Supp.3d 393 (S.D.N.Y. 2018)..................................................................8, 22

*Dura Pharms., Inc. v. Broudo*,
　544 U.S. 336 (2005)..................................................................................6, 7, 8, 12

*Finn v. Barney*,
　471 Fed. Appx. 30 (2d Cir. 2012) ............................................................................2

i

*In re Initial Public Offering Securities Litig.*,
  383 F.Supp.2d 566 (S.D.N.Y. 2005) ............................................................... 2

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) .......................................................................................... 24

*In re Keyspan Corp. Sec. Litig.*,
  383 F.Supp.2d 358 (E.D.N.Y. 2003) ............................................................... 25

*Kusnier v. Virgin Galactic Holdings, Inc.*,
  639 F.Supp.3d 350 (E.D.N.Y. 2022) ............................................................. 6, 22

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005) ..................................................................... *passim*

*In re Merrill Lynch & Co. Research Reports Sec. Lit.*,
  568 F.Supp.2d 349 (S.D.N.Y. 2008) ............................................................. 17, 18

*In re Moody's Corp. Securities Litig.*,
  612 F.Supp.2d 397 (S.D.N.Y. 2009) ............................................................... 17

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ..................................................................... 7, 20, 22

*Orlan v. Spongetech Delivery Systems, Inc. Sec. Litig.*,
  2012 WL 1067975 (E.D.N.Y. Mar. 29, 2012) ................................................. 24

*In re Sanofi Securities Litig.*,
  155 F.Supp.3d 386 (S.D.N.Y. 2016) ................................................................. 2

*Stratte-McClure v. Morgan Stanley*,
  598 Fed. Appx. 25 (2d Cir. 2015) ................................................................. 10, 18

*In re Virtus Inv. Partners, Inc.*,
  195 F.Supp.3d 528 (S.D.N.Y. 2016) ............................................................... 25

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ............................................................................. 8

*Xu v. Gridsum Holding, Inc.*,
  624 F.Supp.3d 352 (S.D.N.Y. 2022) ............................................................... 24

*Zhong Zheng v. Pingtan Marine Enterprise Ltd.*,
  379 F.Supp.3d 164 (E.D.N.Y. 2019) ............................................................... 24

**Statutes and Rules**

15 U.S.C. § 78t ...................................................................................................... 25

Fed. R. Civ. P. 9 ..................................................................................................................6, 23, 24

Fed. R. Civ. P. 12(b)(6) ..................................................................................................................2

iii

Plaintiffs' third attempt to bring a securities class action – a 300-paragraph shotgun-style, but legally deficient, Second Amended Complaint (the "SAC") (Dkt. 58) – fails because Plaintiffs do not state a claim for securities fraud, or for liability under Section 20(a).  Under the Private Securities Litigation Reform Act ("PSLRA"), Plaintiffs cannot transform puffery, forward-looking statements, or short sellers' characterization of already public information, into legally actionable "misstatements" or "omissions."  Especially because Plaintiffs failed to conduct their own independent investigation and instead rely on secondhand allegations (some of which are demonstrably false, and none of which they attempted to corroborate).  But even if they could, the claims would still be legally deficient because they fail to properly allege that such purported misstatements were material, or the legal cause of their losses in light of the publicly available information.  Allegations of loss causation are particularly deficient because of the many other factors which could (and did) influence Singularity's stock price during the relevant period.  The SAC must account for these intervening causes to survive, but completely ignores them.

In this memorandum of law, Defendants Singularity Future Technology Ltd. f/k/a Sino-Global Shipping America Ltd. ("Singularity" or the "Company") and Zhikang Huang ("Zhikang") address why the SAC must be dismissed due to Plaintiffs' failure (and inability) to plead loss causation (as to all Defendants), and failure to plead with particularity or state a claim under Section 20(a) (as to Zhikang).  Singularity and Zhikang incorporate by reference the memoranda of law submitted by Defendants Yang Jie, Xiaohuan Huang, and Lei Cao as to Plaintiffs' failure to allege a material misstatement or omission, scienter, Plaintiffs' failure to conduct their own investigation, and control under Section 20(a) (which is applicable to Defendant Zhikang).  For all of these reasons, the SAC should be dismissed, with prejudice.

1

## STATEMENT OF FACTS[1]

### A.    Singularity's Attempted Pivot Into Crypto Mining

Plaintiffs purport to represent a class of investors who purchased Singularity stock between February 2, 2021 and February 24, 2023.  *See* SAC ¶ 1.  Plaintiffs allege that prior to the Class Period, Singularity was a shipping and logistics company "in decline," and that its stock price was volatile.  *See* SAC ¶¶ 4-5, 46.  The Class Period commences with Singularity's announcement that it would be transforming from "a non-asset based global shipping and freight logistical integrated solutions provider" into a cryptocurrency and bitcoin mining firm.  SAC ¶ 102 (quoting Form 8-K).  This announced transformation came at a time when the crypto market, including crypto mining, was in a boom period.[2]  A chart summarizing Singularity's stock fluctuations during the period is annexed as **Exhibit A** to the accompanying Declaration of Alexander Malyshev ("Malyshev Decl.").  Charts tracking the bitcoin and crypto industry during the same period (showing similar movements) are attached as **Exhibits B** and **C** to the Malyshev Declaration.

In connection with its pivot, Singularity raised funds, engaged in various transactions to buy equipment for its new venture, and found partners to help it enter the promising crypto market.

---

[1] The Statement of Facts accepts as true Plaintiffs' allegations for the purpose of this Motion, except for (i) legal characterizations of factual events, and (ii) where contradicted by documents the Court may consider, including (a) "well-publicized stock prices," *In re Initial Public Offering Securities Litig.*, 383 F.Supp.2d 566, 574 (S.D.N.Y. 2005) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000)), and (b) "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to plaintiff and upon which it relied in bringing the suit." *In re Sanofi Securities Litig.*, 155 F.Supp.3d 386, 397 (S.D.N.Y. 2016) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

[2] *See, e.g.*, Daniel Roberts, *Bitcoin Breaks $40,000 as 2020 Surge Continues Into New Year*, YAHOO! FINANCE, (Jan. 7, 2021), https://finance.yahoo.com/news/bitcoin-keeps-hitting-new-records-193106428.html (describing a "surge" in bitcoin value from 2020 continuing into 2021 and labelling it a "bitcoin bonanza"); *Bitcoin and Crypto Mining in 2021 - The Expected Trends*, BUSINESS MONEY, (Jan. 15, 2021), https://www.business-money.com/announcements/bitcoin-and-crypto-mining-in-2021-the-expected-trends/ ("Despite the Bitcoin profitability levels halving in mid-2020, there has been an upward trajectory from late 2020 that is spilling over to 2021. This alone is enough reason to say that *the crypto mining industry will be better in 2021 than in 2020*. The general rise in Bitcoin prices will definitely steer [crypto] mining profitability." (emphasis added)).  This Court may take judicial notice of news articles and other documents "for the purpose of establishing that the information was publicly available" and being said in the press. *Finn v. Barney*, 471 Fed. Appx. 30, 32 (2d Cir. 2012).

