UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X
                                                 :

SEN GAO, CONGLI HUO, RUBIN WANG,        :    Case No. 22-cv-07499-BMC
LUXIAO XU, Individually, and on behalf of all others :
similarly situated,                                      :

                                                 :    **AFFIRMATION IN SUPPORT**
                   Plaintiffs            :    **OF MOTION TO DISMISS**
                                                 :

       v.                                          :

                                                 :
SINGULARITY FUTURE TECHNOLOGY, LTD    :
F/K/A SINO-GLOBAL SHIPPING AMERICA LTD,    :
YANG JIE, LEI CAO, ZHIKANG HUANG, TUO PAN, :
XIAOHUAN HUANG, JING SHAN, TIELING       :
LIU, JING WANG, LEI NIE, JOHN LEVY, THOR    :
MINER, INC., AND GOLDEN MAINLAND, INC.,   :
                                               :

                   Defendants.             :

                                                 :
------------------------------------------------------------------ X

      James J. Mahon, an attorney duly admitted to this court and to the highest courts of the

State of New York, hereby affirms and states as follows under penalties of perjury:

      1.      I am a shareholder of the law firm of Becker & Poliakoff LLP, attorneys for

Defendants Yang "Leo" Jie (hereinafter referred to as "Yang Jie" or "Mr. Jie") and Xiaohuan

Huang (hereinafter referred to as "Xiaohuan Huang" or "Ms. Huang") and I am familiar with the

facts and circumstances as set forth below.

**PROCEDURAL HISTORY**

      2.      This matter has its genesis in the filing of a Complaint by Piero Crivellaro,

individually, and on behalf of an alleged putative class against Singularity Future Technology, Ltd

1

("Singularity"), Yang Jie, Lei Cao, Zhikang Huang, Tuo Pan, Xiaohuan Huang, Jing Shan, Tieling Liu, Jing Wang, and Lei Nie on December 9, 2022. (the "Initial Complaint"). [D.E.[1] 1].

3.  By Order dated June 13, 2023, the Court appointed Ruibin Wang, Sen Gao, Luxiao Xu, and Congli Huo as lead Plaintiffs (the "Sig Group" or "Lead Plaintiffs"). [D.E. 13].

4.  By Docket Order dated July 18, 2023, the Court granted Lead Plaintiffs leave to file a Consolidated Amended Complaint by August 18, 2023 and set September 8, 2023 as the deadline to file requests for pre-motion conference.

5.  On August 18. 2023, the Lead Plaintiffs Filed their First Consolidated Amended Complaint (the "First Amended Complaint"). [D.E. 34]

6.  By Docket Order dated August 30, 2023, the Court granted Lead Plaintiffs leave to File a Corrected Amended Complaint (the "Corrected First Amended Complaint") and extended the Defendants time to file pre-motion conference letters to September 15, 2023.

7.  On September 15, 2023, defendants Lei Cao, Xiaohuan Huang, Yang Jie, Singularity Future Technologies, Ltd., Zhikang Huang, and Jing San (the "Moving Defendants") filed letters requesting pre-motion conferences. [D.E. 46-48, 50].

8.  By Docket Order dated September 19, 2023, the Court granted the Moving Defendants' request for pre-motion conferences. The Court then set a deadline of September 29, 2023 for Lead Plaintiffs to submit responses to the pre-motion conference requests or, in the alternative, to file a Second Consolidated Amended Complaint.

9.  By Order dated September 27, 2023, the Court granted Lead Plaintiffs an extension to file the Second Consolidated Amended Complaint to October 6, 2023. In the same order, the Court waived the pre-motion conference requirement for motions to dismiss. [D.E. 55].

---

[1] [D.E.] refers to the docket entry and will proceed the number of the docket entry referenced.

24270267v.3

10.     On October 6, 2023, the Leak Plaintiffs filed their Second Consolidated Amended Complaint (the "Operative Complaint") in this matter.  [D.E. 58].

11.     The Operative Complaint is a two-count complaint alleging causes of action for 1) violation of Section 10(b) of the Exchange Act and the accompany promulgated regulation 10b-5 and 2) for individual liability under Section 10(a) of the Exchange Act.  Id.

12.     The Operative Complaint further names a number of defendants, including Singularity Future Technology, Ltd. f/k/a Sino-Global Shipping America Ltd., Yang Jie, Lei Cao, Zhikang Huang, Tuo Pan, Xiaohuan Huang, Jing Shan, Tieling Liu, Jing Wang, Lei Nie, John Levy, Thor Miner, Inc., and Golden Mainland, Inc.  Id.

13.     The Operative Complaint relies heavily on a Report published by Hindenburg Research (the "Hindenburg Report"), a known short-seller and then holder of short options on Singularity at the time its Report was published on May 5, 2022.  A true and correct copy of the Report published by Hindenburg Research is annexed as **Exhibit A**.

14.     The Operative Complaint also relies heavily on a report issued by Peabody Street Research, another known short- seller and then holder of short options on Singularity at the time its report was published on May 5, 2022.  A true and correct copy of the Report published by Peabody Street Research (the "Peabody Report") is annexed hereto as **Exhibit B**.

