# EXHIBIT BB

{EXHIBIT 1 }

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 2 of 30 PageID #: 1724

# Exhibit A

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 3 of 30 PageID #: 1725

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION

INTERNATIONAL ARBITRATION TRIBUNAL

| | |
|---|---|
| IN THE MATTER OF: | ) |
| CHINA COMMERCIAL CREDIT, INC., | ) |
| Claimant/Counterclaim Respondent, | ) |
| v. | ) ICDR Case No. 01-18-0000-4901 |
| SORGHUM INVESTMENT HOLDINGS | ) |
| LIMITED, | ) |
| Respondent/Counterclaimant. | ) |

## **FINAL AWARD**

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Arbitration Agreement set forth in Section 11.4 ("Arbitration Agreement") of "ARTICLE XI MISCELLANEOUS" of the SHARING EXCHANGE AGREEMENT made and entered into by and between the above-named Parties (and each of the shareholders of Respondent named on Annex 1 of the Agreement, none of whom are Parties to this Arbitration) as of August 9, 2017 ("Agreement"), and having been duly sworn, and having duly heard the proofs and allegations of the Claimant/Counterclaim Respondent China Commercial Credit, Inc. ("Claimant"), represented by Mark David Hunter and Jenny Johnson-Sardella of Hunter Taubman Fischer & Li LLC ("Claimant's Counsel"), and Respondent/Counterclaimant Sorghum Investment Holdings Limited ("Respondent") (collectively, the Claimant and Respondent are referred to herein as the "Parties" or the "Party" when referring to one of the Parties), represented by Shang Dai, Amiad Kushner and Rongping Wu of Dai & Associates, P.C. ("Respondent's Counsel"), and after due notice in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"), amended and effective October 1, 2013 ("AAA Commercial Arbitration Rules"), and after due deliberation, do hereby, issue this FINAL AWARD in this Arbitration as follows:

1

Case 1:22-cv-07499-BMC     Document 63-29     Filed 11/20/23     Page 4 of 30 PageID #: 1726

## I.     BACKGROUND

1.    Claimant is a company incorporated in the State of Delaware, United States of America. Claimant trades on the Nasdaq stock exchange and is subject to United States federal securities regulations and reporting requirement, including those of the Securities & Exchange Commission ("SEC").

2.    Respondent is a British Virgin Islands Company.

3.    At all relevant times, Darong Huang was the President and Director of Respondent, President, Chairwoman and General Manager of Respondent's operating subsidiary Shanghai Wheat Asset Management Co, Ltd. ("Wheat"), and President, Executive Director and Chief Executive Officer of Shanghai Nonobank Financial Information Services Co, Ltd. ("Nonobank"), a wholly-owned subsidiary of Wheat.

4.    From January 9, 2017, the date she was hired by Wheat, Xiaoying Sun, who reported to Ms. Huang, was designated a leader of Wheat's Listing Working Group.

5.    Ms. Sun negotiated several agreements related to a potential transaction involving Respondent and Claimant. On December 19, 2017, her employment was terminated.

6.    Long Yi is Claimant's Chief Financial Officer and one of its Directors.

7.    As of at least October 27, 2016, Yang Jie was Claimant's largest shareholder (approximately 16.5% of Claimant's outstanding shares of common stock), and Claimant's Vice President of Finance.

8.    Subsequent to that date, Mr. Jie acquired additional shares of stock; and, on December 4, 2017, Mr. Jie was the beneficial owner of 22.5% of Claimant's shares of common stock.

9.    In early 2017, Ms. Sun negotiated a Cooperative Memorandum of Understanding ("MOU") with respect to a potential transaction between Nonobank and Claimant. Pursuant to the MOU, Nonobank agreed to deposit US$3.5 million in an escrow account to be agreed upon. The US$3.5 million would be paid to Mr. Jie if the transaction was consummated. Mr. Jie was identified in the MOU as a representative of Claimant's main shareholders. On March 21, 2017, the MOU was executed by Ms. Huang and purportedly by Mr. Jie.

10.   On March 24, 2017, the Escrow Agreement was executed by Ms. Huang on behalf of Nonobank, and was purportedly executed by Mr. Jie and Mr. Yi Lin, who had been designated in the Escrow Agreement as the Escrow Agent.

11.   As noted above, the Parties entered into the Agreement as of August 9, 2017.

12.   Claimant and Respondent formed a working group of their respective representatives who were working together on the transaction contemplated in the Agreement ("Working Group").

13.   Under the terms of the Agreement, Claimant was required to file with the SEC a proxy statement seeking shareholder approval of the transactions contemplated by the Agreement (the "Proxy Statement").

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 5 of 30 PageID #:
1727

14. On December 4, 2017, Claimant Filed a Revised Preliminary Proxy Statement on Schedule 14A ("Revised Preliminary Proxy Statement").

15. Claimant had filed at least one earlier draft Preliminary Proxy Statement, which it revised based at least in part on a comment letter sent by the SEC Staff on November 17, 2017.

16. On December 14, 2017, Claimant received a comment letter from the Staff of the SEC regarding the Revised Preliminary Proxy Statement ("Comment Letter"). The Comment Letter requested that Claimant respond to two comments "within ten business days by providing the requested information or advise us as soon as possible when you will respond."

17. The comments for which the Staff requested a response in its Comment Letter are not in issue in this Arbitration.

18. The events subsequent to the Comment Letter are an integral part of the issues in this Arbitration and are discussed below.

## II.    MATERIAL PROVISIONS OF THE AGREEMENT

For purposes of this Final Award the material provisions of the Agreement are as follows:

19. Section 6.7 [the "No Trade" provision], among other things, required, and each of the Parties acknowledged and agreed that:

> each is aware, and that [Respondent's] Affiliates are aware (and each of their respective Representatives is aware or, upon receipt of any material nonpublic information of [Claimant], will be advised) of the restrictions imposed by the Federal Securities Laws…on a Person possessing material nonpublic information about a publicly traded company. …[W]hile any of them are in possession of such material nonpublic information, it shall not purchase or sell any securities of [the Claimant] [with one exception not here relevant], communicate such information to any third party, take any other action with respect to the [Claimant] in violation of such Laws, or cause or encourage any third party to do any of the foregoing.

20. Section 6.9 (a) [part of the Efforts provision] requires each of the Parties to use its commercially reasonable efforts, and cooperate fully with each other:

> to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under applicable Laws and regulations to consummate the transactions contemplated in this Agreement (including the receipt of all applicable consents of Governmental Authorities [including the SEC]) and to comply as promptly as practicable with all requirements of Governmental Authorities.…

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 6 of 30 PageID #: 1728

21. Section 6.11 [part of The Proxy Statement provision] governs the obligations of the Parties with respect to the preparation and filing with the SEC of the Proxy Statement.

22. Section 6.11(a) requires, among other things, that Claimant prepare and file the Proxy Statement with the SEC.

23. Sections 6.11(b) and (c) set forth the obligations of the Parties with respect to the information contained in the Proxy Statement, among other documents.

24. Section 6.11(b) requires, among other things, that: a) "[Claimant] shall ensure that, when filed the Proxy Statement and other Proxy Documents will comply in all material respects with the requirements of the Exchange Act and its rules and regulations thereunder" (the Proxy Statement and other Proxy Documents will be referred to hereinafter as the "Proxy Statement"); b) Claimant shall provide Respondent with proposed forms of the Proxy Statement in advance of submission to allow Respondent a reasonable amount of time to review and comment on the Proxy Statement and Claimant shall reasonably consider such comments; c) both Parties shall respond promptly to any comments of the SEC or its Staff and promptly correct any information provided by it for use in the Proxy Statement if and to the extent that such information shall have become false or misleading in any material respect; and, d) the Parties [including Respondent's direct and indirect subsidiaries and variable interest entities] shall make their respective directors, officers and employees available upon reasonable advance notice, in connection with the drafting of the Proxy Statement, among other documents, and respond in a timely manner to comments from the SEC.

25. Section 6.11(c) provides, among other things, that if a Party discovers any information relating to a Party's officers, directors or employees that should be set forth in an amendment to the Proxy Statement in order that the Proxy Statement not include any misstatement of a material fact or omit to state any material fact necessary to make the statement therein, in light of the circumstances under which they were made, not misleading, the Party discovering the information "shall promptly notify" the other Party and an appropriate amendment or supplement shall be promptly filed with the SEC.

