**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SEN GAO, CONGLI HUO, RUIBIN WANG, LUXIAO XU, Individually and on behalf of all others similarly situated, | Case No. 1:22-cv-07499-BMC |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS** |
| v. | |
| SINGULARITY FUTURE TECHNOLOGY, LTD. F/K/A SINO-GLOBAL SHIPPING AMERICA LTD., YANG JIE, LEI CAO, ZHIKANG HUANG, TUO PAN, XIAOHUAN HUANG, JING SHAN, TIELING LIU, JING WANG, LEI NIE, JOHN LEVY, THOR MINER, INC., and GOLDEN MAINLAND, INC. | JURY TRIAL DEMANDED |
| Defendants. | |

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ iv

TABLE OF DEFINED TERMS ......................................................................................... xii

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 3

I.      Singularity Touts a Dramatic Business Transition ................................................ 3

II.     Jie Assumes Control of Singularity, Deceiving Investors About His Criminal and
        Otherwise Dubious Background ............................................................................. 4

        A.      Jie Engaged in Nefarious Conduct in Connection with the CCC/Sorghum
                Transaction ................................................................................................. 4

        B.      Defendants Concealed Jie's Alleged Criminal History and Other Legal Troubles in
                China ........................................................................................................... 5

        C.      Defendants Omit Levy's History as Director of CCC, Where Jie Committed
                Numerous Financial Improprieties ............................................................. 6

III.    Singularity Claims to Transform Its Ailing Global Shipping and Logistics Business to a
        Cryptocurrency Mining and Hardware Development Business ............................. 7

        A.      Singularity Rebrands and Launches Its Cryptocurrency Mining Operations ............ 7

        B.      Singularity and Jie Form a Sham Joint Venture with Golden Mainland to Become a
                Leader in Cryptocurrency Mining .............................................................. 8

        C.      Singularity Forms Thor, a Sham Company, Purporting to Build Proprietary
                Cryptocurrency Mining Machines Which It Purports to Sell to SOS ................... 9

        D.      Singularity Knowingly Entered into a Sham Related Party Transaction with Rich
                Trading Whose Bank Accounts Were Controlled By Singularity's Management .. 10

IV.     Singularity Fails to Establish and Maintain Effective Internal Controls ........................ 10

V.      The Truth Emerges ................................................................................................ 11

        A.      Hindenburg Research and Peabody Street Research Issue Bombshell Reports That
                Expose Substantial Fraud by Defendants ................................................ 11

        B.      Singularity Admits to Material Weaknesses in Internal Controls ........................ 12

        C.      Singularity Discloses the Existence of Governmental Investigations ................... 13

    D.    Singularity Admitted That It Could Not Deliver on the SOS Transaction .............. 13

    E.    Singularity's Unregistered Securities Sales Are Revealed as a Fraud.................... 13

VI.    Post-Class Period Developments Strengthen Allegations of Class Period Misconduct .... 14

ARGUMENT .................................................................................................................. 16

I.    Applicable Legal Standards Support Denial of Defendants' Motions .............................. 16

II.    The SAC Adequately Alleges Material Misstatements and Omissions ........................... 17

    A.    Defendants Had a Duty to Disclose Jie's Past Misconduct ..................................... 17

        1.    Defendants' Omissions Rendered their Public Statements About Jie's Professional Background Misleading ............................................. 18

        2.    Defendants' Arguments Regarding the "Uncharged" Nature of Jie's Criminal Conduct in China Are Unavailing.................................................. 19

        3.    The Omitted Information Was Not Reasonably Available to Investors ........ 21

    B.    Defendants' Statements Regarding Singularity's Private Offerings and Internal Control Were Materially Misleading ........................................................... 23

        1.    The Private Offering Representations Were Materially Misleading ............. 23

        2.    Singularity's Internal Control Deficiencies Were Not Adequately Disclosed 23

        3.    The Misstatements Regarding Singularity's Cryptocurrency Initiative and its Golden Mainland Joint Venture Are Actionable ............................................. 24

    C.    Levy and Zhikang Huang "Made" False and/or Misleading Statements................ 30

    D.    The SAC's Reliance on Short Seller Reports, Uncertified Translations, and Court Filings from Other Lawsuits Is Entirely Permissible................................................. 32

        1.    The SAC Properly Relies on the Hindenburg Report ..................................... 33

        2.    Plaintiffs May Rely on Uncertified Translations at the Pleading Stage ........ 35

        3.    Plaintiffs May Rely on Allegations in Other Lawsuits at the Pleading Stage 36

III.    The SAC Alleges a Strong Inference of Scienter as to All Defendants ............................ 37

    A.    Defendants Acted with Conscious Misbehavior and/or Recklessness ................... 38

    B.    The SAC Alleges Motive and Opportunity to Commit Fraud................................. 45

|  |  | 1. | Defendants' Motive to Misrepresent Singularity's Sham Transformation into a Cryptocurrency Business ................................................................ 46 |

|  |  | 2. | Undisclosed Related Party Transactions Create Sufficient Motive ............... 47 |

|  | C. | Additional Support for Scienter .............................................................. 49 |

|  |  | 1. | Internal Control Deficiencies Support a Strong Inference of Scienter .......... 49 |

|  |  | 2. | Governmental Investigations Support a Strong Inference of Scienter........... 49 |

|  |  | 3. | Senior Management Resignations and Terminations Support an Inference of Scienter ......................................................................................... 50 |

|  |  | 4. | Corporate Scienter Supports an Inference of Scienter .................................. 51 |

| IV. | The SAC Adequately Alleges Loss Causation ................................................. 52 |

|  | A. | Plaintiffs Need Not Account for or Disaggregate Intervening Causes of Plaintiffs' Loss at the Motion to Dismiss Stage ..................................................... 53 |

|  | B. | The Corrective Disclosures Did Not Concern Already-Public Information............ 56 |

| V. | Plaintiffs Adequately State a Section 20(a) Claim Against All Individual Defendants..... 58 |

| CONCLUSION........................................................................................... 60 |

**TABLE OF AUTHORITIES**

<u>Cases</u>                                                                                                    <u>Page(s)</u>

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ............................................................................................. 55, 56

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ................................................................................................. 16

*Applestein v. Kleinhendler*,
   No. 20-cv-1454-AMD-VMS, 2021 WL 493424 n.1 (E.D.N.Y. Feb. 10, 2021) ...................... 40

*Batwin v. Occam Networks, Inc.*,
   No. 07 Civ. 2750, 2008 WL 2676364 (C.D. Cal. July 1, 2008) ............................................. 49

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
   No. 19CV00024, 2021 WL 2646353 ................................................................................ 52, 58

*BG Litig. Recovery I, LLC v. Barrick Gold Corp.*,
   180 F. Supp. 3d 316 (D.N.J. 2018) ........................................................................................ 57

*Caiola v. Citibank, N.A., N.Y.*,
   295 F.3d 312 (2d Cir. 2002) ................................................................................................... 24

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ................................................................................................... 53

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*,
   No. 19 Civ. 10825, 2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ...................................... 36, 37

*City of Pontiac Gen. Employees' Ret. Sys. V. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012) ..................................................................... 30, 31, 38, 45

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011) .................................................................................... 47

*City of Sterling Heights Police & Fire Ret. Sys. V. Abbey Nat'l, PLC*,
   423 F. Supp. 2d 348 (S.D.N.Y. 2006) .................................................................................... 28

*City of Sterling Heights Police & Fire Ret. Sys. V. Reckitt Benckiser Grp. PLC*,
   587 F. Supp. 3d 56 (S.D.N.Y. 2022) ...................................................................................... 39

*City of Warren Police & Fire Ret. Sys. V. World Wrestling Ent. Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020) ......................................................................... 20, 35, 36

*Connolly v. Wood-Smith*,
   No. 11 Civ. 8801, 2012 WL 7809099 (S.D.N.Y. May 14, 2012) ........................................... 35

*Constr. Laborers Pension Tr. For S. California v. CBS Corp.*,
   433 F. Supp. 3d 515 (S.D.N.Y. 2020) .................................................................................... 39

*Curry v. Hansen Med., Inc.*, No. C,
   09-5094, 2012 WL 3242447 (N.D. Cal. Aug. 10, 2012) ....................................................... 44

iv

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018).................................................................................. 28

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)................................................................................................................ 52

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)................................................................................................... 47

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)................................................................................................... 53

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ........................................................................................... 28, 29

*Flynn v. Sientra Inc.*,
    No. CV1507548, 2016 WL 3360676 (C.D. Cal. June 9, 2016)............................................. 46

*Freeland v. Iridium World Commc'ns, Ltd.*,
    545 F. Supp. 2d 59, (D.D.C. 2008) ....................................................................................... 57

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010).................................................................................... 17

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000)............................................................................... 22, 46, 56, 57

*George v. China Auto. Sys., Inc.*,
    No. 11 Civ. 7533, 2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) ........................................... 55

*Gissin v. Endres*,
    739 F. Supp. 2d 488 (S.D.N.Y. 2010).................................................................................... 25

*Gonzalez v. Cheesecake Factory Rests., Inc.*,
    No. 21 Civ. 5017, 2023 WL 2477697 (E.D.N.Y Mar. 13, 2023) .......................................... 35

*Gordon v. Vanda Pharms. Inc.*,
    No. 19 Civ. 01108 (FB) (LB), 2021 WL 911755 (E.D.N.Y. Mar. 10, 2021)......................... 58

*Granger v. New York City Transit Auth.*, Manhattan,
    712 F. App'x 119 (2d Cir. 2018)............................................................................................ 40

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018).................................................................................... 29

*Hall v. The Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008).............................................................................. 50, 56

*Handal v. Tenet Fintech Grp. Inc.*,
    No. 21 Civ. 6461, 2023 WL 6214109 (E.D.N.Y. Sept. 25, 2023).................................... 33, 35

*Ho v. Duoyuan Global Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012).................................................................................... 33

*Horowitz v. Sunlands Tech. Grp.*,
    No. 19 Civ. 3744, 2022 WL 4392401 (E.D.N.Y. Sept. 21, 2022).......................................... 21

*HSH Nordbank AG v. RBS Holdings USA Inc.*,
   No. 13 Civ. 3303, 2015 WL 1307189 (S.D.N.Y. Mar. 23, 2015) ........................................... 37

*In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11 Civ. 2279,
   2012 WL 3758085 (S.D.N.Y. Aug. 29, 2012) ...................................................................... 49

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005) ................................................................... 31, 43, 60

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) ................................................................................. 38

*In re AOL Time Warner, Inc. Sec. and ERISA Litig.*,
   381 F.Supp. 2d 192 (S.D.N.Y. 2004) .................................................................................. 42

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................................................. 43

*In re Barrick Gold Sec. Litig.*,
   No. 13 Civ. 3851, 2015 WL 3486045 (S.D.N.Y. June 2, 2015) .................................... 30, 31

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
   851 F. Supp. 2d 746 (S.D.N.Y. 2012) ................................................................................. 37

*In re Cannavest Corp. Sec. Litig.*,
   307 F. Supp. 3d 222 (S.D.N.Y. 2018) ............................................................................ 32, 49

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   No. 17 Civ. 1580, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) ......................................... 58

*In re Columbia Sec. Litig.*,
   155 F.R.D. 466 (S.D.N.Y. 1994) ........................................................................................ 57

*In re Complete Mgmt. Inc. Sec. Litig.*,
   153 F. Supp.2d 314 (S.D.N.Y. 2001) .................................................................................. 47

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   No. 18 Civ. 7253, 2023 WL 2682905 (E.D.N.Y. Mar. 29, 2023) ......................................... 50

*In re DraftKings Sec. Litig.*,
   650 F. Supp. 3d 120 (S.D.N.Y. 2023) ................................................................................. 35

*In re Enzymotec Sec. Litig.*,
   No. 14 Civ. 5556, 2015 WL 8784065 (D.N.J. Dec. 15, 2015) ............................................. 57

*In re Fannie Mae 2008 Sec. Litig.*,
   742 F. Supp. 2d 382 (S.D.N.Y. 2010) ................................................................................. 54

*In re Fannie Mae 2008 Sec. Litig.*,
   891 F. Supp. 2d 458 (S.D.N.Y. 2012) ................................................................................. 37

*In re ForceField Energy Inc. Sec. Litig.*,
   No. 15 Civ. 3020, 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017) ......................................... 18

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009) ............................................................................ 21, 57

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ............................................................ 49, 50

*In re Hain Celestial Group Inc. Sec. Litig.*,
  No. 216CV04581, 2022 WL 18859055 (E.D.N.Y. 2022) ................................ 51

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
  20 F.4th 131 (2d Cir. 2021) ............................................................................ 38

*In re Hebron Tech. Sec. Litig.*,
  No. 20 Civ. 4420, 2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021) .................. 34

*In re Intercept Pharms., Inc. Sec. Litig.*,
  No. 14 CIV. 1123, 2015 WL 915271 (S.D.N.Y. Mar. 4, 2015) ...................... 38

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  251 F. Supp. 3d 596 (S.D.N.Y. 2017) ............................................................. 17

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ............................................................. 22

*In re LaBranche Sec. Litig.*,
  405 F. Supp. 2d 333 (S.D.N.Y. 2005) ............................................................. 60

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
  No. 13 CV 214, 2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ........................ 34

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010) ............................................................. 22

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) ......................................................... 26, 46

*In re Moody's Corp. Sec. Litig.*,
  599 F. Supp. 2d 493 (S.D.N.Y. 2009) ............................................................. 51

*In re Mylan N.V. Sec. Litig.*,
  379 F. Supp. 3d 198 (S.D.N.Y. 2019) ............................................................. 37

*In re Nielsen Holdings PLC Sec. Litig.*,
  510 F. Supp. 3d 217 (S.D.N.Y. 2021) ............................................................. 40

*In re Omnicom Group, Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) ............................................................................ 58

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014) ...................................................... 37, 49, 51

*In re OSI Pharms., In*c. Sec. Litig.,
  No. 04-CV-5505, 2007 WL 9672541 (E.D.N.Y. Mar. 31, 2007) .................. 57

*In re Pareteum Sec. Litig.*,
  No. 19 CIV. 9767, 2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) ................ 50

*In re Peabody Energy Corp. Sec. Litig.*,
  No. 20-CIV-8024, 2022 WL 671222 (S.D.N.Y. Mar. 7, 2022) ..................... 39

*In re Petrobras Sec. Litig.*,
  150 F. Supp. 3d 337 (S.D.N.Y. 2015).................................................................. 59

*In re Pfizer Inc. Sec. Litig.*,
  936 F. Supp. 2d 252 (S.D.N.Y. 2013).................................................................. 38

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)............................................................. 32, 60

*In re Romeo Power Inc. Sec. Litig.*,
  No. 21-CIV-3362, 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022) ......................... 40

*In re Salix Pharms., Ltd.*,
  No. 14-cv-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .................. 50

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015).................................................................... 27

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016).................................................................. 18

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
  915 F. Supp. 2d 450 (S.D.N.Y. 2013).................................................................. 32

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 16 Civ. 6728, 2019 WL 3001084 (S.D.N.Y. July 10, 2019) ........................... 58

*In re Sotheby's Holdings, Inc.*,
  No. 00 Civ. 1041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) .......................... 18

*In re Supercom Inc. Sec. Litig.*,
  No. 15 CIV. 9650, 2018 WL 4926442 (S.D.N.Y. Oct. 10, 2018) .......................... 27

*In re Synchrony Fin. Sec. Litig.*,
  No. 18 Civ. 1818, 2022 WL 427499 (D. Conn. Feb. 11, 2022) ............................ 52

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................................. 47, 55

*In re Teva Sec. Litig.*,
  No. 17 Civ. 00558, 2023 WL 3186407 (D. Conn. May 1, 2023) ........................... 37

*In re Time Warner Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir.1993)..................................................................................... 47

*In re Tronox, Inc. Sec. Litig.*,
  769 F. Supp. 2d 202 (S.D.N.Y. 2011).................................................................. 59

*In re Twinlab Corp. Sec. Litig.*,
  103 F. Supp. 2d 193 (E.D.N.Y. 2000).................................................................. 47

*In re Vivendi Universal, S.A., Sec. Litig.*,
  765 F. Supp. 2d 512 (S.D.N.Y. 2011).................................................................. 52

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
  504 F. Supp. 3d 224 (S.D.N.Y. 2020).................................................................. 30

*In re WorldCom, Inc. Sec. Litig.*,
    346 F. Supp. 2d 628 (S.D.N.Y. 2004)...................................................................22

*In re XL Fleet Corp. Sec. Litig.*,
    No. 21 Civ. 2002, 2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) .........................34

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ............................................................................................30

*King County, Wash. v. IKB Deutsche Industriebank AG*,
    708 F. Supp. 2d 334 (S.D.N.Y. 2010)............................................................55, 56

*Kronfeld v. Trans World Airlines, Inc.*,
    832 F.2d 726 (2d Cir. 1987)...............................................................................21

*Kusnier v. Virgin Galactic Holdings, Inc.*,
    639 F. Supp. 3d 350 (E.D.N.Y. 2022) ...............................................................52

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)..........................................................................52, 56

*Levy v. Maggiore*,
    48 F. Supp. 3d 428 (E.D.N.Y. 2014) .................................................................31

*Lewy v. SkyPeople Fruit Juice, Inc.*,
    No. 11 Civ. 2700, 2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012)......................34

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
    173 F. Supp. 2d 129 (S.D.N.Y. 2001)................................................................23

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)................................................................21

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976)...............................................................................37

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020)................................................................35

*Longo v. OSI Sys., Inc.*,
    No. 17 Civ. 8841, 2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ......................21

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)..........................................................................51, 52

*Major Energy Elec. Servs., LLC v. Horowitz*,
    No. 19 Civ. 10431, 2020 WL 4432121 (S.D.N.Y. July 31, 2020) ......................37

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) .......................................................................................16, 45

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013)............................................................33, 34

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)...............................................................................17

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ................................................................ 21

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) .................................................. 24

*Nam v. Permanent Mission of Republic of Korea to United Nations*,
    657 F. Supp. 3d 382 (S.D.N.Y. 2023) ................................................... 36

