UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                      :

PIERO CRIVELLARO, *et al.*,          :

                         :     **MEMORANDUM DECISION AND**

                Plaintiffs,    :     **ORDER**

                         :

        - against -           :     22-cv-07499 (BMC)

                         :

                         :

SINGULARITY FUTURE TECHNOLOGY   :

LTD., *et al.*,                      :

                         :

                  Defendants.   :

-------------------------------------------------------- X

**COGAN**, District Judge.

       Plaintiffs brought this putative class action against Singularity Future Technology Ltd. and a dozen related persons and entities, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act.  Seven defendants, including Singularity, have moved to dismiss. Although the motions are, for the most part, well founded, the amended complaint manages to state a claim under § 10(b) against Singularity and its CEO, Yang Jie, arising from various statements made by Singularity's CEO about two allegedly fraudulent transactions.  Singularity and Jie's motions are accordingly denied in part, but the rest of the motions are granted.

## BACKGROUND

       For two decades, Singularity operated as a shipping and logistics company under the name "Sino-Global Shipping America, Ltd."[1]  Its business model was two-pronged: it offered domestic shipping services through its U.S. subsidiaries, and it offered freight logistics services through its Chinese subsidiaries.  By 2021, however, business had "long been in decline" under

---

[1] For simplicity, I refer to the defendant-company only as Singularity, even though it did not formally adopt the name until January 3, 2022.

the leadership of then-CEO defendant Lei Cao.  This downturn prompted the alleged conduct and correlative disclosures that form the basis of plaintiffs' suit.

Principally, Singularity announced in a February 2021 Form 8-K that it was planning to "enhance" its "traditional logistics service platform" by expanding into a new field: Bitcoin mining.[2]  To kickstart its new venture, Singularity entered into securities purchase agreements to sell common stock, raising over $28,000,000.  It used the new capital to purchase $4.6 million worth of "digital currency operation servers."

In addition to purchasing the servers, Singularity undertook two joint ventures.  First, it partnered with HighSharp (Shenzhen Gaorui) Electronic Technology Co., Ltd., a Chinese semiconductor manufacturer, to build and sell "high-quality, reliable digital mining machines" through a newly created entity – Thor Miner, Inc.  Singularity explained in a press release that the venture "will encompass collaborative engineering, technical development and commercialization of a proprietary bitcoin mining machine under the name Thor, with exclusive rights covering design production, intellectual property, branding, marketing and sales."  Seemingly in line these statements, the Thor venture ultimately yielded what appeared to be a lucrative sales contract.  Specifically, three months after the venture's formation, Singularity announced that Thor had agreed to sell "certain cryptocurrency mining hardware and other equipment" to a buyer, SOS Information Technology New York Inc., for an aggregate $200 million.

---

[2] Bitcoin mining is the process through which Bitcoin transactions are verified and secured by so-called Bitcoin "miners" running hardware-intensive programs.  In exchange for running the mining programs, miners receive fractions of a Bitcoin.  See Euny Hong, How Does Bitcoin Mining Work?, Investopedia, (December 5, 2024) https://www.investopedia.com/tech/how-does-bitcoin-mining-work/ [https://perma.cc/FY7D-63H3]

Second, a few months after disclosing the SOS contract, Singularity undertook a separate joint venture with an American electricity provider, Golden Mainland Inc.  Quite distinct from the Thor venture, in which the partners sought to sell mining machines, the Golden Mainland venture involved constructing and operating a mining facility – and a massive one at that. According to Singularity's SEC disclosures, the companies were planning "to invest up to $250 million over time to build a total of 1GW of mining sites in Texas, Ohio, and other states, with capacity for up to 300,000 Bitcoin miners, each with 3,400 watts/hour in energy consumption."

Singularity also made efforts to reverse its declining business that were unrelated to Bitcoin mining.  Relevant here, it invested over $3 million in Rich Trading Co., Ltd. USA in late 2021.  The trading company held itself out as an international importer and dealer of high-tech computer parts.  The investment, Singularity disclosed, entitled Singularity to "90% of the profits generated by" Rich Trading's computer-equipment trades.