SAC ¶¶ 3-6.  These included sales of registered and unregistered securities, announced on February 9, 10-11, 2021, and an announcement on February 16, 2021, that Singularity was seeking to "vastly accelerate its efforts to raise cash based on its cryptocurrency transformation."  SAC ¶¶ 104, 106-08, 111.  The efforts also included the purchase of digital currency operation servers and digital currency mining servers, announced on March 3, and September 21, 2021.  SAC ¶¶ 114, 116.  Singularity also entered into various business relationships with other companies.  On February 14, 2022, Singularity announced a project cooperation agreement with Rich Trading Co. Ltd. USA ("RTC") for trading computer equipment.  SAC ¶¶ 191-92.  Singularity also entered into two joint ventures with: (1) HighSharp called Thor Miner, announced on October 4, 2021 (the "Thor Joint Venture") and (2) Golden Mainland, Inc., announced on April 11, 2022 (the "Mainland JV").  SAC ¶¶ 147-49, 126-28.  The Thor Joint Venture entered into a contract to sell crypto mining machines to SOS Information Technology New York, Inc. ("SOS"), announced on January 14, 2022 (the "SOS Agreement").  SAC ¶¶ 157, 161.

Defendants made hopeful statements about Singularity's business strategy, including its pivot into the cryptocurrency sphere.  *See e.g.*, SAC ¶¶ 102, 120, 126-28 (citing press releases and filings with the SEC).[3]  However, they also disclaimed forward-looking statements[4] and disclosed internal and external issues confronting Singularity, including internal control deficiencies, SAC ¶¶ 201-09,[5] and various global trends and market forces such as the COVID-19 pandemic,

---

[3] *See, e.g.*, Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Feb. 3, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021006399/ea134547-8k_sino.htm.

[4] *See, e.g.*, Press Release, Sino-Global Shipping America, Ltd., Sino-Global Announces New Executive Leadership to Drive Bitcoin Mining Operations Expansion (Feb. 2, 2021); Press Release, Sino-Global Shipping America, Ltd., Sino-Global Enters Bitcoin Mining Machine Joint-Venture with Highsharp; Will Make Investment to Drive Product Development   and   Expansion   (Oct.   4,   2021),   https://www.sec.gov/Archives/edgar/data/1422892/000101376221000102/ea148358ex99-1_sinoglobal.htm.

[5] The SAC cites Forms 10-Q, and 10-K filed during the period from February 12, 2021 to February 14, 2022.  *See, e.g.*, Sino-Global Shipping America, Ltd., Quarterly Report for the Quarter Ended December 31, 2020 (Form 10-Q) (Feb. 12, 2021), https://www.sec.gov/Archives/edgar/data/1422892/000121390021008946/f10q1220_sinoglobal.htm

11238090.19

restrictions in China, and the global chip shortage, *see, e.g.*, SAC ¶¶ 154 (citing Press Release, Sino-Global Shipping America, Ltd., Sino-Global Enters Bitcoin Mining Machine Joint-Venture with Highsharp; Will Make Investment to Drive Product Development and Expansion (Oct. 4, 2021); *id.* ¶¶ 171-73 (citing court filings from litigation with SOS, captioned *SOS Info. Tech. N.Y., Inc. v. Thor Miner Inc.*, Index No. 65735/2022 (N.Y. Sup. Ct., N.Y. County)).

One of the largest transactions announced was the transaction with SOS—which required that Singularity deliver crypto mining machines to SOS. *See* SAC ¶ 157. The scale of the agreement announced with SOS was massive—with Singularity announcing that it had secured a $200,000,000 contract. *Id.* Under the terms of the agreement, Singularity was to sell SOS 44,792 mining machines in installments. SAC ¶ 158. Ultimately, Singularity struggled to fulfill the terms of the agreement and shipped only 1,948 machines to SOS. *See* SAC ¶ 168.

## B.    Defendant Jie's Alleged Troubles Were Well Publicized Prior To The Class Period

At the beginning of the Class Period, Jie was serving as Singularity's vice president. Beginning on November 1, 2021, Jie became the Company's CEO. *See* SAC ¶¶ 6-7, 26. Prior to joining Singularity, Jie was associated with another company, China Commercial Credit ("CCC"). SAC ¶ 58. In 2019, prior to the Class Period and during Jie's tenure at CCC, CCC was involved in litigation that resulted in published opinions by a New York court (also in 2019) finding that Jie had played a role in diverting funds. *See* SAC ¶ 63. Additionally, beginning as early as 2019, Jie was asked questions regarding his alleged legal problems in China in an American newspaper. *See* SAC ¶ 70. As set forth in Jie's concurrent motion to dismiss, the SAC's allegations with respect to actual criminality are false and inactionable.

---

(disclosing pre-Class Period internal controls issues ); Singularity Future Technology Ltd., Quarterly Report for the Quarter Ended December 31, 2021 (Form 10-Q) (Feb. 14, 2022), https://www.sec.gov/ix?doc=/Archives/edgar/data/1422892/000121390022007553/f10q1221_singularity.htm (disclosing similar internal controls issues that had persisted from before the Class Period).

**C.      The Hindenburg and Peabody Reports Merely Re-Packaged Public Information**

On May 5, 2022, two short seller reports were issued criticizing Singularity: (1) Hindenburg Research's report, titled "Singularity Future Technology: This Nasdaq-Listed Company's CEO Is A Fugitive, On The Run For Allegedly Operating A Massive Ponzi Scheme" (the "Hindenburg Report"); and (2) Peabody Street Research's report, titled "How Did A Chinese Fugitive Wind Up As The CEO Of A Publicly Traded Company?" (the "Peabody Report"). SAC ¶¶ 213-14. While the reports purported to "reveal" alleged fraud in transactions that Singularity had entered into during the Class Period, including (1) the two joint ventures; (2) the SOS Agreement; and (3) the RTC agreement (SAC ¶¶ 222-27), they merely re-packaged already public information.

The Hindenburg Report alleged that Jie was wanted criminally in China, and reported that Jie was connected to CCC's failure. *See* SAC ¶ 216. But in reality, the Hindenburg and Peabody reports merely summarized the prior litigation in New York involving CCC and Jie's involvement (which were already public). *See* SAC ¶ 219.