15.     By Docket Order dated October 19, 2023, the Court extended the Defendants' time to file motions to dismiss, setting November 20, 2023 as the deadline to file motions to dismiss, January 5, 2024 as the final date for Lead Plaintiffs to File Oppositions to Motions to Dismiss, and setting a deadline of January 26, 2024 for Defendants to file reply briefs.  Thus, the instant motion is timely.

**THE INSTANT MOTION**

16.     This Affirmation is respectfully submitted in support of Defendant's motion to dismiss the Lead Plaintiffs' action, as well as that of the purported putative class, pursuant to <u>Fed. R. Civ. P. 12(b)(6)</u> and the Private Securities Litigation Reform Act (the "PSLRA").

**Singularity Had a History as a Troubled Company For Years Prior to the Start of the Class Period**

17.     Singularity Future Trading f/k/a Sino Global Shipping ("Singularity" or "Sino Global") has numerous historical events that can be described as nothing less than a series of "storm warnings." **Exhibit B.**

18.     Sino-Global has a history of delisting notices.  Looking back within the last decade prior to the filing of this lawsuit, Sino Global was a troubled company.  For example, on November 23, 2012, Sino Global filed a Form 8-K stating "[o]n November 21, 2012, Sino Global…received from the Nasdaq OMX Group…a letter (the "Nasdaq letter") indicating that it is not in compliance with Nasdaq Marketplace Rule 5550(b)(1) [for failing] to maintain a minimum of $2,500,000 in stockholder equity for continued listing. A true and correct copy of the November 23, 2012 Form 8-K is annexed as **Exhibit C.**

19.     As noted in the Peabody Report and confirmed through review of the SEC filings, Singularity's stock has undergone events that could be constituted as "storm warnings."  In 2013, Sino Global sold independent Chinese business owner Zhong Zhang 1,800,000 shares of Sino Global stock at a price of $1.71 a share.  A true and correct copy of Sino Global's Notice of Fiscal Year 2013 Annual Meeting of Shareholders containing the details of the stock sale to Zhong Zhang is annexed as **Exhibit D.**  <u>See</u> **Exhibit B.** (Peabody Report).

20.     That was only part of the story. **In 2013 Sino-Global's stock value** fluctuated between **$9.40 a share** and **$12.65 a share**.  A true and correct copy of a spreadsheet with historical

24270267v.3

data for Singularity obtained from the Nasdaq website with the daily share price history for Singularity is annexed as **Exhibit E.**[2]

21.    This seems incongruous for a company that posted **net losses** of **$2,576,896** for fiscal year ending in 2013 and a **net loss of $2,812,969** for fiscal year ending in 2012.  A true and correct copy of Sino Global's Form 10K filed on September 27, 2013 is annexed as **Exhibit F.**

22.    Even more interesting was the fact that Sino Global admitted that the purpose of the sweetheart sale of stock to Mr. Zhang had a sole purpose of increasing its shareholder equity to be compliance with the NASDAQ notice, when Sino Global announced the sale of these shares had closed.  A true and correct copy of Sino Global's May 22, 2013 Form 8-K is annexed as **Exhibit G.**

23.    At a conservative valuation, the private placement sale of stock to Mr. Zhang came with an approximate discount of **$13 Million Dollars**. **Exhibits E** and **G**.

24.    Naturally, Mr. Zhang's business entity Zhiyan Investment Group, developed as a major source of business for Sino Global's revenue.  **Exhibit B**  (Peabody Report).  See also, A true and correct copy of Sino Global's Form 10-K filed on September 15, 2014 annexed as **Exhibit H.** ("We are substantially reliant on a single customer for a majority of our business.").

25.    For the fiscal year ending in 2014, Sino-Global experienced an accumulated deficit of **$3.3 Million Dollars**.  Id.

26.    In 2014, Sino Global miraculously maintained a share price between **$7.25 a share** and **$16.45 a share**.  This was while the company maintained a deficit of **$2.6 Million** on its balance sheet.  Id.

---

[2] In this Affirmation, Singularity's historical share prices will be cited, each citation hereafter will be made with an implied reference to the historical share price as set forth in **Exhibit E.**

24270267v.3

27.     2015 was another tumultuous year for Sino Global, with its share price again fluctuating, and a failed venture to purchase a ship for its shipping purchase. **Exhibit B.** (Peabody Report).

28.     On November 12, 2015, Sino Global filed a Form 8-K disclosing that Nasdaq issued a Notice of Delisting.  A true and correct copy of the November 12, 2015 Form 8-K is annexed as **Exhibit I.**

29.     In response to the Notice of Delisting, Sino Global decided, again, to issue 10,000,000 shares, by a Form S-8 filed on February 11, 2016.  A true and correct copy of the February 11, 2016 Form S-8 is annexed as **Exhibit J.**

30.     Later that year in 2016 and early 2017, numerous executives sold off a number of shares of Singularity after a run-up of Singularity's stock.  **Exhibit B.**

31.     All of the sales activity by insiders was done while the stock had a range between approximately **12** and **20 Dollars a share.** Id. See **Exhibit E.**

32.     In 2019, Nasdaq once again issued a Notice of Delisting of Sino Global's stock, which was disclosed on a July 23, 2019 Form 8-K.  A true and correct copy of the July 23, 2019 Form 8-K is annexed as **Exhibit K.**