26. Section 6.12(a) provides that:

> The Parties agree that no public release, filing or announcement concerning this Agreement or the Ancillary Documents or the transactions contemplated hereby or thereby shall be issued by any Party or any of their Affiliates without the prior written consent of [Claimant and Respondent] (which consent shall not be unreasonably withheld, conditioned or delayed), except as such release or announcement may be required by applicable Law or the rules or regulations of any securities exchange, in which case the applicable Party shall use commercially reasonable efforts to allow the other Parties reasonable time to comment

on, and arrange for any required filing with respect to, such release or announcement in advance of such issuance.

27.    Section 9.1 provides, among other things, that the Agreement may be terminated and the transactions contemplated by the Agreement may be abandoned at any time prior to closing under the following circumstances: a) Section 9.1(d) by written notice by Respondent if: (i) there has been a breach by Claimant of any of its representations, warranties, covenants or agreements contained in the Agreement, or if any representation or warranty of the Claimant shall have become untrue or inaccurate…and (iii) the breach or inaccuracy is incapable of being cured or is not cured within the earlier of twenty days after written notice of such breach or inaccuracy is provided by Respondent or the Outside Date [which was February 9, 2018] and b) Section 9.1(e) contains the same exact provision as set forth above in Section 9.1(d) except that it sets forth Claimant's rights with respect to a breach by Respondent.

28.    Section 9.2 provides that:

> [t]his Agreement may only be terminated in the circumstances described in Section 9.1 and pursuant to a written notice delivered by the applicable Party to the other applicable Parties, which sets forth the basis for such termination, including the provision of Section 9.1 under which such termination is made. In the event of a valid termination of this Agreement pursuant to Section 9.1, this Agreement shall forthwith become void, and there shall be no Liability on the part of any Party or any of their respective Representatives, and all rights and obligations of each Party shall cease, except: i) Sections 6.12, 6.13, 9.3, 9.4, Article XI and this Section 9.2 shall survive the termination of this Agreement, and (ii) nothing herein shall relieve any Party from Liability for any willful breach of any representation, warranty, covenant or obligation under this Agreement or any Fraud Claim against such Party, in either case, prior to termination of this Agreement (in each case of clauses (i) and (ii) above). Without limiting the foregoing, and except as provided in Sections 9.3 and 9.4 and this Section 9.2, the Parties' sole right prior to the Closing with respect to any breach of any representation, warranty, covenant or other agreement contained in this Agreement by another Party or with respect to the transactions contemplated by this Agreement shall be the right, if applicable, to terminate this Agreement pursuant to Section 9.1.

29.    Section 9.4 of the Agreement provides, in relevant part that if the Agreement is terminated by Respondent pursuant to Section 9.1 (d) or Section 9.1 (g) the Party that has been terminated shall pay the Party terminating the Agreement a Termination Fees equal to the Expenses actually incurred by or on behalf of the terminating Party. The Termination Fee was to be paid by wire transfer of immediately available funds within

5

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 8 of 30 PageID #: 1730

10 business days after the notifying Party delivers to the other Party the amount of such Expenses, together with reasonable documentation in connection therewith.

30. Section 9.3 of the Agreement defined Fees and Expenses, in relevant part, as:

> Expenses shall include all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, financial advisors, financing sources, experts and consultants to a Party hereto or any of its Affiliates) incurred by a Party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution or performance of this Agreement or any Ancillary Document related hereto and all other matters related to the consummation of this Agreement.

31. Section 11.4 is the Arbitration Agreement. It provides in relevant part:

> Any and all disputes, controversies and claims…arising out of, related to, or in connection with this Agreement or the transactions contemplated hereby (a *"Dispute"*) shall be governed by this Section 11.4. … Each party shall submit a proposal for resolution of the Dispute to the arbitrator within twenty (20) days after confirmation of the appointment of the arbitrator [which period was extended by agreement of the Parties.] The arbitrator shall have the power to order any party to do, or to refrain from doing, anything consistent with this Agreement, the Ancillary Documents and applicable Law, including to perform its contractual obligation(s); provided, that the arbitrator shall be limited to ordering pursuant to the foregoing power (and, for the avoidance of doubt, shall order) the relevant party (or parties, as applicable) to comply with only one or the other of the proposals. The arbitrator's award shall be in writing and shall include a reasonable explanation of the arbitrator's reason(s) for selecting one or the other proposal. The seat of arbitration shall be in New York County, State of New York. …

32. Section 11.5 of the Agreement provides, among other things, that: "This Agreement shall be governed by, construed and enforced in accordance with the Laws of the State of New York without regard to the conflicts of laws principles thereof.

## III.    ARBITRATION PROCEEDINGS

### A. Claimant's Claims

33. Claimant filed a Demand for Arbitration dated January 25, 2018, with the International Centre for Dispute Resolution ("ICDR"), including a letter from Mark David Hunter of Claimant's Counsel to Ms. Huang in which Mr. Hunter asserted on behalf of Claimant

Case 1:22-cv-07499-BMC     Document 63-29     Filed 11/20/23     Page 9 of 30 PageID #:
1731

that Respondent breached Sections 6.7, 6.9(a) and 6.11(b) the Agreement, as well as its implied duty of good faith and fair dealing in the Agreement (the Demand and accompanying letter from Mr. Hunter are referred to herein as the "Demand").

34. The Demand stated that, on December 21, 2017, pursuant to Section 9.1(e) of the Agreement, Claimant sent Respondent a formal written notice that Respondent was in breach of the Agreement ("Notice of Breach Letter".)

35. In its Demand, Claimant asserts, on information and belief that Respondent participated in unusual trading activity in violation of Respondent's no-trade obligations set forth Section 6.7.

36. In its Demand, Claimant asserts that Respondent breached its agreement and obligation under Section 6.9(a) to use its commercially reasonable efforts to consummate the transaction contemplated by the Agreement and, its agreement and obligation under Section 6.11(b) to cause each of its employees and the employees of its direct and indirect subsidiaries and variable interest entities and to make their respective directors, officers and employees available to Claimant to assist with drafting the necessary SEC filings with respect to the transaction contemplated by the Agreement, including the Proxy Statement and responding to the SEC's comment letters in a timely manner.

37. Specifically, Claimant asserts that Respondent breached Sections 6.9(a) and 6.11(b) when Ms. Huang sent an email on December 19, 2017, to the Working Group instructing it to "suspend all of the ongoing activities and work relating to the transaction until [they] receive[d] instructions to continue work from either Julia or [Ms. Huang]" ("Suspension of Work Email").

38. At the time Ms. Huang sent the Suspension of Work Email, the Working Group was working on a response to the Staff's Comment Letter.

39. In its Demand, Claimant also asserts that Respondent breached its duty of good faith and fair dealing, which is implied in all New York contracts, by suspending all activities and work in connection with responding to the Comment Letter.

40. In its Demand, Claimant sought an award of damages to be determined, "including but not limited to the Termination Fee under Section 9.4 of the Agreement, and all costs and expenses (including attorney fees) resulting from [Respondent's] breaches of the Agreement."

## B. Respondent's Answer and Counterclaims

41. On April 11, 2018, Respondent filed its Answer and Counterclaim against Claimant, which did not comply with the filing fee requirements of the AAA Commercial Arbitration Rules.

42. On April 12, 2018, I issued an order permitting the Counterclaim provided that Respondent comply with the AAA's Commercial Arbitration Rules regarding its filing fee requirements.

43. On April 18, 2018, Respondent complied with the required filing fee requirements.

44. Although the Answer and Counterclaim is one pleading, for the sake of clarity when referring to the part of the pleading that is the Answer, I have referred to it as the "Answer;" and, when referring to that part of the pleading that is the Counterclaim, I have referred to it as the "Counterclaim."

45. In its Answer, Respondent acknowledged that, pursuant to Section 9.1(e) of the Agreement, on December 21, 2017, Claimant sent Respondent the Notice of Breach Letter in which it claimed that Respondent breached the Agreement, but denied that it breached the Agreement or failed to fulfill any of its obligations under the Agreement.