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
    455 Fed. Appx. 10 (2d Cir. 2011) ......................................................... 44

*Nodus Int'l Bank, Inc. v. Arocha Hernandez*,
    511 F. Supp. 3d 1316 (S.D. Fla. 2023) ................................................. 36

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ........................................................... 37, 38

*Nutriband, Inc. v. Kalmar*,
    No. 19 Civ. 2511, 2020 WL 4059657 (E.D.N.Y. July 20, 2020) ........... 18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) .............................................................................. 29

*Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012) ................................................... 51

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015) ..................................................... 51

*Roberti v. OSI Sys.,Inc. Sys.*,
    No. 13 Civ. 9174, 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ........... 40

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) .................................................................. 16

*S.E.C. v. China Ne. Petroleum Holdings Ltd.*,
    27 F. Supp. 3d 379 (S.D.N.Y. 2014) ..................................................... 48

*S.E.C. v. Rio Tinto plc*,
    No. 17 Civ. 7994, 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ......... 28

*S.E.C. v. Blackburn*,
    15 F.4th 676 (5th Cir. 2021) ................................................................. 45

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F. Supp. 3d 313 (S.D.N.Y. 2018) ................................................... 38

*Skiadas v. Acer Therapeutics Inc.*,
    No. 1:19-CV-6137, 2020 WL 3268495 (S.D.N.Y. June 16, 2020) .... 44, 46

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ........................................................... 25, 27

*Solomon v. Sprint Corp.*,
    No. 19 Civ. 05272, 2022 WL 889897 (S.D.N.Y. Mar. 25, 2022) .......... 53

*Suez Equity Invs. L.P. v. Toronto–Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001)................................................................................ 60

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*,
    531 F.3d 190 (2d Cir. 2008)............................................................................ 51

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).................................................................................. 38, 46

*Todd v. STAAR Surgical Co.*,
    No. 09 Civ. 5094, 2016 WL 6699284 (C.D. Cal. Apr. 12, 2016)........................... 44

*U.S. Sec. & Exch. Comm'n v. Amah,*
    No. 21 Civ. 6694, 2023 WL 6386956 (S.D.N.Y. Sept. 28, 2023)........................... 30

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir. 1993)............................................................................ 22

*Van Dongen v. CNinsure*,
    951 F. Supp. 2d 457 (S.D.N.Y 2013)................................................................. 47

*Vanleeuwen v. Keyuan Petrochemicals, Inc.*,
    No. 13 Civ. 6057, 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014) ..................... 36, 48

*Vignola v. FAT Brands, Inc.*,
    No. 18 Civ. 7469, 2019 WL 6888051 (C.D. Cal. Dec. 17, 2019) ................... 18, 21

*Wang v. Cloopen Grp. Holding Ltd.*,
    661 F. Supp. 3d 208 (S.D.N.Y. 2023)........................................................... 28, 44

*Williams v. Citigroup Inc.*,
    659 F.3d 208 (2d Cir. 2011).............................................................................. 60

*Yannes v. SCWorx Corp.*,
    No. 20-CV-03349, 2021 WL 2555437 (S.D.N.Y. June 21, 2021) ......................... 44

<u>Statutes</u>

15 U.S.C. § 78u-4 .................................................................................................. 16
15 U.S.C. § 78u-4(b)(1)(B)..................................................................................... 17

<u>Rules</u>

Fed. R. Civ. P. 9(b) .......................................................................................... 16, 17
Fed. R. Civ. P. 15(a)(2)....................................................................................... 61
Fed. R. Evid. 201 .................................................................................................. 40

## TABLE OF DEFINED TERMS

| Term | Definition |
|------|------------|
| AGM Group | AGM Group Holdings |
| Anhui Ponzi Scheme | $300 million Ponzi scheme in China involving Anhui Tianhe Union Technology Co., Ltd. |
| Cao | Lei Cao |
| Cao Br. | ECF 64-1 - Memorandum of Law in Support of Defendant Lei Cao's Motion to Dismiss the Second Amended Complaint |
| CCC | China Commercial Credit Inc. |
| CCTV | Closed-circuit Television |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| China | People's Republic of China (including Hong Kong) |
| Class Period | February 2, 2021, through February 24, 2023, inclusive |
| Company | Singularity Future Technology, Ltd., f/k/a Sino-Global Shipping America, Ltd. |
| COO | Chief Operating Officer |
| Defendants | Singularity Future Technology, Ltd. f/k/a Sino-Global Shipping America Ltd., Yang Jie, Lei Cao, Zhikang Huang, Tuo Pan, Xiaohuan Huang, Jing Shan, Tieling Liu, Jing Wang, Lei Nie, John Levy, Thor Miner, Inc. and Golden Mainland Inc. |
| FINRA | Financial Industry Regulatory Authority |
| Golden Mainland | Golden Mainland, Inc. |
| Hebei Mei Dong Report | Report of Hebei Mei Dong Law Firm, commissioned by Singularity, to contradict the Hindenburg Report |
| HighSharp | HighSharp (Shenzhen Gaorui) Electronic Technology Co., Ltd. |
| Hindenburg Report | Report dated May 5, 2022 issued by Hindenburg Research |
| Jie | Yang Jie |
| Individual Defendants | Yang Jie, Lei Cao, Zhikang Huang, Tuo Pan, Xiaohuan Huang, Lei Nie, Jing Shan, Tieling Liu, John Levy, and Jing Wang |
| Jie Br. | ECF 63-47 - Memorandum of Law in Support of Defendants' Yang Jie and Xiaohuan Huang Motion to Dismiss |
| Jinhe | Jinhe Capital Limited |
| Levy | John Levy |
| Levy Br. | ECF 60-1 - Defendant John Levy's Memorandum of Law in Support of His Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint |
| Liu | Tieling Liu |

| Mainland JV | Purported joint venture between Singularity and Golden Mainland announced on April 11, 2022 |
| --- | --- |
| NASDAQ | Nasdaq, Inc. stock market |
| Nie | Lei Nie |
| NoNoBank Action | *Shanghai NoNoBank Fin. Info. Serv. Co. v. China Commercial Credit Inc.,* Index No. 653834/2014 (N.Y. Sup. Ct., N.Y. County) - action filed by NoNoBank to recover the $3.5 million payment in the Sorghum deal |
| Pan | Tuo Pan |
| Peabody Report | Report dated May 5, 2022, issued by Peabody Street Research |
| PRC | People's Republic of China, including Hong Kong |
| rigs | "proprietary" crypto mining computers |
| Shan | Jing Shan |
| SAC | Second Amended Complaint |
| Shan Br. | ECF 61-1 - Memorandum of Law in Support of Motion By Defendant Shan To Dismiss Plaintiffs' Second Amended Class Action Complaint |
| Singularity or Company | Singularity Future Technology, Ltd. f/k/a Sino-Global Shipping America Ltd. |
| Sino-Global Shipping America, Ltd. | Former name of Singularity Future Technology, Ltd. |
| SOF | Statement of Facts |
| Sorghum | Sorghum Investment Holdings Ltd. |
| Sorghum Action/Sorghum Litigation | *Sorghum Investment Holdings Ltd. v. China Commercial Credit, Inc.*, Index No. 655372/2018 (N.Y. Sup. Ct., N.Y. County) (NYSCEF No. 62) |
| Sorghum Deal/Sorghum Transaction | August 2017 transaction in which Shanghai Wheat Asset Management Co., Ltd., a wholly-owned subsidiary of Sorghum entered into an agreement to acquire CCC via a reverse merger. Jie was to receive $3.5 million if the deal closed, and prior to the close of the transaction, the funds would be wired into an escrow account maintained by Jie's counsel. If the deal did not close, the escrowed $3.5 million would be refunded to NoNoBank. |
| SOS | SOS Information Technology New York Inc. |
| SOS Litigation | *SOS Info. Tech. N.Y., Inc. v. Thor Miner, Inc.*, Index No. 654735/2022 (N.Y. Sup. Ct., N.Y. County) - action filed by SOS on December 9, 2022, against Singularity and Thor, among others, for failure to deliver the promised proprietary crypto mining machines. |
| SPA | Securities Purchase Agreement |
| Special Committee | Committee formed by the Company to address matters discussed in the Hindenburg Report |
| Thor | Thor Miner, Inc. |

| Thor Joint Venture | Purported joint venture between Singularity and Highsharp announced on October 4, 2021 |
|---|---|
| Singularity and Zhikang Br. | ECF 62-5 - Memorandum of Law in Support of Defendants Singularity Future Technology, Ltd.'s and Zhikang Huang's Motion to Dismiss the Second Amended Complaint |
| Zonglun Report | Report of the Zonglun Firm, commissioned by Jie to respond to the Hindenburg Report |
| Zonglun W&D | Zonglun W&D Law Firm, PRC |

## INTRODUCTION

This is more than a classic case of securities fraud; it is a brazen and extreme fraud.[1] During the Class Period of February 2, 2021 through February 24, 2023, Defendants misled shareholders about virtually every aspect of Singularity's purported transformation from a languishing global logistics company to a cryptocurrency mining and hardware development business. The fraud was neither narrow nor discrete. Defendants concocted a parade of sham transactions and fictitious joint ventures, falsely claimed to manufacture a sophisticated cryptocurrency mining computer that they invented virtually overnight and concealed various related party transactions that served only to line their pockets, all while lying to both public and private investors regarding the sale of over $21 million in unregistered Singularity stock. The truth, however, was that Singularity's CEO was a fugitive on the run from Chinese authorities, having orchestrated a massive Ponzi scheme there and then launching a multifaceted fraud at China Credit Corporation before starting anew with his wife, Defendant Xiaohuan Huang, and former CCC director, Defendant Levy, along with the other Defendants.

On May 5, 2022, the truth began to catch up to Defendants with the publication of rigorously detailed and highly incriminating research reports by Hindenburg Research and Peabody Street Research. The Hindenburg and Peabody Reports revealed that, among other things: (i) Jie had an extensive criminal background and was wanted in China for his participation in a Ponzi scheme; (ii) Jie had engaged in a raft of financial improprieties while an executive at CCC, where Levy had been a director (which was another fact Defendants hid from investors); (iii) Singularity's transactions with SOS and Rich Trading were undisclosed related party transactions; and (iv) Defendants Golden Mainland and Thor Miner were sham entities devised by

---

[1] All capitalized terms not otherwise defined herein shall have the meaning ascribed in the "Table of Defined Terms" or the SAC. All references to "¶" are to the SAC. All emphasis is added, and citations omitted, unless otherwise noted.

Singularity to create the false impression that the Company's fictitious cryptocurrency business was not only legitimate, but successful. Those disclosures were catastrophic for investors, causing Singularity's common stock price to fall 28.89%, from a closing price of $6.75 on May 4, 2022, to a closing price of $4.80 on May 5, 2022, and fall an additional 11.67% on May 6, 2022.

In the wake of these revelations, three separate securities litigations were filed against Defendants, including Singularity, Jie, Shan, Pan, and Cao, for misrepresenting Singularity's cryptocurrency business and raising over $21 million through fraudulent means. During that time, Singularity faced delisting due to its inability to file quarterly and annual reports with the SEC. Even more troublingly, the Company revealed that it was being investigated by the United States Attorney's Office for the Southern District of New York, the SEC, and FINRA. On this news, Singularity's stock price continued to plummet, ultimately closing at $0.60 on February 24, 2023 when Singularity announced that it had agreed to settle all of the then pending securities fraud claims. The stock price has never recovered – it closed at $0.57 on January 5, 2023 – and every single one of the Individual Defendants has been terminated for cause or resigned.

In response to these allegations, Defendants argue that Plaintiffs have not adequately pled the falsity, scienter, or loss causation allegations of their Section 10(b) claim. Defendants generally argue that Plaintiffs impermissibly rely on group pleading and that research reports, court filings, judicial opinions, and police records (without a certified translation) cannot form the basis of a fraud claim here. That is plainly contrary to the law. With respect to scienter, Defendants try to parse out the allegations and avoid considering them holistically as the Second Circuit requires. Defendants also improperly suggest that since there were no insider stock sales, somehow there is no motive or opportunity to commit the fraud despite admitted self-dealing through related party transactions that were not disclosed during the Class Period and the creation of obvious sham

companies. Defendants also suggest that the SAC is somehow devoid of specific allegations to show that the Defendants engaged in conscious misbehavior – this is despite the SAC providing several specific instances that support a strong inference of scienter. But even if this head-in-the-sand defense was plausible – it is surely not, given the specificity of the allegations here – it would certainly evidence that Defendants were reckless, which alone is enough to plead a strong inference of scienter.

Defendants challenge loss causation on the purported basis that Plaintiffs' losses are attributable to unrelated factors and that the correctives did not reveal non-public information. That is wrong because whether a stock price rose following a corrective disclosure is irrelevant to the loss causation analysis and the corrective disclosures did not concern already-public information which, here, was limited to information in China and court dockets. Finally, Defendants quibble with Plaintiffs' Section 20(a) claims, attempting to argue that the evidence is not clear that they were control persons and that Plaintiffs have not pled violations of Section 10(b). Those arguments do not withstand scrutiny.

## STATEMENT OF FACTS

Founded in 2001, Singularity historically held itself out as a provider, through wholly-owned Chinese subsidiaries (including Hong Kong), of global shipping and freight logistics solutions. ¶4. It operated in two segments: (1) shipping agency and management services, operated by U.S. subsidiaries; and (2) freight logistics services, operated by subsidiaries in the PRC. ¶4. Singularity became a publicly listed company in 2008, trading on the NASDAQ under the symbol SINO.

## I.   Singularity Touts a Dramatic Business Transition

On February 2, 2021, when the Class Period begins, Singularity announced plans to transform from a shipping and freight logistics business into a cryptocurrency and bitcoin mining firm. Under the leadership of Lei Cao, who preceded Jie as CEO, Singularity was in decline. ¶6.

Senior management launched a scheme to create the outward appearance that it was shifting away from its struggling shipping and logistics business to the emerging cryptocurrency space. Defendants knew that Singularity's lack of experience in the crypto space, the continuing COVID-19 lockdowns in China, and the global semiconductor shortage made the transition close to impossible – and, critically, the joint ventures Singularity formed to execute this transition were shams. ¶8. Nonetheless, Defendants repeatedly represented that Singularity's crypto business was a success, and capitalized on its illusory achievements to raise tens of millions of dollars based on promises Defendants knew at the time were bogus. ¶8.

## II.     Jie Assumes Control of Singularity, Deceiving Investors About His Criminal and Otherwise Dubious Background

On November 1, 2021, Cao resigned, and Jie was promoted to CEO. ¶48. Publicly, Singularity said little about its new CEO, not disclosing that: (i) while an executive at CCC prior to his employment with Singularity, Jie misappropriated millions of dollars of escrow funds, engaged in a related party transaction to procure a sham fairness opinion to consummate a merger, and in the dispute that followed after that proposed merger fell apart, attempted to avoid liability by submitting a false affidavit filed by his attorney; (ii) orchestrated a $300 million Ponzi scheme in China, utilizing forged or otherwise misleading documents in an attempt to convince others that the allegations regarding his criminal conduct were incorrect; and (iii) caused inaccurate versions of his educational background to proliferate. ¶49.

### A.     Jie Engaged in Nefarious Conduct in Connection with the CCC/Sorghum Transaction

In August 2017, at a time when Jie and his wife, Defendant Xiaohuan, were CCC's largest shareholders, Shanghai Wheat Asset Management Co., Ltd., a wholly-owned subsidiary of Sorghum, entered into an agreement to acquire CCC via a reverse merger. Per the agreement, Jie was to receive $3.5 million if the deal closed, and prior to the close of the transaction, the funds

would be wired into an escrow account maintained by Jie's counsel. If the deal did not close, the escrowed $3.5 million would be refunded to NoNoBank. After the deal fell apart, Sorghum alleged that it had discovered that Jie was under criminal investigation for securities fraud in China – a fact concealed from Sorghum, as well as investors – and that Jie had procured a false fairness opinion through an undisclosed related party to facilitate the transaction. On May 6, 2019, Justice Borrok of the New York Supreme Court found that discovery had revealed that Jie had improperly diverted $3.5 million to an account he controlled in connection with Sorghum's action to vacate an arbitration award in favor of CCC arising from the failed transaction (the "Sorghum Action"). ¶67.

Following the arbitration award in favor of CCC, NoNoBank sued to recover the $3.5 million payment in the Sorghum deal. Evidence of Jie's misconduct surfaced in the NoNoBank Action, and Justice Borrok found that a Sorghum employee had been "secretly working" with Jie "to divert the escrow funds to accounts controlled by Jie, and Sorghum later discovered that Jie was "under criminal investigation in China in connection with the theft of approximately 2.9 billion RMB, the equivalent of roughly 300 million U.S. dollars, from more than 20,000 investors through fraudulent securities transactions." ¶66. These disturbing facts regarding Jie's conduct immediately prior to his employment with Singularity were kept from investors by Defendants, including Defendant Levy, who was aware of Jie's fraudulent activities, having also been employed by CCC.

### B.     Defendants Concealed Jie's Alleged Criminal History and Other Legal Troubles in China

Defendants also kept Jie's criminal conduct from investors. Such conduct, which numerous Chinese sources corroborate, included orchestrating a massive Ponzi scheme for which dozens of individuals have been jailed and for which Jie is still wanted by authorities in the PRC.

During CCC's dispute with Sorghum, Jie attempted to prove that he was not under criminal investigation in China by producing a letter from PRC police purporting to show that they did not

intend to pursue charges against him. The Hefei Police, however, confirmed that that letter was a fabrication (¶72), and the phony letter caused PRC authorities to charge Jie with forgery. ¶¶73-74.

Singularity's Form 8-K filed on July 3, 2022, revealed that its Board's Special Committee investigation into the allegations made in the Hindenburg Report doubted the authenticity of documentation Jie had provided to the SEC indicating that charges against him in China relating to the alleged $300 million Ponzi scheme had been dropped. ¶75. To the contrary, the Special Committee concluded that a "Red Notice" – a request to law enforcement worldwide to arrest an individual – had been issued with respect to Jie. ¶75.