On top of that, Singularity brought in a new slate of managers to combat its declining business.  In November 2021, Cao stepped down as CEO, and defendant Yang Jie, previously the Vice President, took his place.  Defendant Jing Shan was hired as COO, and defendant John Levy was brought on as a director and board advisor.

Through some combination of its crypto ventures, newly hired leadership, and investments, Singularity was able to pull itself away from the brink of financial calamity.  Or at least that is what the public markets thought.  From February 2021, when Singularity first announced its crypto plans, to April 2022, after the Rich Trading investment and while both joint ventures were purportedly well underway, Singularity's stock price rose from roughly $5 per share to nearly $20 per share.

Yet this reversal of fortunes did not last.  After reaching its peak in the beginning of April, Singularity's stock price plummeted to around $6 per share by the month's end.  Then, in May 2022, two short sellers – Peabody Street Research and Hindenburg Research – published reports expressing doubts that Singularity's stock was worth even its then-deflated value.  The main thrust of both articles was that that Jie was a fraudster and fugitive on the run from the Chinese government.  Jie, the short sellers claimed, was wanted by Chinese law-enforcement authorities for defrauding investors in his previous company, Chinese Commercial Credit, out of hundreds of millions of dollars.

Further, the short sellers questioned the veracity of Singularity's crypto mining operations.  Suggesting that Thor never developed a "proprietary" crypto mining machine, the reports highlighted that Thor's machine was nearly indistinguishable from a competitor's mining machine; Thor's website used a picture of the competitor's machine with the competitor's logo photoshopped out; and that Jie's wife was a director at SOS, Thor's only buyer.  As for the Golden Mainland joint venture, the short sellers revealed that Golden Mainland's website was created just days before the joint venture was announced, that it was registered as a corporation just six months prior, and that the only apparent business operating at its listed address was a State Farm Insurance office.  Singularity's representation that Golden Mainland was an energy provider operating "10+ GW of power resource use rights" was also suspect.  By the short sellers' calculations, 10 gigawatts of power could supply 7.5 million homes, and if it truly did own such expansive resource rights, Golden Mainland would nearly double the output of the largest hydro plant in the country.

Similarly, the Hindenburg report raised questions as to whether the Rich Trading investment was merely meant to siphon cash to Singularity's managers and directors.  According

to state records, Rich Trading's principal office is Singularity's old headquarters, and its CEO is married to defendant Tuo Pan, Singularity's then-CFO. Moreover, there was no public record of Rich Trading ever having imported the high-tech computer equipment Singularity claimed had been traded. Import logs showed that the company had only made two imports to date – two shipments of towels from China.

The day after the reports were published, Singularity's stock closed at $4.80, a near 30% drop from the previous day. The following day, it fell another 11% to $4.24. The next few months were even worse. In November, Singularity announced that the DOJ, the SEC, and FINRA had launched investigations based on the information raised in the short-seller reports, and that the company had been served with subpoenas. In January 2023, it announced that SOS was suing Singularity and HighSharp for breaching the Thor contract. By the end of the class period, Singularity's stock price had fallen to a mere $0.60 per share.

Plaintiffs, Singularity shareholders, eventually filed the current action against Singularity, ten current and former Singularity directors and officers, Golden Mainland, and Thor. The suit asserts two counts: a Section 10(b) claim against all defendants, and a Section 20(a) claim against the individual defendants. Both seek to hold defendants liable for various misstatements and misleading omissions made throughout the duration of the class period.

## DISCUSSION

In their unwieldy amended complaint, which at some points borders on shotgun pleading, plaintiffs cull heaps of alleged misstatements and omissions from Singularity's public communications during the class period. The alleged fraudulent conduct can be sorted into seven groups: (1) omissions related to Jie's background, (2) omissions related to Singularity's internal controls, (3) statements and omissions related to Singularity's announcement of its pivot

5

into crypto, (4) statements and omissions related to Singularity's private offerings, (5) statements and omissions related to the Thor joint venture, (6) statements related to the Golden Mainland joint venture, and (7) statements related to the Rich Trading investment.  Only the latter two give rise to an actionable Section 10(b) claim, and only against Jie and Singularity.  The Section 20(a) claim is wholly without merit.