As to Singularity, the Hindenburg and Peabody Reports compared Singularity's public disclosures with information regarding crypto mining machines and alleged that Singularity's machine was almost identical to a competitor's machine. *See* SAC ¶ 222. They also claimed to have uncovered, *based on publicly available documents*, that the transaction with SOS was a related party transaction. *See* SAC ¶ 225. Finally, both the Hindenburg and Peabody Reports alleged that the other transactions and joint ventures Singularity had announced as part of its pivot were shams, relying largely on publicly available information regarding the companies Singularity had entered into those transactions with. *See* SAC ¶¶ 226-27.

11238090.19

## STANDARD OF REVIEW

To survive a motion to dismiss under FRCP 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In a securities fraud action under Section 10(b) and Rule10b-5, Plaintiffs must plausibly allege "(1) a material misrepresentation or omission by the defendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F.Supp.3d 350, 368 (E.D.N.Y. 2022) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011)).

Plaintiffs' claims are subject to FRCP 9(b)'s heightened pleading standard which requires Plaintiffs to "state[] with particularity . . . the circumstances constituting fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). They must "(1) specify the statements [they contend] were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012). Moreover, under the PSLRA, "securities fraud complaints [must] 'specify' each misleading statement; . . . set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and . . . 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(1), (2)).

**ARGUMENT**

**POINT I**
**PLAINTIFFS DO NOT PLAUSIBLY ALLEGE LOSS CAUSATION**

Plaintiffs do not sufficiently plead loss causation for a number of reasons.  First, Plaintiffs fail to demonstrate the alleged stock price changes were not attributable to intervening causes— chiefly, general cryptocurrency market volatility,[6] a 2022 crash across the crypto industry,[7] semiconductor and chip shortages, and COVID-19 restrictions in China.[8]  Second, to the extent that the claims are based on omissions, Plaintiffs point to corrective disclosures that failed to reveal non-public information.

To satisfy the loss causation requirement, a plaintiff must allege that (1) the misrepresentation or omission artificially inflated the price of the stock; (2) the market learning of the misrepresentation or omission resulted in a stock price drop; and (3) the stock price drop was not caused by other, unrelated, market factors.  *See Dura Pharms.*, 544 U.S. at 342-43, 345-46 (holding that plaintiffs must allege proximate causation by accounting for three traditional elements of causation and loss because price inflation alone and sale at a lower price is insufficient); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 510 (2d Cir. 2010) (noting the loss causation approach in the Second Circuit is "one of proximate cause" defined by the "zone of

---

[6] *See* Malyshev Decl., Exhibits B & C.

[7] Colin Harper, *Bitcoin Mining In 2022: The Year Boom Turned To Bust*, FORBES: DIGITAL ASSETS, (Dec. 23, 2022, 12:47 PM),  https://www.forbes.com/sites/colinharper/2022/12/23/bitcoin-mining-in-2022-the-year-boom-turned-to-bust/?sh=52ee563f70b6; David Canellis, *5 Charts Showing How Brutal 2022 Was For Public Bitcoin Miners*, BLOCKWORKS, (Jan. 18, 2023, 3:09 PM), https://blockworks.co/news/2022-for-public-bitcoin-miners (demonstrating top crypto mining companies "underperformed against bitcoin, which fell about 60% through [2022]")

[8] Ana Swanson & Catie Edmondson, *Commerce Dept. Survey Uncovers 'Alarming' Chip Shortages*, N.Y. TIMES, (Jan. 25, 2022), https://www.nytimes.com/2022/01/25/business/economy/chips-semiconductors-shortage.html (discussing survey findings, including that "it takes companies twice as long in some cases to procure certain in-demand chips" and noting pandemic conditions); Goh Chiew Tong, *Global Chip Shortage Is Not Over And the Slowdown Is 'Going To Bite,' Analyst says*, CNBC, (July 19, 2022, 8:45 PM), https://www.cnbc.com/2022/07/20/global-chip-shortage-continues-amid-inflation-rising-rates-and-war-idc.html (discussing connection between chip shortage and war in Ukraine limiting ability to get krypton for chip production).

7

risk"). Because Plaintiffs have not accounted for Singularity's fluctuating stock price or general market forces, they have failed to meet this burden.

Loss causation can be pled in two ways (1) that "the existence of the cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud" or (2) "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *DoubleLine Capital LP v. Odebrecht Finance Ltd.*, 323 F.Supp.3d 393, 456 (S.D.N.Y. 2018); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016) (noting "[t]hat 'corrective disclosure' and 'materialization of risk' are not wholly distinct theories").

Ultimately, "to establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' . . . *i.e.*, that the misstatement or omission concealed something from the market, that when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)) (first ellipsis and emphasis in original). Plaintiffs do not. The historic volatility of Singularity's stock, the general volatility of the crypto market, and global economic trends are not accounted for in the SAC. And for many of the complained of statements, Plaintiffs point to disclosures that merely put a negative spin on already publicly available information.

## A.    Plaintiffs Fail To Account For Stock Price Volatility During The Class Period

There are a "tangle of factors affecting [the] price" of Singularity's stock during the Class Period. *Dura Pharms.*, 544 U.S. at 343. Even before Singularity's move into cryptocurrency, the stock was constantly fluctuating, and Singularity was in danger of being de-listed.[9] Then, after

---

[9] *See, e.g.*, Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Jan. 24, 2020), sec.gov/Archives/edgar/data/1422892/000121390020001738/f8k012120_sinoglobal.htm; Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (July 26, 2019), sec.gov/Archives/edgar/data/1422892/000121390019013704/f8k072319_sinoglobal.htm; Sino-Global Shipping

11238090.19

Singularity announced a pivot from shipping and logistics to crypto mining, the stock price became subject to general investor excitement (and subsequent disappointment) in the crypto market and that market's volatility which was caused by a host of other factors, including the COVID-19 pandemic, supply chain issues, and semiconductor and chip shortages. These factors were especially pronounced during the majority of the Class Period which includes 2022, a tumultuous year in the crypto market which negatively impacted even the flagship crypto mining companies. Plaintiffs do not sufficiently account for these intervening causes. Because this is a fraud case, the issue is not whether entering the crypto industry in 2021 was a good business decision, but whether Plaintiffs tie specific misstatements directly to quantifiable losses in light of a host of intervening causes. They do not.