33.     In 2019, Sino Global once again suffered a net loss, at the time, the greatest **net loss** ever tracking data since 2012, of **$7,012,113 Dollars**.  A true and correct copy of the September 30, 2019 Form 10-K is annexed as **Exhibit L.**

34.     Sino Global's revenue also plunged by 84 percent.  Id.; **Exhibits L** and **B.**

35.     On January 3, 2020, Sino Global began to suffer corporate governance difficulties, as reflected in yet another Notice of Delisting that was disclosed by Form 8-K filed on January 3, 2020.  A true and correct copy of the January 3, 2020 Form 8-K is annexed as **Exhibit M.**

36.     Another Notice of Delisting was disclosed on January 21, 2020 on a Form 8-K.  A true and correct copy of the January 21, 2020 Form 8-K is annexed as **Exhibit N.**

37.     In 2020, Sino Global's stock price maintained an approximate average price of **$2 Dollars** per share.

38.     Despite this, Sino-Global engaged in private placements sales of its stock, including one for 1,000,000 shares as disclosed on a Form 8-K filed on January 31, 2020.  A true and correct copy of the January 31, 2020 Form 8-K is annexed as **Exhibit O.**

39.     In 2020, Singularity also found another way to satisfy Nasdaq's listing requirements following the receipt of a Nasdaq delisting notice by entering into a 1 for 5 reverse stock split as disclosed in a Form 8-K dated and filed on July 6, 2020.  A true and correct copy of the July 6, 2020 Form 8-K is annexed as **Exhibit P.**

40.     In 2020, while posting a net loss, Singularity's shares traded between **$1.42 a share** and **$3.90 a share.**

41.     The first half of 2021 brought fierce activity on the part of Sino Global or Singularity, with a share price that would see steady rise with a reduction in price or value and another rise.  Sino Global's share price opened on January 4, 2021 with a share price of **$2.21 a share.**

42.     On January 25, 2021, the company filed a Registration Statement on Form S-1 relating to the sale of unregistered securities from some affiliated entities under a registration statement.  A true and complete copy of the January 25, 2021 Form S-1 is annexed as **Exhibit Q.**

43.     The audited financials attached to the January 25, 2021 Registration Statement (Form S-1) notate a significant loss per share – a total of **$4.78 per share**, an **accumulated deficit** of **$23,421,594**, an **operating loss** of **$17,738,104** and a **net loss** of **$17,928,647**.  Id.

7

44.     However, the markets did not reflect this information.  On January 25, 2021, Sino Global's stock closed at **$3.57 per share**.  On January 26, 2021, with dismal financials, the stock increased in value to **$4.24 per share**.  Sino-Global's stock continued to rise in value closing at **$4.34** on January 27, 2021.

45.     On January 28, 2021, another private offering of stock was announced through a Form 8-K disclosure, consistent with Sino Global's prior poor cash position.  A true and completed copy of the January 28, 2021 Form 8-K is annexed as **Exhibit R.**

46.     Consequently, that same day, January 28, 2021, Sino Global's shares rose to **$5.04 per share**.

47.     On January 29, 2021, there was reorganization of some management of Sino Global pursuant to a Form 8-K filing made the same day where Sino-Global made staffing changes to its Chief of Operations and Chief Technology Officer.  A true and correct copy of the January 29, 2021 Form 8-K is annexed as **Exhibit S.**

48.     With the change in directors, Sino Global's stock rose again to a price of **$5.87 per share** on January 29, 2021.

49.     On February 3, 2021, Sino Global filed a Form 8-K stating "its newly appointed Chief Operating Officer Mr. Lei Nie and Chief Technology Officer Mr. Xintang You will spearhead the Company's effort to enter Bitcoing mining as part of its 2021 development strategy."  A true and correct copy of the February 3, 2021 Form 8-K and the accompanying press release are annexed as **Exhibit T.**

50.     That same day, on February 3, 2021, Sino Global's stock closed at **$7.44 a share**.

24270267v.3

51.     On February 8, 2021, another Form 8-K was filed announcing, yet another private placement offering resulting in cash flow of over $13.5 Million Dollars to the company.  A true and correct copy of the February 8, 2021 Form 8-K is annexed as **Exhibit U.**

52.     That same day, February 8, 2021, Sino Global's stock closed at one of its high points for 2021 at **$11.00 a share** with, yet again, another volume of over **20 Million Shares**.

53.     The Edgar database lists other private placements injecting cash into the company disclosed on Form 8-Ks in 2021.  A true and correct copy of the EDGAR docket sheet is annexed as **Exhibit V.**

### There was Public Information About Mr. Jie in the Market Before Mr. Jie Joined Sino-Global

54.     Plaintiffs make overtures about Mr. Jie's previous history in relation to Singularity or Sino Global. [D.E. 58] ¶¶48-94.  Plaintiffs further make allegations, as though the Hindenburg Report was somehow biblical or groundbreaking.  Id. at ¶¶212-229

55.     However, although allegations are made as though this was somehow a corrective disclosure, however this is simply not the case.