46. In its Answer, Respondent asserts that Claimant never validly terminated the Agreement and does not have standing to request a Termination Fee under the Agreement.

47. Specifically, in its Answer, Respondent asserts that although Claimant notified Respondent in Claimant's Notice of Breach Letter that Respondent breached the Agreement, prior to the expiration of the 20 day cure period under Section 9.1(e), before Claimant could terminate the Agreement, Respondent terminated Claimant by written notice on December 29, 2017 ("Termination Letter").

48. In its Counterclaim, Respondent alleges that it properly terminated the Agreement, based upon Claimant's incurable breach of Section 6.12(a) and multiple suspicious issues relating to Claimant's major shareholder, Mr. Jie, which raised serious concerns.

49. Respondent asserts that by letter dated January 14, 2018, Respondent requested payment from Claimant of a Termination Fee of US$2,355,119.12 in accordance with Section 9.4.

50. Respondent asserts that Claimant further breached the Agreement by failing to pay the requested Termination Fee as required by Section 9.4.

51. Upon recalculating the Termination Fee, Respondent now seeks an award of damages against Claimant in the amount of US$1,863,551.56 instead of US$2,355,119.12, which it originally sought, together with all costs and expenses (including attorney's fees) resulting from Claimant's breaches.

### C. Claimant's Reply to the Counterclaim

52. On April 26, 2018, Claimant filed its Reply to the Counterclaim in which it denied the allegations of the Counterclaim.

### D. Preliminary Hearing Conference Call

53. The initial Preliminary Hearing Conference Call ("PHCC") was held on March 28, 2018. Jenny Johnson-Sardella of Claimant's Counsel appeared on behalf of Claimant. No one appeared on behalf of Respondent, although notice had been given to

Case 1:22-cv-07499-BMC   Document 63-29   Filed 11/20/23   Page 11 of 30 PageID #: 1733

Respondent. However, it was noted that the Respondent had until March 29, 2018, to object to my service as the Arbitrator, and the PHCC was adjourned without date.

54. On March 29, 2018, Ms. Huang notified the ICDR that Respondent would appear and that it notified its Counsel who would appear on its behalf.

55. Based upon the representations of Ms. Huang, I scheduled the PHCC for April 9, 2018. The PHCC was held on that date and Claimant was represented by Ms. Johnson-Sardella and Respondent was represented by its Counsel Bernard C. Daley, Shang Dai and Steven Eichel of Dai & Associates, P.C.

56. An additional PHCC was also held on April 12, 2018 at which Counsel for both Parties were in attendance.

57. During the April 12 PHCC, among other things, Counsel for the Parties confirmed the following: a) the AAA's Commercial Arbitration Rules, including its Expedited Procedures, Amended and Effective October 1, 2013 are in effect in this Arbitration; b) the Arbitration is governed by the Federal Arbitration Act;  c) pursuant to the Arbitration Agreement, the language of the Arbitration is English; d) All documents, including affirmations and affidavits to be submitted in support of the Parties respective Submissions, are to be submitted in English; e) the Parties are to agree on a certified translator to translate into English documents to be submitted in the Arbitration that are originally in a language other than English; f) all conditions precedent that are set forth in Section 11.4 of the Agreement have been satisfied; and, g) pursuant to the Arbitration Agreement the form of the Award is to include, "a reasonable explanation of my reason(s) for selecting one or the other Party's Proposal for Resolution" ("PFR") that the Parties were required to submit pursuant to Section 11.4 of the Agreement.

### E. Jurisdiction, Seat of the Arbitration and Choice of Law

58. **Jurisdiction.** During the April 12 PHCC, Counsel for the Parties confirmed that: a) they have no objection to my service as the Arbitrator in this Arbitration and that I am acceptable to the Parties as the Arbitrator in this Arbitration; b) they have no objection to my jurisdiction to determine the claims and controversies asserted in the Claims and Counterclaim herein or to the arbitrability of the Claims and Counterclaim herein. Based on the above, I have determined that I have full jurisdiction and authority to decide all matters that are presented in this Arbitration.

59. **Seat of the Arbitration.** Pursuant to Section 11.4 of the Agreement, the seat of arbitration shall be in New York County, State of New York, USA.

60. **Choice of Law.** Pursuant to Section 11.4 and Section 11.5 of the Agreement, the Disputes in this Arbitration shall be decided in accordance with the Laws of the State of New York without regard to the conflicts of laws principles thereof.

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 12 of 30 PageID #:
1734

## F.    The Parties' Respective Proposals for Resolution

61.    Pursuant to the Arbitration Agreement, Section 11.4, the Parties submitted their respective PFR's to the ICDR on June 14, 2018.

62.    On June 29, 2018, Claimant objected to the Respondent's PFR. On July 2, 2018, I received Respondent's response to the Claimant's objections.

63.    On July 3, 2018, I issued my ruling in which I denied Claimant's Objections to Respondent's PFR.

## G.    Claimant's PFR

64.    In its PFR, Claimant requests that it be awarded its Termination Fee in the amount of US$1,436,521.50 as a result of Respondent's incurable breach of Section 6.7, and its breaches of Section 6.9(a) and Section 6.11(b) of the Agreement. As more fully set forth in its PFR, Claimant asserts that Respondent incurably breached Section 6.7 when certain of its employees and officers sold their entire positions in Claimant's stock following the Suspension of Work Email; and, that Respondent breached Section 6.9(a) and Section 6.11(b) for failure to use commercially reasonable efforts and to cooperate fully with the Claimant to consummate the transactions contemplated by the Agreement and to make its directors, officers and employees available in connection with responding in a timely manner to SEC comments. Claimant asserts that it is entitled to the Termination Fee because it could have terminated the Agreement and did not waive its right to do so. Claimant denies that it breached Section 6.12(a) when it filed the Form 8-K on December 27, 2017, without advance notification to Respondent or seeking any input from Respondent before making the filing.

65.    In support of its PFR, Claimant submitted the following, in accordance with 28 U.S.C. § 1746: a) the declaration of Long Yi including exhibits attached thereto dated June 14, 2018. Mr. Yi is Claimant's current Chief Financial Officer and a Director of Claimant; b) the declaration of Yi Lin, including exhibits attached thereto, executed June 14, 2018. Mr. Lin is an attorney who was named in the Escrow Agreement as the Escrow Agent, and who Respondent asserts executed the Escrow Agreement; and, c) the declaration of Letian Yu dated June 15, 2018. Ms. Yu is the former Board Secretary of Wheat. Ms. Yu's declaration was submitted with the Claimant's PFR on June 14, 2018. I accept that it was dated June 15, 2018, because of the time difference between China and the United States.

66.    In his declaration, Mr. Yi declared that he had personal knowledge of the matters set forth in his declaration. Among other things, Mr. Yi declared that:

a)    When Claimant received the Comment Letter on December 4, 2017, containing two comments, the Working Group was preparing the responses to the Comment Letter, and Claimant intended to respond to the Comment Letter as soon as possible;

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 13 of 30 PageID #:
1735

b) On December 19, 2017, Respondent's CEO Ms. Huang forwarded the Suspension of Work Email to the Working Group, instructing them to "suspend all of the ongoing activities and work relating to the transaction until [they] receive[d] instructions to continue work from either Julia [Zhou] [or Ms. Huang];"

c) The Suspension of Work Email also noted that Ms. Sun was no longer working for Wheat and that the Daishang law firm [Dai & Associates] was engaged to advise Wheat;

d) When he inquired what role the Daishang law firm would play in the transaction, neither Ms. Huang nor Ms. Zhou responded;

e) To avoid violating the terms of the Agreement and any relevant securities laws, Mr. Yi attempted to contact Respondent and Ms. Huang regarding Claimant's responses to the Comment Letter. Neither Respondent nor Ms. Huang responded to his inquiries and declined to have a conference call to discuss the Comment Letter questions, although the disclosures included in the Revised Proxy Statement had been authorized by Respondent's U.S. counsel, its People's Republic of China counsel, its auditing firm, and financial advisors;

f) On December 21, 2017, in accordance with Section 9.1(e) of the Agreement, Claimant provided Respondent with the Notice of Breach Letter;

g) On December 22 and 24, 2017, he tried to contact Ms. Huang and Ms. Zhou via WeChat, at least four times each day, but neither responded to his calls;