Defendants also misrepresented the circumstances surrounding a legal opinion furnished by Zonglun W&D Law Firm, PRC, which Jie used in support of motions to dismiss two suits filed by private investors. ¶78. According to the July 3, 2022 Form 8-K, the Zonglun W&D legal opinion stated that "Jie was not charged with a crime in China, the investigation and underlying case had indeed been closed, and Jie was not formally treated as a criminal suspect in the PRC." ¶78. The Form 8-K failed to disclose that the Zonglun W&D legal opinion was limited to one criminal case involving Anhui Tianhe Union Technology Co., Ltd., and substantial evidence suggests that the legal opinion was otherwise inaccurate and/or misleading. Moreover, the SAC details how Jie was (and/or currently is) on PRC's wanted list for criminal offenses and is a defendant in civil lawsuits relating to financial misconduct. ¶¶78-94.

### C.   Defendants Omit Levy's History as Director of CCC, Where Jie Committed Numerous Financial Improprieties

Singularity touted Defendant Levy as a corporate director, including his role in the Board Advisory, an advisory service for corporate boards. ¶¶96, 98. However, Singularity failed to disclose Levy's recent role as a director of CCC, the entity at which Jie, as a member of the executive team, perpetrated a host of frauds. Among other things, as a former CCC director,

Defendant Levy would likely have been aware of the Sorghum Action arising from Jie's fraud. ¶¶97-99. It is not credible that Levy would know nothing of Jie's criminal and otherwise nefarious conduct, or that Singularity would innocently leave Levy's tenure with CCC out of its 8-K announcing his Board appointment.

### III.   Singularity Claims to Transform Its Ailing Global Shipping and Logistics Business to a Cryptocurrency Mining and Hardware Development Business

Singularity announced on February 3, 2021 that it planned to transform from a shipping and logistics company to a cryptocurrency company. ¶101. This was a sham: it feigned a business transition through a series of fraudulent transactions designed only for the purpose of raising tens of millions of dollars from the sale of unregistered securities. ¶¶101-05.

On February 10, 2021, Singularity announced that it planned to capitalize on its purported shift to cryptocurrency by selling unregistered securities to investors. Specifically, Defendant Cao announced that the Company had entered into agreements to sell 3,655,000 shares of Singularity stock, raising $28,509,000 for the purpose of "investment in information technology and software and hardware in connection with our new cryptocurrency initiative." ¶¶104, 106.

The purported investors in common stock and warrants had, in fact, been induced to make the investments based on false claims that Singularity expected substantial growth from its new cryptocurrency business. ¶105. Defendants knew such representations lacked a reasonable basis, as they were premised on entities – such as the joint ventures with Thor and Golden Mainland – they knew were shams. ¶105; *see also*, ¶¶111-13.

### A.   Singularity Rebrands and Launches Its Cryptocurrency Mining Operations

On March 3, 2021, Singularity filed a Form 8-K with the SEC, signed by Cao, which stated that the Company had entered into an agreement to purchase 2,783 digital currency operation servers for $4.6 million. ¶114. Defendants thereafter continued to mislead the market by purporting

7

to effect a full-scale transformation of the Company by changing its name and business model. ¶¶118-21. Singularity's announcement, description, and content of its newly launched website as of March 28, 2022, were false and misleading because the Company neither intended nor had the capability to meaningfully engage in a cryptocurrency mining business. Not surprisingly – given its sham entities and the vacuousness of its representations – Singularity has since abandoned and no longer refers to the Company's foray into cryptocurrency business. ¶¶122-24.

**B.    Singularity and Jie Form a Sham Joint Venture with Golden Mainland to Become a Leader in Cryptocurrency Mining**

To continue to perpetuate its sham transformation, on April 11, 2022, Singularity announced a joint venture with Golden Mainland, styled the Mainland JV, to provide historic volumes of electricity that would be required to power its purported cryptocurrency mining business. ¶125. Investors were told that Mainland JV planned "to invest up to $250 million over time to build a total of 1GW of mining sites in Texas, Ohio, and other states, with capacity for up to 300,000 Bitcoin miners, each with 3,400 watts/hour in energy consumption." ¶¶126-28.

Defendants' statements regarding the purported joint venture with Golden Mainland were knowingly false because: (i) Golden Mainland does not appear to actually exist; (ii) the purported operations of the Mainland JV do not pass muster – if Defendants' representations about the joint venture had been accurate, Mainland JV would be – by a significant margin – the largest Bitcoin mining facility in the world; (iii) according to the April 10, 2022 Joint Venture Agreement, the address of the joint venture was Singularity's headquarters; (iv) the address listed on Golden Mainland's website – which differs from the address reported to the Georgia Secretary of State (where the entity was registered on October 25, 2021) – corresponds with an entirely unrelated entity; and (v) the unexplained and unverified changes to Golden Mainland's senior management undermine its reliability.  ¶¶125-143.

## C.    Singularity Forms Thor, a Sham Company, Purporting to Build Proprietary Cryptocurrency Mining Machines Which It Purports to Sell to SOS

On October 4, 2021, Singularity further attempted to bolster an appearance of crypto success by purporting to form the so-called Thor Joint Venture with Chinese circuit designer HighSharp, for the development and sale of "proprietary" crypto mining computers ("rigs") under the brand name "Thor." ¶¶144-47. Per the announcement, the Thor Joint Venture "will encompass collaborative engineering, technical development and commercialization of a proprietary bitcoin mining machine under the name Thor, with exclusive rights covering design production, intellectual property, branding, marketing and sales." ¶148. Defendant Cao, then-CEO of Singularity, described it as "a major strategic development for Sino-Global [Singularity] with the potential for significant long-term financial benefit." ¶149.

In fact, Singularity and Thor had not developed a proprietary cryptocurrency mining machine for which they held intellectual property rights. Lead Counsel's investigation yielded no evidence of any utility patent, despite a search of the relevant U.S. and international databases. ¶¶151-156.

Even if Defendants had developed a proprietary cryptocurrency mining machine, they knew that COVID-19 and the global semiconductor shortage would make it extremely difficult to provide a sufficient quantity of machines in a commercially reasonable time. That reality called into question its agreement with SOS, to deliver approximately 44,792 rigs for $200 million. ¶¶151, 157, 158.

After the Hindenburg and Peabody Reports undermined the validity of the Thor Joint Venture, SOS began contacting Defendant Shan, Singularity's COO, to request assurances that Thor could perform its contractual obligations to SOS. SOS's concerns were not unfounded: between April and October 2022, Thor managed to fulfill only approximately 10% of the order, and on December 9, 2022, SOS finally sued Singularity and Thor, among others, for failure to deliver the promised proprietary crypto mining machines (the "SOS Litigation"). Notably, the SOS Litigation

was settled within two weeks of its filing; Singularity and Cao also admitted that they were aware long before the formation of the Thor Joint Venture of the impact that COVID-19 would have on its ability to deliver the rigs promised under the SOS contract. ¶¶157-84.[2]

### D. Singularity Knowingly Entered into a Sham Related Party Transaction with Rich Trading Whose Bank Accounts Were Controlled By Singularity's Management

The Company also engaged in a sham transaction with an entity known as Rich Trading. In its Form 10-Q for the period ended December 31, 2021, filed on February 14, 2022, Singularity disclosed that it had agreed to invest $4.5 million into Rich Trading, which would trade computer equipment and direct 90% of the profits back to Singularity. ¶191. Simultaneously, the Company entered into the agreement to advance $3,299,815 to Rich Trading. When Singularity disclosed the Rich Trading agreement, it omitted that Rich Trading was a related party transaction (as the Company later admitted in its Form 10-K for Q1 2023), and omitted that Rich Trading was controlled by members of Singularity's management, including Jie, Rich Trading's CEO. ¶¶190-98.

## IV. Singularity Fails to Establish and Maintain Effective Internal Controls

Singularity consistently represented that it maintained an effective internal control regime. ¶199. However, when Singularity reported that its disclosure controls were not effective, it downplayed the seriousness of those deficiencies. For example, Singularity stated that the material weaknesses in its internal controls concerned a "lack of segregation of duties for accounting personnel," "lack of a full time U.S. GAAP personnel in the accounting department to monitor the recording of the transactions" (¶¶201, 203, 207), and "lack of resources with technical competency

---

[2] Defendants also misrepresented (or failed to correct) Jie's wife's (Defendant Xiaohuan Huang's) employment history with SOS. When Singularity announced on October 23, 2020, that Xiaohuan Huang had been appointed to the Company's Board, that announcement also disclosed that she was "President of SOS Information Technology New York, Inc." During the SOS Litigation, counsel for SOS sent a letter to Shan stating Xiaohuan Huang had never been an employee of SOS and instructed her to correct the misrepresentation. ¶¶185-89.

to address, review and record non-routine or complex transactions under U.S. GAAP" (¶205), among others. Such disclosures did not reveal the scope of Singularity's major internal control failings.

## V.     The Truth Emerges

Between May 5, 2022 and February 24, 2023, Singularity investors learned the shocking truth about Singularity's brazen, pervasive, and widespread fraud.

### A.     Hindenburg Research and Peabody Street Research Issue Bombshell Reports That Expose Substantial Fraud by Defendants

On May 5, 2022, Hindenburg Research issued the Hindenburg Report and Peabody Street Research issued the Peabody Report. Both Reports revealed myriad aspects of Defendants' fraud. ¶¶213-15.

The Hindenburg and Peabody Reports extensively detailed that Jie: (i) is a fugitive from Chinese authorities for operating an alleged $300 million Ponzi scheme; (ii) still has an outstanding arrest warrant in China; (iii) allegedly forged Chinese state documents such that police have added forgery to his list of suspected crimes; (iv) is the subject of an active "Red Notice" (the equivalent of an international arrest warrant) in China for his role in the Ponzi scheme; (v) engaged in significant financial improprieties while General Manager of CCC, and CCC was sued as a result of a failed reverse merger (with the Sorghum subsidiary) in which Jie retained an entity that he himself owned to provide a "fairness opinion" on the reverse merger; and (vi) had been named in a lawsuit over that failed reverse merger initiated by Sorghum, and it was later shown that he stole $3.5 million from an escrow account and attempted to cover it up with a false affidavit. ¶¶216-19.

The Hindenburg and Peabody Reports also revealed that Levy's Singularity biography conspicuously omitted his tenure as a Director of CCC, where Jie had engaged in significant financial improprieties – so Levy surely knew of them. ¶¶220-21.

Regarding Thor Miner, the Hindenburg and Peabody Reports concluded that Singularity's

purported proprietary bitcoin mining machine likely did not exist because "Singularity [Thor Miner] is selling a Bitcoin miner that is almost identical to a competitor's." ¶222.

Regarding SOS, the Hindenburg Report concluded that not only was Jie connected to SOS by virtue of his wife's role as SOS Vice President (if that was, in fact, true), but an entity called "Jie's Enterprise and Development" which used the same address as SOS. ¶¶223-25.

Regarding Golden Mainland and the Mainland JV, both Reports provided extensive evidence that Singularity's $250 million deal with Golden Mainland was a sham: Golden Mainland had been formed only months before the transaction was announced, it had non-existent officers, and its office address was a State Farm Insurance office. ¶226.

With respect to Rich Trading, the Hindenburg Report disclosed that Rich Trading used Singularity's former corporate address. More importantly, the Hindenburg Report asserted that there was no evidence that Rich Trading engaged in the trading of computers, or in any trading at all. ¶227.

After publication of the Hindenburg and Peabody Reports, the price of Singularity shares fell 28.89%, from a closing price of $6.75 per share on May 4, 2022, to close at $4.80 per share on May 5, 2022, on unusually heavy trading volume. The price of Singularity shares fell further on May 6, 2022, approximately 11.67%, to close at $4.24 per share. ¶228. And, on May 6, 2022, the Board formed a Special Committee to investigate the claims raised in the Hindenburg Report. ¶229.

### B.      Singularity Admits to Material Weaknesses in Internal Controls

On May 25, 2022, Singularity filed a Form 8-K that admitted, but downplayed the serious issues with the Company's internal controls. Singularity's Form 8-K filed on October 7, 2022, partially disclosed issues with the Company's internal controls, reporting a potential delisting by NASDAQ. In response, on October 7, 2022, Singularity's share price fell 10.55%, from a closing price of $2.56 per share on October 6, 2022, to $2.29 per share. ¶¶230-35.

C.      **Singularity Discloses the Existence of Governmental Investigations**

On November 16, 2022, Singularity disclosed (i) governmental investigations of the Company related to the claims raised in the Hindenburg Report, and (ii) that it had received subpoenas from the Department of Justice and the SEC. ¶237. On this news, on November 16, 2022, the price of Singularity shares fell 18.68%, from a closing price of $2.57 per share on November 15, 2022, to close at $2.09 per share, on unusually heavy trading volume. On November 17, 2022, the price of Singularity shares fell an additional 45.93% to close at $1.13 per share. ¶238. In a Form 8-K filed on January 9, 2023, Singularity filed its Separation Agreement with Cao and revealed the Company was under investigation by FINRA. ¶¶240-41.

D.      **Singularity Admitted That It Could Not Deliver on the SOS Transaction**

On January 5, 2023, Singularity announced (i) that SOS had sued Singularity and Thor Miner (in addition to Cao, Jie, Levy, Liu, Pan and Shan) for breach of the SOS agreement under which Thor was to deliver $200 million in crypto mining rigs, and (ii) that a settlement had been reached pursuant to which Thor would pay SOS $13 million. ¶242.

E.      **Singularity's Unregistered Securities Sales Are Revealed as a Fraud**

Singularity, Jie, Shan, Pan, Cao, Thor Miner, and Golden Mainland utilized Singularity's sham transition into a cryptocurrency company to fraudulently raise tens of millions of dollars through the sale of unregistered securities. At least three of those transactions were alleged to have been fraudulent, resulting in three separate lawsuits against Singularity and certain of the Individual Defendants, which resulted in the Company repaying $10.5 million. ¶243.

First, on September 23, 2022, Hexin Global Limited and Viner Total Investments Fund sued Singularity, Jie, Shan, Pan, and Cao to recover $6,124,910.82 in damages arising from an SPA between Helix, Viner, and Singularity, entered into on December 14, 2021. On news of this suit, the price of Singularity shares fell over 4%, from a closing price of $2.98 on September 22, 2022, to

13

close at $2.86 per share on September 23, 2022. In their lawsuit, Hexin and Viner alleged that Defendants had induced their investment through representations that Singularity was on the verge of incredible growth due to its new crypto line of business. ¶¶244-52.

On October 6, 2022, Jinhe filed a lawsuit against Singularity alleging that the Company violated a November 2021 financial advisory services agreement. On this news, Singularity's common stock price declined 12.93%, from a closing price of $2.94 per share on October 5, 2022, to close at $2.56 per share on October 6, 2022, and continued to decline in the following days, closing at $2.29 per share on October 7, 2022 and $2.15 per share on October 10, 2022. ¶¶253-55.

Then, on December 5, 2022, St. Hudson Group LLC, Imperii Strategies LLC, Isyled Technology Limited, and HS-QYNM Family Inc. sued Singularity, Jie, Cao, Shan, and Pan, alleging that they invested $4,400,000 to purchase unregistered shares of Singularity based on the representations of Singularity, Jie, Cao, Shan, and Pan regarding Singularity's cryptocurrency business. On this news, Singularity's common stock price declined 2.60%, from a closing price of $0.77 per share on December 5, 2022, to close at $0.75 per share on December 6, 2022. ¶¶256-57.

Ultimately, Singularity paid $10,525,910.82 to settle the claims brought in these suits. ¶258.

## VI.   Post-Class Period Developments Strengthen Allegations of Class Period Misconduct

On February 27, 2023, Singularity announced that, as it had previously reported, the Board had formed a Special Committee to investigate the Hindenburg Report's claims of alleged fraud, misrepresentation, inadequate disclosure, and other matters related to the Company and its management. ¶259.

Then, on March 1, 2023, Singularity announced that its previously-issued financial statements for the fiscal year ended June 30, 2021, included in the Company's Form 10-K filed on November 29, 2021, should no longer be relied upon as a result of incorrect accounting treatment of approximately $4.5 million of accounts receivable. According to this announcement, the

Company intended to "amend its financial statements for the fiscal year 2021 to restate loans receivable – related parties and bad debt recovery." Further, the Company's audit committee had concluded that the financial statements for the quarters ended September 30, 2021 and December 31, 2021 included in the Company's Quarterly Reports on Form 10-Q, filed on November 12, 2021 and February 14, 2022, "should no longer be relied upon as a result of incorrect recognition of revenue from freight shipping services in the amount of $980,200 for the three months ended September 30, 2021 and six months ended December 31, 2021." Critically, the Company announced that "due to a lack of proper procedures in identifying and recording related party transactions, there was an error in the accounting treatment of the Company's recovery (provision) for doubtful accounts, net related to its other receivables." ¶260. As a result, Singularity and its management concluded that a material weakness existed in the internal control over financial reporting and that its disclosure controls and procedures were not effective as of June 30, 2021, September 30, 2021, December 31, 2021, and June 30, 2022, respectively. ¶260.

Less than a week later, on March 6, 2023, Singularity issued an amended Form 8-K/A in which it announced that it had discovered errors in the disclosure related to certain 2019 transactions contained in the Form 8-K filed on February 28, 2023. ¶261.

Also of note, in its Form 10-Q for the quarter ended December 31, 2022, filed on March 7, 2023, the Company admitted that its transaction with Rich Trading on November 16, 2021, was an improper related party transaction, and that Rich Trading's bank accounts were controlled by Singularity's management. ¶262. Likewise, Singularity's Form 10-Q for the following quarter (Q1 2023) acknowledged that the Company's Rich Trading transaction was a related party transaction – which was not previously disclosed as a related party transaction. ¶263.