## I.    Standard

To survive a motion to dismiss, "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007)).  In addition to the allegations in the complaint, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  ATSI Comms. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

## II.    Section 10(b) Claim

Rule 10b-5 implements the prohibition on securities fraud in Section 10(b).  To make out a Rule 10b-5(b) claim for material misstatements and omissions, a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011).  Only three of these

requirements are germane to the motions to dismiss here – the material-misstatement requirement, the scienter requirement, and the loss-causation requirement.[3]

### A. Material Misstatements and Omissions

Rule 10b-5(b) contains dual prohibitions. "It prohibits 'any untrue statement of a material fact' – *i.e.*, false statements or lies,'" and it "prohibits omitting a material fact necessary 'to make . . . statements made . . . not misleading'" *i.e.*, misleading omissions or "half-truths." Macquarie Infrastructure Corp. v. Moab Partners, L.P., 601 U.S. 257, 263 (2024) (second alteration in original) (quoting 17 C.F.R. § 240.10b-5(b)). Under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act's enhanced pleading standards, a plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). As a corollary, a plaintiff alleging that a defendant made a misleading omission must identify some affirmative statement rendered misleading by the omission. See Macquarie, 501 U.S. at 265. "Pure omissions" – omissions that do not render some public statement misleading – are unactionable, even if a "reasonable investor would very much like to know" the omitted information. In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993).

The PSLRA also contains a safe harbor for so-called "forward looking" statements – statements of belief, opinion, or goals. Slayton v. American Express Co., 604 F.3d 758, 765 (2d Cir. 2010). A forward-looking statement falls within the safe harbor when it "is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove

---

[3] In other words, Jie and Singularity contest the two statements that I conclude are actionable on only those three grounds.

that it was made with actual knowledge that it was false or misleading."  Id.  Thus, a plaintiff

seeking to hold a defendant liable for a forward-looking statement must plead facts making it

plausible that a defendant subjectively knew that the statement was untrue at the time it was

made.

The amended complaint is ripe with accusations about unactionable pure omissions,

forward-looking statements within the PSLRA's safe harbor, and statements that are simply not

plausibly false.  Take first Singularity's failure to disclose Jie's alleged criminal background.

Sure, a reasonable Singularity shareholder would have likely wanted to know that its new CEO

was facing criminal fraud charges in China.  But plaintiffs do not identify any positive law, like

an SEC line item, requiring defendants to disclose Jie's allegedly criminal background, and no

statement about Jie was rendered misleading by defendants' nondisclosure.  The company's 8-K

announcing his appointment merely stated his background and the company's belief that he

would be a competent executive.  Nowhere does Singularity represent that Jie had a clean record,

and Singularity did not selectively omit Jie's experience at CCC.  Cf. In re ForceField Energy

Inc. Sec. Litig., No. 15-cv-3020, 2017 WL 1319802, *12 (S.D.N.Y. Mar. 29, 2017) (holding that

a company misled investors by disclosing executives' "prior work experience without also

disclosing the executives' histories at companies that had been accused of fraud"). [4]  To the

---

[4] For similar reasons, Singularity did not have a duty to disclose that Levy was a director at CCC while Jie worked
there.  Singularity did not exhaustively list Levy's prior experiences; it merely listed Levy's current affiliations and
a few relevant prior affiliations.  Unlike the company in ForceField, Singularity did not only omit companies at
which Levy may have been involved with fraud.  See 2017 WL 1319802 at *12.

extent that Jie's criminal background is material, Singularity's failure to disclose it cannot support a claim of securities fraud.[5]

Singularity's omissions about its internal controls are similarly untethered to any affirmative statement.  In its February 2021 Form 10-Q, Singularity disclosed that it "carried out an evaluation" into its controls and procedures and concluded that its internal controls and procedures "were not effective and adequately designed" to meet federal reporting obligations for two reasons: (1) "[l]ack of segregation of duties for accounting personnel who prepared and reviewed the journal entries," and (2) "[l]ack of a full time U.S. GAAP personnel in the accounting department to monitor the recording of the transactions."  Its next three quarterly reports and its 2021 annual report all contained near-identical disclosures.