For Plaintiffs to plausibly allege loss causation, they must account for prior stock price drops, other market trends, and gradual changes in stock price over the course of the Class Period. *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 Fed. Appx. 72, 74-76 (2d Cir. 2013) (loss causation pleading insufficient where class period opened with corporate defendant reporting losses that deflated price and the public already had information about the defendant's insolvency); *60223 Trust v. Goldman Sachs & Co.*, 540 F.Supp.2d 449, 461 (S.D.N.Y. 2007) (finding loss causation was inadequately pleaded when the allegations did "not even refer to the phenomenon of the gradual loss of the stock's value, much less attempt to explain it as related to loss causation"). That is particularly the case where the investment was in a company that was pivoting into a crypto industry that was at its height, and the losses "coincide[d] with a marketwide phenomenon causing comparable losses to other investors" in that industry

America, Ltd., Current Report (Form 8-K) (Nov. 23, 2012),
sec.gov/Archives/edgar/data/1422892/000114420412064660/v329190_8k.htm.

2022. *Lentell*, 396 F.3d at 174 ("[T]he prospect that the plaintiff's loss was caused by the fraud decreases' and a plaintiff's claim fails when 'it has not adequately [pleaded] facts which, if proven, would show that [plaintiff's] loss was caused by the alleged misstatements as opposed to intervening events." (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994))). "Although Plaintiffs need not rule out all competing theories for the decline in stock price, their allegations *must* 'show that [their] loss was caused by the alleged misstatements as opposed to intervening events.'" *Stratte-McClure v. Morgan Stanley*, 598 Fed. Appx. 25, 29 (2d Cir. 2015) (quoting *Lentell*, 396 F.3d at 174) (emphasis added)). Plaintiffs do not.

Plaintiffs fail to plausibly allege that the inflation in stock price was caused by any of the alleged misrepresentations, or that any loss was caused by allegedly corrective statements. The Class Period opened on February 2, 2021 with, according to Plaintiffs, "Singularity's legacy shipping business [having] long been in decline, hampered by razor-thin margins and reliance on a small number of clients." SAC ¶ 5. On February 3, 2021, after Singularity announced its "planned Bitcoin mining expansion" and that it was "excited to explore opportunities created by current market conditions and enter the cryptocurrency sector," Singularity stock increased by almost 57% in value, or $2.70. *See* SAC ¶¶ 102-03.[10] Although, generally, changes in stock price on the same day or the day following an announcement measures the market's reaction to a company's disclosure, here the longer-term stock price changes exhibit the volatility of Singularity's stock and the market into which Singularity had entered. *See, e.g., In re China*

---

[10] The SAC quotes from Singularity's 8-K filing incorporating a press release. *See* Sino-Global Shipping America, Ltd., Current Report (Form 8-K) (Feb. 3, 2021), sec.gov/Archives/edgar/data/1422892/000121390021006399/ea134547-8k_sino.htm. Although Plaintiffs misstate the increase in stock price in the Complaint, SAC ¶ 103, the increase in price was larger than Plaintiffs allege after the pivot into crypto was announced. Defendants rely on the chart (and the underlying share price data) provided in Exhibit A of the Malyshev Decl. Additionally, because Singularity's stock was trading at low prices during the Class Period, percent changes in price can overstate the magnitude of price changes. For that reason, this memorandum will provide both a percent change and actual change.

*Organic Securities Litig.*, 2013 WL 5434637, *9 (S.D.N.Y. Sept. 30, 2013) (analyzing stock price the day of the announcement and looking to stock price behavior in days following a disclosure of negative news).   Just in the days that followed Singularity's announced pivot into the crypto market, its stock price continued to increase, albeit in an erratic manner, peaking at $11 on February 8.

On February 9, 2021, Singularity announced the first of its efforts to raise funds for its expansion into Bitcoin mining.  Following this announcement, the stock price *dropped* from $11 on February 8 to $9.10 (17.3%) on February 9, and then further to $7.40 on February 10 (18.7%), in total a $3.60 decrease (32.7%).  The stock price ultimately increased again, but these trends in Singularity's stock price are prevalent throughout the Class Period: announcements of apparently good news accompanied by either drops in stock price or only short-lived increases.  This is indicative of market skepticism about Singularity's ability to compete, and not reliance on any statements by Singularity.  This initial fluctuation of Singularity's stock price is emblematic of Singularity's historical stock price, which Plaintiffs note in their Complaint at various points—being aware of Singularity's "checkered history" of "red flags."  SAC ¶ 139; *see also id.* ¶¶ 46-47.

Not only do Plaintiffs fail to account for Singularity's historical stock price fluctuations, but they also cherry-pick alleged stock price reactions to company announcements.  For example, Plaintiffs completely ignore the previously discussed stock price drop that accompanied the announcement of the sale of company stock valued at $28,509,000 on February 9 until February 11 (although they discuss the announcement).  *See* SAC ¶¶ 104-05.  Instead, Plaintiffs focus on the inflation in stock price after the February 9, 2021 filing of a Registration Statement announcing that the Company would be "seeking to vastly accelerate its efforts to raise cash based on its cryptocurrency transformation."  That vague, forward-looking statement accompanied an increase

11

in stock price over a week from February 9 to February 17 from $9.10 to $9.47 (a 4% increase). SAC ¶¶ 111-12.  But in the weeks following that hopeful announcement, Singularity stock dropped to a price below the opening price in the Class Period, $4.63 (a 51% decrease), on March 5, 2021. A March 12, 2021, announcement that Singularity had purchased digital currency operation servers accompanied a short-term bump from $7.44 to $8 (7.5%) on the day of the announcement, and up to $8.57 (a 15% increase) one week later.  But that price increase to $8.57 would eventually be reversed, unexplained by Plaintiffs, as the SAC later alleges that the stock was at $2.50 on September 21, 2021, when Singularity made another announcement regarding a mining server purchase which caused a slight increase but only to $2.58 (a 3.2% increase) on September 22, the day following the purchase announcement.  *See* SAC ¶¶ 116-17.

Fatally to their claim, Plaintiffs *fail* to account for this decline in Singularity stock price between seemingly positive company disclosures that contained alleged material omissions (from over $10 per share on February 22, 2021, to under $3 per share in September 2021).  Time and again, the SAC fails to link disclosures with allegedly material omissions or misstatements to inflation of or drops in Singularity's stock price.  *See Dura Pharms.*, 544 U.S. at 346 (recovery requires two "traditional elements" of loss causation: a misrepresentation "leads to an inflated purchase price" and to economic loss).  Instead, a review of the stock price history shows the stock price was fluctuating throughout the Class Period, tracking both the value of Bitcoin and the cryptocurrency market generally.[11]  Plaintiffs selectively chose which changes to highlight in the SAC.