56.     The allegations, which Mr. Jie vehemently denies, made in the complaint related to a failed reverse merger and $3.5 million ([D.E. 58] ¶¶54-69) were readily available to the public market based on a New York County Supreme Court case filed in 2018 captioned Shanghai Nonobank Financial Info. Serv., Co., Ltd. v. Yang Jie, et al. under index number 653834/2018.  A true and correct copy of the complaint filed in that matter is annexed as **Exhibit W.**

57.     The Complaint, which was electronically available and easily obtainable by searching Yang Jie's name, contains each allegation related to the failed reverse merger and directly references the Shanghai Nonobank action.

9

58.     What the Operative Complaint does not reveal and what the Hindenburg report does not reveal is that the <u>Shanghai Nonobank</u> action against Mr. Jie was voluntarily discontinued by so-ordered stipulation on March 13, 2020, well before Mr. Jie's employment with Sino Global or Singularity began.   A true and correct copy of the stipulation of discontinuance filed in the <u>Shanghai Nonobank</u> action is annexed as **Exhibit X.**   Consequently, no judgment or other judicial decree of liability or obligation came as a result of the <u>Shanghai Nonobank</u> litigation.

59.     Curiously, ¶33 of the <u>Shanghai Nonobank</u> complaint contains allegations containing information, for which the Plaintiffs allege was never disclosed and that there was a duty to disclose.  <u>Id.</u>  Those allegations are of Mr. Jie's alleged criminality in China, which Mr. Jie expressly denies.

60.     In fact, the allegations in the <u>Shanghai Nonobank</u> complaint, filed in 2018 mirror the allegations made in the Peabody Report.   *Compare* Shanghai Nonobank Compl. ¶33 **Exhibit W** *with* Peabody Report. **Exhibit B.**

61.     Furthermore, an English language website, Capitalwatch, contains a news article from August 25, 2018 that cites the same information, and upon information and belief, the same story cited by the Peabody Report. **Exhibit B.**

62.     Thus, it is quite obvious that Mr. Jie joined Sino Global/Singularity with all of this information in the public market, despite it being presented to the Court in a form not sufficient to support a cause of action.

### Lead Plaintiffs' Operative Complaint's Reliance on Pleadings that are Not Sufficient to Constitute a Cause of Action.

63.     In an effort to evade dismissal for reliance on a short-seller report and the accompanying rank hearsay, Lead Plaintiffs rely on numerous documents in the Operative

Complaint from pleadings in cases that were voluntarily discontinued to uncertified pleadings in foreign languages without a certified translation.

64.     For example, in relation to the alleged failed reverse merger, Lead Plaintiffs rely on a decision and order **on a motion to dismiss** in the action titled <u>Shanghai Nonobank Info. Serv. Co. Ltd v. Jie</u>, New York County Supreme Court Index No. 653834/2018, <u>see</u>, Operative Complaint ¶¶63, 66, etc.  A true and correct copy of the Order on the Motion to Dismiss rendered on July 12, 2019 is annexed hereto as **Exhibit Y**.

65.     A review of the docket in the <u>Shanghai Nonobank</u> action reveals that matter was voluntarily discontinued by so-ordered stipulation dated March 13, 2020.  **Exhibit X**.

66.     Furthermore, while there was a decision entered vacating an arbitration award in <u>Sorghum Investment Holds, Ltd. v. China Commercial Credit, Inc.</u>, Index No. 655372/2018 in New York County Supreme Court, a critical part of the decision was missing from the Operative Complaint: the fact that the arbitration award was vacated because the arbitrator exceeded her authority.  A true and correct copy of the Court's decision vacating the arbitration award in the <u>Sorghum</u> action is annexed hereto as **Exhibit Z**.

67.     Furthermore, the Court's decision vacating the arbitration award did not explicitly mention Mr. Jie.  Rather the Plaintiffs attempt to disingenuously use a factual recitation from the motion treating it as though the party's recitation was fact finding by a judicial authority. <u>Id.</u>

68.     Furthermore, the docket from NY State ECF as well as New York State E-Courts shows that there was not a hearing held where testimony could be taken for such a finding of facts that could be made.  A true and correct copy of the Court's appearance docket in the <u>Sorghum</u> action is annexed hereto as **Exhibit AA**.

24270267v.3

69.     Plaintiffs have failed to include, in the complaint, certified copies of any of the documents allegedly procured from China, nor have they presented Certified Translations of the documents or any legal opinion at all.

70.     Furthermore, there was an arbitration decision issued in the China Commercial Credit Case.  A true and correct copy of the Arbitration Decision is annexed hereto as **Exhibit BB**.

71.     The arbitration decision makes numerous references and makes detailed summaries of factual recitations of the parties.  Id.

72.     Lead Plaintiffs' complaint, likewise, attempts to summarize those factual recitations from a party's position and repackage it as a finding of fact. *Compare* Operative Complaint ¶¶77, 87 *with* **Exhibit BB**.