h) On December 26, 2017, he then attempted to call Ms. Huang on her cellular phone on five separate occasions between 8:00 a.m. and 10:00 a.m. On the first two attempts, no one answered, on the third attempt, Ms. Huang answered the phone, but stated that she did not respond by phone and hung up. He immediately called her again for a fourth and fifth time, but there was no response;

i) He attempted to reach her later that afternoon, but his phone number appeared to be blocked as his calls never reached her again;

j) Subsequent to Ms. Huang's December 19 Suspension of Work Email, Claimant's stock price dropped about 50% between December 19 and 21, 2017. In addition, the trading volume in Claimant's stock increased approximately five fold on December 20, 2017;

k) Claimant had reason to believe that the unusual trading activity was a result of Respondent's improper disclosure of nonpublic information in connection with the Agreement. Specifically, Respondent's officers and employees had sold their shares of Claimant's stock in direct contravention of Section 6.7 of the Agreement;

l) By way of example, Mr. Yi stated that Xiaozhong Li, VP of Wheat Financial held 42,325 shares of Claimant's stock as of November 28, 2017, but by December 28, 2017, he held no shares. Also, Lequan Zhou, Director of the Liquidity Management Department at Wheat, held 13,901 shares of Claimant's stock as of November 28, 2017, but by December 28, 2017, held no shares. Mr. Yi attached as an exhibit to

11

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 14 of 30 PageID #: 1736

his declaration the Non-Objecting Beneficial Owners List that supported his declaration with respect to share ownership by Xiaozhong Li and Lequan Zhou;

m) On December 27, 2017, after receiving no response from Respondent, Claimant was required to file a Form 8-K with the SEC pursuant to Regulation FD of the Securities Exchange Act of 1934 and Section 3.4 of the Agreement in connection with the "precipitous" decline in Claimant's share price since December 19, 2017;

n) He never received any notice from Mr. Yi Lin, the alleged Escrow Agent for the Escrow Agreement, that he received any escrow funds related to the transaction;

o) He set forth the approximate cost breakdown and total expenses in connection with the termination of the transaction totaling US$1,436,521.15. (Mr. Lin declared this was the approximate amount. As noted above in its Submission, Claimant requested an award in the amount of US$1,436,521.50).

67. In his declaration, Mr. Lin declared that his declaration was upon his own knowledge and review of his records concerning the facts and circumstances of this matter. Among other things, Mr. Lin declared that:

a) He is an attorney licensed in the State of New York;

b) On April 20, 2018, he received a letter from Bernard C. Daley on behalf of Dai & Associates, P.C., counsel to Nonobank, demanding return of funds with interest held in escrow pursuant to an alleged March 24, 2017, "Escrow Agreement", a copy of which was not provided with the letter ("April 20 Letter"). The April 20 Letter demanded that he wire RMB27,620,000 to a designated account in China;

c) On April 23, 2018, he responded to the April 20 Letter that he had no record of any such Escrow Agreement and requested proof of deposit if it was made with his office as Escrow Agent;

d) On May 1, 2018, Mr. Daley wrote him a second letter ("May 1, 2018 Letter") requesting that he confirm if the signature on the Escrow Agreement attached to the May 1 Letter was Mr. Lin's signature and if he received any funds based on the Escrow Agreement;

e) On May 4, 2018, he responded to the May 1 Letter and confirmed that he did not sign the purported Escrow Agreement attached to the May 1 Letter , and noted that Mr. Daley's client's internal corporate authorization and approval failed to show deposit of funds with him as Escrow Agent;

f) He reviewed his escrow deposit records for the period March 1, 2017, through December 1, 2017, and found no record of any escrow deposit from Mr. Daley's client;

g) He further reviewed his escrow agreement record and found no record of any escrow agreement wherein Nonobank is a depositor and he is an escrow agent;

h) Until the date of his declaration on June 14, 2018, he has received no proof, direct or indirect, concerning deposit of funds by Nonobank or its affiliated entity.

12

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 15 of 30 PageID #: 1737

68. In her declaration, Letian Yu declared that she has personal knowledge of the matters set forth in her declaration. Among other things, Ms. Yu declared that:

   a) On May 19, at a birthday dinner, Ms. Huang told her that Respondent would merge with the Nasdaq-listed company [Claimant] and inferred that the purchase of its stock would have a relatively high return in the future;

   b) As a result, she immediately purchased Claimant's stock that night;

   c) At the beginning of December 2017, after Julia Zhou started working with Wheat Financial in early November 2017, Ms. Huang stated that Respondent would gradually have its own independent Initial Public Offering ("IPO") process in place and abandoned the idea of cooperating with Claimant;

   d) This was confirmed in an email on November 19, 2017, when Wheat Financial announced that Xiaoping Sun would no longer participate in the Claimant/Respondent merger;

   e) Ms. Huang mentioned several times in internal meetings that Respondent would have its own independent IPO plan and will no longer have any collaboration with Claimant;

   f) As a result, internal employees of Wheat Financial who held Claimant's stock began selling their shares of stock in Claimant.

### H. Respondent's PFR

69. In its PFR, Respondent seeks the Termination Fee of $1,863,551.56 together with interest, attorneys' fees, and costs in connection with this Arbitration as a result of Claimant's incurable breach of Section 6.12(a) of the Agreement. As more fully set forth in its PFR, Respondent asserts that Claimant incurably breached Section 6.12(a) when it filed the Form 8-K on December 27, 2017, without advance notification or consultation with Respondent and without obtaining Respondent's prior written consent or, to the extent the filing was required by law to be made, without using commercially reasonable efforts to allow Respondent a reasonable time to comment on the filing.

70. In support of its PFR, Respondent submitted the Affirmation of Darong Huang.

71. In her affirmation, Ms. Huang affirmed, among other things, that:

   a) When Ms. Sun was hired by Wheat on January 9, 2017, she was designated a leader of Wheat's Listing Working Group to work on a potential transaction with Claimant;

   b) Ms. Sun reported to Ms. Huang;

   c) Ms. Sun negotiated several agreements related to a potential transaction involving Respondent and Claimant;

   d) Ms. Sun negotiated the MOU, which involved a potential transaction between Nonobank and Claimant. Pursuant to the MOU, Nonobank agreed to deposit

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 16 of 30 PageID #:
1738

US$3.5 million in an escrow account to be agreed upon, which amount would be paid to Mr. Jie if the transaction was consummated;

e) On March 20 and 21, the MOU was executed by Ms. Huang on behalf of Nonobank, and by Mr. Jie;

f) On March 24, 2017, the Escrow Agreement was executed by Ms. Huang on behalf of Nonobank, and by Mr. Jie and Mr. Yi Lin as escrow agents;

g) On April 7 and April 19, 2017, pursuant to the Escrow Agreement, one of Nonobank's affiliates wired, in several wire transactions, the amount of RMB 25,450,000.00 to fund the escrow account;

h) Ms. Sun was Respondent's principal representative in the negotiation and documentation of the MOU, the Escrow Agreement and the Agreement;

i) Ms. Huang signed these three agreements based on information that Ms. Sun provided her. She never met Mr. Yi or Mr. Jie;

j) After the Agreement was signed on August 9, 2017, Ms. Sun was Respondent's principal representative in communicating with Claimant and its representatives concerning the transaction, including Claimant's filings with the SEC;

k) Mr. Jie was Claimant's largest shareholder, owning 22.5% of the outstanding shares of Claimant's common stock as disclosed in SEC filings, and he was Claimant's VP of Finance as well as the General Manager of Claimant's office in New York;

l) Under the terms of the Agreement, Claimant was required to file with the SEC a proxy statement seeking shareholder approval of the transactions contemplated by the Agreement;

m) On December 4, 2017, Claimant filed an amended Preliminary Proxy Statement on Schedule 14A [referred to in the filing and in this Award as a "Revised Preliminary Proxy Statement"];

n) The Revised Preliminary Proxy Statement indicated that Mr. Jie remained the beneficial owner of [22.5%] of Claimant's outstanding shares of common stock.