On July 12, 2023, Singularity announced in a Form 8-K that it had received a notice from

NASDAQ stating that the Company was not in compliance with Nasdaq Listing Rules due to its failure to timely hold an annual meeting of shareholders for the fiscal year ended June 30, 2022. ¶266. On July 14, 2023, Singularity announced receipt of another notice from NASDAQ, informing the Company that it "no longer complies with Nasdaq's independent director and audit committee requirements under Nasdaq's Listing Rule 5605 following the resignation of Tieliang Liu from the Company's board of directors and audit committee effective July 3, 2023." ¶267.

Lastly, in a Form 10-K filed on September 29, 2023, Singularity admitted that the scope of the Company's planned financial restatements would "increase[] possibility of litigation and regulatory inquiries" and "affect investor confidence." The same Form 10-K also admitted that the Company still had not finished remediating its internal weaknesses in internal controls and that material weaknesses in the internal regime existed for the period ending June 30, 2023. ¶¶268-69.

## ARGUMENT

### I.     Applicable Legal Standards Support Denial of Defendants' Motions

On a Rule 12(b)(6) motion, a Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007). "[F]act-specific question[s] cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). To state a Section 10(b) claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Securities fraud actions are subject to the pleading requirements of the PSLRA, 15 U.S.C. § 78u-4, and Fed. R. Civ. P. 9(b).

## II.        The SAC Adequately Alleges Material Misstatements and Omissions

Under the PSLRA and Rule 9(b), falsity is alleged if the plaintiff "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). "A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010). To assess whether falsity is adequately alleged, the court must review defendants' statements in context and taken together. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250-51 (2d Cir. 2014). Whether a statement is materially false or misleading "is generally a question reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017). It is inappropriate to resolve such disputes on a motion to dismiss, "unless the Court, drawing all reasonable inferences in favor of the plaintiff, determines that *reasonable minds could not differ* on the question of whether the statements alleged in the complaint were misleading in light of the circumstances under which they were made." *Id.* As discussed herein, the SAC adequately alleges material misstatements and omissions.[3]

### A.        Defendants Had a Duty to Disclose Jie's Past Misconduct

Defendants argue that omissions with respect to Jie's past civil and criminal misconduct are inactionable because (i) there is no duty to disclose corporate mismanagement or "uncharged" criminal conduct, (ii) the SAC allegedly fails to plead facts supporting the conclusion that Jie committed the "uncharged" criminal conduct in China, and/or (iii) the allegedly omitted facts were publicly available. *See* Jie Br. at 7-12; Levy Br. at 17-18. Such arguments are unavailing.

---

[3] This Section addresses Defendants' arguments relating materially false and misleading statements as articulated in (i) Jie Defs. Br. at 7-17 & 21-24; (ii) Cao Br. at 10-15 & 18; (iii) Levy Br. at 15-19; and (iv) Zhikang and Singularity Br. at 23-24.

### 1.    Defendants' Omissions Rendered their Public Statements About Jie's Professional Background Misleading

When a company makes a disclosure, whether it be voluntary or required, there is a duty to make it "complete and accurate." *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041, 2000 WL 1234601, at *4 (S.D.N.Y. Aug. 31, 2000). This duty exists "even where the omitted information relates to allegedly illegal conduct." *Id*. Thus, as Defendants themselves concede (*see* Jie Br. at 9-10), failure to disclose incidents of corporate mismanagement or criminal conduct by corporate executives, charged or uncharged, *is actionable* if those incidents are "sufficiently connected" to the company's existing disclosures such that their omission renders the company's statements misleading. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016).

Where, as here, a company makes public statements regarding an executive's background and experience, courts have routinely held that the executive's past corporate and/or criminal misconduct is sufficiently connected thereto such that a failure to disclose the misconduct is actionable. *See, e.g., Nutriband, Inc. v. Kalmar*, No. 19 Civ. 2511, 2020 WL 4059657, at *10 (E.D.N.Y. July 20, 2020) (actionable omission pled where defendant "provided information on his … background in the industry" but failed to disclose his "alleged criminal history"); *In re ForceField Energy Inc. Sec. Litig.*, No. 15 Civ. 3020, 2017 WL 1319802, at *11 (S.D.N.Y. Mar. 29, 2017) (actionable omission pled where company disclosed executives' "prior work experience without also disclosing the executives' histories at companies that had been accused of fraud").[4]

Here, Defendants made numerous statements about Jie's "business management experience," including, specifically, his experience at CCC. *See* ¶¶51-53. Yet, Defendants omitted to disclose that Jie (i) had, during his tenure at CCC, misappropriated millions of dollars of escrow

---

[4] *See also Vignola v. FAT Brands, Inc.*, No. 18 Civ. 7469, 2019 WL 6888051, at *8 (C.D. Cal. Dec. 17, 2019) (actionable omission pled where company failed to disclose "the bankruptcies [that previously] occurred under the direct supervision and management of [the company's] 'seasoned' leadership team").

funds, engaged in a related party transaction to procure a sham fairness opinion, and attempted to escape liability based on a false affidavit filed by his attorney in the litigation that followed, and (ii) was wanted in China for his involvement in a Ponzi scheme. ¶¶49-94. Given Defendants' public disclosures about Jie's qualifications to serve as Singularity's CEO, Defendants' failure to disclose Jie's past misconduct is clearly actionable.[5]

> **2.    Defendants' Arguments Regarding the "Uncharged" Nature of Jie's Criminal Conduct in China Are Unavailing**

Defendants also claim that because Jie's involvement in the Anhui Ponzi Scheme constitutes "uncharged" criminal conduct, Plaintiffs were required to identify a "specific law" that Jie violated and/or to "state a plausible claim" that the underlying conduct occurred. Jie Br. at 10. This argument must be rejected for several reasons.

*First*, Defendants' argument misses the point. The SAC alleges not that Defendants were obligated to disclose Jie's violation of any particular criminal law, but that Jie was wanted by, and on the run from, the Chinese government for his role in a massive Ponzi scheme. Regardless, the SAC does identify Jie's suspected crime – namely, "fraudulent fundraising." ¶93.

*Second*, Jie's conduct was not "uncharged." Following a criminal investigation, PRC authorities determined that Jie was the "main culprit" who "orchestrated the whole [Ponzi scheme]" and, as a result, issued a "Red Notice" against him and applied with the Baohe District People's Procuratorate for his arrest. ¶93; *see also* ¶¶75, 87-99. According to Singularity, a Red Notice is "a request to law enforcement worldwide to locate and provisionally arrest a person pending extradition, surrender, or similar legal action" and it is "based on an arrest warrant or court order issued by the judicial authorities in the requesting country." ¶75. Although Defendants now

---

[5] Defendants' related argument that the omission of Levy's tenure at CCC – a company that failed due to Jie's fraud and misappropriation of assets – did not render statements about Levy's experience, qualifications, and commitment to boardroom excellence misleading (*see* Levy Br. at 18-19), is misplaced for the same reason.

dispute this version of events, arguing that no such Red Notice was ever issued (*see* Jie Br. at 12), their competing theory cannot defeat the SAC's well-pled allegations. *See City of Warren Police & Fire Ret. Sys. V. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 133 (S.D.N.Y. 2020) (at the pleading stage, "the Court must accept as true the complaint's well-pleaded allegations, without regard to defendants' competing accounts").

*Third*, and in any event, the SAC sufficiently alleges facts which, taken as true, demonstrate Jie's involvement in the criminal Ponzi scheme. Specifically, the SAC alleges that although Jie fled to the United States and thus, has (so far) managed to evade arrest and prosecution in China, his twenty-three (23) co-conspirators were all convicted of fraudulent fundraising and/or illegal absorption of public deposits. ¶¶90, 93. The SAC also alleges criminal rulings and judgments in those other cases that articulate Jie's involvement in the Ponzi scheme – providing detailed accounts of how his crimes were committed and how he manipulated the criminal process – and indicate the government's intention to prosecute Jie as well. *See* ¶¶84, 87-88, 91-93.

*Finally*, the SAC includes a copy of a "statement issued by the Economic Crime Investigation Squad of Hefei Public Security Bureau Baohe District Branch on July 18, 2018, states that the Squad issued a "Red Notice," against Jie in May 2017, and had applied with the Baohe District People's Procuratorate for the arrest of Jie Yang on suspicion of a fraudulent fund-raising crime" obtained by Class Counsel's through independent investigation. ¶93. Thus, contrary to Defendants' contentions (*see* Jie Br. at 10), the SAC states a plausible claim that the underlying conduct occurred. [6]

---

[6] The SAC also sufficiently alleges that Jie committed the additional crime of forgery. *See* ¶72 (quoting a letter from the Hefei Police confirming that a document Jie produced during the legal dispute between CCC and Sorghum Investment Holdings Ltd. (which purported to be a letter from the Hefei police indicating that they did not intend to charge Jie for his involvement in the Ponzi scheme) was "clearly fabricated," and that, as a result, the Hefei Police now also "suspected [Jie] of forging official government documents"); *see also* ¶¶73, 77.

20

### 3.    The Omitted Information Was Not Reasonably Available to Investors

Defendants also claim that they had no duty to disclose Jie's fraudulent conduct at CCC or his criminal conduct in China because such information could have been discerned from publicly available court filings and/or Chinese language documents. *See* Jie Br. at 7-9, 11. But "investors are not generally required to look beyond a given document to discover what is true and what is not." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008). While it is true that a party is relieved of a duty to disclose information "where it is equally available, widely reported, or so basic that any investor could be expected to know it," *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 168-69 (S.D.N.Y. 2015), "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document … on the basis that the information is public knowledge." *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987).

Where, as here, the so-called publicly available information was published in a foreign language, courts have routinely refused to relieve defendants of their duty to disclose such information. *See, e.g., Horowitz v. Sunlands Tech. Grp.*, No. 19 Civ. 3744, 2022 WL 4392401, at *8 (E.D.N.Y. Sept. 21, 2022) (reasonably diligent investor would not have been aware of a decision "issued in Chinese by a Chinese regulatory agency.").[7]

Similarly, courts have refused to relieve defendants of their duty to disclose at the pleading stage where the allegedly omitted information was ascertainable only through court filings in unrelated lawsuits. *See, e.g., Vignola*, 2019 WL 6888051, at *11 (although omitted information

---

[7] *See also Longo v. OSI Sys., Inc.*, No. 17 Civ. 8841, 2021 WL 1232678, at *7 (C.D. Cal. Mar. 31, 2021) ("[I]t is plainly unreasonable to require an investor to comb foreign websites in languages such as Arabic, Chinese, Russian, etc., to determine whether the company in which he or she has invested has disclosed information that may be material to his or her investment."); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) (publication of information in Chinese newspapers did not "transform the information contained within the articles into matters of general public knowledge").

had been "publicly disclosed through court filings," whether such information was "well-known to investors" at the time is a question of fact inappropriate for determination on a motion to dismiss). For this reason, whether a defendant's failure to disclose may be excused depends upon whether the omitted information has been conveyed to the public "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information" created by the alleged omissions. *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 581 (S.D.N.Y. 2010).[8] This is an "intensely fact-specific [inquiry] and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

Here, Defendants fail to demonstrate that Jie's past criminal conduct in China, or his misconduct while at CCC, was well-known to investors at the time the omissions were made.[9] In fact, Defendants spend much of their briefing attempting to persuade the Court that Jie did not engage in any misconduct, and that the so-called publicly available information cited in the SAC is unreliable. *See* Jie Br. at 11-12, 23-24. Defendants cannot have it both ways, claiming that the so-called publicly available information cited in the SAC is unreliable and simultaneously claiming that this same information was conveyed to the public with the level of "credibility" necessary to relieve them of their duty to disclose it.[10]

---

[8] Defendants' cited authority does not hold to the contrary. *See, e.g., In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377-79 (E.D.N.Y. 2003) (finding that information already disclosed *in the company's own SEC filings* was "readily accessible in the public domain").

[9] For the same reason, Defendants' argument that there was no duty to disclose Levy's tenure at CCC because it was "publicly" available on a single website of an unrelated company (*see* Levy Br. at 19) fails. *See In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004) (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993)) ("[S]poradic press reports or reports published in other contexts may 'not be considered to be part of the information that was reasonably available' to investors.").

[10] Defendants similarly argue, with respect to the alleged Thor Miner misrepresentations, that the worldwide chip shortage was a matter of public knowledge. *See* Jie Br. at 16-17. While true, the SAC alleges that Defendants misrepresented that they could *overcome* the worldwide chip shortage due to Singularity's Thor Joint Venture, pursuant to which HighSharp had allegedly agreed to supply Singularity with the chips necessary to build its Thor machines, despite the global shortage. *See* ¶¶147, 154-55. However, Defendants failed to disclose that HighSharp was contractually obligated to provide the same chips to AGM Group as a "top priority" and, as a result, Defendants knew they would not be able to overcome the shortage as represented. *See* ¶¶174, 176.

### B.     Defendants' Statements Regarding Singularity's Private Offerings and Internal Control Were Materially Misleading

#### 1.     The Private Offering Representations Were Materially Misleading

Defendants also argue, without any supporting authority, that their representations regarding Singularity's private offerings were not false and/or misleading. *See* Cao Br. at 13-14. This argument must also be rejected.

The SAC alleges that Defendants represented that Singularity had entered into private placement agreements with accredited investors for the *express purpose* of funding its "new cryptocurrency initiative." ¶106; *see also* ¶¶104, 111. However, unbeknownst to investors, Singularity had enticed its accredited investors to invest based on false assurances of substantial growth in its cryptocurrency business – a business that, also unbeknownst to investors, was nothing more than a sham fabricated to raise funds and inflate the Company's stock price. *See* ¶¶109, 113. Defendants' failure to disclose this information rendered their statements regarding the private offerings false and/or misleading. *See, e.g., Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 138 (S.D.N.Y. 2001) (falsity pled where company represented it was seeking investments to "expand its services business" and "complete the transition" from "its VAR business to the services side," when, in reality, the company was "not in a position to move forward unencumbered by its VAR business," or "to use the [investment] proceeds" for its services business).

#### 2.     Singularity's Internal Control Deficiencies Were Not Adequately Disclosed

Defendants also argue that their representations regarding Singularity's internal controls were not materially misleading because they adequately disclosed the Company's internal control deficiencies. *See* Cao Br. at 15. This too must be rejected.

While Defendants are correct that Section 10(b) does not impose "an affirmative duty to disclose any and all material information" (Cao Br. at 15), it does impose a duty to ensure that one's statements are "both accurate and complete." *Caiola v. Citibank, N.A., N.Y.,* 295 F.3d 312, 331 (2d Cir. 2002). Here, Defendants represented that they had identified seemingly minor deficiencies in Singularity's internal controls – including a lack of segregation of duties for accounting personnel and a lack of full time U.S. GAAP personnel – and that, as of December 31, 2021, they had taken steps to remediate those issues, including the hiring of an external CPA firm to assist the Company with its financial statements going forward. *See* ¶¶201-09. Once they chose to speak on this topic, Defendants were required to disclose all information necessary to ensure that their statements were not misleading. *See Caiola,* 295 F.3d at 331.

Instead, Defendants omitted crucial information, including that (i) the Company had not fully remediated the identified weaknesses and, as a result, its internal controls continued to be ineffective *through June 30, 2023* (¶¶210, 269), and (ii) the Company's internal control deficiencies were much more serious than represented, ultimately warranting an investigation and action by the U.S. Attorney's Office and the SEC and a potential delisting by NASDAQ. ¶¶210, 260-61, 264-68. Defendants' failure to disclose this information rendered their statements materially misleading. *See, e.g., Mulderrig v. Amyris, Inc*., 492 F. Supp. 3d 999, 1023 (N.D. Cal. 2020) (company's disclosure of deficiencies in internal controls and its representation that those deficiencies were being remediated were materially misleading given company's failure to disclose that internal controls were deteriorating further and that additional deficiencies existed).

### 3. The Misstatements Regarding Singularity's Cryptocurrency Initiative and its Golden Mainland Joint Venture Are Actionable

Defendants next claim that certain statements referenced in (i) paragraphs 102, 106-08, 111, 114, 116, and 119-20 of the SAC relating to Singularity's cryptocurrency initiative, and (ii)

the Mainland JV press release, are protected forward-looking statements and/or puffery. *See* Jie Br. at 15-16;[11] Levy Br. at 16-17; Cao Br. at 11-13. Defendants also claim that certain statements referenced in paragraphs 102 and 120 of the SAC and in the Golden Mainland press release are inactionable opinions. *See* Jie Br. at 15-16; Cao Br. at 11-12. These arguments too must be rejected.

### a.    The Identified Statements are Not Protected Forward-Looking Statements

Forward looking statements are those that "speak predictively about the future, such as a projection of revenues ... or other financial items; a statement of the plans and objectives of management for future operations; or a statement of future economic performance." *Gissin v. Endres*, 739 F. Supp. 2d 488, 505 (S.D.N.Y. 2010). The PSLRA safe harbor protects such statements only if (i) they are identified as forward-looking and accompanied by "meaningful cautionary language," (2) they are "immaterial," or (3) "the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

Here, most of the statements in the identified paragraphs discussing Singularity's cryptocurrency initiative are not forward-looking. For example, the statements in paragraph 120 of the SAC discuss the Company's alleged past and present achievements in the cryptocurrency space and the design of its new website, which, at that point, had already occurred. *See* ¶120. The same is true for the alleged misstatements in paragraphs 114 and 116 (discussing the execution and restructuring of a purchase order agreement, which had already occurred), paragraph 119

---

[11] The Jie Defendants also claim that a statement contained in the press release attached as Ex. GG to the Mahon Affirmation is a protected forward-looking statement. *See* Jie Br. at 15. But as the Jie Defendants themselves point out, that statement is nowhere cited in the SAC. *See id.* In any event, that statement – that the Company's name change recognizes its "significant progress and represents the latest step in aligning the Company's growth efforts in cryptocurrency and other new markets" (*id.*) – is not forward-looking. It is a statement of fact regarding the Company's historical and current progress and growth in the cryptocurrency space – a fact that Defendants knew was false.

(discussing the Company's name change, which had already occurred), paragraph 102 (discussing the Company's expansion into Bitcoin mining in the present tense, noting that the expansion "follows" a series of steps in preparation and "utilizes" leadership team members who specialize in crypto mining operations), and paragraphs 107-08 (announcing the *closing* of private offerings).