Plaintiffs accuse defendants of misleading investors by failing to disclose "the extent to which" Singularity's internal controls were deficient.  This accusation is unactionable primarily because plaintiffs never explain precisely what was wrong with Singularity's controls.  Relying on subsequent investigations and prosecutions into the company, the amended complaint merely concludes that the controls must have been even more deficient than Singularity disclosed.  In doing so, plaintiffs fail to explain exactly what Singularity omitted, to say nothing of whether such an omission rendered its actual disclosures misleading.

Nearly all the alleged conduct relating to Singularity's Bitcoin mining ventures is unactionable too.  Plaintiffs' central theory is that defendants never intended nor had the capability to pivot into crypto – they only did so to "line their pockets."  Thus, plaintiffs

---

[5] Nor did Singularity make an actionable misstatement about Jie's educational background.  Plaintiffs have not alleged any facts making it likely that Singularity's disclosure was false – the other disclosures are just as likely to have been false.  And they certainly have not adequately alleged "a substantial likelihood that a reasonable shareholder would consider" Jie's educational background "important."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)

conclude, the announcement of the pivot, the announcement of the security purchase agreements, and the disclosures related to Thor are all misleading; Singularity should have told investors that it did not intend to undertake any of these projects.

These representations are prototypical forward-looking statements about beliefs, opinions, and goals – Singularity was *planning* to pivot into crypto mining, the new capital was *going* to fund the venture, and Thor *will* develop proprietary mining machines. Yet plaintiffs make little effort to plead actual knowledge of falsity. Outside of some conclusory allegations that Singularity lacked the capability to build out a Bitcoin mining operation, the amended complaint is completely devoid of any facts about the individual defendants' states of mind while the statements were made. Indeed, some allegations suggest the opposite. Plaintiffs admit, for instance, that Singularity purchased "digital currency operation servers" with the money it raised from the direct offering. Such a purchase suggests that at least some defendants were indeed attempting to steer Singularity into Bitcoin mining.

That is not to say the complaint fails to raise any plausible inference of wrongdoing. The eventual breach of the SOS contract suggests that Thor did not have the capability to fulfill the promises made in Singularity's announcement of the deal, and the Golden Mainland and Rich Trading transactions raise some red flags, which I discuss more thoroughly below. However, the PSLRA burdens plaintiffs with raising a plausible inference that Singularity executives knew, *at the time of making* a forward-looking statement, that the statement was false or misleading. Plaintiffs do not pin knowledge to any exact moments.

Amid all this unactionable conduct, the amended complaint does properly plead two bases for a securities fraud claim. First, Singularity made various plausibly false statements about its Golden Mainland joint venture. Singularity stated that "Golden Mainland is a company

10

engaged in the provision of electricity services in North America" operating "10+ GW of power resource use rights." But, according to the amended complaint, Golden Mainland was formed only six months prior to the announcement of the joint venture; there is no record of Haiyo Jiang, who was purportedly the CEO, CFO, and Secretary of Global Mainland at the time of the agreement; its business address listed on the joint venture agreement directs to a local insurance agency; and the address currently listed on Golden Mainland's website is in fact the address of its law firm. This sufficiently buttresses a conclusion that Golden Mainland was not a major energy provider with enough resource use rights to power 7.5 million homes, but rather a sham corporation, potentially set up by Singularity to extract assets from a failing business.