Moreover, Plaintiffs do not plausibly allege that the market was positively responding to specific statements related to Singularity's pivot into crypto mining.  As discussed above, the

---

[11] *See* Malyshev Decl. Exhibits B & C.

11238090.19

initial spike in value from the announcement of Singularity's pivot was wiped away by the time Singularity disclosed its main transactions in the crypto market. Significantly, there is no sustained price inflation from the disclosure of various benchmark transactions that Plaintiffs point to, such as the Thor Joint Venture and the Mainland JV.

In the month following the Thor Joint Venture announcement on October 4, 2021, the price increased from $2.31 on October 1 to $3.70 (60%) on November 2. But most of that gain appears to be unrelated to the Thor Miner announcements, as in the first ten days following the announcement, the price increased only $0.42 (18%), and there was an even smaller increase immediately after the announcement, increasing by $0.10 (4%) the day of the announcement, $0.01 (0.4%) the day after the announcement, and just $0.08 (3%) by the end of the week on October 8. Plaintiffs make no attempt to explain why there would be a delayed market response to the Thor Joint Venture deal or how, given that delay, the Thor Joint Venture could have caused the increase in stock price.

Similarly, Plaintiffs do not explain how any losses were caused by the announcements surrounding the Mainland JV. After the stock price dropped from its peak price during the Class Period of $19.78 on April 7, 2022 by 64%, to $7.08, Singularity announced the Mainland JV on April 11. That announcement provided a slight bump to the price by 23% (to $8.70) on April 12. But that increase was completely erased in just two days, and on April 14 the stock price fell to $6.46, below the closing stock price on April 11, the day of the announcement.

Nor do Plaintiffs attempt to explain the drop in Singularity's stock price which was already occurring at the time of the Hindenburg and Peabody Reports. After Singularity stock reached a Class Period peak on April 7, 2022 at $19.78 the stock price dropped by over 65% and $13.03 per share by May 4, 2022—prior to the Hindenburg and Peabody report publications on May 5.

Following the publication of both negative reports, the stock price continued its decline, but only dropped by $1.95 (29%) from May 4 to May 5 and by $2.45 (36%) between May 4 and May 11. Thus, the *majority* of the loss occurred *prior* to the reports being published.  It is a reasonable conclusion that the continuing slide was part of that trend, and not the result of the intervening reports.  As such, Plaintiffs have failed to allege that the "share price fell significantly after the truth became known." *Cent. States*, 543 Fed. Appx. at 75-76 (quoting *Dura Pharms.*, 544 U.S. at 347) (noting the plaintiffs failed to allege that the "share price fell significantly after the truth became known" when the defendant's stock dropped in price by 40% before an alleged corrective-disclosure article was published).

Additionally, Plaintiffs do not allege that the alleged related-party transactions had any effect on inflating the value of the stock or on its decline in value.  *See* SAC ¶¶ 191-93, 227 (RTC related-party transaction allegations); *id.* ¶¶ 185-89 (SOS agreement related-party transaction allegations).  In fact, the stock price dropped following the announcement of the RTC transaction on February 14, 2022, from the previous trading day of February 11 by 1.39% (a $0.09 drop) and by 3.6% (a $0.23 drop) by close on February 15.  The SOS Agreement announcement on January 14, 2022, which was a positive announcement for Singularity's crypto business, resulted in a *drop* from the previous day of about 7% ($0.37), a drop of 2.8% ($0.03) after the next two trading days, a drop of 9.7% ($0.45) after ten days, and an overall drop of 15.3% ($0.71), in the two weeks following the announcement.

Plaintiffs rely solely on general investor reliance on alleged sham transactions to account for all of their losses.  But they fail to account for the market-wide trends that impacted Singularity stock performance.  For example, once the two reports were published on May 5, 2022, and the stock price dropped to $4.30 per share on May 11, Singularity's stock price climbed again to as

high as $4.74 on May 17.  And Plaintiffs do not account for that subsequent stock price increase, which defied a downward trend that might be expected following the announcement.  The failure to do so would certainly align with an explanation that the crypto market behaved with that kind of volatility, particularly in 2022.  But Plaintiffs do not discuss it.

The volatility of Singularity stock, increases and decreases, can be substantially attributed to the volatility in the crypto market.[12]  In 2021, the value of Bitcoin, the cryptocurrency that Singularity was attempting to mine, fluctuated in value by about as much as $40,000 per token.[13]  Also, 2021 saw considerable optimism for the crypto market and crypto mining.[14]  Significantly, February 2021 saw a 47% increase in the value of Bitcoin, and in the timeframe between the start of the Class Period on February 2 and February 17 (when Singularity stock price increased from $4.74 to $9.47, a nearly 100% increase), Bitcoin's value spiked 47%.  In February 2021, when Singularity stock dropped in price, as it did from February 20 to February 27, Bitcoin's value also decreased.  Indeed, a holistic look at Bitcoin's value throughout 2021 mirrors the volatility demonstrated in Singularity stock.[15]  A similar trend can be seen in comparing Singularity's stock performance against S&P Dow Jones' Cryptocurrency Broad Digital Market (BDM) Index.[16]

---

[12] Omid Malekan, *What Skeptics Get Wrong About Crypto's Volatility*, HARVARD BUS. REV., (July 6, 2022), https://hbr.org/2022/07/what-skeptics-get-wrong-about-cryptos-volatility (discussing the 2022 "dark times for the crypto industry" and noting that general volatility in the crypto market exists and crediting it to the industry being "young").

[13] *See* Malyshev Decl., Exhibit B.

[14] Daniel Roberts, *Bitcoin Breaks $40,000 as 2020 Surge Continues Into New Year*, *supra* (describing a "surge" in bitcoin value from 2020 continuing into 2021 and labelling it a "bitcoin bonanza," noting that institution investors, "Wall Street titans," and well-known financial institutions have invested in bitcoin); *Bitcoin and Crypto Mining in 2021 - The Expected Trends*, *supra* ("Despite the Bitcoin profitability levels halving in mid-2020, there has been an upward trajectory from late 2020 that is spilling over to 2021. This alone is enough reason to say that *the crypto mining industry will be better in 2021 than in 2020*. The general rise in Bitcoin prices will definitely steer [crypto] mining profitability." (emphasis added)).

[15] *Compare* Malyshev Decl., Exhibit A (Singularity stock chart) *with* Malyshev Decl., Exhibit B (Bitcoin U.S. dollar value).

[16] *Compare* Malyshev Decl., Exhibit A *with* Malyshev Decl., Exhibit C (cryptocurrency market index).