### Singularity's Stock Price Did Not Show Any Reaction Toward Mr. Jie Joining Sino Global/Singularity.

73.     Mr. Jie commenced his employment with Sino Global in January, 2021.  A true and correct copy of the Form 8-K dated November 1, 2021 is annexed as **Exhibit CC.**

74.     The Operative Complaint contains allegations that are tied to a press release by Sino-Global classifying Mr. Jie as an "outstanding executive" and "has the insight and judgment to deliver the leadership we need today."  A true and correct copy of the press release announcing Mr. Jie's employment with Sino Global as CEO is annexed hereto as **Exhibit DD**

75.     The Operative Complaint further criticized the announcement and focuses in on the fact that the 8-K stated "Mr. Jie has been nominated to serve because of his business management experience."  [D.E. 58]**.**  The Operative Complaint somehow attempts to dress these otherwise inactionable statements under the cloak of a material misrepresentation or omission.

12

76.     It is notable that Sino Global's share price closed with a share price of $3.41 a share, a loss of $0.08 for the day when Mr. Jie's hiring was announced and the 8-K filed with the Securities and Exchange Commission.

77.     Two days later, on November 12, 2021, Sino-Global filed its Form 10-Q and the shares closed at $3.74 per share. A true and complete copy of the November 12, 2021 Form 10-Q is annexed as **Exhibit EE.**

78.     The November 12, 2021 Form 10-Q revealed a **working capital deficit** of **$40,615,598** for the company, with a **net loss** of **$2,921,662** for the first three quarters of 2021; just two days after Mr. Jie was announced as Chief Executive Officer. Id.

79.     Sino Global's November 2021 disclosure exhibited a company with an identity problem, it was still involved in the shipping industry, while showing a diversification into the cryptocurrency market, a relatively new market for an international freight forwarding company. Id.

80.     Sino Global's stock closed the following Monday November 15, 2021 with a price of $4.17 per share.

81.     On November 19, 2021, it was announced in a Form 8-K that Mr. John Levy was appointed as an independent board member. A true and correct copy of the November 19, 2021 Form 8-K is annexed as **Exhibit FF.**

82.     Sino Global's stock closed down for that day with a price of $3.58 per share.

83.     Sino Global's stock continued with a downward trend closing at a low price of $3.05 per share on December 3, 2021, which gradually increased to a price of $3.50 per share on December 10, 2021, one month after Mr. Jie was hired.

13

84. Sino Global's stock closed down on December 14, 2021 with a price of $3.50 per share, after the announcement.

85. Sino Global's stock closed up at $4.49 a share on December 31, 2021.

86. On January 4, 2022, Sino Global's stock closed at $5.19 per share.

87. On January 5, 2022, Sino Global filed a Form 8-K announcing a change in the company's name, with an accompanying amendment to the company's articles of organization to reflect the Singularity name. The accompanying press release indicated the name change was to align the company with cryptocurrency markets. True and complete copies of the January 5, 2022 Form 8-K and the accompanying press release are annexed collectively as **Exhibit GG.**

88. That day, Sino Global/Singularity's stock closed down at $1.07 per share.

89. On January 11, 2022, Singularity filed a Form 8-K announcing that its joint venture with Thor Miner and entered into a purchase and sale agreement for cryptocurrency mining hardware with SOS Information Technology New York for $200 million dollars. A true and complete copy of the January 11, 2022 Form 8-K is annexed as **Exhibit HH.**

90. After the Form 8-K filing on January 11, 2022, Singularity's stock closed down 6 cents to $4.40 per share.

91. Three days later, on January 14, 2022, another Form 8-K was filed amending the joint venture announcement to include a statement that the joint venture received a payment of $40 million. A true and complete copy of the January 14, 2022 Form 8-K amendment is annexed as **Exhibit II.**

92. In the days after the joint venture announcement, Singularity's stock rose to $4.42 per share on January 25, 2022, decreasing to $3.56 per share on January 27, 2022, and increasing to $5.48 per share on February 4, 2022.

14

93.     On February 7, 2022, Singularity's stock price rose and closed at $6.08 per share, however, that day there was also a disclosure that over one million warrants were exercised by the filing of a Schedule 13-G.  A true and correct copy of the February 7, 2022 Schedule 13-G is annexed as **Exhibit JJ.**

94.     On February 14, 2021, Singularity filed another Form 10-Q quarterly report reflecting a significant net loss of $11,840,032 for the end of year 2021, a tenfold increase over the previous year, in addition to an increase deficit of $41,953,051, approximately ten million dollars more than the previous year.  A true and correct copy of the February 14, 2021 Form 10-Q is annexed as **Exhibit KK.**

95.     Singularity's stock closed at $6.38 per share the same date of the dismal financial reports that were filed with the Securities and Exchange Commission (the "SEC"), with mounting losses by the cash starved company.

96.     Singularity's stock continued to increase in value to $7.43 per share on March 9, 2022.

97.     Singularity's stock closed at $7.27 per share on March 10, 2022.

98.     Singularity's stock then had a steady increase, and a $2 dollar spike to close at $9.44 per share on March 16, 2022, then closing again at $10.24 per share on March 17, 2022.

99.     There was then a decline in share price and a spike again to close at $11.53 per share on March 25, 2022.

100.    On March 28, 2022, Singularity announced that it revamped its website and issued a press release related to the release of its new website.  A true and correct copy of the March 28, 2022 press release is annexed hereto as **Exhibit LL**.

24270267v.3

101.    Singularity's stock then increased, again without any corporate activity, to reach $17.00 per share on April 5, 2022, and then $19.78 per share on April 7, 2022.