o) At about that time [December 4, 2017], Ms. Huang "discovered" that Claimant's Revised Preliminary Proxy Statement did not disclose the existence of the MOU or the Escrow Agreement including the fact that Mr. Jie stood to receive a US $3.5 million from a subsidiary of Respondent in connection with the transaction, although it did state that several discussions were held between Mr. Yi and Mr. Jie and Ms. Sun with regard to due diligence requests;

p) On December 14, 2017, Claimant received the Comment Letter regarding the Revised Preliminary Proxy Statement requesting that Claimant respond to two comments "within ten business days by providing the requested information or advise us as soon as possible when you will respond;"

q) Ms. Huang was greatly concerned that the Revised Preliminary Proxy Statement omitted information concerning the MOU and the Escrow Agreement as she

FILED: NEW YORK COUNTY CLERK 10/29/2018 04:32 PM
NYSCEF DOC. NO. 5

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 16 of 30 PageID #:

INDEX NO. 655372/2018

RECEIVED NYSCEF: 10/29/2018

14

Case 1:22-cv-07499-BMC     Document 63-29     Filed 11/20/23     Page 17 of 30 PageID #: 1739

understood all material facts about the transaction were required to be disclosed publicly;

r) On about December 14, she and her team discovered that Daqin Consulting Service (Shenzhen), Limited, who had been retained to opine on the fairness of the transaction to Respondent was wholly-owned by Mr. Jie, thereby disqualifying it from giving Respondent a fairness opinion;

s) On or about December 17, 2017, China Central Television ("CCTV") announced that Mr. Jie was under criminal investigation by Chinese law enforcement authorities in connection with fraudulent securities transactions [unrelated to the transactions in issue in this Arbitration] (the "Fraud");

t) On December 15, 2017, the relevant Chinese law enforcement authority issued a press release about the Fraud stating that Mr. Jie was the main suspect;

u) On December 19, 2017, CCTV issued a press release regarding the criminal investigation which stated that Mr. Jie was a fugitive wanted by law enforcement;

v) In light of her significant concerns [set forth above], on December 19, 2017, Ms. Sun's employment at Respondent and Wheat was terminated;

w) On that same day, she sent the Suspension of Work Email to the parties involved in the transaction and notified them that Ms. Sun was no longer employed by Wheat, and no longer had authority to represent Respondent and Wheat and, that Julia Zhou would replace Ms. Sun as Respondent and Wheat's representative on the transaction;

x) In the Suspension of Work Email, she "made the following request to the parties: "[i]n order to ensure that Ms. Zhou and I have enough knowledge about the details of the Merger Transaction, please suspend all of the ongoing activities and work relating to the transaction until you receive instructions to continue work from either Julia and me;"

y) Notwithstanding the Suspension of Work Email, between December 19 and 26, 2017, "we" continued to review the Claimant's SEC filings and actively communicated with Claimant's counsel, Respondent's auditors, Respondent's counsel, Mr. Yi, and Mr. Jie;

z) On December 20, 2017, Mr. Yi sent an email indicating that "we" were obligated to respond promptly to the comments made by the SEC in its December 14 Letter.

aa) On December 20 at 7:06 p.m. New York time (December 21, 2017, at 8:06 a.m. China Time) she replied to Mr. Yi that: i) she continued to work diligently on the transaction with Respondent's professional advisors and individuals involved in the proposed transaction; ii) she reasonably believed Ms. Sun was not acting in Respondent and Wheat's best interest; iii) the fairness opinion issued to Respondent was given by a company with a conflict of interest; iv) she had fiduciary duties to be reasonably informed to report to the boards of directors of the Respondent and other companies involved in the transaction and to act in good faith and in the best

15

interest of those entities and their equity shareholders; v) she intended to conduct a thorough investigation to comply with such duties; vi) that Claimant had not disclosed the MOU and the fact that Mr. Jie stood to receive US$3.5 million if the transaction was consummated; and vii) she requested that Claimant delay filing another amendment to its Preliminary Proxy Statement to remedy its inadequate disclosures;

bb)   On December 21, 2017, she received an email from Mr. Yi attaching an unsigned Notice of Breach Letter, which asserted that Respondent was in breach of the Agreement based on Respondent's failure to assist Claimant in responding to the SEC comments. The Notice of Breach Letter stated that Respondent had 20 days to cure the breach. It also notified Respondent that Claimant had noticed unusual trading activity and reminded Respondent of its no-trade obligation under the Agreement;

cc)   On December 28, 2017, Respondent formally responded to the Notice of Breach Letter with a letter disputing that Respondent had breached the Agreement and notifying Claimant that Respondent was investigating newly discovered information including the criminal investigation of Mr. Jie in China and requesting Claimant's assistance in the investigation;

dd)   Claimant never responded to the request and did not make any SEC filings disclosing these facts about Mr. Jie. Claimant also did not respond to Respondent's request to provide evidence of any unusual trading activity;

ee)   On December 29, 2017, Respondent discovered that Claimant had filed a Form 8-K on December 27, 2017, without any prior notification or consultation with Respondent;

ff)   The Form 8-K disclosed the fact that on December 21, 2017, Claimant had delivered the Notice of Breach Letter claiming that Respondent was in breach of Section 6.9(a) and Section 6.11(b) of the Agreement. The Form 8-K did not explain that Respondent was investigating extraordinary issues relating to Mr. Jie that Respondent believed were necessary to disclose, including the fact that he was the main suspect in a criminal investigation in China;

gg)   On December 29, 2017, Respondent notified Claimant by letter that it was terminating the Agreement immediately due to the Filing of the Form 8-K in violation of Section 6.12(a) of the Agreement;

hh)   On or about January 1, 2018, Mr. Jie sent an email to Respondent, denying that he was part of the Fraud and attached a "No-Prosecution" letter which stated that he had been the victim of the Fraud;

ii)   Respondent hired a Chinese lawyer who gave an "authenticity" opinion that the document supplied by Mr. Jie was falsified;

jj)   On January 14, 2018, Respondent sent a letter to Claimant demanding that Claimant pay the Termination Fee, which Claimant did not do;

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 19 of 30 PageID #: 1741

kk)  Ms. Huang attached Respondent's business records setting forth the expenses actually incurred by Respondent and its subsidiaries in connection with the proposed transaction. She affirmed that the expenses actually incurred were approximately US$1.8 million.

## IV.   REASONABLE EXPLANATION FOR SELECTING ONE OF THE PARTY'S PFR

72.  In this Arbitration, pursuant to the Parties' Arbitration Agreement set forth in Section 11.4 of the Agreement, I must accept either Claimant's PFR or Respondent's PFR and issue an Award that the Party against whom I make an award must comply with the Party's PFR in whose favor I have issued the Award.

73.  In accordance with Section 11.4, set forth below is my reasonable explanation of my reasons for selecting the PFR of one Party over the PFR of the other Party.

74.  Under New York law, in order for a party to an agreement to recover damages for a claim that the other party breached the Agreement, the party claiming that the other party breached the agreement must prove by a preponderance of evidence: a) the existence of an agreement; b) the party making the claim performed its obligations under the agreement; c) the other party to the agreement breached the agreement; and, d) damages resulting from such breach.

75.  Both Claimant and Respondent claim that they performed their respective obligations under the Agreement and, that the other party breached the Agreement.

76.  I have determined that Claimant is entitled to an Award of US$1,436,521.50 the amount set forth in its Submission and I order Respondent to comply with Claimant's PFR and to pay the amount to Claimant that is set forth in its PFR. In its PFR, Claimant did not seek an award of attorneys' fees and costs incurred in this Arbitration and no amount for such attorneys' fees and costs will be awarded. Claimant is entitled under New York law to an award of interest from the date of breach of the Agreement to the date of this Award at the statutory rate of interest of 9% per annum. I find that the date of breach is December 19, 2017.

77.  My reasons are based on my analysis and findings with respect to the respective declarations and affirmations of the Parties' respective witnesses and on the documentary evidence, including the Agreement, which I have cited to herein that was attached as exhibits to the respective declarations and affirmation ("Documentary Evidence"). The Documentary Evidence that I have cited to herein is admitted into evidence by me.

Case 1:22-cv-07499-BMC Document 63-29 Filed 11/20/23 Page 20 of 30 PageID #: 1742

## A. Respondent's Breach of Sections 6. 9(a) and 6.11(b)

78. In her Suspension of Work Email, Ms. Huang gave no indication that Respondent had any concerns about any issues related to the transaction, including any issues relating to non-disclosure of the MOU or the Escrow Agreement, any concerns about Mr. Jie, or any other issues related to any alleged untrue statement of a material fact or omission to state a material fact in the December 4 Revised Preliminary Proxy Statement or any earlier Preliminary Proxy Statement.