In fact, the only statements in the identified paragraphs that could plausibly be seen as forward looking are the statements regarding (i) Singularity's intention to sell securities in private offerings to fund its cryptocurrency transformation (*see* ¶¶106, 111), and (ii) Singularity's "plan to switch to a direct mining business rather than contracting with third parties in order to have greater control." ¶116; *see* Cao Br. at 12. However, these statements are not protected by the safe harbor because (i) as discussed at Section III.A, *infra*, they were made with full knowledge of their falsity, and (ii) they were not accompanied by meaningful cautionary language.

"[C]autionary language that is misleading in light of historical fact cannot be meaningful under the statute." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304-05 (S.D.N.Y. 2013). Here, the statements in paragraphs 111 and 106 of the SAC were accompanied only by general warnings that (i) the Company's alleged efforts in the "cryptocurrency mining business … *may* not provide the expected benefits" and/or "*may* prove costlier than expected", and (ii) the price of the Company's stock *may* fluctuate based on the "timing, progress and results of" its "new initiative" in the "cryptocurrency industry." Such language was misleading in light of historical fact – namely, that the Company's cryptocurrency initiative was a sham *from the start* and thus, had no chance of providing any supposed benefits or results. "By superficially warning of possible risks while failing to disclose critical facts," Defendants' cautionary language was akin "to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *In re MF Glob.*

26

*Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d at 318.

Moreover, to be "meaningful," cautionary language must "expressly warn of" or "directly relate to the risk that brought about plaintiffs' loss." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 530 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). Here, the above-cited language did not expressly warn of the true risk at hand – *i.e.,* that Singularity would not be funding its cryptocurrency initiative, as represented, because that initiative was a farce. The same is true for the statement in paragraph 116, which was accompanied only by general warnings regarding uncertainties associated with COVID-19 and the fluctuation in cryptocurrency values over time. Such "vague" warnings were clearly insufficient because they did not warn investors of "the exact risk that materialized." *Slayton*, 604 F.3d at 772.

As for the Golden Mainland press release, certain statements therein regarding the joint venture's future "plans to invest" in Bitcoin mining sites could plausibly be seen as forward-looking. *See* ¶¶126-27. However, those statements also do not merit the safe harbor's protection because they too were (i) made with full knowledge of their falsity (*see* Section III.A, *infra*), and (ii) unaccompanied by meaningful cautionary language (warning only of the general risk that the joint venture might fail due to the COVID-19 pandemic and fluctuations in cryptocurrency values).

### b.   The Identified Statements are Not Puffery

Puffery is a vague statement of corporate optimism that is "too general to cause a reasonable investor to rely upon [it]." *In re Supercom Inc. Sec. Litig.*, No. 15 CIV. 9650, 2018 WL 4926442, at *22 (S.D.N.Y. Oct. 10, 2018). However, even general statements of corporate optimism are "actionable if they contradict facts known to a defendant, if they are worded as guarantees or are supported by specific statements of fact, or if the speaker does not genuinely or reasonably believe them." *Id.* (cleaned up).

Here, many of the statements in the identified paragraphs are not so vague as to be deemed

inactionable. Rather, they provide specific details about the Company's alleged growth and momentum in the cryptocurrency market, highlighting the Company's purported establishment of "state-of-the-art crypto mining pools" (¶120), its fundraising efforts to support its cryptocurrency transformation (¶¶106-08, 111), its purchase order agreements (¶¶114, 116), and its appointment of a leadership team specializing in Blockchain and cryptocurrency mining. ¶102. Such statements are "fact-based expressions of opinion" that are not puffery. *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 229 (S.D.N.Y. 2023).

Moreover, Defendants' statements contradicted facts known to them at the time – namely, that Singularity was *not* experiencing successful growth in the cryptocurrency market and that its so-called cryptocurrency initiative was a charade. Such statements are actionable. *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (statement that company "anticipates a continuation of its accelerated expansion schedule" actionable where company knew the expansion already failed); *S.E.C. v. Rio Tinto plc*, No. 17 Civ. 7994, 2019 WL 1244933, at *11 (S.D.N.Y. Mar. 18, 2019) (statement that project had significant future potential actionable where speaker had reason to believe project lacked potential); *City of Sterling Heights Police & Fire Ret. Sys. V. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348 (S.D.N.Y. 2006) (similar).[12]

**c. The Identified Statements Are Not Inactionable Opinions**

Opinions are "subjective statements that reflect judgments as to values that [are] not objectively determinable," or statements "classically indicative of opinion such as 'I believe' and

[12] Defendants also argue, without any supporting authority, that Defendants' representation that Jie was "nominated to serve [as Singularity's CEO] because of his business management experience" is "mere puffery," expressing only Defendants' "hope that Jie would lead the company to a bright future." Jie Br. at 7. This argument must also be rejected. The statement in question was neither "general" nor "aspirational." *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 443 (S.D.N.Y. 2018). It was one of historical, objectively verifiable fact, insofar as it (misleadingly) informed investors of Jie's *past* experience and qualifications, and that such experience served as the basis for a *past* decision of the Company – namely, its decision to appoint him as CEO.

'I think.'" *Gregory v. ProNAi Therapeutics Inc.,* 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018). The only statement in the Golden Mainland press release that can arguably be so classified is Jie's statement: "We believe that investing in and building out sites with Bitcoin mining capacity [through the Mainland JV] will provide a platform with the scale to support the demand levels in the industry." ¶128. However, even if this is properly considered an opinion, it is actionable. And, regardless, the remainder of the statements in that press release are not opinions.

In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), the Supreme Court held that liability for making a false statement of opinion may lie if (i) "the speaker did not hold the belief she professed," (ii) "the supporting facts she supplied were untrue," or (iii) the speaker omitted information "about the inquiry the [she] did or did not conduct or the knowledge [she] did or did not have," whose omission made the statement misleading to a reasonable investor. *Id.* at 1327, 1332. Here, Jie clearly knew, and omitted to disclose, that the Mainland JV was a sham – a fact that rendered his statement misleading to a reasonable investor. *See* Section III.A, *infra*. Consequently, Jie also did not hold the belief he professed to hold – namely, that the (sham) joint venture would provide the Company with "a platform with the scale to support the demand levels in the industry." ¶128.

As for paragraphs 102 and 120 of the SAC, several statements therein can arguably be viewed as opinions.[13] However, these statements are also actionable because they again omitted to disclose that the Company's cryptocurrency business was a farce. These "opinion" statements

---

[13] *See, e.g.,* ¶120 ("The timing made sense for us to formally launch [our new website] now given our recent high-profile announcement to enter the greenfield distributed storage market, which we expect will build on our successful bitcoin mining asset and Blockchain businesses."); *id.* ("We are revolutionizing cryptocurrency, Blockchain and other new markets by focusing on innovative solutions for globally interconnected networks and establishing state-of-the-art crypto mining pools."); *id.* ("We have been aggressively expanding in rapid growth areas and are excited with the launch of our new corporate website, which aligns with our business strategy and leadership vision for the fast-evolving cryptocurrency, Blockchain and other new markets we serve."); ¶102 (Singularity is "thrilled to expand to Bitcoin mining").

were also supported by untrue statements of fact – namely, that Singularity had successful bitcoin mining and Blockchain businesses to build upon, and that Singularity was serving and expanding in the cryptocurrency and Blockchain markets (when, in fact, it was not).

**C.     Levy and Zhikang Huang "Made" False and/or Misleading Statements**

Levy and Zhikang Huang also argue that, under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), they were not the "makers" of any of the alleged representations and that the SAC improperly relies on the group pleading doctrine to allege their liability. *See* Levy Br. at 15-16; Zhikang and Singularity Br. at 23-24. This argument also fails.[14]

Under *Janus*, an executive is the "maker" of a statement where he "had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive." *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21 Civ. 6694, 2023 WL 6386956, at *10 (S.D.N.Y. Sept. 28, 2023). Here, Zhikang Huang concedes that he signed the Form 10-K filed on September 29, 2021. *See* Singularity and Zhikang Br. at 23 (citing ¶204). As such, he is clearly the maker of the false and/or misleading statements therein. *See In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 262-63 (S.D.N.Y. 2020) ("[C]ourts consistently hold that signatories of misleading documents 'made' the statements in those documents, and so face liability under Rule 10b-5(b).").

Moreover, and contrary to Defendants' contentions, the group pleading doctrine is "alive and well" in the Second Circuit after *Janus*. *City of Pontiac Gen. Employees' Ret. Sys. V. Lockheed Martin Corp.,* 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012); *see In re Barrick Gold Sec. Litig.*, No. 13 Civ. 3851, 2015 WL 3486045, at *2 (S.D.N.Y. June 2, 2015). That doctrine allows plaintiffs to rely on a presumption that "group-published" statements, such as statements in "SEC filings and

---

[14] Singularity and the remaining Individual Defendants – Jie, Xiaohuan Huang, Cao, and Shan – do not dispute that they are "makers" of the alleged misrepresentations or omissions under *Janus*.

press releases," are jointly authorized, and therefore "made" by "all individuals with direct involvement in the everyday business of the company." *City of Pontiac Gen. Employees' Ret. Sys.,* 875 F. Supp. 2d at 373-74 (cleaned up).

The SAC clearly alleges that Zhikang Huang and Levy were involved in Singularity's everyday business. Zhikang Huang served as Singularity's inside director, Chief Operating Officer, and Vice President of Operations (¶29), and in that capacity, he (i) directly participated in Singularity's day-to-day operations, (ii) had access to inside information concerning Singularity's business and operations, (iii) was directly involved in Singularity's sham cryptocurrency transformation and in the oversight of its internal controls,[15] and (iv) signed, approved, and/or ratified Singularity's alleged false and/or misleading statements. *See* ¶¶37, 204. This is sufficient to plead Zhikang Huang's liability. *See Levy v. Maggiore*, 48 F. Supp. 3d 428, 451 (E.D.N.Y. 2014) ("[A] misleading statement may be attributable to a corporate insider by virtue of [his] high level position.").[16]

As for Levy, the SAC alleges that he served as an outside director of the Company, as the Chair of its Compensation Committee, and as a Member of its Corporate Governance and Auditing Committees. ¶35. While outside directors, such as Levy, are generally "excluded from the day-to-day management of a corporation," they "can fall within the group pleading presumption when … [their] access to information [is] more akin to a corporate insider." *In re Cannavest Corp. Sec.*

---

[15] *See* ¶¶29, 201, 203, 205, 207, 209 (quoting Singularity's public filings indicating the Company's evaluations of the effectiveness of its internal controls were conducted "under the supervision of and with the participation of [the Company's] management" which at all relevant times included Zhikang Huang); Mahon Aff. Ex. GG at 1 (Exhibit No. 99.1) (Singularity's January 5, 2022 press release stating the "Board of Directors and [the Company's] management team" were behind the decision to change the Company's name in furtherance of its cryptocurrency transformation).

[16] *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 449 (S.D.N.Y. 2005) (where defendant holds "a high level position indicating that he [i]s an insider with direct involvement in day-to-day affairs," he is responsible for group published statements made during his tenure).

*Litig.*, 307 F. Supp. 3d 222, 241 (S.D.N.Y. 2018).

Here, Levy's responsibilities at Singularity made him akin to a corporate insider. As a member of Singularity's Auditing Committee, he was responsible for, *inter alia* (i) reviewing and "discuss[ing] with management and the [Company's] independent auditor[,] the [Company's] annual audited financial statements and quarterly financial statements," (ii) "[r]eview[ing] … the Company's internal system of audit and financial controls," (iii) "review[ing] and approv[ing] the internal corporate audit staff functions," and (iv) "evaluat[ing the qualifications [and] performance … of the [Company's] independent auditors." *See* Mahon Aff. Ex. GG [10-K for FY ending June 30, 2022] at 25-26. Moreover, as disclosed in Singularity's January 5, 2022 press release, Levy and other Board members were responsible for the decision to change the Company's name as part of its cryptocurrency transformation. *See* Mahon Aff. Ex. GG; *see also* ¶119.

"These allegations of everyday involvement with the Company are sufficient to invoke the group pleading doctrine." *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 477 (S.D.N.Y. 2013) (where defendant served on audit committee and was "responsible for overseeing the Company's financial reporting," "reviewing the performance of the outside auditors," "reviewing the quarterly financial statements with management," and "reviewing the Company's internal controls for financial reporting" the group pleading doctrine applied); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 642 (S.D.N.Y. 2007) (allegations that individual defendants "served on the Audit Committee," "had extensive access to [] internal information" and "approved th[e] [Company's] financial statements" sufficient to invoke the group pleading doctrine).

### D.   The SAC's Reliance on Short Seller Reports, Uncertified Translations, and Court Filings from Other Lawsuits Is Entirely Permissible

Defendants also argue that the SAC's falsity allegations fail because they are based, in part, on: (i) information taken from the Hindenburg Report, which was written by a potentially biased

short-seller and was allegedly based almost entirely on "unverified news reports and confidential witnesses" (Jie Br. at 8-9, 17, 21-24; Cao Br. at 18); (ii) inadmissible, uncertified translations of Chinese language materials (Jie Br. at 10-12); and (iii) pleadings filed in other lawsuits. *Id.* at 12-13, 16; Cao Br. at 14. As discussed herein, these arguments fail.

### 1.    The SAC Properly Relies on the Hindenburg Report

Among the *many* different documented sources relied upon by Plaintiffs are two separate and distinct short seller reports, the Hindenburg Report and the Peabody Report. *See, e.g.,* ¶¶213, 214. Defendants do not contest the reliability of the Peabody Report, or Plaintiffs' reliance thereon. Defendants' argument that the SAC improperly relies on the Hindenburg Report fails for several reasons.[17] *First*, the contention that a report is inherently unreliable because it was written by a short seller has been "repeatedly rejected in prior cases." *McIntire v. China MediaExpress Holdings, Inc*., 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013). As numerous courts have recognized, the truth or reliability of a short seller's report "is a factual dispute not appropriate for resolution at th[e] [pleading] stage." *Id*.; *Handal v. Tenet Fintech Grp. Inc*., No. 21 Civ. 6461, 2023 WL 6214109, at *12 (E.D.N.Y. Sept. 25, 2023) (same); *see Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012) ("Even though Defendants claim that Muddy Waters is a biased party … the reliability of the report is a question of fact.").

*Second*, the Hindenburg Report – only one of *many* sources relied upon by Plaintiffs – is not primarily based on unverified reports and confidential witness statements, as Defendants claim. *See* Jie Br. at 22. Rather, the Report clearly identifies its sources, including, *inter alia*, SEC filings, Jie's autobiography, Chinese and New York State court records, Chinese news articles, articles published by reputable U.S. media outlets, such as the Miami Herald, CCTV footage, interviews

---

[17] Although Defendants do not contest the reliability of the Peabody Report, or Plaintiffs' reliance thereon, any argument to that effect would also fail for the reasons discussed herein.

with Chinese authorities involved in the criminal investigation of Jie, a letter written by the Hefei Police in China, video surveillance of Jie's home, Nassau County real estate records, and documents filed with the New York Corporate Registry.

Where, as here, short-seller reports have such clear "indicia of reliability," *In re XL Fleet Corp. Sec. Litig.*, No. 21 Civ. 2002, 2022 WL 493629, at *5 (S.D.N.Y. Feb. 17, 2022), courts routinely credit allegations attributed to those reports at the pleading stage. *See In re Hebron Tech. Sec. Litig.*, No. 20 Civ. 4420, 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021) (courts will credit allegations derived from short-seller reports "where facts are cited that tend to substantiate the[] allegations or reveal the basis for the short-seller's factual assertions"); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 13 CV 214, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) ("[C]ourts in this district frequently accept allegations based on short-seller reports at" the pleading stage); *Lewy v. SkyPeople Fruit Juice, Inc.*, No. 11 Civ. 2700, 2012 WL 3957916, at *14 (S.D.N.Y. Sept. 10, 2012) (allegations from short-seller report adequate where "the bases for the investigators['] findings are set forth in detail").

Furthermore, and contrary to Defendants' contentions (*see* Jie Br. at 23-24), Plaintiffs' counsel did, in fact, independently verify the Hindenburg Report's findings. Specifically, Plaintiffs' counsel located and reviewed the documents and records referenced in the Hindenburg Report, as well as independent sources of information, and discussed their contents in detail in the SAC, determining that they corroborated the Hindenburg Report's findings. *See* ¶¶58-100, 130-43, 156, 158-60, 162-84, 195-98.[18] Although Defendants contend that the report of the Zonglun

---

[18] As such, the authority cited by Defendants is inapt. *See* Jie Br. at 22-23. For example, Defendants rely heavily on *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774 (S.D.N.Y. 2020), where the complaint did "not allege any independent corroborative facts" and made "threadbare allegations, all reliant on [a short-seller's] attributions to unnamed persons." *Id.* at 802. The same is true for *In re DraftKings Sec. Litig.*, 650 F. Supp. 3d 120 (S.D.N.Y. 2023), where the short-seller report was based solely on "unidentified and unspecified … sources" that were not independently verified by plaintiffs' counsel. *Id.* at 154-56.

Firm, commissioned by Jie, and the report of the Hebei Mei Dong Firm, commissioned by Singularity, contradict the Hindenburg Report regarding Jie's criminal activity in China, this merely demonstrates a "factual dispute[] not appropriate for resolution at this stage." *Handal*, 2023 WL 6214109, at *12.[19] The untested contentions on which Jie relies are contradicted by the independent investigation of Lead Counsel and Sorghum. *See* ¶¶66, 93.