Second, it is equally plausible that Singularity made false assertions concerning the Rich Trading transaction. The amended complaint contains plenty of facts suggesting that Rich Trading, which Singularity stated was a computer-equipment trading company, was another entity formed to siphon assets from Singularity. As the short seller reports and complaint point out, there is no record of Rich Trading ever buying or selling equipment, and its business address is the same address that Singularity used just weeks prior to the transaction. Most importantly, Rich Trading's CEO at the time is defendant Pan's husband, and Singularity did not disclose that it was investing in a related party. That alone is enough to render the disclosure materially misleading. See SEC v. China Ne. Petroleum Holdings Ltd., 27 F. Supp. 3d 379 (S.D.N.Y. 2014).

Notably, defendants do not make a serious attempt in their briefs to argue that these disclosures were true. Rather, they primarily counter that the statements fall within the forward-looking-statements safe harbor. The SEC filings and press releases do contain some forward-looking language concerning the company's predictions and goals for the transactions. Cf. In re

Adient, 2020 WL 1644018 at *17.  But that puffery is not what renders the disclosures

misleading.  Rather, it is two assertions of present fact – that Golden Mainland was a "company

engaged in the provision of electricity services in North America" and that Rich Trading was an

electronics supplier.  Those assertions fall well outside the safe harbor.

Defendants also contend that I cannot consider any facts in the complaint drawn from the

Peabody or Hindenburg reports.  Because the short sellers and not the plaintiffs uncovered the

related-party transactions and many of the suspicious facts about Golden Mainland, defendants

argue, I must ignore their findings when assessing the plaintiffs' allegations.  This argument is

unfounded.  "[F]actual attributions to short-seller reports to satisfy pleading requirements in a

securities fraud complaint" are permissible when "independent factual allegations corroborate[]

the factual allegation in the complaint drawn from short-sellers' reports."  Long Miao v. Fanhua,

Inc., 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).  This rule ensures that plaintiffs do not rely on

unverified reports from confidential informants that might have an interest in diminishing the

value of a stock – a consideration not relevant here, where the short sellers relied on previously

unpublicized information in the public record.  Regardless, plenty of independent sources

corroborate the short seller's reports on Golden Mainland and Rich Trading.  State corporate

registries, import records, and the companies' own websites all tell the same story, and plaintiffs

even added some additional red flags of their own to the complaint.

One question remains about the potentially actionable statements: who made them?  Rule

10b-5 holds liable only the "maker" of material misstatements, or "the person or entity with

ultimate authority over the statement, including its content and whether and how to communicate

it."  Janus Cap. Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011).  I can easily

conclude that Jie, on behalf of Singularity, made each statement: he signed the SEC filings and

executed the contracts.  It is much harder to discern how plaintiffs have tied any of the other individual defendants to the statements.  The closest they come is by alleging that Jie notified Shan about the Golden Mainland transaction, but they do not plead any corroborating facts or provide any description of Shan's role that would make it plausible she had "ultimate authority" over the SEC filing or the contract.

So, after sifting through the towering pile of statements and omissions that plaintiffs presented in their amended complaint, I find only two types that give rise to a securities fraud claim: the statements representing that Golden Mainland was a large-scale energy provider, and the statements representing that Rich Trading traded computer equipment.  I also conclude that, of the defendants who moved to dismiss, only Singularity and Jie can be held liable for those statements.  I now proceed to the remaining contested elements.

### B. Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  <u>Tellabs, Inc. v. Makor Issues & Rights Ltd.</u>, 551 U.S. 308, 319 (2007).  Under the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter when making a false or misleading statement.  15 U.S.C. § 78u-4(b)(2).  A "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  <u>Tellabs</u>, 551 U.S. at 324.

For individual defendants, there are two methods by which plaintiffs can establish scienter: by pleadings facts showing "(1) that defendants had the motive and opportunity to commit fraud," or by pleading "(2) strong circumstantial evidence of conscious misbehavior or recklessness."  <u>ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.</u>, 553

F.3d 187, 198 (2d Cir. 2009).  In turn, there are four categories of "strong circumstantial evidence": allegations that defendants (1) "benefitted in a concrete and personal way from the purported fraud," (2) "engaged in deliberately illegal behavior," (3) "knew facts or had access to information suggesting that their public statements were not accurate," or (4) "failed to check information they had a duty to monitor."  Id. at 199 (quoting Novak, 216 F.3d at 311).