Singularity's stock price inflation and deflation tracked investor excitement and skepticism in the crypto market.  Singularity was swept up in that current and, in 2022, the value of Bitcoin and the crypto mining industry collapsed due to a variety of factors including semiconductor and chip shortages and various global economic trends and events.[17]  During this time, Singularity stock price tracked crypto mining company stock prices.  As Bitcoin fell in value over the entire year, crypto mining company stocks also did—and fell even worse.

According to one Forbes commentary, "[f]or bitcoin miners, 2022 was the year that the gold rush became panned out."  Several statistics from December 2022 demonstrated market downturn during the year: (a) bitcoin was down 63%; (b) bitcoin mining profitability was down 70%; (c) the prices of the most sought-after bitcoin mining machines were down 85%; (d) bitcoin mining stocks were down anywhere from 80-98%; and (e) the average industrial electricity cost in the U.S. was up 23%.[18]  In that context, Singularity's overall stock drop of 90% in 2022 could be accounted for by looking at the performance of the crypto market.  The drop can also be explained by the Company's status as a new entrant in the market with ambitious goals.  But announcing ambitious goals, in an industry that does not pan out, is not securities fraud.

Here, it is clear that Plaintiffs fail to "disaggregate those losses caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, from disclosures of the truth behind the alleged misstatements."

---

[17] Colin Harper, *Bitcoin Mining In 2022: The Year Boom Turned To Bust*, *supra*; David Canellis, *5 Charts Showing How Brutal 2022 Was For Public Bitcoin Miners*, *supra* (demonstrating the top crypto mining companies "underperformed against bitcoin, which fell about 60% through [2022]"); Ana Swanson & Catie Edmondson, *Commerce Dept. Survey Uncovers 'Alarming' Chip Shortages*, *supra* (discussing the survey findings, including that "it takes companies twice as long in some cases to procure certain in-demand chips" and noting pandemic conditions); Goh Chiew Tong, *Global Chip Shortage Is Not Over And The Slowdown Is 'Going To Bite,' Analyst says*, *supra* (discussing the connection between the chip shortage and the war in Ukraine limiting the ability to get krypton for chip production).

[18] Harper, *Bitcoin Mining In 2022: The Year Boom Turned To Bust*, *supra*.

16

*Cent. States*, 543 Fed. Appx. at 76 (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009)) (noting this requirement in establishing loss causation comes from *Dura Pharmaceuticals*); *see also In re Merrill Lynch & Co. Research Reports Sec. Lit.*, 568 F.Supp.2d 349, 364 (S.D.N.Y. 2008) ("Here, as in *Lentell*, the Complaint *does not assert facts that distinguish between the alleged fraud and the market-wide collapse* of Internet stocks as the cause of [the plaintiff's] losses." (emphasis added)).  Plaintiffs are required to allege the causes of their economic losses with more specificity under these circumstances – a crash in the very market which Singularity was attempting to enter.  *See In re Moody's Corp. Securities Litig.*, 612 F.Supp.2d 397, 399 (S.D.N.Y. 2009) (citing *Lentell* and *60223 Trust*) (Plaintiffs "must make a more detailed showing of loss causation *when there is evidence of an industry-wide downturn*, . . . or when the record indicates that the Company's stock lost almost all its value before the first alleged corrective disclosure." (citations omitted) (emphasis added)).  They have not done so.

**B.      Failure To Disaggregate Intervening Causes Is Fatal To Loss Causation**

This deficiency in the allegations is fatal to Plaintiffs' attempt to plausibly plead loss causation.  In *60223 Trust*, for the entire class period, the defendant's stock price had gradually declined, which had "an important bearing on loss causation."  540 F.Supp.2d at 460.  That complaint, like the SAC, had "no analysis of that [gradual declining] trend, but only [gave] the subject brief, generalized notice" of the trend in a single paragraph.  *Id.*  Likewise, in *Lentell*, the plaintiffs failed to sufficiently plead loss causation in part because they "fail[ed] . . . to account for the price-volatility risk inherent in the stocks they chose to buy."  *Lentell*, 369 F.3d at 176.  In a follow-up case to the class action in *Lentell*, this District Court found a complaint deficient because it "neglects to address the fact that, during the 'relevant time period'" the defendant's stock price lost "nearly all of its value" which "proceeded apace with the 'crater[ing]' of the Internet sector."

17

*In re Merrill Lynch*, 568 F. Supp.2d at 363-65 (alteration in original).  The same failure to account for intervening, market-wide causes for economic losses has led courts to reject securities fraud claims in several other cases.  *Stratte-McClure*, 598 Fed. Appx. at 29 (loss causation pleading failed because it did not plausibly allege that the "drop in stock price was not caused by the intervening market deterioration throughout the financial services industry"); *Cent. States*, 543 Fed. Appx. at 74 (plaintiff's allegations did not plausibly plead loss causation because their "purchases and losses coincided with a marketwide phenomenon—the housing bubble burst").

Plaintiffs mention intervening causes, such as the COVID-19 pandemic and the semi-conductor and chip shortages, but they do not explain why those intervening causes were not substantial reasons for Singularity's stock price decline throughout the Class Period.  *See* SAC ¶¶ 8, 147, 151, 154, 171-73, 176, 182, 272.  Instead, Plaintiffs write-off the market forces that could have significantly impacted Singularity's stock price rather than engaging with them as intervening causes of economic loss in detailed allegations.  That is not sufficient at the pleading stage in the face of a market-wide downturn, which requires Plaintiffs to at least account for and grapple with the related intervening causes of loss.

## C.     The Disclosures That Uncovered Alleged Omissions Did Not Reveal Non-Public Information

Plaintiffs have also failed to plead loss causation to the extent their claims are based on alleged omissions, because the alleged omissions concerned already public information.  The Hindenburg and Peabody reports merely put a negative spin on public information to which investors already had access (which is to be expected of short sellers).  In a fraud-on-the-market theory of recovery, as pleaded by Plaintiffs, it is presumed that all public information contributes to the price of the stock, including any negative information.  *Basic, Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988) (noting the presumption is premised on "market price of shares traded on well-

developed markets reflect[ing] all publicly available information"). Since the allegedly omitted information that would negatively impact Singularity's stock price—i.e., the allegations of criminal and financial misconduct against Defendant Jie—was already public, it was *already reflected* in Singularity's stock price and the Hindenburg and Peabody reports *did not correct* any alleged omissions or misrepresentations.

For the corrective disclosure theory of loss causation, Plaintiffs must plead that "because [the disclosure] corrected a prior falsehood, [it] precipitated a change in the security's price causing [Plaintiffs'] loss." *In re China Organic Sec. Litig.*, 2013 WL 5434637 at *7; *see also In re Am. Int'l Grp. Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 534 (S.D.N.Y. 2010) ("Loss causation may be adequately pleaded by alleging either a corrective disclosure of a *previously undisclosed* truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline." (emphasis added)). Plaintiffs fail to allege that theory because the omissions alleged by Plaintiff pertain to already disclosed information.