102.    Curiously, however, the stock dropped $7 dollars in value on April 8, 2022, when the stock closed at $12.65 per share.

103.    After the weekend, on April 11, 2022, Singularity's stock cratered to $7.08 per share, again, without any activity on EDGAR, even with a press release of a joint venture agreement.  See, infra ¶35.

104.    On April 13, 2021, Singularity's stock closed at $8.41 per share, yet again.

105.    On April 14, 2021, Singularity filed a Form 8-K announcing a joint venture agreement with Golden Mainland for bitcoin mining sites of 300,000 machines, with an aggregate joint investment resulting in Singularity being the majority shareholder.  A true and correct copy of the April 14, 2021 Form 8-K filing is annexed as **Exhibit MM**.

106.    Even with that filing with the Securities Exchange Commission, the market, if that who is really trading the stock, yawned and the share price fell to 6.46 per share.

107.    Singularity's stock dipped and increased again closing at a share price of $6.75 per share on May 4, 2022.

### SINGULARITY'S STOCK FELL SIGNIFICANTLY FROM ITS PEAK PRIOR TO THE RELEASE OF THE HINDENBURG AND PEABODY STREET REPORTS.

108.    As referenced in the Operative Complaint, two short-seller reports were released on May 5, 2022: The Hindenburg Report (**Exhibit A**) and the Peabody Report (**Exhibit B**). Operative Complaint [D.E. 58].

24270267v.3

109. The Operative Complaint is naturally fixated on the Hindenburg Report, with a mere reference to the Peabody Street Research report, with not a single citation, only referencing it being similar. [D.E. 58].

110. Page 23 of the Hindenburg Report reveals that Hindenburg had an active Short Position on Singularity. **Exhibit A.** Naturally, Hindenburg Research stood to realize significant financial gains by a stock value decrease. Id.

111. The Hindenburg Report was filled with unverified references to events that occurred, and was targeted to one person, ignoring the numerous red flags that existed. Id.

112. Conversely, the Peabody Street Research Report, while not perfect, contains just a page and a half targeted at Mr. Jie, but mostly focused on the storm warnings described within this statement of facts. **Exhibit B.**

113. Unlike the Hindenburg Report that was a complete assault on Mr. Jie, the Peabody Report merely dedicates two pages to Mr. Jie, disclosing an English language United States based source of Mr. Jie's history, then moves on to Singularity's history. Id.

114. The Peabody Report focuses in on 1) insider trading that occurred at Singularity that they alleged started far before Mr. Jie's tenure; 2) Singularity's declining legacy shipping business; 3) Singularity's failed business venture with a Chinese Ship; 4) insider trading in 2016 after a run up in share price that followed a delisting notice; 5) Singularity's dismal financial statements; 6) cryptocurrency deals; 7) joint ventures that appear to be going nowhere; and 8) various business improprieties. **Exhibit B.**

115. Conversely, the Hindenburg Report ignores the historical improprieties and focuses on one person, Mr. Jie. **Exhibit A.** It appears as though the Hindenburg Report was almost too tailor-made for the instant litigation.

24270267v.3

116.     Neither the Peabody Report nor the Hindenburg Report released any new ground-shaking or earth-shattering information that was not already in the market, as exhibited above.

117.     In fact, the Hindenburg Report contains material inaccuracies relating to Singularity, attempting to tie everything to Mr. Jie and scapegoat him in an effort to "feather their nest." **Exhibit A.**

118.      For example, the Hindenburg Report attempted to tie Sino-Global/Singularity's move toward cryptocurrency to Mr. Jie's employment. **Exhibit A.**

119.     Furthermore, the Hindenburg Report was largely unverified data, which was consequently referenced in Plaintiffs' Complaint. [D.E. 58], **Exhibit A.**

120.     Regardless, in the immediate aftermath of the Hindenberg Report, Singularity's share price decreased to **$4.80 per share** and remained in the high **$4 dollar** range, in fact increasing in the days after the decline which was allegedly caused by the Hindenburg Report.

### THE PLAINTIFFS' COMPLAINTS WERE FILED BASED ON UNVERIFIED HEARSAY EVIDENCE AND BASED ON INFORMATION THAT WAS IN THE PUBLIC MARKET.

121.     It was based on these facts that the Lead Plaintiffs filed the Operative Complaint. [D.E. 58].

### THE OPERATIVE COMPLAINT

122.     Lead Plaintiffs filed the Operative Complaint on October 26, 2023, and within the Operative Complaint, Lead Plaintiffs attempted to move the proverbial goal post by impliedly requesting an extension of the class period to the end of time, or when weak evidence has minimal effect on damages, whichever is sooner.  [D.E. 58].

123.     The Operative Complaint begins with an opening salvo and launches directly into attacks on Mr. Jie without pleading that Singularity or Mr. Jie even had a duty to disclose the

information. Instead, Plaintiffs lead their attack by stating what was and was not done without pleading the legal duties, as though the elements of duty, loss causation, and scienter did not exist. E.g., Id. ¶¶ 49-95.

124. The Operative Complaint then commences with the inconsistent citation of random stock prices and claim omissions without pleading that there is a duty to disclose such information. E.g., Id. ¶¶50-52.