79. In response to the Suspension of Work Email, Mr. Yi sent Ms. Huang a December 20 email in which he stated that Respondent was obligated to respond promptly to the Staff's December 14 Comment Letter to the December 4 Revised Preliminary Proxy Statement.

80. On December 21, 2017 (December 20 New York time), Ms. Huang sent an email to Mr. Yi in response to his email. Most of Ms. Huang's email deals with concerns about Respondent's former employee Ms. Sun, whom Ms. Huang believed was not acting in the best interest of Respondent or Wheat. Ms. Huang requested a delay in filing because she stated that Respondent believed some unspecified disclosures needed to be corrected and some disclosures needed to be added, for example, the escrow account and disclosure about the arrangement [which she did not identify as the MOU] that she stated was a significant part of the transaction.

81. On December 21, 2017, Claimant sent its Notice of Breach Letter.

82. As noted above in more detail, in its Notice of Breach Letter and subsequently in its PFR, Claimant asserted that Respondent breached Sections 6.9(a) (failing to use commercially reasonable efforts and to cooperate fully) and 6.11(b) (failure to make Respondent's directors, officers and employees available to Claimant in connection with the drafting of Proxy Statement Documents) when Ms. Huang issued her December 19 Suspension of Work Email.

83. In its Notice of Breach Letter, Claimant also noted unusual trading activities in its shares of stock and reminded Respondent of its no trade obligations in Section 6.7.

84. In its Claims in this Arbitration and its PFR, Claimant asserts that Respondent breached Section 6.7 of the Agreement.

85. In its Notice of Breach Letter, Claimant also reminded Respondent of its obligations and representations in Section 4.30 of the Agreement (none of the information contained in the Proxy Statements when filed, contained any untrue statement of a material fact or omitted to state a material fact), and stated that to the extent there was any material untrue statement in the Proxy Statements filed on August 14, 2017, October 10, 2017, November 6, 2017 and December 4, 2017 that Respondent was aware of, Respondent will be deemed to have breached its representation in Section 4.30.

18

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 21 of 30 PageID #: 1743

86. In its Notice of Breach Letter, Claimant reserved its right to seek all damages and remedies available to it including, but not limited to, the Termination Fee under Section 9.4.

87. Claimant did not terminate the Agreement pursuant to Section 9.1(e).

88. Although Claimant notes that the Notice of Breach Letter was sent by Mr. Yi, he did not sign it, Respondent has made no assertion that the failure of Mr. Yi to sign invalidates the Notice of Breach Letter.

89. In order to reach my finding whether Respondent breached the Agreement as Claimant asserts, I have reviewed the relevant Documentary Evidence, the affirmation of Ms. Huang and the declarations of Mr. Lin and Mr. Yi.

90. In her June 14, 2018 affirmation, Ms. Huang affirmed that on March 21, 2017, she signed the MOU on behalf of Nonobank. At the time she signed the MOU, Ms. Huang was the President, Executive Director and Chief Executive Officer of Nonobank, a wholly-owned subsidiary of Wheat.

91. Ms. Huang affirmed that she never met Mr. Jie.

92. Ms. Huang affirmed that, pursuant to the terms of the MOU, on March 24, 2017, she signed the Escrow Agreement, and that Mr. Jie and the Escrow Agent Mr. Lin, signed the Escrow Agreement.

93. Ms. Huang affirmed that she never met Mr. Lin, and, therefore, could not have witnessed Mr. Lin signing the Escrow Agreement.

94. In her affirmation, Ms. Huang affirmed that at or about December 4, 2017, "she discovered that Claimant's December 4, 2017, preliminary proxy statement did not disclose the existence of the MOU or the Escrow Agreement. … [and it] did not disclose the fact that, as contemplated by these agreements, Mr. Jie stood to receive a US$3.5 million payment from a [subsidiary of Respondent] in connection with the Transaction."

95. She also affirmed that "while [Claimant's] preliminary proxy statement disclosed that in March 2017 'several discussions were held between Mr. Yi and Mr. Jie…and Ms. Sun with regard to due diligence requests,' it omitted any mention of the signing of the MOU and the Escrow Agreement that same month…"

96. Ms. Huang affirmed that, "[i]t was [her] understanding that [Claimant] was required to disclose publicly all material facts concerning the Transaction…[and that she] was greatly concerned that [Claimant's] preliminary proxy statement omitted material information, including the fact that Mr. Jie…stood to receive a US$3.5 million payment in connection with the Transaction."

97. Ms. Huang affirmed that on April 7, 2017, and April 19, 2017, pursuant to the Escrow Agreement, one of Nonobank's affiliates, on behalf of Nonobank, wired RMB 25,450,000.00 [although not stated is appears from the context to be the equivalent of US$3.5 million] in several wire transactions to fund the escrow account.

Case 1:22-cv-07499-BMC Document 63-29 Filed 11/20/23 Page 22 of 30 PageID #: 1744

98. Ms. Huang's affirmation did not provide any documentary evidence in support of Respondent's claim that any amount was actually wire transferred [or otherwise sent by any means] to the Escrow Agent or to the Escrow Account.

99. Ms. Huang affirmed that she sent the December 21 email to Mr. Yi, which she attached as an exhibit to her affirmation.

100. In her affirmation, Ms. Huang affirmed that in her December 21, 2017, email she "emphasized that [Claimant] had not disclosed the $3.5 million payment that Mr. Jie stood to receive if the Transaction was consummated, and that [Respondent] had requested that [Claimant] delay filing another amendment to its preliminary proxy statement in order to remedy its inadequate disclosures."

101. This overstates what is in the December 21 email. She did not identify or refer to the MOU or the US$3.5 million dollar payment. The only reference to any specific disclosures that she made in the December 21 email was her statement: "[f]or example, the escrow account and some details of the arrangement were a significant part of the transaction that we believe should have been disclosed."

102. Ms. Huang's affirmation as to the purported April 7 and April 19, 2017, wire transfer information is inconsistent with information set forth in her December 21 email to Mr. Yi as well as Respondent's December 28, 2017, letter to Claimant [including Mr. Yi and Mr. Jie] signed by her [attached to her affirmation] ("December 28 Letter"), both of which are inconsistent with each other as well as refuted by Mr. Lin in his declaration.

103. Specifically, in the December 21, 2017, email Ms. Huang stated that:

> [m]ore surprisingly and concerningly, according to Mr. Yi Lin (CCCR counsel), funds to be deposited into escrow with Mr. Lin, as escrow agent, were never deposited in the escrow account pursuant to our executed escrow agreement until approximately 10:58 a.m. NY time today (12/19/2017), when the escrow agent received a text message from Jie Yang (owner of CCCR) informing the escrow agent that the funds were just being wired to the escrow agent's account.

104. However, in her December 28 Letter to Claimant Ms. Huang stated that:

> [W]e and our counsel have tried to confirm that the $3.5 million is in fact sitting in the Escrow Agent's escrow account, however, we have not received any confirmation or response from the Escrow Agent as of the date of this letter. Since this is a significant portion of the consideration for the Transaction (and a critical step of the Transaction, in my understanding)…" [she requests information related to the Escrow Agreement and the escrow account.]

20

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 23 of 30 PageID #: 1745

105. The sequence of events affirmed by Ms. Huang demonstrates that her recitation of events is inconsistent as follows: a) on or about December 4, 2017, she "discovered" that the Revised Preliminary Proxy Statement did not disclose the existence of the MOU or the Escrow Agreement, both of which she signed 9 months earlier. She asserts that these documents are a critical step to the transaction contemplated.

106. In her December 21 email, she informed Mr. Yi that Mr. Lin told Respondent that the escrow funds had been deposited in the escrow account on December 19, 2017, at 10:58 a.m. New York time when he received a text message from Mr. Jie informing him that the funds were just being wired to the escrow agent's account. This is the same day she sent the email directing the Working Group to suspend work on the transaction contemplated by the Agreement.