### 2. Plaintiffs May Rely on Uncertified Translations at the Pleading Stage

It is well-established that a complaint may rely on evidence that is inadmissible at trial. *See City of Warren Police & Fire Ret. Sys.,* 477 F. Supp. 3d at 133 ("[A] plaintiff need not offer admissible proof of its allegations for the Court to accept them as true at this [motion to dismiss] stage.").[20] Thus, whether the SAC's translations were certified is of no consequence here. *See Handal*, 2023 WL 6214109, at *12 (considering Chinese language exhibits annexed to the complaint at pleading stage, even though they were "unaccompanied by certified translations").[21]

---

[19] Plaintiffs' counsel reviewed the findings of the Zonglun and Hebei Mei Dong Reports and determined that they were unreliable and misleading, as detailed in the SAC. *See* ¶¶76-94. Most notably, although those reports concluded that no Red Notice was issued against Jie in China, the SAC cites a statement issued by the Economic Crime Investigation Squad of the Hefei Public Security Bureau, Baohe District Branch confirming that the Squad did, in fact, issue a Red Notice for Jie's arrest in connection with the Anhui Ponzi Scheme, which appears to be the same report identified by Sorghum when it sued Jie for fraud. ¶93. Moreover, as pointed out in the SAC, the Zonglun and Hebei Mei Dong Reports' conclusion that Jie was never prosecuted or convicted for his involvement in the Ponzi scheme is misleading, given that Jie only avoided prosecution and conviction by fleeing to the United States. *See* ¶¶79, 85.

[20] For this reason, Defendants' argument that the SAC improperly relies on hearsay (*see* Jie Br. at 23) is also misplaced. *See Connolly v. Wood-Smith*, No. 11 Civ. 8801, 2012 WL 7809099, at *6 (S.D.N.Y. May 14, 2012) ("On a motion to dismiss, where the allegations must be accepted as true and all reasonable inferences must be drawn in the claimant's favor, the fact that the pleadings may rely on hearsay does not warrant dismissal.").

[21] In support of their argument to the contrary, Defendants mistakenly rely on authority discussing uncertified translations in other procedural contexts. *See, e.g., Gonzalez v. Cheesecake Factory Rests., Inc*., No. 21 Civ. 5017, 2023 WL 2477697, at *1 (E.D.N.Y Mar. 13, 2023) (noting that on a motion to compel arbitration, courts may only consider "admissible evidence," and determining that the defendant "failed to adduce admissible evidence" because he "failed to present a certified English translation" of the Spanish-language agreement at issue); *Nam v. Permanent Mission of Republic of Korea to United Nations*, 657 F. Supp. 3d 382, 390, 407 (S.D.N.Y. 2023) (refusing to consider uncertified translations of Korean language exhibits because, on a motion for summary judgment, "parties must cite to admissible evidence"). They also rely on inapt authority from the Southern District of Florida, in which the court merely noted that it was not "in a position to evaluate" a document "submitted in Spanish *without an English translation*" – entirely contrary to what Plaintiffs alleged here. *Nodus Int'l Bank, Inc. v. Arocha Hernandez*, 511 F. Supp. 3d 1316, 1325 (S.D. Fla. 2023) (emphasis added).

Moreover, Defendants do not contend that any of the SAC's translations are inaccurate. Rather, they simply dispute the veracity of the documents themselves, claiming that the independent investigation of the Zonglun Firm allegedly demonstrates that no criminal charges were levied against Jie in China. *See* Jie Br. at 11-12. As discussed above, this is nothing more than a factual dispute inappropriate for resolution at the pleading stage. *See City of Warren Police & Fire Ret. Sys.*, 477 F. Supp. 3d at 133 (while defendants "dedicate much of their briefing to disputing the truth of [plaintiffs'] allegations, … the Court must accept as true the complaint's well-pleaded allegations, without regard to defendants' competing accounts").

### 3.    Plaintiffs May Rely on Allegations in Other Lawsuits at the Pleading Stage

Contrary to Defendants' contentions (*see* Jie Br. at 12-13, 16; Cao Br. at 14), the SAC's reliance upon information taken from pleadings in other lawsuits is also entirely proper. For one, most of the court filings cited in the SAC are decisions, orders, or judgments of a judge or arbitrator and/or sworn affidavits. *See, e.g.,* ¶¶61-67, 77, 84, 87, 146, 152-53, 159, 162, 165, 171-72, 175, 189, 229. As such, the allegations that Defendants challenge represent legal determinations and sworn testimony, not unproven allegations, as Defendants contend.

In any event, "there is nothing improper about utilizing information contained in [a] complaint as evidence to support private claims under the PSLRA." *Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 13 Civ. 6057, 2014 WL 3891351, at *4 (S.D.N.Y. Aug. 8, 2014); *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19 Civ. 10825, 2021 WL 212337, at *6 (S.D.N.Y. Jan. 21, 2021) ("Defendants are incorrect to assert that [plaintiffs] may not rely on facts pleaded in outside litigation."); *In re Mylan N.V. Sec. Litig.*, 379 F. Supp. 3d 198, 214 (S.D.N.Y. 2019) ("[T]he weight of authority holds that plaintiffs may base factual allegations on complaints from other proceedings because neither Circuit

precedent nor logic supports . . . an absolute rule against doing so.") *Major Energy Elec. Servs., LLC v. Horowitz*, No. 19 Civ. 10431, 2020 WL 4432121, at *7 (S.D.N.Y. July 31, 2020) (same).[22]

Numerous courts have recognized that it makes little sense to say information that a plaintiff "could unquestionably rely on if it were mentioned in a news clipping or public testimony – is immaterial simply because it is conveyed in an unadjudicated complaint." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) (quoting *In re Bear Stearns Mortgage Pass–Through Certificates Litig.*, 851 F. Supp. 2d at 767-68); *see City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*, 2021 WL 212337, at *5 ("consent orders and outside complaints were fair game for Plaintiffs to use in fashioning their complaint" as they are akin to "news clipping[s] or public testimony, which … are valid sources to draw from"). The SAC's reliance on pleadings in other lawsuits (*see* ¶¶68, 88, 170, 244-58) is entirely appropriate.

## III.    The SAC Alleges a Strong Inference of Scienter as to All Defendants

A complaint pleads scienter by alleging facts that give rise to a strong inference of "conscious misbehavior *or* recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007) (emphasis in original); *accord In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137 (2d Cir. 2021) ("[T]he court erred in failing to weigh Plaintiffs' scienter allegations as a whole."). "The inference that the

---

[22] In arguing to the contrary, Defendants rely on a line of case law that has been rejected by the vast majority of courts as an improper expansion of the Second Circuit's decision in *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976). *See, e.g., In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 628 (S.D.N.Y. 2014); *In re Teva Sec. Litig.*, No. 17 Civ. 00558, 2023 WL 3186407, at *25 (D. Conn. May 1, 2023); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012); *HSH Nordbank AG v. RBS Holdings USA Inc.*, No. 13 Civ. 3303, 2015 WL 1307189, at *3 (S.D.N.Y. Mar. 23, 2015); *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*, 2021 WL 212337, at *5; *Major Energy Elec. Servs., LLC*, 2020 WL 4432121, at *7.

defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be just as plausible as any non-culpable inference. *Tellabs*, 551 U.S. at 324. "[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Employees' Ret. Sys. V. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

"[S]cienter is a fact-specific issue that is generally better left to the trier of fact to determine." *In re Pfizer Inc. Sec. Litig.*, 936 F. Supp. 2d 252, 262 (S.D.N.Y. 2013). Thus, "[c]ourts routinely impute to the corporation the intent of officers and directors[.]" *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010). Here, the SAC's mutually reinforcing allegations of conscious recklessness and motive create a strong inference of Defendants' scienter. *See Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018).

### A.      Defendants Acted with Conscious Misbehavior and/or Recklessness

Actionable recklessness is alleged where the defendants "knew facts or had access to information suggesting that their public statements were not accurate [or] failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311. A strong inference of scienter is pled where the allegations "suggest that [defendant] consciously chose not to disclose the [adverse] information, which it knew or should have known to be a significant negative finding." *In re Intercept Pharms., Inc. Sec. Litig.*, No. 14 CIV. 1123, 2015 WL 915271, at *11 (S.D.N.Y. Mar. 4, 2015). Here, the SAC provides several bases for inferring that Defendants were aware of undisclosed adverse information when they spoke, and therefore were reckless at a minimum.

*First*, the SAC's theory of scienter is deeply rooted in the Individual Defendants' own conduct. This consideration factors into multiple categories of alleged material misrepresentations and omissions concerning lawsuits involving Singularity and Jie's legal troubles. *See* SOF §§ II(A)-(C), *supra.* For example, Jie undoubtedly was aware of his own background. *See Constr.*

*Laborers Pension Tr. For S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 548 (S.D.N.Y. 2020) (CEO was aware of his own prior personal misconduct). Similarly, (i) Levy clearly was aware of his own professional experience – that he served as the Director of CCC and that his tenure overlapped with Jie; (ii) Huang was clearly aware of her own executive position at SOS, which made SOS's transaction with the Company a related party transaction; and (iii) Pan was clearly aware that his own wife was the CEO of Rich Trading, which made Rich Trading's transaction with the Company a related party transaction. Critically, the scienter of corporate officers, such as Jie, Levy, Huang and Pan are imputed to Singularity. *See, e.g.*, *In re Peabody Energy Corp. Sec. Litig.*, No. 20-CIV-8024, 2022 WL 671222, at *21 (S.D.N.Y. Mar. 7, 2022) (scienter of individual officers or directors may be imputed to the corporation); *City of Sterling Heights Police & Fire Ret. Sys. V. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 99 (S.D.N.Y. 2022) (similar).

*Second*, Defendants knew that the Company's joint ventures – Thor Miner and Golden Mainland – formed to purportedly implement Singularity's cryptocurrency transformation, were sham entities. Defendants' knowledge of the artificial nature of these transactions and counterparties is inferred from the fact that Defendants spoke publicly about these transactions. Singularity and Cao touted the Thor Joint Venture in a press release attached to a Form 8-K. ¶¶146-149. Shan defended the legitimacy of the Thor Miner deal in a sworn certification filed in the State Supreme Court of New York in the lawsuit filed by SOS over the Company's failure to deliver. ¶146, n. 68. Notably, Defendants Thor Miner, Singularity, Cao, Jie, Levy, Liu, Pan, and Shan were defendants in the SOS action and benefitted from Shan's representations to the court in that action.[23] *See In re Romeo Power Inc. Sec. Litig.*, No. 21-CIV-3362, 2022 WL 3701095, at *3

---

[23]Complaint, *SOS Info. Tech. N.Y., Inc. v. Thor Miner, Inc.*, Index No. 654735/2022, NYSCEF No. 1 (N.Y. Sup. Ct., N.Y. County Dec. 9, 2022, *https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId =vP1WR8hB0OWxaUW65wz2dw==&system=prod*. Note, this Court may take judicial notice of documents on other

(S.D.N.Y. Aug. 25, 2022) (inference of scienter supported by defendants' statements); *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 237 (S.D.N.Y. 2021) (repeated public statements "support an inference that [d]efendants knew facts or had access to information suggesting that these statements were materially misleading"); *Roberti v. OSI Sys., Inc. Sys.*, No. 13 Civ. 9174, 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015) (similar):

*Thor Joint Venture*. The Individual Defendants knew that Thor Miner was a sham joint venture, incapable of manufacturing cryptocurrency mining machines. *See* ¶151.[24] The patents to the mining machines that Defendants touted would imminently be owned by the JV, do not exist. *See* ¶¶155-156. It is reasonable to infer that Cao and Shan who spoke about the joint venture publicly and other executives who were sued by SOS – Jie, Levy, Liu and Pan – knew that Thor Miner was a sham.[25] Jie signed the Joint Venture agreement with Highsharp.[26] Cao signed the Strategic Alliance Agreement with Highsharp.[27] Shan signed the Purchase and Sale Agreement

---

court dockets. *See Applestein v. Kleinhendler*, No. 20-cv-1454-AMD-VMS, 2021 WL 493424, at *1 n.1 (E.D.N.Y. Feb. 10, 2021) ("These facts are taken from the plaintiff's complaint, as well as from other court dockets, of which this Court is permitted to take judicial notice.") (citations omitted); "I have taken judicial notice of plaintiff's testimony in *Granger I* since it is a publicly filed document." *Granger v. New York City Transit Auth.*, No. 16-cv-2264-BMC, 2017 WL 1067764, at *5 n.4 (E.D.N.Y. Mar. 21, 2017) (Cogan, J.), *aff'd sub nom. Granger v. New York City Transit Auth.*, Manhattan, 712 F. App'x 119 (2d Cir. 2018), citing Fed. R. Evid. 201.

[24] Thor Miner was served as a Defendant in this action on September 5, 2023. ECF 41. To date, no appearance has been entered for Thor Miner in this litigation and it is in default. Thor Miner's failure to appear provides further support for Plaintiffs' allegations that it was a sham joint venture used by the Defendants to facilitate the fraud.

[25] Cao knew that crypto policy changes in China combined with ongoing global component shortages would significantly impair Singularity's bitcoin production capacities even if the joint venture was legitimate (it was not). Despite that knowledge, Cao assured investors that the Company was poised to overcome the chip shortage. By making these statements, Defendants relied on their sham joint venture with Highsharp to "exclusively" produce "high-performance computing chips" for them despite the knowledge that their arrangement was neither "exclusive" nor viable because the chip-producing capacity and/or the JV never existed. ¶¶154-156. *See supra* n. 8. *See* Cao Br. at 6, 17-18.

[26] Ex. 2 to Memo. of Law in Opp. to Plaintiff's Order to Show Cause, SOS Info. Tech. N.Y., Inc. v. Thor Miner, Inc., Index No. 654735/2022, NYSCEF No. 36 (N.Y. Sup. Ct., N.Y. County Dec. 12, 2022), https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=omCuw03pEilPkh4R375eSQ==&system=prod

[27] Ex. 1 to Memo. of Law in Opp. to Plaintiff's Order to Show Cause, *SOS Info. Tech. N.Y., Inc. v. Thor Miner, Inc.*, Index No. 654735/2022, NYSCEF No. 35 (N.Y. Sup. Ct., N.Y. County Dec. 12, 2022), https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=MhI1Nyniu4lkp5zMYQUHiQ==&system=prod

with SOS[28] and served as the COO of Singularity and Thor Miner. ¶153. It is utterly implausible that Cao, Shan, Jie, Levy, Liu and Pan were not aware (or did not become aware) of the truth regarding Thor Miner. This is one of the many examples alleged in the SAC of the Individual Defendants' knowing participation in Singularity's fraud. *See* Shan. Br. at 6.

*Golden Mainland Joint Venture.* The Individual Defendants knew that Golden Mainland was a sham entity created to defraud the market regarding Singularity's purported cryptocurrency success. The SAC alleges in detail why the Defendants knew or should have known that Golden Mainland was incapable of providing any kind of energy for bitcoin mining. *See* ¶¶125-143. Despite Defendants' claims that Golden Mainland was a substantial international owner of nuclear power, hydropower, wind energy, solar energy, geothermal energy, and biomass energy, including in the United States, it too has failed to appear in this litigation despite having been properly served at the office of its registered agent on September 5, 2023 (ECF 42) further supporting Plaintiffs' allegation that Golden Mainland is a sham.

*Third*, Defendants, including Cao, Shan, Jie, and Levy, knew that Singularity's cryptocurrency transformation was impractical. Regardless, and without formulating a legitimate plan, Defendants represented that they would overcome the chip shortage and build the Thor Miner machines (¶154). But Defendants later claimed that Thor Miner could not deliver on the SOS deal because of the chip shortage (¶171) providing no explanation for their knowledge that HighSharp had obligated itself to provide chips as a "top priority" to AGM Group, not Thor Miner. ¶174.

*Fourth*, less than a year after touting its transition into a crypto company, the Company exited the crypto business. Shortly thereafter, many of the Individual Defendants were terminated

---

[28] Ex. 1 to Compl., *SOS Info. Tech. N.Y., Inc. v. Thor Miner, Inc.*, Index No. 654735/2022, NYSCEF No. 2 (N.Y. Sup. Ct., N.Y. County Dec. 9, 2022), https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId =jqqLRgjOs9gMerCNGP85bw==&system=prod

for cause and its crypto ventures exposed as shams. Accordingly, it can be reasonably inferred that the Defendants had no intention to make the transformation, or at the very least, were reckless in announcing the transformation knowing that they did not intend to pursue it or that it was unfeasible. ¶¶119, 120, 122, 124.

*Fifth*, Defendants consciously, or at least recklessly, entered into sham transactions with third party companies including SOS (to secure investment for the Company), Thor Miner and Golden Mainland. *See* ¶¶157-184. *See In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F.Supp. 2d 192, 226-27 (S.D.N.Y. 2004) (sham transactions sufficient to plead scienter). Particularly, Jie, who was the CEO at the time the SOS agreement was signed, knew that the Company was not capable of delivering on its promises because the Company did not have the resources and/or intention to transform into a cryptocurrency business.

*Sixth*, Defendants' efforts and representations to private investors to raise cash based on Singularity's cryptocurrency transformation, despite knowing that the transformation was a sham, or, at a minimum, having no basis to believe the transformation was feasible, further indicates conscious misbehavior or recklessness. ¶113. Singularity's recently filed Form 8-Ks admitted the fraudulent proposed sales of unregistered shares, securities, common stock, preferred stock, warrants, rights, share purchase contracts, and share purchase units were all signed by Cao, the then CEO. ¶¶106-108. As discussed above, because Cao stood at the helm of the Company, was involved with the day-to-day affairs of the business and charted its sham transformation, he knew (or should have known) that raising over $21 million in cash through the sale of unregistered shares based on the Company's proposed transformation was fraudulent. *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d at 459 (scienter alleged where CEO, CFO signed SEC filings with misstatements about "extremely important" division); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324

F. Supp. 2d 474, 497 (S.D.N.Y. 2004) (reasonable to impute knowledge to a signatory of SEC filings directly involved in the day-to-day operations of the company). *See* Cao Br. at 17-18.

Scienter is likewise established as to Singularity, Jie, Cao, Shan, and Pan because each (i) was involved in the fraudulent sale of unregistered share to investors such as Hexin and Viner and (ii) induced investors into making an investment based on false representations that the Company was going to be "focusing on blockchain technology." ¶¶244-252, 256-58. Moreover, because Jie served as the Vice President at the time of the sham transactions, while Cao served as the CEO, they both knew full well that the Company's potential transformation was a sham and that their representations regarding the proposed sale of unregistered shares were fraudulent. Thus, contrary to the Jie Defendants' assertion, the SAC indeed pleads that Jie engaged in deliberate illegal behavior in managing a company. *See* Jie Br. at 19.