For corporate defendants, the scienter inquiry presents a slightly more difficult task. Most straightforwardly, a plaintiff can "impute" a strong inference of scienter "from an individual defendant who made the challenged misstatement" to the corporate defendant. Jackson v. Abernathy, 960 F.3d 94, 98 (2d Cir. 2020).  The individual defendant must have made the statement while acting on behalf of the corporation.  See Teamsters Local 445 Freight Pension Fund v. Dynex Cap., Inc., 531 F.3d 190 (2d Cir. 2008).  Or, a plaintiff can demonstrate that a statement is so "dramatic" that is must have been "approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." Tellabs, 513 F.3d at 710.

Plaintiffs adequately pled scienter for both remaining misstatements.  Defendants are right that the "scienter" section of the amended complaint is no help, as it relies chiefly on a conclusory assertion that "Singularity's senior management's actual knowledge, and access to information" creates a "strong inference" that the individual defendants knew the two transactions were shams.  Yet the nature of both transactions establishes that Jie "knew facts or had access to information suggesting that [Singularity's] public statements were not accurate." ECA, 553 F.3d at 198.

There are a few inferences one could draw from the facts of the Golden Mainland joint venture.  Perhaps Golden Mainland presented Singularity with some corroborating evidence of

its resource rights that would assure even the most cautious investor. Perhaps a single rogue actor within Singularity falsified information about Golden Mainland, and executives like Jie were none the wiser to the true state of Singularity's new partner. Each scenario is certainly possible, but neither is more compelling than the inference that Jie was, at the very least, grossly reckless in representing that a six-month-old company with almost no infrastructure owned the resource rights to power 5% of all American homes. The same is true for the Rich Trading investment. Perhaps Pan hid her husband's position at the company from other Singularity executives, and another employee presented Jie with false information about Rich Trading to induce him into signing off on the investment. Nevertheless, the most cogent and compelling conclusion is that Jie either knew, or had easy access to information revealing, that Rich Trading did not in fact operate as a computer-equipment dealer and that the investment was a related-party transaction.

By virtue of establishing Jie's scienter, the amended complaint also establishes corporate scienter for Singularity. Jie was undoubtably acting in his official capacity as an agent of Singularity when he was signing SEC filings and making public announcements on behalf of the company. See Dynex Cap., 531 F.3d at 195. And, even setting Jie's scienter aside, Singularity's scienter for the Rich Trading transaction can also be imputed from Pan. Pan "benefitted in some concrete way" from Singularities misstatement that Rich Trading was an importer of computer parts; the misstatement concealed a transaction that transferred assets from Singularity to Pan's husband's accounts. See China Ne. Petroleum 27 F. Supp. 3d 379.

C. *Loss Causation*

Assured of scienter, I move to the final contested element of plaintiffs' Section 10(b) claim: loss causation. Loss causation is "closely related to the common law doctrine of

proximate cause." Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 183 (2d Cir. 2007). For that reason, a "mere disparity between the purchase price plaintiffs paid for their shares of common stock and the shares' true value at the time of purchase is insufficient to prove loss causation"; plaintiffs must have suffered tangible economic harm. Thomas Lee Hazen, Treatise on the Law of Securities Regulation, § 12:93 (8th ed. 2023) (citing Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005)). Often, like here, a plaintiff advances a "corrective disclosure theory" of loss causation, i.e., "the existence of the cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud." DoubleLine Cap. LP v. Odebrecht Fin. Ltd., 323 F. Supp. 3d 393, 456 (S.D.N.Y. 2018).