Defendant Jie's alleged criminality and misconduct (the inaccuracy of which is more thoroughly addressed in his brief) was referenced in a source cited by Peabody Street Research in its report, as well as in other filings, including China Commercial Credit, Inc.'s filings as far back as 2017 and in New York state court litigation: *Shanghai Nonobank Financial Serv. Co. Ltd. v. Yang Jie*, Index No. 653834/2018 and *Sorghum Investment Holdings Ltd. v. China Commercial Credit Inc.*, Index No. 655372/2018. There was also an arbitration related to Defendant Jie's conduct that publicized the information: *China Commercial Credit, Inc. v. Sorghum Inv. Holdings Ltd.*, ICDR Case No. 01-18-0000-4901 (July 30, 2018). Further, Defendant Jie was interviewed about his own history in China, including the allegations, as outlined in a Miami Herald article

from April 2019.  SAC ¶ 70.[19]  Plaintiffs cite to the various filings and sources to support their allegations about Defendant Jie.  *See* SAC ¶¶ 57-74, 86-88.  But that cuts both ways: those very citations show the information was *already public*.

This case parallels the Second Circuit decision in *Omnicom*, where plaintiffs did not sufficiently plead the corrective disclosure theory of loss causation because the information that was alleged to have caused the economic loss was merely "[a] negative journalistic characterization of previously disclosed facts."  597 F.3d at 512; *see also In re Arcimoto Inc.*, 2022 WL 17851834, *6-7 (E.D.N.Y. Dec. 22, 2022) (dismissing claim in case that was "on all fours with *Omnicom*" because "publications that merely characterize information already circulating in the public sphere in a negative way cannot prove loss causation").  The Hindenburg and Peabody reports were merely a synthesis of already public information by short sellers seeking to cast doubt on the viability of Singularity's business plan.  Further, by the time of Defendant Jie's appointment, legal inquiries into Jie appeared to have been resolved, as Defendant Jie, through the Chinese law firm Zhonglun W&D Law Firm, and the Company, through Chinese law firm Hebei Mei Dong Law Firm, were able to confirm in 2023.  The pair of Chinese law firm reports came after the Hindenburg and Peabody reports were published and revealed that there were no pending criminal charges against Defendant Jie.  *See* SAC ¶¶ 78-79 (citing the reports of the two law firms that investigated Jie's history).  And even before the Class Period began, at least one of the New York state court cases based on Jie's conduct was resolved.  Affirmation of James J. Mahon, *Hexin Glob. Ltd., et al. v Singularity Future Tech. Ltd.*, No. 22-cv-08160 (S.D.N.Y. Feb. 10, 2023) (ECF No. 22, ¶ 53) ("Mahon Affirmation") (referencing voluntary discontinuance of *Nonbank*

---

[19] *See* S. Blaskey, N. Nehamas, and C. Ostroff, *Cindy Yang helped Chinese tech stars get $50K photos with Trump. Who paid?*, Miami Herald, (Apr. 19, 2019), https://www.miamiherald.com/latest-news/article227941749.html.

litigation on March 13, 2020).  Plaintiffs cite language from various portions of the Mahon Affirmation, but do not include in the SAC that the *Nonobank* case was discontinued

Additionally, the Hindenburg and Peabody reports fail as corrective disclosures because information about Singularity's cryptocurrency business plan and the various joint ventures were examinable in light of already-public information.  First, the information about the HighSharp-AGM joint venture agreement was already publicly available *before* the Thor Joint Venture was entered into by Singularity.  *See* SAC ¶ 222.  It was thus public knowledge that HighSharp would be supplying machines for AGM before the Thor Miner deal was struck.  Likewise, it was public knowledge that Defendant Jie had connections to SOS when the contract was entered into, both by corporate records and in the Company's own disclosures.  *See* SAC ¶ 223.  Second, that the Mainland JV would have been a historically large crypto mining project should have been recognizable as an ambitious (perhaps over-zealous) undertaking.  The information about Riot Platforms Inc.'s facility that Plaintiffs point to illustrates the ambition of the joint venture.  *See* SAC ¶¶ 130-31.  That information was equally available to the public, and Plaintiffs demonstrate that the announcement was an expression of hope and puffery because Riot's crypto mining facility, the world's largest, would clearly be difficult to match, let alone exceed.

Relatedly, the investing public would have had access to the crypto market trends at the time which indicated that entering crypto mining would be a volatile (and expensive) undertaking. Taken together with Singularity's past performance and disclosures of internal control deficiencies, the purchase of Singularity's stock was inherently risky.  As analyzed above, the less-than-enthusiastic investor responses to the announcements of both joint ventures (as evidenced by only slight increases or ultimately drops in stock price) demonstrate that the information may have already been viewed with a critical eye by investors conducting due diligence into Singularity, a

struggling logistics business turned crypto mining company.  Thus, the two reports did not correct any misunderstandings about Singularity.  That means they are not sufficient as corrective disclosures under that theory of loss causation.

In addition, the related party transactions alleged by Plaintiffs could be attributed to the already-public information about the Company's material deficiencies in internal controls, which *had been disclosed from the beginning of the Class Period*.  *See* SAC ¶¶ 199-211 (recounting filings from February 2021 until February 2022 that disclosed internal control deficiencies); *id.* ¶¶ 230-31 (disclosing in a Form 8-K filing that the next Form 10-Q filing would be filed "as soon as practicable"); *id.* ¶ 269 (noting that September 29, 2023 Form 10-K continued to acknowledge internal control deficiencies that had subjected the Company to potential delisting).

In sum, Singularity's history and entry into the volatile crypto market also made economic losses fall outside the zone of risk of any alleged material omissions.  The materialization of undisclosed risk did not cause Plaintiffs' losses because the information available to the public about the volatility and crypto market and global trends ensured that "buyers of securities [got] what they [thought] they [were] getting" in buying Singularity's stock.  *Omnicom*, 597 F.3d at 513-14; *accord DoubleLine Capital LP*, 323 F.Supp.3d at 456; *see also Kusnier*, 639 F.Supp.3d at 382 (citing *Lentell*, 396 F.3d at 177) (materialization of risks "already publicly known" cannot support adequate loss causation allegations without facts sufficient to differentiate losses caused by disclosed and undisclosed risk).  Plaintiffs fail to allege loss causation as the investing public was aware of the risks involved in purchasing Singularity stock and investing in the crypto market.