125. The Operative Complaint then make statements that would otherwise be defamatory, but for the litigation privilege, such as criticizing how Mr. Jie was listed on a Company's website, criticizing how Mr. Jie's photograph appears, and making wild speculation as to why Mr. Jie's profile appeared the way it did on Singularity's website.. Id. ¶¶54-55

126. The Operative Complaint then makes allegations relating to a reverse merger transaction relying on a complaint and an order on a motion to dismiss in the Shanghai Nonobank action, without saying that matter was **voluntarily discontinued**. E.g., Id. ¶¶61-62.

127. However, Lead Plaintiffs do not disclose the true status of the Shanghai Nonobank action in the Operative Complaint, instead attempting to lead to court to believe this case contained judicial fact-finding that requires deference as fully decided based on the facts and the law.

128. Furthermore, Lead Plaintiffs, as if representing actions in one action as if fully decided by a judge or jury, utilizes an Order Vacating an arbitration decision in the Sorghum Investment Holdings matter, casting light upon it as if it were the result of a bench or jury trial with findings of fact and conclusion of law after a hearing. E.g., Id. ¶¶63-64.

129. Furthermore, Lead Plaintiffs then, again, attempt to pass the recitation of parties' contentions in a decision, as if they were, again, some form of judicially held facts to attempt to hold their house of cards holding up what they perceive as a golden crown of accusations. One

example of this is in the Operative Complaint where Lead Plaintiffs cite an Arbitration Decision, however, the provisions cited by the Lead Plaintiffs come from the section of the Arbitration Decision entitled "Respondent's PFR" and recites the Respondents submissions. A true and correct copy of the Arbitration decision is annexed as **Exhibit BB** . *Compare* **Exhibit BB** at 13-17 *with* Operative Complaint [D.E. 58] ¶¶77, 87.

130. In fact, in the very same arbitration decision that Lead Plaintiffs apparently view as a "crowning glory," the arbitrator chose the Claimant's PFR over the Respondent's PFR. **Exhibit BB**.

131. Lead Plaintiffs, in the Operative Complaint, also cite a number of uncertified Chinese documents, some of which are only excerpts of court documents (without the complete document for context), as well as other documents in the Chinese language without certified translations. [D.E. 58].

132. Upon information and belief, some of these translations apparently were drawn directly from the short seller reports: either the Hindenburg Report or the Peabody Report, reports from entities that had significant pecuniary interest in the outcome of their respective articles, as their short options would be riding on how readers would view and perceive their publications.

133. Furthermore, the Operative Complaint makes unsupported attacks on independent legal opinions from two Separate Chinese Law Firms that conducted investigations and found the same result: that Mr. Jie was **not** a fugitive of justice and was **never** charged criminally. The Operative Complaint makes these unsupported attacks without so much as even an excerpt from an independent legal opinion or a single citation indicating an independent investigation was performed, save for mere internet searches and computerized, or even worse undisclosed use Artificial Intelligence performed translations. [D.E. 58].

134.     The Operative Complaint then cites cherry-picked alleged misrepresentations and omissions without so much as citing all of the underlying disclosure documents.

135.     For example, the Operative Complaint alleges an omission in relation to now former director Jon Levy, despite not pleading a duty to disclose the information on the part of the company.  Operative Complaint [D.E. 58] ¶¶96-99.  A true and correct copy of the November 19, 2021 Form 8-K is annexed hereto as **Exhibit NN**.

136.     The Operative Complaint then cites another occurrence that happened during Mr. Jie's tenure at Singularity, Singularity's name change from Sino-Global Shipping America, Ltd to Singularity Future Technology, Ltd, and makes another assertion that "false and misleading" statements were made without factual support.  Operative Complaint [D.E. 58] ¶¶119-122.

137.     Lead Plaintiffs cite a January 5, 2022 Form 8-K and an accompanying Press Release cited in Singularity's January 5, 2022 Form 8-K, but omit language, which is critical and cited in the accompanying memorandum of law.  True and correct copies of the January 5, 2022 Form 8-K and the accompanying press release are annexed hereto as **Exhibit OO**.

138.     The Operative Complaint then attacks Singularity with unsupported allegations related to the Golden Mainland Joint Venture, or even worse, contain images drawn from the Peabody Report.  *Compare* Operative Complaint [D.E. 58] ¶¶125-138 *with* Peabody Report **Exhibit B**.

139.     Pertinent to Mr. Jie, the Operative Complaint then cites to another joint venture involving Thor Miner and Singularity, with allegations that were directly drawn from a Complaint in the matter captioned SOS Info. Tech. N.Y., Inc. v. Thor Miner, Inc., New York County Supreme Court Index No. 654735/2022.  A true and correct copy of the Complaint filed in the SOS Info. Tech. N.Y., Inc. matter is annexed hereto as **Exhibit PP**.

140.     The Complaint only asserts allegations and pleadings in that matter, which was voluntarily discontinued with prejudice against Singularity and Yang Jie by the filing of Notices of Voluntary Discontinuance on December 28, 2022 and January 3, 2023.  True and correct copies of the Notices of Voluntary Discontinuance dated December 28, 2022 and January 3, 2023 are collectively annexed hereto as **Exhibit QQ**.