107. Based on the declaration of Mr. Lin, the details of which are set forth below, which I find credible, I do not find it credible that Ms. Huang or anyone in her organization or her counsel received a message from Mr. Lin that funds had been deposited into the purported escrow account on December 19 or on any other date.

108. In her December 28, 2017, Letter, Ms. Huang stated that Respondent had not received any confirmation or response from the Escrow Agent, although Respondent and its counsel tried to confirm that the Escrow Agent did receive the funds.

109. This statement is directly contradicted by Ms. Huang's statement in her December 21 email.

110. In her June 14, 2018, affirmation, Ms. Huang affirmed that the funds were wire transferred in a series of transactions on April 7 and April 19, 2017, to fund the Escrow Account.

111. This statement contradicts Ms. Huang's statements in her December 21 email and in her December 28 Letter.

112. Moreover, in addition to these inconsistencies, I do not find it credible that between December 4 and December 19, 2017, the date she directed the Working Group to suspend work, that Ms. Huang, who was President, Executive Director and Chief Executive Officer of Nonobank, was incapable of finding out whether one of Nonobank's affiliates wire transferred the funds to the purported Escrow Agent's Escrow Account, to someone else, or did not wire any such funds to anyone.

113. With respect to Mr. Lin, the purported Escrow Agent, in his declaration, he declared that he received a letter from Mr. Daley of Dai & Associates, PC dated April 20, 2018, attached as an exhibit to his declaration, demanding the return of funds in the amount of RMB 27,620,000 with interest held in escrow pursuant to an alleged March 24, 2017 "Escrow Agreement."

114. Mr. Lin declared that on April 23, 2018, he responded to the April 20 Letter.

115. The Documentary Evidence shows that in his April 23 response, Mr. Lin told Mr. Daley that in December 2017 he had promptly replied to similar emails he received from Qing Lin, Esq. and Dawei Gong Sun, Esq., Mr. Daley's colleagues that he had no

21

Case 1:22-cv-07499-BMC Document 63-29 Filed 11/20/23 Page 24 of 30 PageID #: 1746

record of any escrow agreement; and, he requested they provide proof of the alleged funds deposit, but never received any such proof.

116. In his April 23 response, Mr. Lin declared that he had no record of such an escrow account.

117. Mr. Lin requested that Mr. Daley send him proof as to the deposit of funds with his office escrow account.

118. On May 1, 2018, Mr. Daley sent a copy of the purported Escrow Agreement and asked Mr. Lin if he had a record of the Escrow Agreement, if the signature on the Escrow Agreement was Mr. Lin's signature or the signature of anyone else in his office, and whether Mr. Lin or his office had received any funds pursuant to the Escrow Agreement.

119. In his declaration, Mr. Lin declared that on May 4, 2018, he responded to Mr. Daley's May 1 letter

120. In his May 4 response, Mr. Lin informed Mr. Daley that the signature on the Escrow Agreement was not his signature nor that of anyone from his office. He further stated that although he was aware that a draft version of the agreement was circulated for discussion purposes, he did not sign the Escrow Agreement, and he has no record of it being fully executed by the other parties.

121. Mr. Lin also stated that the document provided by Mr. Daley as to the purported escrow funds was an internal document of Mr. Daley's client that did not show any money was transferred to or deposited into Mr. Lin's escrow account.

122. In his declaration, Mr. Lin declared that until the date of his declaration on June 14, 2018, he further reviewed his escrow deposit record and found no record of any Escrow Agreement wherein Nonobank is a depositor and he is the escrow agent; and, that he has "received no proof, direct or indirect, concerning deposit of funds by" Nonobank or its affiliated entities.

123. Ms. Huang's assertion that she "discovered" the disclosure of the MOU was not disclosed in the December 4 Revised Preliminary Proxy Statement also does not ring true.

124. Although the record does not indicate when the first Preliminary Proxy Statement was sent to the SEC, it is clear from the record that the December 4 Revised Preliminary Proxy Statement was not the first Preliminary Proxy Statement as it was labeled "revised."

125. I note that the Documentary Evidence refers to earlier Proxy Statements filed on August 14, 2017, October 10, 2017, and November 6, 2017.

126. It is simply not credible that with a transaction of this magnitude (a reverse merger) that Ms. Huang never looked at any Proxy Statements until the December 4 Revised Preliminary Proxy Statement or never informed her counsel, accountants or anyone involved in the Working Group of the MOU and its terms and the Escrow Agreement, agreements which she signed and was well aware of.

Case 1:22-cv-07499-BMC    Document 63-29    Filed 11/20/23    Page 25 of 30 PageID #: 1747

127. Even if that is true, which I do not find credible, after her December 4 "discovery" of the omission to mention the MOU from December 4 to December 21, Huang made no mention to Claimant of and took no action to notify the Claimant of this "omission" from the Revised Preliminary Proxy Statement of this "critical" information that was a substantial part of the Transaction.

128. Similarly, Ms. Huang made no mention of and took no action to notify Claimant of Respondent's concerns about Respondent's assertion of Mr. Jie's possible involvement in criminal activity in China, which she apparently learned about several days before the Suspension of Work Email.

129. Based upon the above, I find that Respondent breached Section 6.9(a) and Section 6.11(a).

130. I find that Claimant has carried its burden of proof that Respondent breached Section 6.9(a) and 6.11(b) that under the circumstances here present such breach was a willful breach under New York Law, and Claimant is entitled to recover damages as a result of Respondent's willful breach of the Agreement.

## B. Respondent's Breach of the Section 6.7 of the Agreement

131. In his Notice of Breach Letter, Mr. Yi informed Respondent that since December 19, 2017, to date of the Notice of Breach Letter, Claimant had noticed unusual trading activity and reminded Respondent of its no trade obligations under Section 6.7 of the Agreement.

132. Ms. Huang's response was essentially to ask Claimant to tell her who at Respondent was trading in Claimant's shares and that they would be dealt with.

133. I find that Ms. Huang's conduct belies her words and that she was not aware of any such activity by Respondent.

134. In his June 14, 2018, affirmation, Mr. Yi affirmed that subsequent to Ms. Huang's December 19 Suspension of Work Email, Claimant's stock price dropped about 50 % between December 19, 2017, and December 21, 2017. In addition, the trading volume increased approximately five fold on December 20, 2017. Mr. Yi submitted Documentary Evidence in support of this assertion.

135. During a birthday dinner on May 19, Ms. Huang told Ms. Yu, who at the time was the Board Secretary of Wheat, that Respondent would merge with Claimant and inferred that the purchase of its stock would have a relatively high return in the future.

136. Ms. Yu affirmed that, as a result of this conversation, she immediately purchased Claimant's stock that night.

137. Ms. Yu affirmed that after Julia Zhou started at Wheat in early November 2017, beginning in December 2017, Ms. Huang stated that Respondent would gradually have its own independent IPO process in place and abandoned the idea of cooperating with Claimant.

Case 1:22-cv-07499-BMC   Document 63-29   Filed 11/20/23   Page 26 of 30 PageID #: 1748

138. Ms. Yu affirmed that Ms. Huang mentioned several times in internal meetings that Respondent would have its own independent IPO plan and will no longer have any collaboration with Claimant.

139. As a result, Ms. Yu and other employees of Wheat who held Claimant's stock began selling their shares of stock in Claimant.

140. The Documentary Evidence shows that Lequan Zhou, Director of the Liquidity Management Department at Wheat held 13,901 shares of Claimant's shares of stock as of November 28, 2017, and did not hold any shares of Claimant's stock as of December 28, 2017.

141. The Documentary Evidence shows that Xiaozhong Li, Vice President of Wheat held 42,325 shares of Claimant's stock and sold all of those shares as of November 28 and by December 28, 2017, no longer held any shares.

142. I find that Respondent breached Section 6.7 when Respondent's employees and representatives purchased and sold Claimant's shares of stock during this time period.

143. Section 6.7 is not just a "no trade" provision. In Section 6.7, Respondent acknowledged and agreed that it is aware and its affiliates and each of their respective representatives was aware or, or would be advised upon receipt of material nonpublic information of the restrictions imposed by the US Securities Laws.

144. Furthermore, Section 6.7 requires that while Respondent is in possession of such material nonpublic information it shall not communicate such information to any third party, take any other action with respect to Claimant in violation of such laws, or cause or encourage any third party to do any of the foregoing.