*Seventh*, the core operations theory further supports an inference of scienter. Singularity's statements about the Company's radical transformation from a shipping and logistics business to a cryptocurrency business was unquestionably the single most important issue facing the Company during the Class Period. It is well-settled Second Circuit law that the inference of scienter is supported where the statements at issue relate to a core part of a defendant's business. *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. Appx. 10, 14 n.3 (2d Cir. 2011) (endorsing the core operations doctrine as supportive of scienter); *Wang*, 661 F. Supp. 3d 208, 237 (crediting the core operations doctrine as supporting the inference that defendants knew or should have known the statements were false when made); *Yannes v. SCWorx Corp.*, No. 20-CV-03349, 2021 WL 2555437 (S.D.N.Y. June 21, 2021) (similar); *Skiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020) (scienter found where statements involved "the sin[e] qua non" for company's "success").

*Eighth*, that Singularity was a very small company with just 42 full-time employees[29] further strengthens the inference of Individual Defendants' scienter. *See Todd v. STAAR Surgical Co.*, No. 09 Civ. 5094, 2016 WL 6699284, at *13 (C.D. Cal. Apr. 12, 2016) (noting "relatively small company with only 335 employees" supported inference of individual defendant's actual knowledge of fraud); *Curry v. Hansen Med., Inc.*, No. C 09-5094, 2012 WL 3242447, at *11 (N.D. Cal. Aug. 10, 2012) (allegations that company of under 200 employees was focused on selling one type of product supported strong inference of individuals' scienter).

*Finally*, the SAC alleges factors that, taken together, readily establish a strong inference that Defendants knew that their representations regarding Jie's background were misleading. Jie obviously knew. Levy denies knowledge of Jie's criminal background despite overlapping with Jie at CCC, albeit for less than two months, where Jie committed several fraudulent acts and was prosecuted for doing so. *See* Levy Br. at 10-12.[30] Levy contends that he was not acquainted well enough with Jie to know of his criminal background. The more compelling inference is that Jie and Levy were acquainted at CCC and Levy was aware of Jie's legal troubles – involving CCC – which arose again when Jie *and* Levy were sued by SOS for the failure to deliver Thor Miner machines. The inference of scienter should favor Plaintiffs.

Further, Levy appears to argue that there was no duty to disclose information regarding Jie's background. *See* Levy Br. at 10. Similarly, Jie argues that he had no duty to check

---

[29]   *See*   Sino-Global   Shipping   America,   Ltd.,   (Form   10-K)   (Sept.   29,   2021),   at   p.8, https://www.sec.gov/Archives/edgar/data/1422892/000121390021050437/f10k2021_sinoglobalship.htm

[30] Levy argues that because Jie and Levy overlapped only two months, this is insufficient to establish Levy's knowledge of Jie. Levy Br. at 11. Whether two months is sufficient for two senior members of a company to become acquainted is a question of fact that cannot be resolved at this stage. It is, however, reasonable to infer that Jie and Levy were acquainted when they overlapped at CCC. Next, Levy argues that the Sorghum litigation where Jie's criminal background was discussed, commenced eight months after Levy resigned from the Board. Levy Br. at 11. This is of no consequence as it is reasonable to infer that Levy was made aware of the underlying events because the events were proximate to Levy's tenure as a director.

misstatements regarding his background. *See* Jie Br. at 19. Both are wrong. Jie's criminal background is relevant information, which a failure to disclose would violate Rule 10b-5. *S.E.C. v. Blackburn*, 15 F.4th 676, 681 (5th Cir. 2021) ("Investors make decisions about whether to invest their money in a company, in part, based on the company's leadership" and that there is "little doubt that a reasonable investor would have wanted to know the true identity' of who was leading the company.'"").[31]

Alternatively, even if Individual Defendants were entirely unaware of these issues, they were at least severely reckless by selling to Singularity's investors a transition that they had no basis to believe would come to fruition. Under either theory, the scienter requirement is met.

### B.       The SAC Alleges Motive and Opportunity to Commit Fraud

Although Plaintiffs are not required to plead motive and opportunity to adequately meet the scienter standard. *City of Pontiac Gen. Emps.' Ret. Sys.*, 875 F. Supp. 2d at 371, they do so here.[32] And contrary to Defendants' assertions otherwise (*e.g.*, Jie Br. at 9-10), insider stock sales (or the lack thereof) are not dispositive of scienter. *See, e.g., In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 320 (S.D.N.Y. 2013) (finding scienter where defendants bought stock during class period); *Skiadas*, 2020 WL 3268495 at *11 (finding scienter without insider sales where Plaintiff "has alleged that Defendants had [] incentive in this case"). For the reasons discussed below, the SAC *does* adequately allege Defendants' motive and opportunity.

---

[31] Levy's reliance on *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) is misplaced because the court's observation quoted by Levy was in the context of certain adverse events related to a Company's pharmaceutical drug, and not crucial background information about the CEO of the company.

[32] *See also Tellabs*, 551 U.S. at 325 ("[T]he absence of a motive allegation is not fatal" as scienter may be based on conscious disregard or recklessness); *Ganino*, 228 F.3d at 170 (when allegations establish "conscious or reckless misbehavior, [a court] need not also consider" motive). For this reason, Defendants' assertions (*see* Levy Br. at 9-10, Cao Br. at 16-17; Jie Defs. Br. at 18-20), that the lack of motive fails to establish scienter are unavailing.

### 1. Defendants' Motive to Misrepresent Singularity's Sham Transformation into a Cryptocurrency Business

The SAC alleges that the Defendants were motivated to misrepresent Singularity's sham transformation to a cryptocurrency business. ¶¶37, 101-105. Singularity's legacy shipping business had substantially declined under the leadership of Cao and Jie, and the only way to keep their struggling business afloat was to fundraise. ¶¶5, 6, 101. They needed to prop up the failing Company by "rais[ing] tens of millions of dollars from the sale of unregistered shares based on the sham cryptocurrency business"; the Defendants' false and misleading statements aided this objective. ¶101. Private investors purchased the Company's unregistered securities in reliance on Defendants' misrepresentations regarding its transformation to a cryptocurrency business. ¶¶247, 276, Part V. E. But for these misrepresentations, Defendants would not have been able to raise over $21 million to keep the company afloat and engage in related party transactions. *See Acer Therapeutics*, 2020 WL 3268495, at *11 ("[C]ourts have found allegations of motive adequate where the company[] needed to fundraise to survive."), *recon. denied*, *Skiadas*, 2020 WL 4208442, at *8. *See also Flynn v. Sientra Inc.*, No. CV1507548, 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016) (allegation that defendants "were motivated to conceal the contamination at the Silimed plant from investors so that they could raise enough money in the SPO to keep Sientra afloat" supported inference of scienter).[33] Defendants' sales of unregistered securities, based on misstatements, is akin to engaging in fraud to use secondary offering or IPO proceeds for the

---

[33] Jie's reliance on *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) to argue that a "desire…to appear profitable and the desire to keep stock prices high ….do[es] not constitute 'motive'" does not apply in this instance where the SAC has alleged that the misrepresentations were made in order to achieve a certain specific goal such as keeping the company afloat. Jie Br. at 19. *See In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp.2d 314, 328 (S.D.N.Y. 2001) (while a "generalized desire to maintain a higher stock price" is insufficient to establish motive, allegations of "the artificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement.") *See also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir.1993) (finding a sufficient pleading of motive not to disclose certain information and thereby maintain an inflated stock price when disclosure would have lessened the stock's value prior to an upcoming offering).

benefit of insiders or the company, a motive that contributes to an inference of scienter. In *In re Time Warner, Inc.*, 9 F.3d at 270, the Second Circuit held that an allegation that the company artificially inflated its stock price, thus possibly allowing it to "rais[e] more capital by issuing the same number of shares," was a sufficient allegation of motive to survive a motion to dismiss.[34]

Further, to plead opportunity, a plaintiff must "show that the individual defendants possessed 'the means and likely prospect of achieving concrete benefits by the means alleged.'" *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 297 (S.D.N.Y. 2008). The Individual Defendants, as senior officers and directors of Singularity possessed the means of achieving concrete benefits through their misrepresentations. Indeed, many of the Individual Defendants abused the opportunity to engage in related party transactions. *See* ¶¶190-198 (Jie and Pan); ¶¶223-225 (Jie, Xiaohuan Huang); ¶¶260-262.

### 2.    Undisclosed Related Party Transactions Create Sufficient Motive

Another important piece in the 'motive' puzzle is the presence of multiple undisclosed related party transactions. *See Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 13 CIV. 6057 PAC, 2014 WL 3891351, at *3 (S.D.N.Y. Aug. 8, 2014) ("By alleging specific facts suggesting that Li knew about the related-party transactions and repeatedly failed to disclose them, Plaintiffs have plausibly alleged scienter."); *S.E.C. v. China Ne. Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 389 (S.D.N.Y. 2014) ("[w]hile related party transactions are not per se unlawful, we view

---

[34] *See also Van Dongen v. CNinsure*, 951 F. Supp. 2d 457, 474 (S.D.N.Y 2013) ("secondary offering can provide a motive for fraud"); *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 421 (S.D.N.Y. 2011) ("[P]laintiffs have alleged a concrete . . . economic benefit that accrued to the defendants by reason of the IPO and July 2008 Offering that was . . . increased by misleading potential investors. This is hardly on the same scale as the potential for economic benefit 'generally possessed by most corporate directors and officers' in keeping a corporation profitable or keeping stock prices high."); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (motive adequately pled where, e.g., defendants sought to "inflate the stock price to maximize revenue from the secondary offering, so as to provide it capital to retire debt").

them with 'extreme skepticism,' especially when they go undisclosed" finding that undisclosed related party transactions supported an inference of scienter).

Here, there were at least two undisclosed related party transactions of which Jie knew, and in one, the recipient of shareholder funds was Jie's wife, Defendant Huang. *See id.* (when a plaintiff pleads "a corporate insider's family member is the recipient of shareholder funds, this constitutes a sufficiently concrete and personal benefit to infer motive.").

Specifically, (i) the Company's transaction with SOS for the purchase of cryptocurrency mining machines was an undisclosed related party transaction because, according to Singularity, Huang was the Vice President of SOS at that time, ¶¶157, 186; ("Ms. Xiaohuan Huang, 37 years old, is presently Vice President of SOS Information Technology New York, Inc.");[35] and (ii) the Company's transactions with Rich Trading, as Singularity later admitted in its Form 10-Q for the quarter ended December 31, 2022, was a separate undisclosed related party transaction because the Company's CFO, Lei Nie's wife, Tuo Pan, was the CEO of Rich Trading. ¶¶262, 263. Particularly, the fact that Rich Trading was a related party transaction and that Rich Trading's bank accounts were controlled by members of the Company's management remained undisclosed until after the Class Period ended when it was admitted in Singularity's Form 10-Q for the quarter ended December 31, 2022. *Compare* ¶¶157, 186 with ¶¶262, 263. Thus, the inference of scienter is inescapable. *See In re Advanced Battery Techs., Inc. Sec. Litig.*, No. 11 Civ. 2279, 2012 WL 3758085, at *11 (S.D.N.Y. Aug. 29, 2012) (allegations of misleading offering documents used to fund undisclosed related-party transactions raises "inescapable" inference of "fraudulent intent").

---

[35] This is one example alleged in the SAC to show that Jie and/or Huang benefitted personally from the Company's illegal behavior, contrary to Defendants' assertion. *See* Jie Br. at 19.

C.      **Additional Support for Scienter**

1.      **Internal Control Deficiencies Support a Strong Inference of Scienter**

The SAC details widespread internal control deficiencies at Singularity which were downplayed for a long time until Singularity received delinquency notifications for delisting by NASDAQ for failure to timely file its quarterly and annual reports. From May 2022 to February 2023, the Company received three notifications, and despite the Company's assurances to NASDAQ that it would comply with its SEC requirements, it failed to do so. This extensive and persistent internal control deficiency supports an inference of scienter. *See In re Cannavest Corp. Sec. Litig.*,307 F. Supp. 3d 222, 245 (S.D.N.Y. 2018) ("Courts in this District have repeatedly held that weak internal controls will support an inference of scienter"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d at 633 (same). Moreover, Defendants' failure to remedy a known internal control weakness further supports an inference of scienter. *Batwin v. Occam Networks, Inc.*, No. 07 Civ. 2750, 2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008).

2.      **Governmental Investigations Support a Strong Inference of Scienter**

Governmental investigations contribute to an inference of scienter. *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter."); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586F.Supp. 2d 148,168 (S.D.N.Y.2008) (DOJ investigation added to inference of scienter). As admitted in SEC filings in its November 2022 and January 2023, Singularity was under investigation by the United States Attorney's Office for the Southern District of New York, the SEC and FINRA. ¶¶237, 240.[36]

---

[36] Jie incorrectly relies on *In re Gentiva* to argue that "the mere existence of a governmental investigation" is insufficient to plead scienter. *See* Jie Br. at 20. However, the *Gentiva* court has itself noted that the existence of a governmental investigation is certainly a piece in the scienter puzzle. Taken holistically with all the other factors discussed here, the governmental investigation supports an inference of scienter.

Defendants argue that the fact that the Company formed a Special Committee to conduct an internal investigation into the Hindenburg Report "factors against finding scienter." *See* Levy Br. at 15. That is wrong. To the contrary, that (i) the Company initiated the internal investigation simultaneously with other governmental investigations; and (ii) the internal investigation found several allegations in the short-seller report to have merit and on that basis recommended the resignation of several top executives of the Company including CEO Jie supports a strong inference of scienter.

### 3. Senior Management Resignations and Terminations Support an Inference of Scienter

Courts routinely consider terminations, after the alleged fraud is revealed, as evidence of scienter. *See e.g.*, *In re Dentsply Sirona, Inc. Sec. Litig.*, No. 18 Civ. 7253, 2023 WL 2682905, at *21 (E.D.N.Y. Mar. 29, 2023) (resignations of senior executives supports inference of scienter).[37] Here, Cao was terminated as CEO of the Company (¶280); Pan was suspended as CFO of the Company by the Board of Directors for cause and without pay (¶283); Shan was terminated for cause (¶282) and Jie resigned from his position as CEO and director of the Company following the Special Committee's recommendation to suspend Jie based on its ongoing investigation into the Hindenburg Report (¶284).[38]

---

[37] *See also In re Pareteum Sec. Litig.*, No. 19 CIV. 9767, 2021 WL 3540779, at *15-17 (S.D.N.Y. Aug. 11, 2021) (finding that terminations of executives occurring within a few weeks of the Company's announcement of restatement of its financial condition and operations, contribute to *a strong inference of scienter*); *Hall v. The Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (finding that executive resignations added to the overall pleading of circumstantial evidence of fraud); *see also In re Salix Pharms., Ltd.*, No. 14-cv-8925 (KMW), 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (stating that "resignations provide additional evidence of scienter") (collecting cases).

[38] Defendants Jie and Levy rely on *In re. BISYS Sec. Litig,* and *Hain Celestial* respectively to argue that the leadership changes at Singularity do not support a strong inference of scienter because the resignation or terminations were not linked to the purported fraud. Jie Br. at 14; Levy Br. at 22. That is misplaced. Each of the terminations and resignations alleged in the SAC, including those of Jie, Cao and Levy were either clearly ""tied to" the alleged fraud" or "the employee's scienter "was otherwise evident"". *See In re Hain Celestial Group Inc. Sec. Litig.*, No. 216CV04581, 2022 WL 18859055, at *30 (E.D.N.Y. 2022). For example, Cao's termination was evidently tied to the ongoing investigation by the Special Committee formed by the Company into matters discussed in the Hindenburg Report.

### 4.      Corporate Scienter Supports an Inference of Scienter

Corporate scienter is adequately pled if "the pleaded facts [] create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap., Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). "There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009). Significantly, "an individual whose knowledge is imputed to the corporation [need not] also 'make' the material misstatement or omission at issue." *Pennsylvania Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 372 (S.D.N.Y. 2012). Thus, even if Plaintiffs had not adequately pled certain Defendants' scienter, the knowledge of other Defendants is imputed to the Company. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015). Here, because Plaintiffs have adequately pled a strong inference of scienter as to the Individual Defendants, it has done so for Singularity. *See OSG*, 12 F. Supp. 3d at 634 (corporate scienter alleged based on scienter of company's CEO and CFO); *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix*, 89 F. Supp. 3d 602, 619 (S.D.N.Y. 2015) (corporate scienter alleged through "three key officer[]" defendants); *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 389 (E.D.N.Y. 2022) (corporate scienter alleged for statements not attributed to any individual).[39]

---

¶28. Jie's resignation came after the Special Committee recommended that he be suspended immediately. Levy's resignation came soon after the Special Committee had concluded its investigation and, as the Company itself admitted, was tied to the weak internal controls of the Company (¶264).

[39] *See also Behrendsen v. Yangtze River Port & Logistics Ltd.*, No. 19CV00024, 2021 WL 2646353, at*13 (E.D.N.Y. June 28, 2021) ("[A] plaintiff may raise an inference of scienter for a corporate defendant 'where, for example, a corporation issues a statement 'so dramatic' that it would necessarily 'have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false[.]'").

## IV.  The SAC Adequately Alleges Loss Causation

To plead loss causation, a plaintiff must simply "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (burden in pleading loss causation "is not a heavy one" and need only "give [d]efendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations" (citation omitted)). "'The [] majority of courts' in the Second Circuit . . . 'have required that loss causation meet only the [notice pleading] requirements of Rule 8.'" *In re Synchrony Fin. Sec. Litig.*, No. 18 Civ. 1818, 2022 WL 427499, at *3 (D. Conn. Feb. 11, 2022) (alteration in original) (collecting cases). Because "[l]oss causation is a fact-based inquiry," all reasonable inferences should be drawn in Plaintiffs' favor on a motion to dismiss. *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 174-75 (2d Cir. 2005).