Because loss causation is a modified version of proximate cause, a plaintiff must address intervening causes. See 60223 Tr. v. Goldman, Sachs & Co., 540 F. Supp. 2d 449 (S.D.N.Y. 2007). Although a total failure to confront an intervening cause can doom a securities fraud claim, the presence of a market-wide downturn does not "necessarily eliminate a plausible causal connection between plaintiffs' losses." King Cnty. v. IKB Deutsche Industriebank AG, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010). That is, at the pleading stage, "[t]he Court need not make a final determination as to what losses occurred and what actually caused them, and need only find that Plaintiffs' allegations are plausible," even when "it may be likely that a significant portion, if not all, of Plaintiffs' losses were actually the result of" some market-wide phenomenon. In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d 382, 414 (S.D.N.Y. 2010).

Plaintiffs here advance a straightforward theory of corrective disclosure. In the two days following the publication of the short seller reports, Singularity's stock price fell 30% and 11%, respectively. Taking the allegations in the complaint as true, I can infer that the corrective

disclosures contributed, at least in part, to the sudden decreases.[6]  Of course, as defendants emphasize in their papers, plenty of intervening causes likely contributed to the drop.  Bitcoin was declining in price at the time, and, maybe relatedly, Singularity's stock price declined by 66% in the month prior to the reports.  Further, because I concluded that Singularity made no actionable misstatement or omission about Jie's alleged criminal history, that information too is also an intervening cause that likely contributed to the rapid early-May drops.

As to the effect of Bitcoin's market volatility and Singularity's then-declining stock price, a 30% single-day drop is a steeper decline than a 66% drop over the course of a month, and defendants' own exhibits show that Singularity's stock and Bitcoin's value were not inextricably linked.  While the price of Bitcoin tumbled from October 2021 to April 2022, Singularity's share price rose to its all-time high.  As to Jie's background, to what extent the 30% and 11% drops were caused by revelations about the fraudulent transactions, as opposed to the revelations about Jie, is a prototypical factual inquiry that I need not determine at this stage.  See In re Fannie Mae, 742 F. Supp. 2d at 414.  Accordingly, plaintiffs have adequately pled loss causation.

## III.    Section 20(a) Claim

Because I find that portions of plaintiffs' Section 10(b) claims survive the motions to dismiss, I must now assess whether the amended complaint states a claim for secondary, control-person liability.  To so do, a plaintiff must show "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in

---

[6] Defendants argue that the short seller reports cannot serve as corrective disclosures because they simply repacked information from corporate registries, import databases, and other already public sources.  The reports, however, were not merely "negative journalistic characterization[s] of previously disclosed facts."  In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 512 (2d Cir. 2010).  Defendants do not contend that other news sources had publicized these red flags before.  See id. at 505, 511.

some meaningful sense a culpable participant in the primary violation."  In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009) (citing Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)).   Unlike a Section 10(b) claim, a Section 20(b) does not need to meet Rule 9(b)'s particularity requirement, as "fraud is not an essential element."  Sedona Corp. v. Ladenburg Thalmann & Co., No. 03-cv-3120, 2005 WL 1902780, at *16 (S.D.N.Y. Aug. 9, 2005).  It still must be plausible, though, that the defendant had control "over the transaction in question," not just "over the primary violator" in general.  In re Smith Barney Transfer Agent Litig., 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012) (quotations omitted).

I cannot conclude that plaintiffs have met their burden.  Outside of Jie, only two individual defendants are tied to either of the alleged misstatements – Shan, who plaintiffs allege was notified of the Golden Mainland transaction, and Pan, who must have known about her husband's position at Rich Trading.  An isolated, passing reference to notice does not make it plausible that Shan somehow "controlled" either Jie or Singularity when they made the allegedly false statements, even the under laxer Rule 8 standard.  As to Pan, she did not move to dismiss, and in any event, the complaint does not explain how Pan controlled Jie or Singularity with respect to the Rich Trading disclosures.  I therefore cannot conclude that the amended complaint establishes control-person liability.

**CONCLUSION**

Singularity and Jie's motions are DENIED as to the statements about Golden Mainland and Rich Trading but are otherwise GRANTED.  The remaining motions to dismiss are GRANTED in full.

**SO ORDERED.**

*Brian M. Cogan*

_____
                              U.S.D.J.

Dated: Brooklyn, New York
        December 17, 2024