## POINT II
## PLAINTIFFS IMPERMISSIBLY RELY ON GROUP PLEADING TO ALLEGE DEFENDANT ZHIKANG'S INDIVIDUAL LIABILITY

Plaintiffs do not sufficiently allege Defendant Zhikang's individual liability and impermissibly rely on group pleading.  The SAC mentions Defendant Zhikang by name in only four numbered paragraphs and refers generally to a group of Individual Defendants of which Defendant Zhikang is alleged to be part, in only twenty-two paragraphs of their three-hundred-twenty-two paragraph complaint.  The sparse mention of Defendant Zhikang, which attributes *no* actionable misstatement to him personally, does not meet the heightened pleading standards for securities fraud under FRCP 9(b) or the PSLRA.

As noted, *supra*, in a securities fraud case, allegations must be pleaded with heightened particularity under FRCP 9(b) and the PSLRA.  Such allegations are entirely missing with respect to Defendant Zhikang, and Plaintiffs cannot rely on group pleading to get around this fact.  "In order to satisfy the pleading requirements of Rule 9(b) and the PSLRA, a plaintiff must allege that an officer or director '*personally* knew of, or participated in, the fraud.'"  *See In re Citigroup, Inc. Securities Litig.*, 330 F.Supp.2d 367, 381 (S.D.N.Y. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)) (emphasis in original).  Plaintiffs only allege that Defendant Zhikang made one statement by signing, along with six other Individual Defendants, the Form 10-K for the year ending March 31, 2021, filed on September 29, 2021.  SAC ¶ 204.  Plaintiffs merely allege that the disclosure downplayed—yet disclosed—deficiencies in Singularity's internal controls.  SAC ¶¶ 203-05.  The Form 10-K also noted that Singularity was in the process of resolving those internal control issues.  SAC ¶ 204 ("In order to remediate the material weaknesses stated above, we intend to explore implementing additional policies and procedures . . . ." (quoting Form 10-K dated September 29, 2021)).  Plaintiffs cannot rely on the "group pleading doctrine" to relieve them of their burden of alleging Defendant Zhikang made any

statements, because group pleading is insufficient for a securities fraud claim in light of the particularity requirements of FRCP 9(a) and the PSLRA. *Xu v. Gridsum Holding, Inc.*, 624 F.Supp.3d 352, 365 (S.D.N.Y. 2022) ("[T]he group-pleading doctrine is no longer viable . . . ."); *see also Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 144-45 (2011) (requiring "authority over the content of the statement and whether and how to communicate it" as maker of a statement, not just that the person participated in making the statement).

Similarly, Plaintiffs cannot rely on group pleading to satisfy scienter under the heightened pleading standards. *See In re AstraZeneca Securities Litig.*, 559 F.Supp.2d 453, 472 (S.D.N.Y. 2008) ("The group pleading doctrine cannot apply to create a presumption of scienter as to individual defendants."). "It is well-settled that: [t]he group pleading doctrine has no effect on the PSLRA's scienter requirement. . . . It does not permit plaintiffs to presume the state of mind of those defendants [in the group] at the time the alleged misstatements were made." *Orlan v. Spongetech Delivery Systems, Inc. Sec. Litig.*, 2012 WL 1067975, *11 (E.D.N.Y. Mar. 29, 2012) (noting that scienter is required to be alleged individually). All of the allegations that describe Defendant Zhikang's state of mind place him in a group and are conclusory, which is insufficient under the heightened pleading standard to demonstrate a strong inference of scienter.[20] *See Zhong Zheng v. Pingtan Marine Enterprise Ltd.*, 379 F.Supp.3d 164, 181 (E.D.N.Y. 2019) (finding that that securities fraud plaintiffs failed to "plead particularized facts suggesting [individual defendants] 'actually possessed information contradicting their public statements'" (quoting *Cox*

---

[20] *See* SAC ¶ 273 ("Singularity touted senior management's actual knowledge and access to information, which further gives rise to a strong inference of scienter. Senior management and Directors, including Jie, Zhikang, and Levy, knew that Jie had been accused of extensive criminal conduct and found to have participated in financial improprieties during his tenure at CCC."); *see also id.* ¶ 37 (alleging "[e]ach of the Individual Defendants . . . was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company"); *id.* ¶ 39 ("The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Singularity under respondeat superior and agency principles.").

*v. Blackberry Ltd.*, 660 Fed. Appx. 23, 25 (2d Cir. 2016)).  Without any specific allegations of scienter, Plaintiffs' claims as to Defendant Zhikang must be dismissed.

**POINT III**

**PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 20(A) AS TO DEFENDANT ZHIKANG**

Plaintiffs failed to plead the underlying violations under Section 10(b) or Rule 10b-5 against Defendant Zhang.  Therefore, "[i]n the absence of a primary violation of Section 10(b) or Rule 10b-5, plaintiffs cannot state a claim for controlling person liability under Section 20(a) of the Exchange Act."  *In re Keyspan Corp. Sec. Litig.*, 383 F.Supp.2d 358, 389 (E.D.N.Y. 2003); *see also* 15 U.S.C. § 78t (creating joint and several vicarious liability by controlling persons).  Alternatively, because of Plaintiffs' reliance on group pleading for Defendant Zhikang discussed above, Plaintiffs fail to plausibly allege that Defendant Zhikang "was in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns, Inc*, 493 F.3d at 108 (listing the elements of a Section 20(a) claim); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F.Supp.3d 528, 542 (S.D.N.Y. 2016) (likening this element to "a scienter requirement . . . at least approximating recklessness in the section 10(b) context" that must be pleaded with particularity under the PSLRA).  Moreover, as set forth in more detail in Defendant Cao's accompanying brief, Section 20(a) only attaches to control persons.  Like Defendant Cao, Defendant Zhikang was not a "control person" within the meaning of Section 20(a) for the same reasons as set forth in Defendant Cao's brief.  Thus, the claims pled under Section 20(a) should also be dismissed.

**CONCLUSION**

For the foregoing reasons, and the reasons set forth in the concurrent motions to dismiss of Defendants Yang Jie, Xiaohuan Huang, and Lei Cao, the SAC should be dismissed, with prejudice.

25

Dated:  November 20, 2023
       New York, New York

                     CARTER LEDYARD & MILBURN LLP

                     */s/ Alexander G. Malyshev*
                     Alexander G. Malyshev
                     Madelyn K. White
                     28 Liberty Street, 41st Floor
                     New York, NY 10005
                     Tel: (212) 238-8618
                     Email: malyshev@clm.com
                                 white@clm.com

                     *Counsel for Defendants Singularity Future*
                     *Technology Ltd. and Zhikang Huang*

11238090.19