141.     It is quite evident that the Operative Complaint draws heavily from the Hindenburg Report and the Peabody Report.

142.     The Hindenburg Report, however, only makes citations to media sources with anonymous, and unverified reports.  Further, citations to alleged documents in the Hindenburg Report lead to unverified and unattested documents that were translated through the Google Translate platform.  **Exhibit B.** (The Hindenburg Report).

143.     Upon information and belief, the Operative Complaint draws most, if not all the facts from the unverified and uncertified documents cited within the Hindenberg and Peabody Reports.

144.     For example, in ¶¶177-178 of the Operative Complaint [D.E. 58], the Lead Plaintiffs admitted that the images and information used in the Complaint were drawn directly from the Peabody Report.

145.     Again, in ¶179 of the Operative Complaint [D.E. 58], Lead Plaintiffs admit reliance on the Peabody Report and Hindenburg Report for some allegations in the Operative Complaint.

146.     This theme continues through the entire complaint.

147.     Additionally, the Operative Complaint omits information relating to Singularity's stock price, as referenced in detail above by date and event, instead attributing Singularity's rise and fall to Mr. Jie and the release of the Hindenburg Report.  *See Generally* Operative Complaint

148.    However, this allegation is contradicted by the fact that the share price of Singularity reached its peak price of $19.78 per share on April 7, 2022 and fell to $6.75 per share on May 4, 2022, the day before the Hindenburg Report was published.  **Exhibit E.**

149.    The Operative Complaint also omits the fact that Singularity's peak share price was reached on April 7, 2022, approximately one month before the Hindenburg and Peabody Reports were issued. **Exhibit E**.

150.    The data from Nasdaq exhibits that Singularity's share price was in a decline before the Hindenburg Report and continued to retreat, the data also exhibits that there was no correlation between Mr. Jie's hiring and Singularity's share price.  **Exhibit E.**

151.    The Complaint then pleads in Count I, allegations of violations of Section 10(b) of the Exchange Act and on Rule 10b-5 on the same allegations omitting public information and with citation to unverified sources. *See Generally*, Operative Complaint [D.E. 58].

152.    The securities violation allegations in the Operative Complaint are connected to terms such as reckless without further substance.  *See Generally*, Operative Complaint. Id.

153.    As to the securities violation allegations, the Complaint makes no real allegations about causation, much like the diligence allegations. S *See Generally*, Operative Complaint. Id.

154.    The allegations in the Operative Complaint about omissions and misrepresentations, however, are contradicted by the clear record as set forth in the motion with Securities and Exchange Commission filings, Electronic Court Filings and Public Records.

**DEFENDANTS MR. JIE'S AND MS. HUANG'S ATTORNEYS PERFORMED A BONA FIDE INVESTIGATION, THE ACCURACY OF WHICH WAS SUBSEQUENTLY CONFIRMED BY SINGULARITY'S OWN INVESTIGATION.**

155.    Defendant Yang Jie, through the undersigned attorneys, engaged the Chinese Law Firm Zhonglun W&D Law Firm ("Zhonglun Firm") to perform an investigation whether Mr. Jie

23

has or had any pending criminal charges, convictions, or other evidence of Criminality in China. The Zhonglun Firm subsequently issued a report (the "Zhonglun Firm Report") A true and correct copy of the Zhonglun firm report is annexed as **Exhibit RR.**

156.    The Zhonglun firm report reflects that the underlying complaint that the Hindenburg report asserts criminality on the part of Mr. Jie did not target or charge Mr. Jie, and that others were charged and convicted in connection with that action.  Id.

157.    The Zhonglun firm report continues to state that the criminal action in China reached a final judgment and no conviction was entered against Mr. Jie. Id.

158.    Furthermore, Mr. Jie was not even submitted to the prosecutor's office in China. Id.

159.    Finally, there are not and have not been pending criminal charges in China, pursuant to the investigation and results set forth in the Zhonglun firm report. Id.

160.    Similarly, Singularity also performed their own investigation through independent Chinese Counsel and summarized in a July 3, 2023 Form 8-K, stating "[o]n June 12, 2023, Heibei Mei Dong Law Firm issued a report to the Registrant with respect to these issues.  In their report, the Chinese counsel concluded after conferring with local officials, that investigation of Mr. jie conducted by the Baohe District Police Bureau of Heifei City was completed, that Mr. Jie was never prosecuted and there was no criminal judgment against Mr. Jie as of the date of the report. The Chinese counsel also confirmed that no 'Red Notice' was issued for Mr. Jie by the PRC."  A true and correct copy of the July 3, 2023 Form 8-K is annexed hereto as **Exhibit SS**.

**WHEREFORE**, it is respectfully requested that the Court grant the instant motion to dismiss in its entirety and dismiss the instant complaint.

New York, New York
Dated: November 20, 2023

**BECKER & POLIAKOFF, LLP**
*Attorneys for Defendant Yang "Leo" Jie*
*and Xiaohuan Huang*

By:   /s/ James J. Mahon
      James J. Mahon, Esq. (JM5405)
      45 Broadway, 17th Floor
      New York, New York 10006
      Phone: 212-599-3322
      Fax: 212-557-0295

24270267v.3