145. I find that based upon the conversations of Ms. Huang, who executed the Agreement on behalf of Respondent: a) at the birthday dinner; b) in December 2017 that Respondent would gradually have its own independent IPO process in place and abandoned the idea of cooperating with Claimant; and, c) several times in internal meetings that Respondent would have its own independent IPO plan and will no longer have any collaboration with Claimant, Respondent breached Section 6.7 of the Agreement.

146. I find that Claimant has carried its burden of proof that Respondent breached Section 6.7 of the Agreement, that under the circumstances here present such breach was a willful breach of the Agreement under New York law, and Claimant is entitled to recover damages as a result of Respondent's willful breach of the Agreement.

## C. Claimant's Damages

147. Pursuant to Section 11.4, once I make my determination, I am limited to ordering Respondent to comply with Claimant's PFR.

148. Therefore, I only briefly address the damages issue raised by Respondent.

149. Respondent asserts that because Claimant never terminated the Agreement, it is not entitled to a Termination Fee.

24

150. Claimant asserts that because it had the right to the Agreement, which it did not waive, that it is entitled to the Termination Fee.

151. While I do not agree with the Claimant that it is entitled to the Termination Fee, I do agree that the amounts it seeks to recover are appropriate under Section 9.4, which permits Claimant to recover damages for any willful breach of any representation, warranty, covenant or obligation under the Agreement, prior to the termination of the Agreement.

152. Under the circumstances here present, as set forth above, I find that there was a willful breach of the Agreement by Respondent and that the damages sought in the Claimant's PFR are, under New York law, recoverable damages for a willful breach of the Agreement. Respondent is ordered to comply with Claimant's proposal.

## D. Respondent's Counterclaim for Breach by Claimant of Section 6.12(a)

153. Respondent asserts that it properly terminated Claimant by sending the Termination Letter on December 29, 2017, based upon Claimant's "incurable" breach of Section 6.12(a) of the Agreement.

154. Specifically, Respondent asserts that Claimant breached Section 6.12(a) of the Agreement when, without notice to Respondent and without receiving Respondent's prior written consent, Claimant filed its December 27, 2017, Form 8-K ("Form 8-K Filing"), a public filing which disclosed Claimant's belief that Respondent was in breach of Section 6.9(a) and Section 6.11(b) of the Agreement and the basis for the breach.

155. Section 6.12(a) provides an exception to required notice and prior written consent. In the event the filing is required by applicable law or rules or regulations of any securities exchange [including the SEC], "in which case [Claimant] shall use commercially reasonable efforts to allow [Respondent] reasonable time to comment on, and arrange for any required filing with respect to, such release of announcement in advance of such issuance."

156. It is undisputed that prior to making its Form 8-K filing, Claimant did not notify or consult Respondent.

157. I find that Claimant was required to file the Form 8-K filing in accordance with Regulation FD of the Securities Exchange Act of 1934.

158. The issue with respect to the Counterclaim is whether Claimant breached Section 6.12(a) when it filed its December 27, 2017, Form 8-K without using commercially reasonable efforts to allow [Respondent] reasonable time to comment on, and arrange for any required filing with respect to [the Form 8-K filing] in advance of its issuance."

159. Respondent asserts in effect that even if I were to find that Claimant was required to make the Form 8-K filing that Claimant did not use commercially reasonable efforts to

25

Case 1:22-cv-07499-BMC Document 63-29 Filed 11/20/23 Page 28 of 30 PageID #: 1750

allow Respondent to comment on and arrange for any required filing in advance of the issuance of the Form 8-K.

160. Specifically, Respondent asserts that six days passed from the December 21 Notice of Breach Letter to the December 27 Form 8-K filing and at any time during that period Claimant could have given Respondent advance notice to and a reasonable time to comment on the Form 8-K filing Claimant intended to file.

161. Respondent asserts that during that time it was in the "midst of investigating extraordinary disclosure issues concerning Mr. Jie" (e.g. he was the main suspect in a criminal investigation in China for securities fraud) and the alleged breaches of Section 6.9(a) and Section 6.11(b) were still curable at the time the Firm 8-K was filed.

162. In other words, Respondent asserts that Claimant breached Section 6.12(a) by failing to use commercially reasonable efforts to give Respondent advance notice and an opportunity to comment on the Form 8-K in advance of the filing.

163. I disagree. I find that Claimant did not breach Section 6.12(a).

164. I base my finding on, and agree with, Claimant's analysis in the Memorandum of Law part of its PFR with respect to why Claimant's filing of the Form 8-K without giving Respondent advance notice and an opportunity to comment is in keeping with the intended meaning of a "commercially reasonable effort" and will not repeat it here.

165. In addition, I find that Respondent's argument that the fact that there was a six day time period between the Notice of Breach Letter and the Filing of the Form 8-K somehow means that Claimant failed to use "commercially reasonable efforts" to be incorrect in the context of the facts here present.

166. Although Ms. Huang affirmed that between December 19 and December 26, 2017, "we continued to review [Claimant's] SEC filings and actively communicated with…Mr. Yi and Mr. Jie," the only Documentary Evidence of such communications are the December 19 Suspension of Work Email and December 20–21 email communications. No other communications containing information concerning any investigation of Mr. Jie or any allegations of wrongdoing by Mr. Jie were provided.

167. In his declaration, Mr. Yi affirms his subsequent attempts to contact Ms. Huang, including on December 26, 2017, (paragraph 66(g) through 66(i)) and that she basically ignored his calls or refused to speak with him.

168. It was not until after the Form 8-K was filed that she sent a letter on December 28 that first mentioned any investigation related to Mr. Jie.

169. I find that based upon the above, Respondent failed to carry its burden of proof on its Counterclaim that Claimant breached Section 6.12(a) of the Agreement.

170. Respondent's Counterclaim is dismissed with prejudice.

Case 1:22-cv-07499-BMC Document 63-29 Filed 11/20/23 Page 29 of 30 PageID #: 1751

## FINAL AWARD

In issuing this Final Award, I have considered all the material evidence, the credibility of the witnesses' declarations and affirmations, the Parties' submissions, the relevant legal authorities, and the arguments presented for consideration.

On the basis of the above reasonable explanation of my reasons for selecting Claimant's FPR, I issue this Final Award as follows:

1. Claimant shall have an Award against Respondent in the amount of US$1,436,521.50 (United States One Million Four Hundred Thirty-Six Thousand Five Hundred Twenty-One Dollars and Fifty Cents), together with pre-Final Award interest from December 19, 2017, to date of this Final Award at the New York rate of interest for breach of contract of 9% (Nine Per Centum) per annum pursuant to New York C.P.L.R. §§5001 and 5004.

2. Respondent shall not have an Award against Claimant on its Counterclaim and Respondent's Counterclaim is denied in all respects.

3. The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR), totaling US$17,250.00, and the compensation of the Arbitrator, totaling US$8,280.00, shall be borne as incurred by the Parties.

4. This Final Award shall be in full and final settlement of all claims, counterclaims and defenses submitted to this Arbitration. All claims and counterclaims not expressly granted herein are hereby denied with prejudice.

Respondent is ordered to comply with this Award and shall pay the full amount of this Award within thirty (30) days of this Award.

I hereby certify that, for purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, United States of America.

Dated: July 30, 2018
New York, New York

Barbara Mentz
Sole Arbitrator

State of New York

SS:

County of New York

I, Barbara Mentz do hereby affirm upon my oath as Arbitrator that I am the individual described

27

Case 1:22-cv-07499-BMC   Document 63-29   Filed 11/20/23   Page 30 of 30 PageID #: 1752

in and who executed this instrument, which is my Final Award.

July 30, 2018                                                    _Barbara Mentz_
New York, New York                                              Barbara Mentz
                                                                Sole Arbitrator

State of New York

                                    SS:

County of New York

On this ___30___ day of July, 2018, before me personally came and appeared Barbara Mentz, to me known and known to me to be the individual described in and who executed the foregoing instrument and she acknowledged to me that she executed the same.

_____
Notary Public

MIGUEL ANTONIO URENA
Notary Public - State of New York
NO. 01UR6342819
Qualified in Kings County
My Commission Expires May 31, 2020

28