Loss causation "is typically shown by the reaction of the market to a 'corrective disclosure' which reveals a prior misleading statement." *In re Vivendi Universal, S.A., Sec. Litig.*, 765 F. Supp. 2d 512, 555 (S.D.N.Y. 2011). Here, Plaintiffs allege stock price declines in response to key disclosures concerning or related to Defendants' prior misrepresentations and omissions, including:[40] (i) "on May 5, 2022, the price of Singularity shares fell 28.89%"; (ii) the price of Singularity shares "fell an additional 11.67% on May 6, 2022, following the publication of the Hindenburg Report and Peabody Report"; and (iii) the price of Singularity shares fell 12.93%, 10.55%, and 56.03% on October 6, October 7, and November 16-17, 2022, respectively, after three separate lawsuits filed against Singularity for improprieties regarding its sham cryptocurrency business and inability to file its required quarterly and annual reports with the SEC. *See* ¶294.

---

[40] This Section addresses Defendants' loss causation arguments as articulated in (i) Zhikang and Singularity Br. at 8-18; and (ii) Levy Br. at 19.

Despite the SAC's classic loss causation allegations, Zhikang Huang, Singularity and Levy argue that Plaintiffs have not properly alleged loss causation because: (i) Plaintiffs have not accounted for Singularity's stock price volatility (Zhikang and Singularity Br. at 8-18); and (ii) the corrective disclosures purportedly did not reveal new non-public information (*Id.* at 18-22; Levy Br. at 19). Defendants' arguments fail for the reasons discussed below.

## A. Plaintiffs Need Not Account for or Disaggregate Intervening Causes of Plaintiffs' Loss at the Motion to Dismiss Stage

Defendants argue that Plaintiffs must account for and disaggregate purported intervening causes, including "prior stock price drops, other market trends, and gradual changes in stock price over the course of the Class Period," to adequately allege loss causation. (Zhikang and Singularity Br. at 9.) But whether Plaintiffs' "loss was caused by an intervening event . . . . is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).[41] This is true even where it is "likely that a significant portion, if not all, of Plaintiffs' losses were actually the result" of broader market trends or other intervening causes. *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010).

*Fannie Mae* is especially instructive. There, although it was "likely that a significant portion, if not all, of [p]laintiffs' losses were actually the result of the housing market downturn and not [defendants'] alleged misstatements," the court nevertheless held that plaintiffs adequately alleged loss causation, noting that "at [the motion to dismiss] stage of pleading, '[t]he Court need not make a final determination as to what losses occurred and what actually caused them,' and

---

[41] *See also Solomon v. Sprint Corp.*, No. 19 Civ. 05272, 2022 WL 889897, at *10 (S.D.N.Y. Mar. 25, 2022) ("Defendants' argument[] . . . that Plaintiffs must disaggregate their losses . . . [is] inapplicable . . . on a motion to dismiss."). "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the *only* possible cause for decline in the stock price" because this presents a quintessential factual issue. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014) (emphasis in original).

need only find that [p]laintiffs' allegations are plausible." *Id.* (citation omitted). *A fortiori*, here, where the stock price declines were not "likely" caused by the alternative causes that Defendants point to, the Court need not broadly determine "what losses occurred and what actually caused them." *Id.* Rather, it is enough that Plaintiffs, by showing that Singularity's stock price dropped on specific dates following specific revelations about Defendants' misstatements and omissions, have alleged it is "plausible" that their loss "was the result—at least in part" of Defendants' material misstatements and omissions. *See id.* This is sufficient to survive a motion to dismiss.

Defendants make two specific fact-intensive, yet faulty, arguments regarding Singularity's stock price movement that they claim render Plaintiffs' loss causation allegations inadequate: (i) that Singularity's stock price was already declining at the time of the publication of the corrective disclosures due "substantially" to volatility in the cryptocurrency market; and (ii) that Singularity's stock price rose slightly after certain of the corrective disclosures.

*First*, the existence of other market-wide stock price declines is irrelevant to the analysis of whether the revelation of Defendants' misstatements caused the specific declines alleged by Plaintiffs. *See* ¶294. As discussed *supra*, Plaintiffs need not disaggregate "what losses occurred and what actually caused them" at the motion to dismiss stage and need only plausibly allege a causal connection between Plaintiffs' losses and the corrective disclosures. And, in any event, "the existence of a market-wide phenomenon [does not] necessarily *eliminate* a plausible causal connection between plaintiffs' losses and defendants' alleged fraud." *King County, Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010) (emphasis in original). Rather, "courts have found loss causation adequately pled even where a stock price collapsed contemporaneously with" a "coinciding 'marketwide phenomenon,'" such as the collapse of the U.S. housing market in 2007, or, as here, a downturn in the volatile cryptocurrency market. *George*

*v. China Auto. Sys., Inc.*, No. 11 Civ. 7533, 2012 WL 3205062, at \*12 (S.D.N.Y. Aug. 8, 2012) (finding that discovery will reveal factors impacting stock price).

*Second*, whether a stock price rose following a corrective disclosure is irrelevant to the loss causation analysis. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289-90 (S.D.N.Y. 2008) (holding that recovery of stock price after corrective disclosure does not preclude a showing of loss causation "because [it] may have resulted from factors unrelated" to the fraud (citation omitted)). This argument is foreclosed by the Second Circuit's decision in *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34 (2d Cir. 2012). In *Acticon*, the Second Circuit ruled on a nearly identical argument to the one made by Defendants in this case. *Id.* at 39-40. The Second Circuit first acknowledged "that determining why a stock's price rebounded after an initial drop requires the court to consider 'a competing theory of causation and raises factual questions not suitable for resolution on a motion to dismiss.'" *Id.* at 39 (citation omitted). The court ultimately concluded that "[a]t this stage in the litigation, we do not resolve why the [defendant's] share price rose after its initial fall and instead, drawing all reasonable inferences in favor of [plaintiff], assume that the price rose for reasons unrelated to its initial drop." *Id.* at 40. Here, because this litigation is currently at a stage where "we do not know whether the price rebounds represent the market's reactions to the disclosure of the alleged fraud or whether they represent unrelated gains . . . the recovery does not negate the inference that [Plaintiffs have] suffered an economic loss." *Id.* at 41.

Defendants' reliance on *Lentell v. Merrill Lynch & Co., Inc.* is misplaced. In *Lentell*, the plaintiffs alleged only that "the shares plummeted, and that their investments became virtually worthless." 396 F.3d 161, 174-75. The Second Circuit found it "fatal" that plaintiffs made "no allegation that the market reacted negatively to a corrective disclosure." *Id.* at 175. Here, unlike in

*Lentell*, Plaintiffs specifically allege that "the market reacted negatively to a corrective disclosure" by pointing to specific disclosures on specific dates, and a corresponding material decline in Singularity's stock value. *See* ¶¶228, 294. And "*Lentell* does not say that the existence of a market-wide phenomenon necessarily *eliminates* a plausible causal connection between plaintiffs' losses and defendants' alleged fraud." *King County*, 708 F. Supp. 2d at 343 (emphasis in original).

### B.    The Corrective Disclosures Did Not Concern Already-Public Information

Defendants incorrectly claim that Plaintiffs have failed to allege loss causation because Defendants' omissions regarding, *inter alia*, Jie's criminality and misconduct "concerned already public information." (Zhikang and Singularity Br. at 18-22; *see also* Levy Br. at 19.) This argument is more properly viewed as a truth-on-the-market affirmative defense, whereby information already well-known to the market is considered immaterial, and therefore not misleading. *See, e.g.*, *Hall*, 580 F. Supp. 2d at 226. To establish a truth-on-the-market defense, Defendants must show that any corrective disclosure was previously "conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information . . . ." *Ganino*, 228 F.3d at 167. "The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Id.*[42]

Here, Defendants *do not* come close to meeting that threshold. Whether some obscure references to Jie's criminal past in, *inter alia*, foreign-language news sources and buried references in state court and arbitration filings constitute corrective disclosures is a question of fact that is inappropriate for resolution on a motion to dismiss. *See In re OSI Pharms., Inc. Sec. Litig.*, No.

---

[42] Courts are hesitant to accept the truth-on-the-market defense even at the summary judgment stage. *See, e.g.*, *Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, (D.D.C. 2008) (rejecting defendants' attempt "to inject its truth on the market defense" into loss causation and holding that whether "the disclosures revealed information already known to the market, and thus could not have negatively affected the market . . . remains a factual determination to be decided by the jury"); *In re Columbia Sec. Litig.*, 155 F.R.D. 466, 482 (S.D.N.Y. 1994) (similar).

04-CV-5505, 2007 WL 9672541, at *14 (E.D.N.Y. Mar. 31, 2007) (finding it "inappropriate" to grant motion to dismiss because defendants' truth-on-the-market argument regarding loss causation "relies so heavily on a determination of materiality"). Courts routinely deny motions to dismiss based on the truth-on-the-market defense, particularly where, as here, foreign languages are involved. For example, in *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419 (S.D.N.Y. 2009), the court found "the publication of three newspaper articles – in Chinese – does not transform the information contained within the articles into 'matters of general public knowledge' that may properly be imputed to Fuwei's stockholders." *Id.* at 438.[43]

In addition to being factually incorrect, Defendants' argument that the Hindenburg and Peabody Reports cannot serve as corrective disclosures because they "merely put a negative spin on public information to which investors already had access (which is to be expected of short sellers)" (Zhikang and Singularity Br. at 18), is legally flawed. A "short seller's report can constitute a corrective disclosure, if the report reveals accurate information about a company that exposes actual misstatements by the company." *Behrendsen*, 2021 WL 2646353, at *15 (finding Hindenburg Report sufficient to establish loss causation at the motion to dismiss stage); *see also Gordon v. Vanda Pharms. Inc.*, No. 19 Civ. 01108 (FB) (LB), 2021 WL 911755, at *4 (E.D.N.Y. Mar. 10, 2021) ("Media reports and other similar public disclosures are adequate to establish loss causation"). Even assuming, *arguendo*, that the market was fully aware of all of the information in Chinese language sources and obscure court filings, the notion that "any third party's analysis

---

[43] *See also BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 325 n.59 (D.N.J. 2018) ("Even assuming that such information—which apparently was posted in Spanish—was available to plaintiffs and other investors, it is inappropriate to consider it at this stage."); *In re Enzymotec Sec. Litig.*, No. 14 Civ. 5556, 2015 WL 8784065, at *15 (D.N.J. Dec. 15, 2015) (motion to dismiss denied where defendants asserted that "new Chinese regulations were publicly known—as evidenced by news articles, government reports, and analyst reports" because "to prevail on this theory, Defendants would have to show that the market understood the regulations' implications, which is a fact question not properly addressed at this stage").

of a company's already-public . . . information cannot contribute new information to the marketplace . . . is incorrect." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580, 2020 WL 1329354, at *7 (S.D.N.Y. Mar. 23, 2020) (collecting cases).[44]

Defendants' reliance on *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010), is inapposite. *Omnicom* was decided on a motion for summary judgment on a full factual record that allowed the court to determine that the corrective disclosure at issue was nothing more than a "negative characterization" of already-known facts concerning a company's accounting. In *Omnicom*, the underlying accounting issue had been widely reported in the press a year earlier in widely-circulated publications such as *Fortune*, *Advertising Age*, *New Media Agencies Financial Intelligence*, and *InternetNews.com*, *see Omnicom*, 597 F.3d at 505, nn.1-2, and the alleged corrective disclosure "added nothing to the public's knowledge." *Id.* at 511-12. Here, by contrast, the Hindenburg and Peabody reports uncovered information about Singularity's business and executives that had not been widely discussed in the mainstream press, and then synthesized that information in a way that revealed Defendants' previously unrecognized fraud. *See also In re Petrobras Sec. Litig.*, 150 F. Supp. 3d 337, 343-44 (S.D.N.Y. 2015) (*Omnicom* "concerned a motion for summary judgment" and provides no basis for defendants to "challenge the novelty and accuracy of plaintiffs' alleged news and its impact on the market" at the pleading stage).

## V.      Plaintiffs Adequately State a Section 20(a) Claim Against All Individual Defendants

Defendants argue that Plaintiffs fail to state a Section 20(a) claim because: (i) Plaintiffs' Section 10(b) and Rule 10b-5 claims fail (*see* Levy Br. at 21; Zhikang and Singularity Br. at 25; Jie Br. at 24-25; Cao Br. at 18-20); (ii) Plaintiffs failed to allege with particularity facts giving rise

---

[44] *See also In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019) ("[An analyst's report] was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why Signet's underlying business was weaker than most people realized. It thus qualifies as corrective.").

to a strong inference of scienter (*see* Levy Br. at 21-22; Zhikang and Singularity Br. at 25; Jie Br. at 24-25; Cao Br. at 18-20); and (iii) Plaintiffs failed to adequately allege "actual control" over Singularity (*see* Zhikang and Singularity Br. at 25; Cao Br. at 18-20).

Defendants' argument that Plaintiffs fail to adequately state a Section 20(a) claim because their Section 10(b) and Rule 10b-5 claims fail, itself fails because, as shown above, the SAC adequately pleads a primary violation of Section 10(b) and Rule 10b-5.

Contrary to Levy's unsupported assertion (Levy Br. at 21-22), "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity." *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011).

*Third*, Defendants argue that Plaintiffs fail to state a Section 20(a) claim against Cao because they failed to show that he had any "actual control" over the company. Questions of whether "a person is a controlling person" is a fact-intensive inquiry that should not be resolved on a motion to dismiss. Cao Br. at 18-20. A Section 20(a) analysis at this stage is simply whether Defendants have violated Section 10(b) – and they have. Regardless, Cao's ability to exercise actual control over Singularity during his tenure as CEO cannot seriously be disputed. Cao signed false and misleading SEC filings, including the 8-Ks announcing (i) the Company's sham transformation to a crypto business (¶102); (ii) the sham transaction with HighSharp (the Thor Joint Venture) (¶104); (iii) the fraudulent sale of unregistered shares (¶¶106-109); and (iv) the Company's name change. *See also* ¶¶102, 147. Cao was involved with the day-to-day affairs of the business and charted the Company's sham transformation. Undoubtedly, Cao exercised his control over the matters at issue. *See In re LaBranche Sec. Litig.*, 405 F. Supp. 2d 333, 363–64 (S.D.N.Y. 2005) (relying on *Suez Equity Invs. L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (for Section 20(a), a plaintiff need only plead that the defendant was involved in

the day-to-day management of the company and had responsibility over its statements to the public). Finally, that Cao on November 1, 2021, and did not sign subsequent SEC filings does not relieve him of liability under Section 20(a) for the Section 10(b) violations that occurred during his tenure as CEO. Cao Br. at 19.

Defendant Zhikang also argues that he was not a "control person," because he did not exercise "actual control." Zhikang and Singularity Br. at 25. This is untrue. Zhikang served as COO and a VP of Operations, was involved in the day-to-day operations of the Company, had insider information concerning the business and operations of the Company, and signed, approved and/or ratified the Company's SEC filings that contained the false statements (*see* Section II.C). These allegations are sufficient to show that control sufficient for liability under Section 20(a). *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (if an "officer or director has signed financial statements containing materially false or misleading statements, courts have held that control as to the financial statements is sufficiently pled.").[45]

## CONCLUSION

For the foregoing reasons, each of the Defendants' Motions to Dismiss should be denied.[46]

---

[45] Zhikang asserts that he "was in some meaningful sense, [not] a culpable participant in the controlled person's fraud." *See* Zhikang and Singularity Br. at 25. Zhikang offers no basis for that argument and fails to address the particularized allegations in the SAC. *See* ¶¶29, 36, 37, 204, 273. For reasons discussed in the scienter section, Zhikang was a culpable participant and hence liable under Section 20(a). *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 661–62 (S.D.N.Y. 2007) (holding that the conclusion that plaintiffs have sufficiently plead scienter as to the defendants requires the conclusion that plaintiffs have shown culpable participation as to those defendants).

[46] While Plaintiffs believe that the SAC is adequate and Defendants' Motions should be denied in all respects, to the extent the Court concludes that the SAC is deficient, Plaintiffs respectfully request leave to replead. Such leave should be freely granted. *See Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (noting that Fed. R. Civ. P. 15(a)(2) "provide[s] that courts 'should freely give leave' to amend a complaint 'when justice so requires,' [and] [t]his permissive standard is consistent with our 'strong preference for resolving disputes on the merits.'").

Dated: January 5, 2024                Respectfully submitted,

                                             **BERGER MONTAGUE PC**

                                             /s/ *Michael Dell'Angelo*
                                             Michael Dell'Angelo
                                             Andrew D. Abramowitz
                                             James A. Maro
                                             1818 Market Street, Suite 3600
                                             Philadelphia, PA 19103
                                             Tel: (215) 875-3000
                                             Email: mdellangelo@bm.net
                                                         aabramowitz@bm.net
                                                         jmaro@bm.net

                                             *Lead Counsel for Lead Plaintiffs Ruibin Wang, Sen Gao, Luxiao Xu, and Congli Huo and Lead Counsel for the proposed Class*

                                             **KIRBY McINERNEY LLP**
                                             Ira M. Press
                                             Sarah E. Flohr
                                             250 Park Avenue, Suite 820
                                             New York, New York 10177
                                             Telephone: (212) 371-6600
                                             Email: ipress@kmllp.com
                                                         sflohr@kmllp.com

                                             *Local Counsel for Lead Plaintiffs Ruibin Wang, Sen Gao, Luxiao Xu, and Congli Huo, and Local Counsel for the proposed Class*

                                             **SCHALL LAW FIRM**
                                             Brian Schall
                                             2049 Century Park East, Suite 2460
                                             Los Angeles, CA 90067
                                             Tel: (310) 301-3335
                                             Email: brian@schallfirm.com

                                             *Additional Counsel for Lead Plaintiffs Ruibin Wang, Sen Gao, Luxiao Xu, and Congli Huo*

61

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2024, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel

of record.

<u>*/s/ Michael Dell'Angelo*</u>
Michael Dell'Angelo