# Exhibit D

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SEN GAO, CONGLI HUO, RUBIN WANG, LUXIAO XU, individually and on behalf of all other similarly situated,                    CASE NO.
                         1:22-cv-07499-BMC

            Plaintiffs,

      -against-

SINGULARITY FUTURE TECHNOLOGY, LTD. F/K/A SINO-GLOBAL SHIPPING AMERICA LTD., YANG JIE, LEI CAO, ZHIKANG HUANG, TUO PAN, XIAOHUAN HUANG, JING SHAN, TIELING LIU, JING WANG, LEI NIE, JOHN LEVY, THOR MINOR, INC., and GOLDEN MAINLAND, INC.,

            Defendants.

          Zoom Recorded Videoconference
            September 4, 2025

            10:06 a.m.

          EXAMINATION BEFORE TRIAL OF JIA

YANG taken by an attorney for the

Plaintiffs, pursuant to Notice, held at

the above place and time, before Monique

Cabrera, a Shorthand Reporter and notary

public, within and for the State of New

York.

## Page 2

APPEARANCES
(Via Zoom Videoconferencing):
ON BEHALF OF PLAINTIFFS:

Michael Dell'Angelo, Esquire
Berger Montague
1818 Market Street
Suite 3600
Philadelphia, PA 19103
PHONE: 212.875.3080
E-MAIL: Mdellangelo@bergermontague.com

-AND-

Joel M. Sweet, Esquire
Berger Montague
1818 Market Street
Suite 3600
Philadelphia, PA 19103
PHONE: 212.875.3097
E-MAIL: Jsweet@bergermontague.com

ON BEHALF OF DEFENDANT SINGULARITY FUTURE
TECHNOLOGY LIMITED:

Mark David Hunter, Esquire
Hunter Traubman Fischer & Li, LLC
848 Brickell Ave.
Suite 200
Miami, FL 33131
PHONE: 305.629.1180
E-MAIL: Mhunter@htflawyers.com

ON BEHALF OF YANG JIE:
Samantha A. Lesser, Esquire
Becker & Poliakoff
45 Broadway 17th Floor
New York NY
PHONE: 212.599.3322
E-MAIL: Samlesser@beckerlawyers.com

## Page 3

APPEARANCES

(Via Zoom Videoconferencing):

ALSO PRESENT:

Tony Wicks, Legal Videographer for Lexitas

Fei Allen, Interpreter

Elizabeth York, Paralegal, Berger Montague

## Page 4

THE VIDEOGRAPHER: We are now on record. My name is Tony Wicks. I am the remote videographer for Lexitas.

Today's date is September 4th, 2025 and the time is approximately 10:06 a.m. Eastern.

This deposition is being held remotely in the matter of Gao, et al., versus Singularity Future Technology Limited, et al. The deponent is the 30(b)(6) representative for Singularity Future Technology Limited.

Will counsel please identify themselves and the parties they represent after which the court reporter will swear in the witness.

MR. DELL'ANGELO: Good morning. This is Michael Dell'Angelo from the law firm of Berger Montague on behalf of the plaintiffs and the proposed settlement class.

MR. HUNTER: Good morning. Mark David Hunter on behalf of Defendant Singularity Future Technology Limited.

## Page 5

MS. LESSER: Good morning. My name is Samantha Lesser from Becker New York PC on behalf of Yang Jie.

FEI ALLEN, called as the interpreter in This matter, was first duly sworn to faithfully and accurately translate the questions propounded to the witness from English to Mandarin, and the answers given by the witness from Mandarin to English.

JIA YANG, having been first duly sworn, Was examined and testified through the interpreter as follows:

THE WITNESS: Yes. I swear.

COURT REPORTER: Can you state your name and address for the record?

THE WITNESS: My name is Jia Yang. And my address -- excuse me.

As for my address, do I need to provide you my address -- do I need to state the address on my Chinese ID?

COURT REPORTER: Just your name is fine.

I am ready whenever you are.

MR. DELL'ANGELO: Okay.

EXAMINATION

Page 6

BY MR. DELL'ANGELO:

Q.   Good morning, Ms. Yang.  My name is Michael Dell'Angelo.  I represent the plaintiffs in this action and the proposed settlement class.  I will be taking your deposition today.

Could you please state your full legal name for the record?

A.   My full legal name is Jia Yang.

Q.   Can you spell that, please?

A.   It's J-I-A, Y-A-N-G.

Q.   In advance of this deposition, we inquired of your counsel whether or not the witness that they produced for this deposition, that is you, can comprehend questions and provide answers in English or whether a translator was required.

We understood that your counsel requested that we have a Mandarin translator available.  And so I would make clear to you that we have a Mandarin translator that is available that has been disclosed here to your counsel.  That's Ms. Fei Allen.

Do you see her on the screen

Page 7

there?

A.   Yes.

Q.   And so, so that we are clear:

If I ask you a question and you answer it, we will -- it will be our understanding that you understood the question.  If you don't understand a question and you need clarification or you need translation, please ask.

So if you don't understand the question and you need clarification, please ask me and I will do my best to clarify the question.  If you need translation assistance, please indicate that and Ms. Allen will assist you with the translation.

Do you understand that?

A.   Okay.  Understand.

Q.   Okay.  And is your native language Mandarin?

A.   Yes.

Q.   Okay.  Okay.  And of what country are you a citizen?

A.   Chinese.  China.

Q.   Okay.  And do you reside in

Page 8

China?

A.   Reside?  No.  I am now living in Nevada, Las Vegas.

Q.   Okay.  And are you located in Nevada at this time?

A.   Yes.

Q.   Okay.  And what is your address in Nevada?

A.   My -- oh, okay.  It's 4429 Lawrence Street.

Q.   Okay.  And what is the zip code?

A.   89081.

Q.   Okay.  And is that located in Clark County in Las Vegas?

A.   It's located in North Las Vegas.

Q.   Okay.  And is -- do you understand that to be in Clark County?

A.   Clark County?  I think so.

Q.   Okay.  And do you -- at the outset of your deposition, when you were asked by the court reporter for your address, you mentioned an address on your Chinese identification.

Do you have a Chinese identification card?

Page 9

A.   Oh, yeah.  I do have my passport and my Chinese ID.

Q.   Okay.  And what is your Chinese ID?  How is that different than your passport?

A.   Chinese ID?  Chinese ID, kind of like a driver's license here.  And passport, it's the same as the passport but the address is the same.

Q.   And what is -- the address that is the same that you are referring to, what address that?

A.   The address is Shaanxi Province, Weilan City, Cheng Cheng, yeah.  It's like a long address.

Q.   Okay.  And the passport that you referenced, is that the only passport that you have, or do you have more than one passport?

A.   Yeah.  I only have one passport.

Q.   And is that the passport issued by the CCP, China?

A.   Yes.

Q.   Okay.  And do you have either your passport or your Chinese

Page 10

identification card with you?

A.   I don't have now, but it's in -- do you need me to take it?

Q.   I am just asking if you have it with you where --

A.   Yeah.  Not with me right now.

Q.   Okay.  Do you have other identification with you, where you are sitting?

A.   No.

Q.   Okay.  Do you have a U.S. identification card of some kind?  Like a driver's license or a state-issued identification?

A.   Okay.  I have a driver's license.

Q.   Okay.  And what state issued your driver's license?

A.   You mean the date?

Q.   No.  What state?  Is it Nevada or some other state?

A.   Yeah.  Nevada.

Q.   Okay.  And do you have that with you?

A.   I don't have any ID with me now.

Page 11

Q.   Okay.  Where is your ID right now?

A.   It's just in -- in the bag.  Do you need me to take it?

Q.   Yeah.  If you could get -- if you could get it quickly?

A.   Okay.

Q.   Thank you.

Could you just hold it up to the camera for a moment, please?

Thank you.

Okay.  That's fine.  Thank you.

So you indicated that you're presently located in Las Vegas, Nevada; is that correct?

A.   Yes.

Q.   Okay.  And where specifically are you located in Las Vegas right now?

A.   In my address, 4429 Lawrence Street.

Q.   Okay.  And is that your home?

A.   No.  It's an apartment.

Q.   Okay.  And do you maintain a business address in Nevada or anywhere else in the United States?

Page 12

A.   No.  I have lease agreement here.  So...

Q.   Okay.  And that -- that's for personal residence?

A.   Yes.

Q.   Okay.  And just so we are clear.

Do you have some other office or business location in the United States that you use?

A.   No.

Q.   Okay.  Do you conduct business from the United States on behalf of Singularity?

A.   It's 48 Wall Street in New York.  Yes.  I am the CEO of Singularity.

Q.   Okay.  Thank you.

So is anyone else in the room with you right now?

A.   No.  Only me.

Q.   Okay.  And you're in your apartment if I understand correctly; is that right?

A.   Yes.

Q.   Okay.  And is anyone else in your apartment right now?

Page 13

A.   No.

Q.   Okay.  Other than the Zoom that we are on right now to do your deposition, are you using any other electronic communication devices, like an e-mail or cell phone right now?

A.   No.  I am with the laptop now.

Q.   Okay.  And on your laptop, do you have e-mail or any messaging or chat programs or apps open?

A.   No.  Just open with you, yeah.

Q.   Do you have your phone with you?

A.   I have my phone with me.

Q.   Okay.  And are you using your phone to communicate with anybody during this deposition?

A.   No.

Q.   Okay.  Did you bring any documents with you for your deposition today?

A.   Yeah, I have -- I didn't bring documents.  I just have my notes like for my -- for the questions.

Q.   Okay.  And are they notes that you took?

Page 14

A.   I took by myself. I prepared the questions.

Q.   Okay. And you understand that you're -- do you have an understanding of what capacity you're testifying here today?

Let me withdraw that question?

A.   On behalf of Singularity, the witness.

Q.   So you understand that you're serving as a corporate representative of Singularity?

A.   Yes.

Q.   And you understand that when you provide testimony, you're providing it as if you were speaking on behalf of the company; is that correct?

A.   Yes, correct.

Q.   Okay. And what is your understanding about what the court required in connection with the deposition testimony that you are providing today?

A.   I am sorry. I need translate.

My understanding, I need to explain all the process for transfer the

Page 15

money and our BVI merger agreement.

Q.   Okay. Anything else that you understand that you're required to testify about today?

A.   That's all.

Q.   Okay. Are you currently employed?

A.   Yes.

Q.   And by whom are you employed?

A.   Yeah, I am employee of the company.

Q.   And what company is that?

A.   Singularity Future Technology.

Q.   Okay. And in what capacity are you employed?

A.   I am the CEO.

Q.   Okay. And how long have you been the CEO of Singularity?

A.   I have been CEO since last year November.

Q.   So you have been the CEO of Singularity since approximately November of 2024; is that correct?

A.   Yes.

Q.   Okay. Do you currently have any

Page 16

other jobs?

A.   No.

Q.   And what is your title with Singularity? Is it just CEO or anything else?

A.   Just the CEO, yes.

Q.   Okay. And what are your duties as the CEO of Singularity?

A.   Just to deal with the management team and the board and connect all the -- like in charge of all the company stuffs.

Q.   Okay. And I believe you held up your ID, but I didn't look at it long enough.

Can you tell us how old you are?

A.   I am 32.

Q.   Okay. Thank you.

And have you been the CEO of any companies before Singularity?

A.   No.

Q.   Okay. And did you have any jobs before you were -- became the CEO of Singularity?

A.   Yes, before in China.

Q.   And what was the last job that

Page 17

you had before you became the CEO of Singularity?

A.   Before I was working in a Beijing company called consulting management, consulting company.

COURT REPORTER:  Can you spell that please, the Interpreter?

THE INTERPRETER:  Previously I was working in a Beijing company called Beijing, B-E-I-J-I-N-G, Shengwen, S-H-E-N-G-W-E-N, Chensheng, C-H-E-N-S-H-E-N-G, management consulting.

COURT REPORTER:  Thank you.

THE INTERPRETER: S-H-E-N-G-L-U-N-G.

BY MR. DELL'ANGELO:

Q.   Thank you.

So in that -- what was your job title in that position?

A.   Director of operation.

Q.   Okay. And what were the -- what did the company do?

A.   Management consulting.

Q.   And what type of management

Page 18

consulting did it perform?

A.   Mainly for the -- for the hotel, food, and beverage things.  Before that job I was working in the hotel industry.

Q.   And how long were you -- how long were you in your prior job as the director of operations for the management consulting company?

A.   Two years.

Q.   Two years.

And were you the director of operations for all two years?

A.   Yes.

Q.   Okay.  And I think you indicated that prior to that you worked in the hotel or hospitality industry; is that correct?

A.   Yes.

Q.   Okay.  And in what capacity did you work in the hotel or hospitality industry before you were the director of operation for the management consulting company?

A.   I was -- I was working as sales executive and --

Q.   I am sorry.  I didn't mean to

Page 19

interrupt you.  Please finish your answer.

A.   Yes, sales executive, and then after that I was becoming the hotel manager assistant and was assistant hotel manager doing all the management things for three years, yes.

Q.   Okay.  And what company or hotel was that?

A.   It's called the Ritz-Carlton, Xi'an Hotel.

Q.   Okay.  And where is that located?

A.   In Xi'an City.

Q.   Okay.  In China?

A.   Yes.

Q.   Okay.

All right.  Just a few more background questions.  So when you're performing work, so you live in Nevada but you serve as the CEO for Singularity.  When you perform work for Singularity, do you work from Nevada?

A.   No, I just chose to stay here.

Q.   Okay.  So when you're actually performing your duties as the CEO of

Page 20

Singularity, where do you do that from where are you located physically when you do that?

A.   I am sorry.  I need translate.

Okay.  That time I was in China.

BY MR. DELL'ANGELO:

Q.   Okay.  But you're currently the CEO of Singularity, correct?

A.   Yes.

Q.   Okay.  And do you currently perform duties as the CEO of Singularity?

A.   Currently, yes.

Q.   Okay.  And when you perform your duties as the CEO of Singularity currently, where do you perform them from?  What location?

A.   I mean in Nevada.

Q.   Okay.

A.   My location, yes.

Q.   Thank you.  From your apartment that you identified?

A.   Yeah, it's -- because the work is -- can be remotely.  I can bring laptop to anywhere.

Q.   Okay.  And do you perform work

Page 21

on behalf of Singularity in your capacity as the CEO from any location other than Nevada?

A.   Yes.

Q.   Okay.  And what location or locations do you also perform work on behalf of Singularity in your capacity as CEO?

A.   Sorry, I need translation.

Well, I can work from anywhere at any time because as long as I have a computer I can work online.  I don't need to be physically in somewhere in the company.  So whenever something comes up, as long I have my computer, I can work from wherever I am, anytime, anywhere.

Q.   I understand.  And thank you for that answer.

I would just like to know, are there other locations that you, in fact, work from other than Nevada in your capacity as CEO of Singularity?

A.   No, only here.

Q.   Okay.  Singularity has an office location in New York City in the State of

Page 22

New York in the United States; is that correct?

A. It's correct, but it's a virtual office.

Q. Okay. And what do you mean by "it's a virtual office"?

A. Virtual means that the virtual office help us to receive all the -- all the mails. And it's not a specific office we can work, like sit in the office.

Q. Okay. So I am sorry. I didn't mean to interrupt you. I thought you were -- please finish.

A. No. I mean, the virtual office help us to manage all the company mails and yes, it's not a place that I can sit there.

Q. Okay. And other than the office that Singularity -- the virtual office that Singularity has in New York and the work that you perform from your apartment in Nevada, are there any other offices or locations that you or anyone else works from on behalf of Singularity in the United States?

Page 23

A. No.

Q. Okay. And do you receive any physical mail, like paper mail at -- on behalf of Singularity in Nevada?

A. No.

Q. Okay.

A. So I mean, all the paper mails, the virtual office, once they receive they are going to make a copy then send to my e-mail.

Q. So if I am understanding correctly, the virtual office in New York, they actually open Singularity's mail, scan it, and then e-mail it to you; is that correct?

A. Yes.

Q. Okay. Who opens Singularity's mail in the virtual office in New York?

A. Let me check her name. It's called Tanya Cardenales.

Q. Can you spell the last name, please?

A. T-A-N-Y-A.

Q. Can you spell her surname, please?

Page 24

A. C-A-R-D-E-N-A-L-E-S.

Q. Thank you. And is she employed by Singularity?

A. No. She is employed in the virtual office.

Q. What is the name of the virtual office company?

A. It's called Quick Work Space.

Q. Okay. And Tanya is an employee of Quick Work Space in New York; is that correct?

A. Yes.

Q. When a Quick Work Space representative e-mails you the physical mail that is mailed to New York, is it e-mailed to anyone else or just you?

MR. HUNTER: I just want to object at this point. This is outside the scope of what the deposition is going to be. I understand there is some permissible background questions, but now we're digging into the company's mail procedures, which is beyond the scope of the permissible topics for the day.

Page 25

MR. DELL'ANGELO: Noted. We're laying some foundation for physical documents that we are going to ask questions about, but anyway, you can answer the question unless you are instructed otherwise.

MR. HUNTER: Yeah. Sherry, you can answer the question for now.

THE INTERPRETER: I forgot the question. What is the question?

MR. DELL'ANGELO: Sure. Would the reporter read the question back, please?

(Whereupon the record was read back.)

A. It's also mailed to Sherry Feng, our board secretary.

Q. During the deposition today, I am going to ask you some questions that relate to the United States Securities and Exchange Commission. Are you -- have you heard of the United States Securities and Exchange Commission?

A. Yes.

Q. Okay. During the deposition

Page 26

when I refer to the United States Securities and Exchange Commission, I'd like to refer to it as in its short form as "SEC." So can we have an understanding that when I refer to the SEC, I am referring to the United States Securities and Exchange Commission?

A. Yes.

Q. Thank you. The physical mail that Singularity receives at its virtual office in New York, does that include copies of bank statements?

A. The bank statement we always receive by like electrical e-statement. So...

Q. So that we are clear, does Singularity receive any bank statements in physical form?

A. No. Every bank we receive by e-statement.

Q. To your knowledge, does Singularity receive physical mail relating to the SEC or its SEC filings at the virtual mail -- virtual office in New York?

Page 27

A. SEC mail, yes.

Q. Okay. What other -- does Singularity receive other mail, physical mail at its New York virtual office related to any of its other financial obligations like money that it owes, money that is owed to it?

A. No. As I know all the mail I have seen about like -- well, from what I have seen, the mail we received -- the mail we receive is mostly related to important court documents regarding the company's litigation and also some documents related to the company's payments. Other than that, nothing else.

Q. And in your answer, what type of payments were you referring to?

A. The payments like we do for the -- we call TA -- it's either -- like something related or -- let me check.

Q. Where are you checking?

A. My e-mail. I am checking my phone -- on my phone of my e-mail.

Q. Okay.

A. It's a -- we call it TA, some

Page 28

payments -- doing some payments for this and the payments for some automatic, like the QuickBooks, this financing tools, financing -- that form, all those payments, statements we sometimes receive the mail, physical mail.

Q. In New York?

A. Yes.

Q. Are there any other locations in which Singularity receives physical mail other than the virtual office in New York that you've testified about today?

A. No.

Q. So Singularity does not receive any physical mail in China?

A. No.

Q. It does not have any offices or mailing addresses anywhere other than the virtual office in New York that you identified and already testified about; is that correct?

MR. HUNTER: Objection. Asked and answered a couple of times.

Sherry, you can answer yet again.

Page 29

A. No, we don't have any other locations we receive the mail.

Q. Okay. So I would like to show you a document. We provided copies of these documents to your counsel in advance. Can I have Ms. York share the document at Tab 13, which is the court's minute order dated August 28th of 2025? Are you able to see that document, Ms. Yang?

A. Yes.

Q. Do you recognize this document -- let me withdraw that question. Have you seen this document before?

A. Yes.

Q. Do you have an understanding of what this document is?

A. The -- for the hearing last week -- for the -- like the 30(b)(6) representative for Singularity need to testify.

Q. And is it your understanding that that's what these are, the subjects that you are testifying about today?

Page 30

A. Yes.
Q. And so the docket -- if we are looking at the second page of the document, there is some text in blue under "docket text." It begins "minute entry and order."
Do you see that?
A. Yes. The blue sentence I see.
Q. What that says is "Minute entry and order for order to show cause hearing held before Judge Brian M. Cogan on 8/28/25. Appearance from both sides. The parties shall conduct a Rule 30(b)(6) hearing by 9/4/2025, at which representatives for Singularity will testify to the status of contested funds, the process by which they will be transferred to the United States accounts, and Singularity's planned merger with its British Virgin Islands subsidiary."
Do you see that?
A. Yes.
Q. Is it your understanding that you are here testifying about today?
A. Yes.

Page 31

Q. Are you prepared to testify truthfully and completely about all of the subject matters reflected in the court's minute entry -- minute order at Tab 13, which I marked at Exhibit 1 to this deposition?
(Whereupon, Exhibit 1, Minute Order dated August 28, 2025, was marked for identification.)
A. Yes, I have prepared.
BY MR. DELL'ANGELO:
Q. I apologize. Excuse me. In connection with your -- well, I believe you testified at the outset of your deposition that you undertook to prepare for this deposition today; is that correct?
A. Yes, I have prepared.
Q. And what did you do to prepare for your deposition today?
A. I talked to my counsel, Mr. Mark, and talked to our financing people and our another counsel Joan Wu. We have a couple of calls.
Q. Let me make something very clear

Page 32

to you. I apologize. I am going to ask you some questions about what you did to prepare.
A. Okay.
Q. What I do not want and I am not asking for is the substance of anything that you talked about with your lawyers. Okay? So I understand that you talked to -- you said Mr. Mark. I assume mean Mark Hunter who is present on the video for the deposition today; is that correct?
A. Yes.
Q. Okay. So -- so that we're -- and you also mentioned a Ms. Wu who is -- is she an attorney? Is that correct?
A. Yes.
(Reporter clarification.)
THE WITNESS: Joan, J-O-A-N; W-U.
BY MR. DELL'ANGELO:
Q. Okay. So -- so that we are very, very clear, when I ask you some questions now about what you did to prepare for your deposition, I am not asking you, and I do not want you to

Page 33

testify, about the substance of your communications with Mr. Hunter, Ms. Wu, or anyone that you understood to be an attorney because those are privileged and confidential.
So do you understand that?
A. Yes.
Q. Okay. So Ms. Wu, who does Ms. Wu work for, if you know? Does she work for a law firm? Is she employed by the company?
A. She work for a law firm, and she is -- she's our company's counsel.
Q. And what law firm does Ms. Wu work for?
A. It's -- Ms. Wu also work for the -- the Hunter -- let me see the full name.
Also the Hunter -- the Hunter -- what is the name? I am sorry. I -- I forgot.
Hunter Taubman -- can I just spell it, H-U-N-T-E-R, T -- yeah.
Q. I'm sorry. I didn't mean to interrupt you.

Page 34

But, so -- so I think what you are saying is that Ms. Wu is a lawyer with Mr. Hunter's law firm; is that correct?

A.   Yes.

Q.   Okay.  And when you -- did you speak with Mr. Hunter and Mr. Wu [sic] together or separately in preparation for the deposition today?

A.   Together and separate.

Q.   Okay.  When you spoke to -- for any of the times that you spoke to Mr. Hunter or Ms. Wu, either together or separately, to prepare for your deposition, was anyone else present either physically or virtually?

A.   Also, our board secretary, Sherry Feng.

Q.   Ms. Feng who you mentioned earlier in your testimony, that same person?

A.   Yes.

Q.   Okay.  And I believe that you testified that in addition to Mr. Hunter and Ms. Wu, you also met with, I believe -- because did you say a finance

Page 35

person on behalf of Singularity; is that correct?

A.   Yes.

Q.   Okay.  And who is that person?

A.   The person named is called Jie Liang.

Q.   Can you spell that, please?

A.   J-I-E, L-I-A-N-G.

Q.   And is that a Ms. Liang?

A.   Yes.  Mr. Liang.

Q.   Mister.  Okay.

Mr. Liang, who -- who is -- who do you understand Mr. Liang to be employed by?

A.   He is our financing people.

Q.   And when you say "our," do you mean Singularity?

A.   Singularity, yes.

Q.   Okay.  And where is Mr. Liang located?

A.   He is located in China.

Q.   Okay.  And when you spoke to Mr. Liang in preparation for your deposition, was anyone else present?

A.   No.  Only us.

Page 36

Q.   Okay.  And what did you discuss with Mr. Liang in preparation for your deposition today?

A.   Oh, we talk about the -- the bank transfer things.

Q.   And what do you mean by the "bank transfer things"?

A.   Because he's the one conducting with the -- with Djibouti Central Bank, the -- and he -- he the one directly talking to the bank, so I need an information from him.

Q.   Okay.  And where -- where is he located?

A.   In China.

Q.   Okay.  And where in China, if you know?

A.   He's always in business trip.  I think now maybe he's in Beijing.

Q.   Okay.  And do you know his -- his formal title with Singularity?

A.   How to say finance title?

Account -- no, it's not -- it's just -- I don't know the English.

Well, he is the financial

Page 37

director of our company -- director, yeah.  Financial director.

Q.   Thank you.

Okay.  And when you met with Mr. Liang to prepare for the deposition today, did you look at any documents together?

A.   No documents.

Q.   Did Mr. Liang provide with you any documents to assist you in preparation for your deposition today?

A.   No.  He said he will -- he will find out maybe later the document, but we don't have the documents yet.

Q.   And when you say "later," do you mean after today?

A.   Yes.  He still need to request those documents.

Q.   And what documents are you referring to?

A.   I mean for transfer the money from Djibouti, need to submit a request.  Those documents.

Q.   Okay.  We'll --we'll talk about -- a bit about that later.

Page 38

Are there any other -- okay.

Did you look at any -- excuse me.

Did you look at any documents in preparation for your deposition today?

A.   The documents I have looked for the merger part. We -- because I -- we have the -- the proxy documents for the merger that explaining for the -- explaining the merger details. So I have look -- like, look at the proxy documents.

Q.   Okay. And when you say "the proxy documents," are you referring to the Schedule 14A, the proxy that was filed with the SEC, or something else?

A.   Yeah. It was -- we have submit to SEC on June 23rd.

Q.   2025?

A.   Yeah. 2025, June 23rd.

Q.   Okay.

MR. DELL'ANGELO:  I would like to mark as Exhibit Number 2 to the deposition the document found at Exhibit Tab -- sorry, Tab 20, which is Schedule 14A filed on behalf of

Page 39

Singularity with the SEC.

Ms. York, would you please put that up?

BY MR. DELL'ANGELO:

Q.   And, Ms. Yang, would you open that up and take a look at it when it appears?

(Whereupon, Exhibit 2, Singularity SEC Schedule 14A, Preliminary Proxy Statement, was marked for identification.)

A.   Yeah. I have it open.

BY MR. DELL'ANGELO:

Q.   Okay. Can you take a look at that document and just tell me when you've had an opportunity to -- to take a look at it and identify it for yourself?

A.   Yeah.

Q.   Okay. So when you referred to a proxy, you referred to proxy documents a few moments ago in your testimony, is -- is the document that I've marked as Exhibit 2 to the deposition the Schedule 14A that you're looking at now, is that the document that you were

Page 40

referring to?

A.   Yes. It is this one.

Q.   Okay. And are there -- when you referred to proxy document in your testimony a few minutes ago, were you referring to any documents in addition to the document marked as Exhibit 2?

A.   No. I am just looking at this document.

Q.   Okay. So in preparation for your test -- your testimony today, you looked at the Schedule 14A at Exhibit 2, correct?

A.   Correct.

Q.   Okay. And are there any documents in addition to the document at Exhibit 2 that you looked at in preparation for any of your testimony today?

A.   No.

Q.   Okay.

MR. DELL'ANGELO:  I would like to mark as Exhibit 3 the document at Tab 14, which is an August 29, 2025, letter from Michael Dell'Angelo at

Page 41

Berger Montague to Mark Hunter at Hunter Taubman Fischer & Li.

So, Ms. York, would you please put Exhibit 3 up?

BY MR. DELL'ANGELO:

Q.   And, Ms. Yang, when Exhibit 3 is up, would you please open it and take a look at and tell me when you have had an opportunity to take a look at that document?

(Whereupon, Exhibit 3, Letter from Dell'Angelo to Hunter, dated August 29, 2025, was marked for identification.)

BY MR. DELL'ANGELO:

Q.   Okay. So, Ms. Yang, do you have Exhibit 3 in front of you, the August 29, 2025, letter?

A.   Yes.

Q.   Okay. Have you seen this document before?

A.   Yeah.

Q.   And when did you see it?

A.   I don't remember the specific time. I think once -- once we receive it,

Page 42

I have seen.

Q. Okay. And did you understand this letter to be requesting certain documents in connection with the deposition testimony that you are going to provide today?

A. Yes.

Q. Okay. And did you conduct a search for any of the documents listed in this letter in connection with your testimony today?

MR. HUNTER: Objection. We provided our response to this. I will note for the record she wasn't instructed to look for any documents because documentary productions weren't appropriate.

BY MR. DELL'ANGELO:

Q. You can answer.

MR. HUNTER: No. You can answer, Sherry.

A. Sorry. Well, I didn't understand the question.

BY MR. DELL'ANGELO:

Q. Sure.

Page 43

So, Ms. Yang, look at Exhibit 3. Beginning on the first page it says: "A. Status of the Settlement Funds?"

Do you see that?

A. Yes.

Q. Okay. And there's a number 1 and a number 2, and it goes on to the second page and through the third page, through number 19. Do you see that?

A. Yes.

Q. Okay. And each one of those things in this letter that you looked at identifies certain documents that were requested of Singularity.

My question is, did you look for any of these documents in connection with your deposition testimony today?

A. I have looked some of the documents but not -- not all of them.

Q. Okay. And so my question was a little narrow. It related to subsection A, 1 through 19 on pages 1 through 3. And you will see that there's also subsections B and C starting at number 20 on page 3

Page 44

that goes through 26 on page 4.

Do you see those?

A. Yes.

Q. Okay. Did you look for any of the documents in items 20 through 26 in connection with your deposition today?

MR. HUNTER: I want to restate my objection. Her looking for these documents are irrelevant because they weren't appropriate for production.

MR. DELL'ANGELO: Mark, I will just note in the Southern District of New York and the Eastern District of New York you can object to form. Generally, speaking objections are not permissible.

MR. HUNTER: You can continue. I appreciate the guidance.

A. Yeah. All those documents I didn't see all of them. Maybe some of them I have seen.

BY MR. DELL'ANGELO:

Q. Okay. Which ones -- okay. So I would just like to be clear.

When you say some of them you

Page 45

may have seen, do you mean generally or do you mean in connection with preparation for your deposition today?

A. Like generally.

Q. Okay. And just so that we are very clear, did you or anyone that you are aware of conduct a search for any of the documents listed 1 through 26 on Exhibit 3 in connection with or preparation for this deposition today?

A. No. I was thinking for today's preparation is just for those 3 questions.

Q. Okay.

Okay. So if you recall when we looked at Exhibit 1, the minute order, it talked about some of the topics that the court ordered testimony about today. And the first one was the status of the contested funds.

Do you recall that?

A. Yes.

Q. Okay. And are you the person most knowledgeable at Singularity about the status of the contested funds, as you understand that to be reflected in the

Page 46

court's order at Exhibit 1?

A.   Yes.

Q.   Okay.  And what is your understanding of what "contested funds" means in the court's order at Exhibit 1 to your deposition today?

A.   Sorry.  Can you translate, please?

So for my understanding that is the 3 million and 3 million 250 escrow.

Q.   And those are funds.  Okay.  Thank you.

And is it your understanding that those funds, those contested funds the 3 million and the 3.25 million about which you just testified were to be paid pursuant to a settlement agreement between the plaintiffs in this case and Singularity?

A.   Yes.

Q.   Okay.  Are you familiar with the settlement agreement that discusses those contested funds about which you just testified?

A.   Yes.

Page 47

Q.   Okay.

MR. DELL'ANGELO:  I would like to mark as Exhibit 4 to the deposition the document at Tab 4.

Ms. York, would you please place the document at Tab 4 into of the deposition and I'll mark it as Exhibit 4.

(Whereupon, Exhibit 4, Stipulation and Agreement of Settlement, was marked for identification.)

BY MR. DELL'ANGELO:

Q.   Ms. Yang, when Exhibit 4 is available to you on the screen, would you please click on Exhibit 4 which is the Stipulation and Agreement of Settlement in this litigation dated --

A.   Yes, I have it open.

Q.   And it's dated July 13, 2025.

Okay.  So you have Exhibit 14 -- excuse me, Exhibit 4 open; is that correct?

A.   Yes.

Q.   And have you seen this document

Page 48

before?

A.   Yeah, I have seen this.

Q.   Okay.  And could you turn to the third page of Exhibit 4?  You will see on the top half of the page there is a letter (e) in parentheses.

Do you see that?

A.   Yes.

Q.   And can you just read that out loud, please?

A.   "Cash Settlement Amount means 3 million in cash to be paid by Singularity."

Q.   Okay.  And is that the $3 million that you just testified about as part of the contested funds that you're testifying about today?

A.   Yes.

Q.   Okay.  And then would you please look at letter (s) in parentheses on page 4, and tell me when you see that?

A.   Yes.

Q.   And would you read the text in the subparagraph marked with the letter (s) in parentheses that begins on

Page 49

page 4 and runs to page 5 of Exhibit 4?

A.   Okay.  The "Escrow amount means the 3,250,000 in cash that Singularity will transfer to the Escrow Agent to be held in an escrow account for the benefit of the proposed Settlement Class within (14) calendar days after Defendants have received the information necessary to effectuate a transfer of funds to the escrow accounts, including wiring instructions that include the bank name and ABA routing number, account name and number, and a signed W-9 reflecting a valid taxpayer identification number for the qualified settlement fund in which the Settlement Amount is to be deposited."

Q.   Thank you.

So the $3.25 million referenced in the paragraph marked by letter (s) in parentheses on page 4, that begins on page 4, Exhibit 4, is the $3.25 million that you just testified about that are part of the contested funds that you're testifying about today?

A.   Yes.

Page 50

Q.    Okay.  Thank you.

What is your understanding about when the contested -- so let me withdraw that for a moment.

So that we have an understanding about the words that we'll use for the rest of the deposition, can we have an understanding among us that when you or I use the word "contested funds," we are referring to the $3 million and the $3.25 million for a total of $6.25 million in the language that you just read at Exhibit 4 to this deposition?

A.    Yes.

Q.    Okay.  Thank you.

What is Singularity's understanding of when the contested funds were to be paid?

A.    It's by 14 of August.

Q.    Of what year?

A.    Of 2025.

Q.    And August 14, 2025, has passed, correct?

A.    Yes.

Q.    Okay.  And were the contested

Page 51

funds paid on -- by August 24th of 2025?

A.    I am sorry, what is the question?

Q.    Did Singularity deposit the contested funds by August 24th -- I am sorry, August 14th of 2025?

A.    No.

Q.    Okay.  And as we sit here today, has Singularity deposited the contested funds?

A.    No, not yet.

Q.    Okay.  And so that we're clear, has Singularity transferred or paid any portion of the contested funds as of the time we are sitting here today?

A.    We have made the first payment of 3 million because we submit the request to the bank and the bank give us that 3 million to be transferred for a one time.

Q.    Okay.  And do you know if that $3 million, as of this time, has actually been deposited in an escrow account called for by the settlement agreement?

A.    Yes, still not yet because it's

Page 52

still in the bank processing.

Q.    And just so that the testimony is clear, is it correct that, as we sit here today, no portion whatsoever of the contested funds have been deposited in connection with the settlement agreement at Exhibit 4?

A.    By today not yet.

Q.    Okay.  Thank you.  And who at Singularity was responsible for assuring the timely payment of the contested funds?

A.    Our financing people, Jie Liang.

Q.    And that's Mr. Liang that you testified about earlier?

A.    Yes.

Q.    Anyone other than him?

A.    No.

Q.    And did -- is Mr. Liang the only person at Singularity with the -- well, let me withdraw that.

Does Mr. Liang have the authority to direct the transfer of the contested funds?

A.    Yes, he has the authority.

Q.    Is there anyone else at

Page 53

Singularity who has the authority to direct the transfer of the contested funds?

A.    No.

Q.    Okay.  How is Mr. Liang informed of the company's obligation to transfer the contested funds on or before August 14th of 2025?

A.    He just make a call with me and he tell me the bank still didn't reply and process.

Q.    I understand that.  I appreciate your answer.  I think -- I think we may have a misunderstanding about my question.

What I am trying to understand is how is Mr. Liang informed that the company needed to pay contested funds by August 14th of 2025?

A.    I sent the settlement agreement to him.

Q.    Okay.  When did you send the settlement agreement to Mr. Liang to transfer the contested -- informing him that the company transferred the contested funds?

Page 54

A.  Once the settlement agreement was signed.

Q.  When was that, to the best of your recollection?

A.  I think it was by -- let me check.  I think --

Q.  Well, I am sorry to interrupt you.  What I am asking is, as you sit here today, do you have any independent recollection, do you know, or do you have to look at something to refresh?

A.  Can you translate, please?

Q.  What I am trying to understand is, do you know the answer to the question, as you sit here, or do you need to look at something to get the information?

A.  For me in general I know the answer.  If it's related to specific date, like all the details of the date, I need maybe check the e-mail or something to confirm -- double-check that that date is right.

Q.  As you sit here today, without checking the e-mail, what is your

Page 55

understanding of the date on which you informed Mr. Liang of the company's obligation to transfer the contested funds pursuant to the settlement agreement on or before August 14th of 2025?

A.  When we decide to sign the term sheet of the settlement agreement already, like, knows it's by -- it's by -- I think we signed agreement on 1st of August and then by that day, 14 calendar days.  So it should be 14 of August.  So by the end of -- by 1st of August I inform him.

Q.  So if I am understanding you correctly, are you saying that August 1st, 2025, is the first time that you informed Mr. Liang of the company's obligations to transfer the contested funds pursuant to the settlement agreement?

A.  Yes.

Q.  Can we -- I would like to mark as Exhibit 5 to the deposition the document at Tab 1.

MR. DELL'ANGELO:  Ms. York, would you put up in the deposition the document at Tab 5 -- tab 1, which I

Page 56

will mark Exhibit 5.  That's the settlement term sheet in this litigation dated May 29th of 2025.

(Whereupon, Exhibit 5, Singularity Settlement Fund Escrow Agreement, was marked for identification.)

BY MR. DELL'ANGELO:

Q.  Ms. Yang, when that document is available in the deposition, would you please open and take a moment to look at it.  And when you are done, please let me know.

A.  Yes.  I have opened it.

Q.  Do you recognize the settlement term sheet that I have marked as Exhibit 5 to the deposition?

A.  Yes.

Q.  Okay.  What do you understand it to be?

A.  It's by May 29 already have mentioned about -- with 14 days.

Q.  Well, what do you understand the document itself to be?  Do you understand -- I will withdraw that

Page 57

question.

Do you understand the document to be a term sheet regarding the settlement of this litigation between Singularity and the plaintiffs?

A.  Yes.  I understand this is related to the settlement agreement, but that time we still don't know when we will be officially sign the settlement.

Q.  I understand that.  But a few moment ago in one your answers, you used the word "term sheet."  Do you recall that?

A.  Yes.  Term sheet.

Q.  And I just wanted to be clear that a few moments ago when you used the words "term sheet," were you referring to the document at Exhibit 5 as distinct from the stipulation and agreement of settlement at Exhibit 4?

A.  Yes.

Q.  Thank you.  Okay.  So as of today, Singularity has not transferred the contested funds.  Why is that?

A.  As I mentioned, we already made

Page 58

the first payment of 3 million and it's already in the bank processing.

Q. Okay. But I think we are agreed that the plaintiffs have not actually received it; is that correct?

A. Yes. Still not received it.

Q. Okay. And so my question to you is, as the corporate designee of Singularity, why is it that the contested funds were not paid on or before August 14, 2025?

A. So first reason is the bank need time to get our request and then get approved from the bank and it take time. And the second thing is before last week -- before last week, Monday, our -- all of our U.S. bank account is frozen because of we have a case with Mr. Wang and we just made the settlement on last week, Monday.

So after Monday, on Tuesday our bank account just starting to unfreeze. But up to now, still we have Singularity Bank of America account is still frozen. So we still need to ask the bank when we

Page 59

will be unfreeze our bank account.

Q. In the beginning of your answer you referred to a bank that needed more time. What bank were you referring to?

A. The Djibouti Silkroad Bank.

Q. So the bank that you are saying needed more time is the Silkroad Bank in Djibouti; is that correct?

A. Correct.

Q. Does Singularity maintain bank account in Silkroad Bank in Djibouti?

A. Yes.

Q. Does Singularity maintain more than one account at the Silkroad Bank in Djibouti?

A. No. Only one.

Q. And other than the bank account that Singularity maintains at Silkroad Bank in Djibouti, does Singularity have any other bank accounts in Djibouti?

A. No.

Q. Who receives the statements for the bank Singularity bank account in Djibouti?

A. Our financing people, Mr. Liang.

Page 60

Q. And how does he receive those statements?

A. He's talking to the bank by e-mail.

Q. Is it your understanding that Mr. Liang receives the Singularity's Silkroad Djibouti bank account statement --

A. Yes.

Q. -- by e-mail?

A. Yes.

Q. And does anybody else at Singularity receive those statements other than Mr. Liang?

A. No. Only him.

Q. Okay. Where are those account statements stored?

A. Stored -- it's all like electrical, like e-statements. So it's in our company's records.

Q. Do they get saved to a central server or a cloud server or some other document management system?

A. No.

Q. And so where do they reside

Page 61

other than Mr. Liang's e-mail?

A. We have collect all the documents, like, put in -- in the laptop. Like put in the -- in the laptop. Yes.

Q. What -- what documents are you referring to?

A. You mean the -- the bank statement?

Q. Yes. What I am trying to understand is if -- if I understand correctly, Silkroad Bank e-mails Mr. Liang a statement for Singularity's bank account at Silkroad; is that correct?

A. Yes.

Q. Okay. And then what, if anything -- where, if anywhere, other than Mr. Liang's e-mail, is -- is -- are those bank account statements then stored?

A. No. Only by e-mail.

Q. Okay. And to your knowledge, does Mr. Liang save them anywhere? On his laptop? Or only keeps them in e-mail?

A. Save in the laptop.

Q. Okay. And is that laptop with him in China, or --

Page 62

A.   Yes.

Q.   Okay.  Have you ever seen a bank account statement for Singularity's bank accounts in Djibouti at Silkroad Bank?

A.   Yes.  On the way, also have been sent to our audit.

Q.   Okay.  And when -- when have you last seen a statement for Singularity's Silkroad accounts?

A.   Just end of -- last month's.

Q.   So the end of August 2025?

A.   Yes -- yes.

Q.   Okay.  And -- and how did you come to see that statement?

A.   He send to me, and I can see the statement.  And he also send to the -- and also sent to the audit [sic], because we are in the annual audit.

Q.   So in your prior answer, when you were saying "audit," you are referring to auditor?

A.   Yes.

Q.   Okay.  And what auditor are you referring to?

A.   It's called -- we call the --

Page 63

it's a Singapore auditor company.

Q.   And what is their name?

A.   I'll -- I need to spell it.  Give me a sec.

Q.   Okay.

A.   It's called Audit -- Audit, A-L-L-I-A-N-C-E, LLP.

Q.   Okay.  Thank you.  And they're based in Singapore?

A.   Yes.

Q.   Okay.  So Mr. Liang sent you a statement at the end of August for Singularity's Silkroad bank account in Djibouti; is that correct?

A.   Yes.

Q.   Okay.  And how did he send it to you?

A.   He send me by e-mail.

Q.   Okay.  And did he send that to a Singularity e-mail address?

A.   No.  My personal e-mail.

Q.   Do you have a Singularity e-mail address?

A.   I have.

Q.   But he sent it to your personal

Page 64

e-mail address?

A.   Yeah.  Because we are at our -- in China, we also have WeChat.  And sometimes WeChat is more easier to send the documents, but -- because sometimes I'm afraid that e-mail, I can't -- because I have too much e-mails, maybe I am going to miss it.  And we also sent -- we also sent the statement to auditor by WeChat.

Q.   Okay.  So just so we are clear.  Did Mr. Liang send you the -- the Silkroad statement at the end of August by WeChat or to your personal e-mail?

A.   Both.  WeChat and personal e-mail.

Q.   Okay.  And what's the personal e-mail address to which it was sent?

A.   It's SherryYang001@gmail.com.

Q.   Okay.  And what's the -- the WeChat handle that it was sent to?

A.   You mean my WeChat number?

Q.   Yes.

A.   It's SY11240908.

Page 65

Q.   Okay.  And do you have that statement available to you now?

A.   Let me check.  Not sure.  I can't find in my WeChat.  I maybe ask him to send me again.

Q.   Okay.

A.   Yeah.

Q.   And how -- do you regularly receive copies of Singularity's Silkroad bank accounts from Mr. Liang?

A.   I mean, we have -- we have season -- no.  We have always have the -- the auditing.  So every three months, I -- I have got the statement.

Q.   Okay.  And then who sends the statements to the auditor, you or Mr. Liang or somebody else?

A.   Mr. Liang.

Q.   Okay.  And does he include you in the communication to the auditors?

A.   Yes.

Q.   Okay.  So is it correct that you on a -- every three months, approximately, you receive copies of Singularity's Silkroad statements as they are sent to

Page 66

Singularity's auditors?

A. Yes.

Q. And as of August 14th, 2025 -- well, let me withdraw that for a second.

The -- the statements -- so you -- you've seen the statements in communications from Silkroad Bank to Singularity, correct?

A. Yes.

Q. I understand you received them. I just want to make sure that you've actually looked at them.

So you have actually looked at them?

A. You mean by August 14th, I have received the statement.

Q. No. I am asking just more generally.

So I understand that Mr. Liang sends them to you. I just want to know have you actually, you know, opened up the statement and looked at it?

A. Yes.

Q. Okay. And what language are they in, the statements?

Page 67

A. English.

Q. Okay. All right. And when you look at those statements -- are you reading something on your phone right now or your computer?

A. No. I am still looking for the record, but my --

Q. I -- I understand. Thank you.

Okay. So as of August 14th, 2025, what was the balance of the Singularity's bank account at Silkroad Bank?

A. As I remember, it's 14k million -- the balance for -- the balance is 14 -- is -- is 14 -- is $14 million -- is $14,404,000 as of today.

Q. So as of today.

And is that U.S. dollars?

A. Yes, USD dollars.

Q. Okay. So that's September 4th, 2025, correct?

A. Yes.

Q. And -- and how are you getting that number? Where are you getting it from?

Page 68

A. Because I have seen the -- the documents. And then I was -- I have searched my WeChat records -- history. I have seen this number.

Q. Okay. And, but you are saying that that's the number as of today.

Are you able to see the balance on a daily basis?

A. Because the balance, we -- we didn't -- we didn't use that balance, so the balance should be -- because this balance is by the end of last month, so the balance should be no change.

Q. I understand.

So you -- so if I am understanding correctly, you are saying the balance as of August 31st, 2025 was approximately 14,404,000, and you don't expect that that would have changed in any material way, either up or down; is that correct?

A. Yeah. Correct.

Q. And that's because you haven't used the money in the Djibouti bank account for anything?

Page 69

A. Yes.

Q. Okay. And no funds have come in; is that right?

A. Yes.

Q. Okay.

MR. DELL'ANGELO: So let's mark as Exhibit 6 the document at Tab 19, which is the Singularity's Form 10-K [sic] for the period ending March 31st of 2025.

So Ms. York, would you put up the document at Tab 19, and we will mark that as Exhibit 6?

(Whereupon, Exhibit 6, Singularity SEC Form 10-Q for quarterly period ended March 31, 2025, was marked for identification.)

BY MR. DELL'ANGELO:

Q. And, Ms. Yang, when -- when Exhibit 6 is up and available, would you please take look at that. Tell me if you --

A. Yeah. I open that.

Q. Okay. Do you recognize that document?

Page 70

A. Yes.

Q. Okay. And what do you recognize it to be?

A. It's our 10-Q for the period of the end of March 31st.

Q. Okay. And are you generally familiar with this document?

A. Yes.

Q. Okay. And if you go to page 38 of the document, it -- it indicates that it was signed by Jia Yang, the chief executive officer of Singularity, on May 15, 2025.
Do you see that?

A. You mean page 25?

Q. Let me bring it up. I think it's marked as Exhibit 38. I mean --

A. 38.

Q. Page 38.

A. Sorry, 38.

Q. You will see at the top it says, "Signatures"?

A. Yes.

Q. Is that your name there?

A. Yeah. It's my name.

Page 71

Q. Okay. And did you sign this document?

A. Yeah. I have signed this document.

Q. And you signed it in your capacity as the chief executive officer of Singularity?

A. Yes.

Q. Okay. And -- and did you review it before you signed it?

A. Yeah. I have briefly review.

Q. Okay. And what do you mean by "briefly review"?

A. Like, generally, I see some -- some important, like the points briefly, because for the financing parts, it's -- it's mainly responsible our CFO, and as he got approved, and then for me the financing part, I will just see it briefly.

Q. Okay. And who is the CFO that you are referring to?

A. The one also in the 38 page is called Chee Jiong Ng.

Q. Okay. And you see on the next

Page 72

page, it's at the top right-hand corner, it says Exhibit 31.1, Certification Required by Rule 13a-14(a)/15d-14(a) as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002? Do you see that?

A. I am sorry, which page?

Q. The very next page of the document. It has -- it says Exhibit 31.1 in the upper right-hand corner?

A. Next page, right?

Q. Yes.

A. Yes. Yes, I see.

Q. And did you review and sign this document before it was filed with the SEC?

A. Yes.

Q. Okay. And if you look at paragraph 2 it says that "Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by that report."

Page 73

Do you see that?

A. Yes.

Q. And was that statement true and accurate at the time that you signed it?

A. Yes.

Q. And then the next one, number 3 says, "Based on my knowledge, the financial statements, and other financial information included in this report, fairly present all -- in all material respects the financial condition, results in operation and cash flows of the registrant as of, and for, the periods presented in this report."
Do you see that?

A. Yes.

Q. And was that true at the time that you signed this document?

A. Yes.

Q. Okay. And did you review the financial statements or other financial information included in Exhibit 6 at the time that you signed it?

A. Yeah, I have reviewed.

Q. Okay. And then if you turn two

Page 74

more pages, in the upper right-hand corner you will see it says Exhibit 32.1.

Do you see that document?

A. 32.1, yes.

Q. That's the Certification Pursuant to 18 U.S.C. Section 1350 as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.

Do you see that?

A. Yes.

Q. Okay. And did you sign -- did you review and sign this document before it was filed with the SEC?

A. Yes.

Q. And you see number 2 says, "The information contained in this report fairly presents, in all material respects, the financial conditions and results of the company as of and for the period covered by the Report," dated May 15th of 2025.

Do you see that?

A. Yes.

Q. And was that true and correct at the time you signed it?

Page 75

A. Yes.

Q. Okay. So let's go to page -- it's the fourth page of the document and at the bottom it says number 1. Let me know when you're there.

A. Okay. On page 1.

Q. Okay. Thank you.

Do you know what -- what the information on page 1 is generally? Do you know what that is?

A. The current assets.

Q. And that would be the assets as of the time this report was filed, correct?

A. Yes, correct.

Q. Okay. And if you look at the first line shaded in blue, do you see the word "cash" there under assets, current assets?

A. Yes.

Q. Okay. And if you read across under the column marked March 31, 2025, it indicates that the company had $14,873,924 in cash.

Do you see that?

Page 76

A. Yes.

Q. Okay. And to the best of your knowledge, was that true and correct at the time that this 10-Q was filed with the SEC?

A. Yes.

Q. Okay. And then under that it says "Restricted cash" under -- for the column March 31, 2025, it says $3,048,227.

Do you see that?

A. Yes.

Q. Okay. And was it a true and correct statement that Singularity's restricted cash was $3,048,227 as of March 31, 2025?

A. Yes.

Q. Okay. The cash and restricted cash reflected on page 1 under the financial information section of Exhibit 6 that we just looked at, as of March 31, 2025, what -- where was that cash held by Singularity?

A. We have made 3 million for the Solarlink Group.

Q. So what I am trying to

Page 77

understand, I apologize if my question wasn't clear, so would you agree that the 14,873,924 and the 3,480,000 totals about $17.9 million, can we say, roughly?

A. Yes.

Q. Okay. So that roughly $17.9 million, where did the company keep that money?

A. So the cash 14 million, it's in Djibouti Silkroad Bank. And the 3 million in restricted cash is in East West Bank of New Energy.

Q. Okay. And New Energy is a subsidiary of -- or I am sorry, an affiliate of Singularity?

A. Yes.

Q. So would you turn to page 7 of this document, please?

A. Yes.

Q. And you see in the middle of the page there's a small letter (e) in parentheses and then it says "Cash."

Do you see that?

A. Yes.

Q. Okay. Do you have an

Page 78

understanding of what the information under the section "Cash" is discussing?

A. Cash consists of cash on hand and cash in banks.

Q. Okay. So this section is discussing, is it correct, or is it your understanding --

A. Okay.

Q. -- that the section titled "Cash" on page 17 is attempting to explain where the cash, the $14,873,924 of cash on page 1 is located or held by the company?

A. Yeah.

Q. Just so we're clear, is that your understanding or are you --

A. Yes.

Q. So looking under that section of "Cash" on page 7, the second sentence says, "The Company maintains cash with various financial institutions mainly in the PRC, Hong Kong, the U.S. and Djibouti."

Do you see that?

A. Yeah.

Q. Okay. So from March 31st, 2025

Page 79

to today, were there any other accounts in Djibouti that Singularity held cash in that you haven't testified about today?

A. No.

Q. Okay. So it's just the one account at Silkroad Bank, correct?

A. Yes.

Q. Okay. And then it refers, this 10-Q that you signed also refers to cash being held at a financial institution in the United States.

What financial institutions does that refer to?

A. I am sorry, which part?

Q. So the sentence says, "The Company maintains cash with various financial institutions mainly in the PRC, Hong Kong, the U.S. and Djibouti."

A. Yes.

Q. And what I am asking is, the cash held at financial institutions in the U.S., what financial institutions are those?

A. You mean the bank name?

Q. Yes.

Page 80

A. The Bank of America.

Q. And from March 31st, 2025 to the present, has Singularity had any bank accounts in the United States other than the bank account or accounts at Bank of America that you just referenced?

A. No.

Q. Okay. And how many accounts does Singularity have at Bank of America?

A. Only one.

Q. Okay. Do you know which branch of Bank of America Singularity uses for that account?

A. Branch, I don't know. I just know it's Bank of America.

Q. And does Singularity receive statements for its Bank of America account in the United States?

A. Yes. Also the e-statement.

Q. And so it only receives electronic statements; is that correct?

A. Yes.

Q. Okay. And who receives those statements, if you know?

A. The virtual office.

Page 81

Q. So they get e-mailed to the virtual office or they get physical copies the bank statement?

A. Sorry. The e-mail is going to Sherry Feng. She is the board secretary and she is the signer of the Bank of America.

Q. Where is she located again?

A. She is also same as me, remotely.

Q. Where is she located?

A. I believe she is now in California.

Q. Do you know where in California?

A. I don't know.

Q. Can you remind me what her title was of the company?

A. The board secretary.

Q. The board secretary.

A. Yes.

Q. The board secretary may live somewhere in California but you don't know where; is that correct?

A. As I know because I will not go her house -- like she is maybe in Orange

Gao vs.
Singularity Future Technology

Case 1:22-cv-07499-BMC    Document 128-6    Filed 09/18/25    Page 23 of 58 PageID #:
2991

Jia Yang
September 04, 2025

Page 82

County.

Q.   Is she the only one that receives Singularity's Bank of America statements, or does someone else receive them?

A.   Only her because she is the signer.

Q.   She is the company's signatory on that account?

A.   Yes.

Q.   Does she or somebody else then provide you with a copy of the Singularity's Bank of America statements?

A.   Yes.  She will give to me -- provide it to me.

Q.   How does she provide them to you?

A.   Also sent by WeChat.

Q.   Okay.  The same WeChat number that you gave us earlier in your testimony?

A.   Yes.  And also provided to the auditor.

Q.   Okay.  Does that happen on a monthly basis or some other periodic

Page 83

basis?

A.   Every three months.

Q.   So Ms. Feng provides you and the auditor -- Singularity's auditor with Singularity's Bank of America's statements every three months?

A.   Yes.

Q.   Do you have any of those statements with you now?

A.   I also need to find it.

Q.   While you are looking for that, do you know the current balance -- what is the current balance of Singularity's Bank of America?

A.   She just sent me -- because she normally easily sent to me the screenshot of the bank.  So by today our bank still not unfrozen, unfreeze and the balance, it's still zero.  I mean, the bank is holding -- holding us around 60 -- not 60 -- 73.519,000 USD dollars.

Q.   Okay.  It's not that the balance is zero, it's that you cannot access the balance; is that correct?

A.   Yes.  It's showed legal order

Page 84

and bank is holding that.

Q.   Okay.  What legal order are you referring to?

A.   Or Mr. Wang.

Q.   So just so we are clear, other than the Bank of America account for which Ms. Sherry Feng is the signatory that has approximately $73,519, Singularity has no other bank accounts in the United States; is that correct?

A.   Yes.  Only one.

Q.   So looking back at Exhibit 6, that language we were looking at on page 7, it also refers to bank accounts in Hong Kong.  What bank account -- how many bank accounts does Singularity maintain in Hong Kong?

A.   Only one, but this bank account in Hong Kong already, I think, canceled by bank.

Q.   Well, what bank was that?

A.   HSBC.

Q.   Okay.  And are you saying that HSBC canceled Singularity's -- or closed Singularity's Hong Kong bank account?

Page 85

A.   Yes.  Closed.

Q.   And when did it close it?  When did HSBC close Singularity's bank account in Hong Kong?

A.   I think one month or two months before.  We were trying to transfer money and the bank didn't approve and then they closed our bank.

Q.   Where were you trying to transfer money from and to when HSBC closed Singularity's Hong Kong bank account?

A.   We were trying to transfer the money from HSBC to Bank of America.

Q.   What was the balance of the HSBC Bank account when it closed?

A.   I need to find out because this is long time ago.

MR. HUNTER:  Sherry, just testify as best you can.  Just give the best answer that you can.

BY MR. DELL'ANGELO:

Q.   If I understood your testimony you said it was closed a month or two ago, or did I misunderstand what you said?

Page 86

A. It is closed already.

Q. Okay. When did it get closed?

A. I need to find --

Q. As you sit here, you don't know whether HSBC closed the Singularity Hong Kong bank account?

A. I only remember it's like maybe one month ago, not the specific date.

Q. What was the balance of the HSBC account when it was closed?

A. I need to find out because my memory is not that good.

Q. Okay.

A. I think I don't have this document showing the balance of HSBC when closed.

Q. Okay.

A. I just heard it's closed.

Q. You just heard that it was closed?

A. Yes. And then the financing people dealing with the bank.

Q. And who are the financing people that you are referring to?

A. Mr. Liang.

Page 87

Q. Okay. Who had -- who had signatory authority for the -- Singularity's HSBC account?

A. It's also him.

Q. Mr. Liang?

A. Yes.

Q. The money that was in Singularity's HSBC account when was closed by HSBC approximately a month ago, where did that money go?

A. You mean that after it close, the money?

Q. Yes.

A. I think the bank will return the money but still bank need to process it. It take time.

Q. I guess I would just like to be clear. Do you know where the money -- where Singularity that was in the HSBC Hong Kong bank account went after it was closed?

A. I don't know, no.

Q. Can you look at -- let's go back to Exhibit 6, page 7. If you -- that paragraph that we were looking at that

Page 88

says "Cash," can you go down 7 lines, count 7 lines down?

A. Yes.

Q. Sentence that begins "As of March 31st of 2025," I want to direct your attention to that sentence?

A. Yes.

Q. Okay. So that sentence says, just if you could look along with me, it says "As of March 31st, 2025, and June 30, 2024, cash balances of $66,344 and $65,997 respectfully were maintained at financial institutions in Hong Kong, which were all covered by an insurance."
Now, do you see it says "financial institutions," plural, meaning more than one. Do you see that?

A. Yes.

Q. Do you understand this to mean there was more than one financial institution at which Singularity was maintaining cash in Hong Kong?

A. Yes.

Q. Okay. And did that include Bank of America?

Page 89

A. I mean, it's only saying Hong Kong. Bank of America is U.S.

Q. I am sorry. I will withdraw that.
The financial institutions referred to in the sentence that I read where the company is maintaining cash in Hong Kong, is one of them HSBC?

A. Yes.

Q. Okay. And what are the other financial institutions other than HSBC?

A. No. Only HSBC.

Q. You understand that the 10-Q that you signed says financial institutions, meaning more than one, right, in Hong Kong?

A. No. Only one as I know it. Only HSBC.

Q. Okay. So when it says "financial institutions," plural, in -- at -- in Hong Kong, does that mean that the SEC filing is incorrect?

A. Okay. I can see it's balance of 66 and 65.

Q. Right. But what I am trying to

Page 90

get at is it -- is the SEC filing that you signed refers to financial institutions, with an "s," meaning more than one.

But what you have told us is that there was only -- the only financial institution in Hong Kong was HSBC.

And so what I am trying to understand is, is there another financial institution in Hong Kong at which Singularity held cash at any time from March 31st, 2025 to present?

A.   Let me check.  I just -- I think otherwise we have two HSBC account, but I misunderstand.  It's only one.

Okay.  I have find -- I think -- I think because I cannot 100 percent sure because, as I -- my understanding HSBC may have two accounts holding by Singularity.

But one, I think one is already closed.  The record 1st of August is closed by the bank.

Q.   And what was the balance in the HSBC account that was closed as of August 1st?

A.   Sorry.  Because this document

Page 91

cannot...

Q.   What documents are you referring to?

A.   I am looking for the -- when the bank is closing it -- it's going to have some documents, but I can't open this picture.  I don't know why.

Q.   And I apologize if I asked you this already, but I just want to confirm.

Who had signature authority on the HSBC account in Hong Kong that you testified about earlier?

A.   Oh, it's Mr. Liang.

Q.   Okay.  Thank you.

Do -- do you know the last two or three digits of the Hong Kong bank account at HSBC that was closed that you testified about?

MR. HUNTER:  We may -- after this question, guys, we have been going for two hours almost.  We would like to take a break.

MR. DELL'ANGELO:  Okay.

MR. HUNTER:  I mean there's a question pending.  I -- I get it.

Page 92

A.   Okay.  Let me check.  The digit, I can only see the...

BY MR. DELL'ANGELO:

Q.   So are you looking at the statement for one of the HSBC accounts?

A.   It's not statement.  I just have information at -- for all of the bank account we have.  We have Excel documents, but it didn't write it down, the -- the bank account number.

Q.   Okay.  So you are saying you have an Excel spreadsheet that lists all of Singularity's bank accounts?

A.   Yeah.  I have a -- a sheet.

Q.   Okay.  And -- and generally, what information does that sheet tell you?

MR. HUNTER:  I am going to object.

I am going to advise you, Sherry, to not testify about the documents.  In fact, I'm advising you to put documents away and not refer to them.

You are not required to -- I didn't object earlier to try to be

Page 93

helpful in the deposition.  But now we're -- it's encouraging plaintiffs to go further and further beyond the topics.

So I'm advising you to not reference documents in your testimony any further.

THE WITNESS:  Okay.

BY MR. DELL'ANGELO:

Q.   Okay.  And are you taking your counsel's advice?

A.   Yes.

Q.   Okay.

MR. DELL'ANGELO:  Well, Mark, I believe you wanted to make a break.  We will honor your request.

MR. HUNTER:  I appreciate that.

THE VIDEOGRAPHER:  All right.  Going off the record at 12:05.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  Going back on the record at 12:16.

MR. HUNTER:  Before we -- before we continue, Michael, I would like to

Gee vs.
Singularity Future Technology

Case 1:22-cv-07499-BMC    Document 128-6    Filed 09/18/25    Page 26 of 58 PageID #:
2994

Jia Yang
September 04, 2025

Page 94

make a brief record.

Ms. Yang's answers that go above and beyond the topics designated should not be considered binding on the company.

I understand you have some latitude. But I'd just like the record to be clear that the company intends to take the position that anything above and beyond those topics is not binding on the company.

You -- you can continue with that record. Thank you for the indulgence.

BY MR. DELL'ANGELO:

Q. Ms. Yang, we took a break of about ten minutes. Did you speak to your counsel during the break?

A. Yes. He just tell me to --

MR. HUNTER: Yes. I did. Sherry, don't testify about what we discussed.

THE WITNESS: Okay.

A. Yes.

BY MR. DELL'ANGELO:

Page 95

Q. And you -- did you testify about -- sorry.

Did you speak to your counsel about your testimony?

MR. HUNTER: Objection.

You are asking about the substance of what we discussed, and you and I both know that's privilege.

So I am advising you, Sherry, do not answer that question.

MR. DELL'ANGELO: No. I am not asking about the substance.

BY MR. DELL'ANGELO:

Q. The question is whether or not you discussed your testimony with your counsel during the break. It's "yes" or "no" question.

MR. HUNTER: And I am advising her, her testimony would be the substance of our discussion.

And again, I am advising her not to answer that on the ground that it's privileged.

(Whereupon, a request for instruction not to answer was made.)

Page 96

BY MR. DELL'ANGELO:

Q. How did you communicate with your counsel during the break?

MR. HUNTER: You can answer that, Sherry.

A. By phone call.

BY MR. DELL'ANGELO:

Q. And who was on the phone call?

A. Only us.

Q. Who is "us"?

A. Me and Mark David Hunter.

Q. Okay. So when we took our break, we were looking at Exhibit 6. Exhibit 6 also refers to financial institutions in the PRC.

Do you recall that or see that in Exhibit 6 on page 7?

A. Yes.

Q. What is the "PRC"?

A. It's China.

Q. Okay. And is it correct that, at least as of March 31st, 2025, Singularity maintained bank accounts in China?

A. Yeah.

Page 97

Q. How many bank accounts did Singularity maintain in China as of March 31st, 2025?

MR. HUNTER: Objection. Asked and answered.

You can answer, again, Sherry.

A. I think we only have one.

BY MR. DELL'ANGELO:

Q. Do you know for sure?

A. I am sorry. This -- this part I don't know. I only -- the bank accounts in U.S. and Djibouti and Hong Kong.

Q. I am sorry. I didn't catch the first part of your answer.

You only what about the accounts in the U.S. and Djibouti?

A. Yeah. And the Hong Kong, it's already closed.

Q. I understand.

I -- I apologize, but I didn't hear the first part of your last -- your two answers ago when you said, "I only" -- something -- about the bank accounts in the U.S. and Djibouti.

Could you just repeat It?

Page 98

Because I did not hear. I apologize.

A.   I mean I -- I only -- I only know.

Q.   Are you saying that you only -- you're only -- as you sit here today, you only have information about the company's bank accounts in the U.S. and Djibouti?

A.   Yes.

Q.   Okay. So do you -- do you know whether or not Singularity maintains a bank account in China as of today?

A.   I don't know.

Q.   Okay. Do you know if the company maintained a bank account in China as of August 14th, 2025?

A.   I don't know.

Q.   Do you know if the company maintains any cash or assets in China currently?

A.   I don't know.

Q.   Okay. So does the company maintain bank accounts in Australia?

A.   No.

Q.   Did the company maintain assets -- or bank accounts in Australia?

Page 99

A.   No.

Q.   To the best of your knowledge, the company has never maintained bank accounts in Australia?

A.   Yeah. As my knowledge, no.

Q.   Okay. So we've talked about China, Hong Kong, the U.S., and Djibouti.
     Are there -- does Singularity maintain bank accounts in any other countries that you haven't testified about today?

A.   No.

Q.   Between the period from August 20 -- August 14, 2025, to the present, are you aware of the existence of any bank accounts that Singularity maintains you have not already testified about today?

A.   No.

Q.   Okay. So does Singularity have -- as of today, does Singularity have sufficient funds to pay the contested amount, the $6.25 million?

A.   We have the funds in Djibouti bank.

Page 100

Q.   Okay. And that's the Silkroad bank, right?

A.   What do you mean -- oh, Silkroad, yes.

Q.   Okay. And let's talk about the status of the funds in Djibouti.
     I think you testified earlier that the company attempted to transfer $3 million from its Silkroad account; is that correct?

A.   Yes.

Q.   Okay. When was that?

A.   It's after we sign the Huang settlement agreement last Monday, and we submit on Tuesday.

Q.   So you signed the Huang settlement agreement on September 1st?
     Monday, September 1st; is that correct?

A.   We sign the agreement I think on -- on Saturday, but we made -- we made the payment to Huang on Monday.

Q.   Okay. So you signed it on -- I just want to make sure we have the information correct.

Page 101

     So you signed it on August 30 -- Saturday, August 30th; is that correct?

A.   Yes. And -- and then we -- because the settlement is mentioned that we need to transfer the money to -- to his account, then they will start to unfreeze our bank account.

Q.   And who are the "they"? Is that Huang or his counsel?

A.   Huang and his counsel, yes.

Q.   Okay. And you need -- so what -- what amount are you transferring -- and when you say "you," you're referring to the company, Singularity, correct?

A.   Yes.

Q.   Okay. And what amount is the company transferring to Huang as part of the settlement to unfreeze its accounts?

A.   It's 300,000.

Q.   Okay. And has the company paid Huang the $300,000 yet?

A.   Yes.

Q.   And from what account or accounts was Huang paid the $300,000?

Page 102

A.   We -- we have the loan from two companies.

Q.   So is it correct that Huang's -- the $300,000 settlement payment to Huang was not paid from a Singularity bank account, but rather by virtue of a loan?

A.   Yes.

Q.   And why was -- why is that?

A.   Because we -- we don't have any available bank account and we don't have enough funds in the U.S.

Q.   Okay.  And is there any reason the company couldn't take a loan to pay the contested amount of $6.25 million pursuant to the settlement agreement as it did with Huang?

A.   Oh, that's -- that's a big difference because the amount is big different.

Q.   I understand that.  I'm just asking if there's a reason that the company couldn't do that.

A.   Because we -- we just can't get such a big amount of loan.

Q.   Okay.  And who did the loan come

Page 103

from to pay the Huang settlement?

A.   I need to find out.  It's called -- it's called -- it's two companies name.  Let me check.

     So one is A-T-I C-H-E-M-I-C-A-L-S International.

Q.   And is there another one?

A.   Yes.  This one we made the payment of 200,000.

     And let me find another one.

     Another 10,000 is P-L-A-T-B-U-S.  That's all I looking for.

Q.   And so that's $210,000 of the $300,000, correct, to Huang?

A.   The total is $300,000, yes.

Q.   Right.  But I think you indicated that HEI was paying $200,000 and P-L-A-T U.S. was paying $10,000, right?

A.   Yes.

Q.   Okay.  So that leaves a $90,000 difference, right?

A.   What means "difference"?

Q.   Well, you said that the payment to Huang was $300,000 and --

A.   Yes.

Page 104

Q.   -- you have accounted for $200,000 and $10,000.  So 200,000 plus 10,000 is $210,000, minus $300,000 leaves $90,000.

A.   Oh, sorry, I apologize.  It's 100,000.  200,000, 100,000.

Q.   Okay.  So it's 100,000 from Plat USA and 200,000 from HEI?

A.   Yes, that's correct.

Q.   All right.  As part of the settlement with Huang, was there an agreement that Huang's counsel would do something to lift restrictions on Singularity's bank accounts?

A.   You mean Huang's counsel -- after they received the funds, Huang counsel starting to send the letter, unfreeze letter to the bank.

Q.   Which banks are those?

A.   It's Bank of America.

Q.   Okay.  Any other banks?

A.   Other banks is our subsidiary companies.  It's not operated --

Q.   I'm not sure I understand your answer?

Page 105

     What I am trying to understand is, was Huang's lawyer, as part of your settlement with Huang, was he supposed to send letters to any banks other than Bank of America to unfreeze Singularity's bank accounts?

A.   Yes.  Huang's counsel need to send those letters.

Q.   To which banks?

A.   The Bank of America.

Q.   Okay.  Any banks other than Bank of America?

A.   No.

Q.   Did Huang's counsel do anything to freeze Singularity's assets in Silkroad Bank in Djibouti?

A.   No.

Q.   Okay.  So is it correct that Singularity's assets in Djibouti were not frozen or restricted in any way because of the Huang action?

A.   No.

Q.   That's not correct or that is correct?

A.   That is correct that Huang's

Page 106

counsel -- Silkroad didn't freeze or restrict by Huang's case.

Q. Okay. So why has Singularity been unable to transfer any of the contested funds successfully out of its Silkroad account in Djibouti?

A. Because it's -- it depends on the bank approve. We have submit to request to transfer the money, but bank need time to -- to approve it and process it. It all depends on the bank to approve.

Q. Okay. Are there -- to your knowledge, or to the company's knowledge, were there any -- are there -- were there any ongoing limitations placed on Singularity's bank accounts by restraining notices by Huang that has made Singularity unable to effectuate the transfer of the contested funds?

A. Sorry, I need translate.

Q. Would you like me to re-ask that?

A. Can you ask the question again?

Q. Yes.

Page 107

Are there any -- are there any ongoing limitations on Singularity's bank accounts caused by restraining notices by Mr. Huang that has made Singularity unable to effectuate the transfer of the contested funds?

A. Yes. Actually since our bank account is all frozen, we even cannot submit the request to transfer from Djibouti.

Q. So which bank account are you referring to that's frozen?

A. Bank of America.

Q. Okay. So is what you're saying is that because the Bank of America account is frozen, you can't make the request for Silkroad to send the money to Bank of America?

A. Yes.

Q. Okay. And the Bank of America account is not unfrozen because of the Huang action yet, correct?

A. Yes.

Q. Is there any reason that -- so do you understand that the escrow account

Page 108

into which the contested funds were supposed to go was at Citibank?

A. Yes. The escrow, yes.

Q. Okay. Why couldn't Singularity transfer the contested funds from Silkroad, from its account at Silkroad, directly to the escrow account of Citibank?

A. Well, it's also we need to submit -- like we need to request the bank to give us approval because it's all related to the exchange things. And the bank -- the bank get approve, it take times.

Q. Okay. So it sounds like there are two issues. I just want to make sure I understand.

You're saying that because the Bank of America account was frozen --

A. Yes.

Q. -- even if the bank in Djibouti was willing to transfer the funds, the contested funds, they couldn't go into the Bank of America account until it was unfrozen; is that correct?

Page 109

A. Yeah. For Bank of America, yes. But for you mean the escrow, escrow Citibank, it's -- it's -- we need to talk to the bank and get bank approval and it take us a long time.

Q. And when you say "get bank approval," what bank are you referring to?

A. The Djibouti.

Q. Okay. So I just -- but I want to just make sure that we understand the process because part of what we're -- we're supposed to be -- supposed to be testifying today is the process by which the settlement funds will be transferred to United States account.

And I just would like to understand, from the company's perspective, is there -- is there any reason why the contested funds cannot be transferred directly from Singularity's Silkroad account in Djibouti to the escrow account at Citibank?

A. Well, I think the first thing, we need to get the bank approval for the exchange, the amount of the money. So we

Page 110

get the first approval of 3 million is already take a long time. So the two reasons -- two reasons, one is the frozen accounts is for the 3 million cash but another part -- another side the bank approval take a lot of time.

Q. So I understand that there is the bank approval question. I am really trying to understand one thing. Let's assume -- well, not assuming. All I am trying to understand is, is there any restriction by Huang or anyone else that you are aware of that would prevent Singularity from transferring the contested funds directly to the Citibank escrow account?

A. Okay. They have another policy that Djibouti only can transfer to the first party of Singularity, the bank account name.

Q. Okay. So is what you're saying is that Silkroad will not transfer funds to a third party such as the escrow account, it has to go to a Singul- -- a different Singularity account?

Page 111

A. Yes.

Q. Okay. Did Singularity attempt to open any other account in the United States into which the contested funds could have been transferred, so another first-party account directly from Djibouti?

A. Because before we have legal orders where we are unable to open any of the accounts and now I think -- I believe the Bank of America will be unfreeze as soon as possible. I think the bank already received the unfreeze letter, and they are -- I think for Bank of America processing maybe only take few days.

Q. So you've talked about transferring $3 million of the contested funds but --

A. Yes.

Q. -- but the contested funds are $6.25 million. To date, has Singularity taken any steps to transfer the other $3.25 million?

A. Yes. And we already get prepared all the requested documents and

Page 112

we are planning to submit to the bank by end of this week.

Q. Okay. Is it correct that as of today, as of right now Singularity has not attempted to transfer the additional $3.25 million of contested funds?

A. Yes.

Q. Okay. And with respect to the $3.25 million fund -- I am sorry. I will withdraw that.

With respect to the $3 million that Singularity attempted to transfer from Djibouti to Bank of America, when did Singularity make the transfer request to Silkroad?

A. Last Tuesday.

Q. So that would be August 26th?

A. Yes.

Q. Okay. And why did Singularity wait until August 26th if the deadline was August 14th?

A. Because the frozen bank.

Q. Okay. And who is responsible for making the $3 million transfer from Silkroad to Bank of America, or the

Page 113

request for it on August 26th?

A. Mr. Liang.

Q. And who is responsible for making the transfer of the $3.25 million portion of the contested funds?

A. Also Mr. Liang.

Q. And other than the limitations placed on Singularity's account -- well, withdraw that.

What are the limitations or impediments to transferring the contested funds that Djibouti or that Silkroad Bank has imposed?

A. I am sorry. What is the question?

Q. Yes. I am trying to understand -- well, let's walk through the process. In order -- I will withdraw the question.

In order for Singularity to make the $3 million transfer, a portion of the contested funds, explain to me what the bank did.

A. Okay. The bank --

Q. I am sorry. I apologize for

Page 114

interrupting you. I misstated my question.

With respect to the $3 million that Singularity attempted to transfer from Silkroad to Bank of America, can you explain what Singularity did to request the transfer?

A. Well, we need to prepare the documents that the bank needs. We need to send a formal e-mail to request that we need to request the exchange money out of Djibouti to U.S. And the bank -- once the bank receive the request, they will do the internal processing to give -- then we need to wait until the bank gave us a response.

Q. Are the funds -- Singularity's funds in Djibouti, what currency are they held in?

A. The currency -- it's Djibouti. Djibouti money. I don't know what is that money.

Q. So the company has $14 million, which is almost all of its unrestricted cash in a bank account in Djibouti, but

Page 115

you don't know what currency it's held in?

A. No. Because I received the bank statement is USD dollar.

Q. Okay. So --

A. In the bank -- it's still how to say it. I want to talk to Ing for Chinese. I am not sure if she heard my words.

MR. DELL'ANGELO: Ms. Allen, the witness had a translation request. Did you catch that?

THE INTERPRETER: I am sorry. I was muting the whole time.

A. Our Djibouti bank statements are denominated in U.S. dollars, but we are still subject to their foreign exchange controls. If we request to transfer out for U.S. dollars, the Djibouti bank must still approve our foreign exchange quota. It refers to a foreign exchange quota to us by Djibouti bank.

Q. So the money is held in U.S. dollars but it's subject to a foreign exchange quota?

A. Yes.

Page 116

Q. What do you mean by "foreign exchange quota"?

A. I mean because the bank is in Djibouti, it's already related Djibouti government policy. The center of the bank, they have this policy.

Q. Is this the first time -- Singularity has attempted to transfer the contested funds out of Djibouti. Is this the first time that it's attempted to move money out of Djibouti?

A. Yes.

Q. And so since Singularity opened its Djibouti bank accounts, it's never attempted to move money out of Djibouti; is that correct?

A. Yes.

Q. And so does the company then pay its bills, liabilities out of other bank accounts?

A. No.

Q. How does it pay its -- how does it otherwise pay its bills?

A. You mean Djibouti bank to pay the bills?

Page 117

Q. No. What I am asking is if the transfer of the contested payment is the first time that the company ever moved money out of Djibouti, out of its Silkroad Bank account, when it has other bills to pay like your salary or rent or whatever, what bank account does it use?

A. The Bank of America or for the employee salary, we sometime use the subsidiary bank account.

Q. Which subsidiary companies are those?

A. New Energy Technology and Gorgeous Trading.

Q. Are those -- are the assets of those companies listed in the companies' 10-Qs and available to the company to pay the contested amount?

A. No. They don't have balance.

Q. They don't have balance?

A. Yes. And also frozen.

Q. So the subsidiary accounts were frozen as well?

A. Yes.

Q. They were frozen by Huang's

Page 118

counsel?

A.   Yes.

Q.   And for how long has the Bank of America account been frozen by Huang's counsel?

A.   I think since May.

Q.   May of 2025?

A.   Yes.

Q.   When in May of 2025?

A.   I need to look up.  1st of May.

Q.   So Huang counsel froze Singularity's Bank of America account in the United States as of May 1st of 2025?

A.   Yes.

Q.   So if we go back to Exhibits 5, that's the term sheet, just stake a look at that real quick.

A.   Yes.

Q.   Okay.  And if you look at last page, that's dated May 29th, 2025, right?

A.   Yeah.  Yes.

Q.   So at the time the company, Singularity, signed -- entered into the term sheet, it had known for 28 days that its bank accounts were frozen, correct?

Page 119

A.   The bank frozen solution is like this.  Well, so they -- they are not frozen all the accounts in one time.  So they frozen account one by one.  Like, first they frozen the Bank of America of Singularity.  Then, after maybe the one months, they frozen -- the -- the Chase of New Energy.

So it's at least one by one we -- we were always thinking we still have bank account can use.  But at the end, they frozen everything.

Q.   So Singularity's Bank of America account was frozen May 21, '25, but its subsidiary's bank account at Chase was frozen sometime later?

A.   Yes.

Q.   And I am sorry.  Which subsidiary was that?

A.   New Energy Technology.

Q.   And New Energy Technology had bank account at Chase?

A.   Yes.

Q.   And that was in the United States?

Page 120

A.   Yes.

Q.   And was your plan -- was the company's plan at the time that it entered into the term sheet to transfer money from Djibouti to New Energy's Chase account to pay the contested amount?

A.   Yeah.  We -- actually, we totally have five -- five bank accounts in U.S., like including all the -- the subsidiary company accounts.  So we -- we were thinking we still have bank accounts we can use.

Q.   And so --

A.   We're --

Q.   Sorry.  I didn't mean to interrupt.  Sorry.

A.   It's okay.  I just -- I just want to mention that after one months, I think Chase get frozen.  And then we were thinking we still have the Gorgeous -- the Gorgeous Trading Bank of America still can use.

But -- and we actually using that bank account to pay the salary things.  It's working well.

Page 121

But after another month, Gorgeous was frozen.  So it's at least like one by one we -- we didn't -- we didn't think about it will be froze -- froze everything.

Q.   Okay.  So there -- so you're saying that there are actually -- in addition to the Singularity bank of account -- Bank of America account in the United States, the company subsidiaries have five other bank accounts.

Are they all in the United States?

A.   Yeah.

Q.   So New Energy has a Chase Bank account in the United States; is that right?

A.   Yes.

Q.   And what's the balance of that account?

A.   The balance -- the balance now, it's around 9,000 USD, dollars.

Q.   Okay.  And Gorgeous Trading has an account at Bank of America; is that right?

Page 122

A. Yes.

Q. And what's the balance of that account?

A. It's only 300 USD dollars.

Q. And what are the other three accounts in the U.S.?

A. And -- and the New Energy has East West Bank.

Q. All right.

A. East West Bank is also in U.S., and the -- the balance is only 1,000.

Q. Okay. So there -- I believe that's three banks --

(Crosstalk.)

A. -- and another one is SG Shipping. SG Shipping Bank of America, but this Bank of America accounts we already closed.

Q. And when did you close those? Or when were those accounts closed?

A. May.

Q. May of 2025?

A. Yes.

Q. And why were they closed?

A. May -- May or June. Because at

Page 123

that time we didn't use that bank accounts for a long time, and the bank is always charging us the service fee. And we think it -- it doesn't make sense that if we don't use that bank -- bank accounts that time.

Q. And what were the balances of the East -- sorry, of the SG Shipping accounts at Bank of America when they were closed?

THE VIDEOGRAPHER: Going off the record at 12:58.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: Going back on the record at 1:04.

BY MR. DELL'ANGELO:

Q. So, Ms. Yang, before I guess we lost you and went off the record, the question I had asked is -- was about Singularity's subsidiary SG Shipping had, as I understand it, two bank accounts at Bank of America that were closed in May or June of 2025.

What were the balances of those

Page 124

accounts when they were closed?

A. SG Shipping, when we close it in June, the amount is -- is -- it's 900. And we -- we asked bank to close it. But bank saying because we have legal order so the money 900 would not return to us.

Q. Is it $900?

A. Yes --

Q. Okay. And was there --

A. -- $900.

Q. Sorry.

And did SG Shipping have two accounts at Bank of America?

A. SG Shipping only had one Bank of America.

Q. Okay. So you -- you talked about New Energy's account at Chase. That's one.

Gorgeous Trading had a bank account at Bank of America.

New Energy also had an East West Bank account.

And SG Shipping had a Bank of America accounts.

So that's four accounts. But I

Page 125

think earlier you had said five. So is there one other account that we haven't covered?

A. Oh. My five means including Singularity Bank of America, to totally five.

Q. I understand. Thank you.

A. Sorry.

Q. So -- so that we are clear. From, let's say, May 29th, 2025 to the present --

A. Yes.

Q. -- what other bank accounts, if any, did Singularity or its subsidiaries or any companies it controlled have that you have not already testified about?

A. I mean all bank accounts -- those five accounts all don't have enough funds.

Q. No. What I am trying to understand is if there are any other accounts that Singularity or any of its subsidiary or companies that it controlled have that you have not already testified about?

Page 126

A. Yes. For those five, yes.

Q. Okay. I think you may not be understanding the question. I just want to make sure we're -- we're clear. Let me try to ask a different way.

Are there any bank accounts that you know about that Singularity had or that it Sing -- its subsidiaries had that you have not testified about already?

A. No.

Q. Okay. And so earlier you referenced a spreadsheet with bank accounts that you have.

Does that spreadsheet list any -- without looking at the spreadsheet, does that spreadsheet have any bank accounts that you haven't talked about today?

A. I'm sorry. I need translate.

Q. You're on mute again.

THE INTERPRETER: Can you repeat it again?

MR. DELL'ANGELO: Yeah. So what I'm -- what I am asking is the spreadsheet that she testified about

Page 127

earlier, does it list any bank accounts that the witness has not already testified about today?

A. This is all the bank on the list.

BY MR. DELL'ANGELO:

Q. Okay. And who prepares that spreadsheet?

A. Our -- our bank -- our financing people.

Q. Is that Mr. Liang or someone else?

A. CFO.

Q. And who is that?

A. Chee Jiong Ng, our CFO.

His name is showing on the -- his name is here, C-H-E-E; Jiong, J-I-O-N-G; and N-G.

Q. So when Singularity, Mr. Liang, made the transfer or attempted to make the transfer of $3 million from the Silkroad account to Singularity's Bank -- Bank of America account on August 26th, why -- why did it attempt to transfer less than all of the contested funds?

Page 128

A. Because this 3 million is the bank gave us the approval amount. They -- they won't give us more than 3 million.

Q. Okay. So -- so that we are clear.

Are you saying that as of August 26th, 2025, Silkroad Bank gave Singularity authorization to transfer $3 million to Bank -- its Bank of America account?

A. By 26, we submit the request to the bank. Then the bank going to be -- going to the processing. And it -- it supposed to be transferred successfully by September 20 to September 30 -- I mean by the end of this month.

Q. Okay. But I -- I just want to make sure that we have a clear record and understanding among ourselves.

What -- what I understood you a moment ago to say two answers ago is that the reason Singularity only attempted to transfer $3 million versus the $6.25 million is because --

A. Yes.

Page 129

Q. -- the Silkroad Bank authorized Singularity to transfer $3 million.

A. Yes.

Q. Is it -- okay.

And so is it correct that some time Silkroad Bank authorized Singularity to move $3 million out of its account at Silkroad to Bank of America?

A. Yes.

Q. And when did -- when did Singularity receive Silkroad's information that Singularity was authorized to transfer $3 million from its account at Silkroad to Bank of America?

A. Well, we need -- we need to -- we need to wait because once when we -- when we submit the request, the bank told us we're going to take maybe around one month. So it's going to maybe arrive by the end of September.

And -- and how's the process going in the bank, I don't know.

Q. Right. So if I may, I am going to ask the translator to assist because I think we may -- we may have --

Page 130

A. Okay.

Q. -- we may have a translation issue. And if we don't, I apologize; but I think we --

A. Okay.

Q. So if -- what I am trying to ask is whether or not the Silkroad Bank has authorized the transaction to move $3 million from Silkroad to Bank of America.

I think where we are getting hung up is on the meaning of the word "authorized."

A. Well, the process is like this. We must first submit a request to the bank to transfer the money. After we submitted our request on the 26th, the bank replied to us stating that the first installment could only be 3 million, could only be that amount. That amount, in fact, has already been approved. The first 3 million has been authorized.

But as to the specific time when the bank will actually execute this transfer, the timeline they gave us is by

Page 131

the end of September.

Q. Okay. Thank you. That's very helpful.

So when did Singularity receive the notification from Silkroad Bank that the transfer of the $3 million was authorized?

A. By last Thursday before my hearing.

Q. Okay. So that would be --

A. 28th.

Q. -- 28th. Okay.

And how did the Silkroad Bank communicate to Singularity that Singularity was authorized to move the $3 million from its Silkroad account to its Bank of America account?

A. We talked to Mr. Liang. Mr. Liang directly talked to the bank.

Q. And who did Mr. Liang speak with at the bank?

A. I think the bank -- the bank customer service or the bank staff.

Q. Do you know who Mr. Liang spoke to?

Page 132

A. I don't know.

Q. Did -- did the Silkroad Bank provide any -- any written communication indicating that they were approving the transfer, like an e-mail or letter?

A. Yeah, I think the account can prove, but I don't have it in my hand.

Q. Have you ever seen it?

A. I have seen -- I haven't seen it.

Q. Okay. Do you know, in fact, one way or the other if the Silkroad Bank actually provided written confirmation that the $3 million of the contested funds was approved to be transferred from the Silkroad Bank to the Bank of America?

A. Yeah, I think we have evidence to prove, but --

Q. Well, I'm asking if you know.

A. I -- I don't know. I don't know but I know it is have evidence. I didn't see it.

Q. Okay. And how did you come to learn of the information?

A. Mr. Liang just called me to give

Page 133

me the information.

Q. And when did he call you to give you that information?

A. The 3 million, he call me on the 28th.

Q. Okay.

A. When he submit on 26th, he give me a call and on 28th, 3 million, and he give me a call.

Q. Has Singularity submitted a request to Silkroad Bank to transfer the $3.25 million as part the remainder?

A. Yes, on the 26th.

Q. Isn't that when the bank submitted the request for the $3 million?

A. What do you mean?

Q. Well, yeah, I am trying to understand. So if there was a request for $3 million, right, which has been approved from Silkroad to Bank of America, so then was there a separate request to transfer the $3.25 million, the rest of the --

A. Yes, correct. We are preparing the documents for the second 3.25 and we are going to submit by the end of this

Gao vs.
Singularity Future Technology

Case 1:22-cv-07499-BMC    Document 128-6    Filed 09/18/25    Page 36 of 58 PageID #:
3004

Jia Yang
September 04, 2025

Page 134

week.

Q. Okay. And I understand you talked about that a little earlier.

Has the bank -- has Silkroad Bank approved the transfer of the $3.25 million yet?

A. Not yet.

Q. And what is necessary for Silkroad Bank to approve the $3.25 million transfer?

A. The documents state it's managed by Mr. Liang and he is the one directly responsible for transferring the money and talk to the bank. So all the necessary -- I think the most necessary one is we need to make a request, the request this documents.

Q. So what I'm trying to understand is what -- other than the request, what, if anything, is necessary for Singularity's request to transfer the $3.25 million from Silkroad Bank to Bank of America to be approved?

A. The rest I don't know.

Q. So you don't know what -- other

Page 135

than making the request, you don't know what, if anything, is necessary to have the request to transfer the remainder of the contested funds in the amount of $3.25 million to be transferred from Silkroad Bank to Bank of America?

A. Yeah, I don't know. I just know the request need to submit.

Q. And who -- who will be submitting the request on behalf of Singularity to transfer the $3.25 million?

A. Mr. Liang.

Q. And how will he make that request? By phone call, writing, e-mail?

A. E-mail, I think.

Q. Okay. Do you know?

A. He will give me -- he will give me the copy later.

Q. Okay. But -- but sitting here you don't know, is that correct, how he will make that request?

A. I don't know.

Q. Okay. And do you know how he made the request -- Mr. Liang made the request for the $3 million transfer?

Page 136

A. A 3 million is by e-mail. He told me he sent the e-mail, yes.

Q. Have you seen that e-mail?

A. I didn't see the e-mail. He said he will give me the copy later.

Q. Okay. So it's correct that you haven't seen the e-mail and you haven't seen written confirmation that the Silkroad Bank has -- withdrawn.

It's correct that you have not seen the request to transfer the $3 million on August 26th, and you haven't seen any written confirmation that the request was approved; is that correct?

A. Yes.

Q. So you're just going on what Mr. Liang has told you, correct?

A. Yes.

MR. DELL'ANGELO: I would like to mark as Exhibit 8 the document in Tab 18.

(Whereupon, Exhibit 7, SEC Form 10-Q for period ending December 31, 2024, was marked for identification.)

MR. DELL'ANGELO: Ms. York,

Page 137

would you post to the deposition the document at Tab 18, which is a Form 10-Q for the period ending December 31, 2024.

BY MR. DELL'ANGELO:

Q. And, Ms. Yang, when that document is up, can you just please take a look at it and let us know when you it in front of you.

A. Yes, I have opened it.

Q. So do you recognize Exhibit 8?

MR. HUNTER: Is this --

A. Yes.

MR. HUNTER: I'm sorry, is this 7 or 8? I have this as 7, but I may have missed something.

MR. DELL'ANGELO: I am sorry. I think you're right. I think I was in my list anticipating I had 7 listed, so I apologize.

BY MR. DELL'ANGELO:

Q. The document at Tab 18 that was posted to the deposition is marked as Exhibit 7.

MR. HUNTER: Okay. Thank you.

Page 138

MR. DELL'ANGELO: Thank you, Counsel. There is no Exhibit 8 yet. And the document at Exhibit 7 is Singularity's Form 10-Q for the quarter ended December 31, 2024 period.

BY MR. DELL'ANGELO:

Q. Ms. Yang, do you have Exhibit 7 in front of you?

A. I have the Tab 18, this document.

Q. Yes, that we've mark as Exhibit 17 [sic] to the deposition. Do you have that in front of you? Are you looking at it?

A. Marked 17?

Q. Well --

MR. HUNTER: It's Exhibit 7, Sherry.

BY MR. DELL'ANGELO:

Q. Yeah. For purposes of the deposition, we give that numbers. We're just calling it Number 7, but it was -- so...

A. I mean, I only can see one

Page 139

document here.

Q. Okay. Is it -- do you recognize it as the fourth --

A. The 10-Q, yes.

Q. Okay. And is that for the period December 31, 2024 for Singularity?

A. Yes.

Q. Thank you. All right. So you signed this document, right?

A. I signed -- let me check. By December, yes.

Q. Okay. So would you turn to page 7 of the number page 7?

A. Page 7. Okay, yes.

Q. So you see this looks a lot like the page 7 that we looked at in Exhibit 6, the 10-Q for the period ending March 31st of 2025. My only question, really, for you about this is if you look under the section marked as E cash, the second sentence says, "The company maintains cash at various financial institutions, mainly in the PRC, Australia, Hong Kong and the U.S.

Do you see that?

Page 140

A. Yes, I see.

Q. Okay. As of December 31st of 2024, is it correct that Singularity was holding cash in Australia?

A. I don't know.

Q. Do you know if -- what, if any, financial institutions Singularity may have been using in Australia?

A. I don't know, but at that time I am just new to the company. I think after that, they closed it, the Australia bank or something but I didn't involve to that part.

Q. Okay. Let's just -- because there is similar language in Exhibit 6, can we go back to Exhibit 6, page 7?

A. Yes.

Q. So, again, let me know when you have that in front of you.

A. I am in page 7.

Q. You see the second sentence, we looked at it before, it begins, "The company maintains cash with various financial institutions, mainly in the PRC, Hong Kong, the U.S. and Djibouti." What

Page 141

does "mainly" mean? Is there cash held somewhere other than the PRC, Hong Kong and Djibouti?

A. No. Only -- I mean, it's just here.

Q. What do you mean, "it's just here"?

A. I have -- besides of those mentioned country, I don't know anything else.

Q. So you don't know if the company maintains cash anywhere other than the PRC, Hong Kong, the U.S. and Djibouti, even though its 10-Q that you signed says it's mainly in those places?

A. I don't know.

Q. All right. And we also -- let's look at Exhibit 2. Do you have Exhibit 2 in front of you?

A. Which page?

Q. I am just asking to look at it generally. This is the June 2023, 2025 -- I am sorry, June of '23, 2025 Schedule 14A proxy that Singularity filed; is that right?

Page 142

A.    I lost all the files before I disconnect.

MR. DELL'ANGELO: Ms. York, can you please repost Exhibit 2, which was at Tab 20 for everybody's convenience?

A.    Okay.  I have it.

Q.    Okay.  What is Exhibit 2?

A.    The 14A, proxy statement, yes.

Q.    I am sorry.  What was the purpose of 14A?

A.    The proxy statement.

Q.    And what was the proxy statement?  What was the purpose of the proxy statement?

A.    It's for the merger agreement with BVI.

Q.    What is that?

A.    It's a merger agreement between the SGLY and the artificial intelligence regeneration technology in BVI.  It's also our subsidiary company.

Q.    And what was the purpose of the merger?

A.    We're going to BVI -- business company incorporate -- under the laws of

Page 143

BVI and the wholly-owned subsidiary of the company and pursuant to the company will merge with into SGLY BVI.

Q.    Sorry.  Are you just reading the document?

A.    Yes.

Q.    Are you familiar with --

A.    I am -- I know this agreement but it's just -- we want to make a BVI subsidiary company then as we are going to move -- I mean, to do a merger.  Then as you are aware, going to become the BVI company.

Q.    And why is the company moving its incorporation to BVI?

A.    Because the tax things.  BVI have lower tax and it's just our counsel, Ms. Wu, she suggests us.

Q.    Were you involved in the decision to propose the merger and to move the company to BVI?

A.    Our counsel, Ms. Wu -- I mean, she suggests us to do a BVI.

Q.    Right.  I guess I am asking who at the company made the decision to

Page 144

attempt to transfer the company's incorporation to BVI?

A.    Since the previous CEO already resigned, since this time the company already resigned to becoming a Cayman Island company.  After that we already actually done with all the Cayman Island things but after that our counsel, Ms. Wu, suggests us to become a BVI company.  So we change to BVI.  So this decision is made before I come to the company.

Q.    Okay.  But you are here testifying on behalf of the company.  I am asking who at the company made the decision to transfer -- to move the incorporation from Virginia to BVI?

A.    Me.

Q.    You?

A.    Yes.

Q.    When did you make that decision?

A.    Our BVI company was starting to register May 6th.

Q.    May 6 of 2025?

A.    May 6 of 2025 and we finished at May 29 of 2025.

Page 145

Q.    So you completed the registration to move the incorporation of the company on the same exact date that the company signed the term sheet to settle this case, May 29?

A.    No.  It's just register the BVI subsidiary company and the name is Artificial Intelligence.  I mean, by 29th this company just finished the registration.

Q.    Right.  What I am saying is the registration was completed the same exact date --

A.    Yes.

Q.    -- that you signed the term sheet --

A.    Yes.

Q.    -- to settle this case?

A.    Yes.

Q.    And what is the status of the merger?

A.    So the merger need to get approved by the board meeting.  So it's still -- the merger agreement still on the process.  We are still waiting for get

Page 146

approval.

Q. Waiting for approval from the board?

A. Also submit to -- I think the -- because the lawyer -- our counsel is dealing with this. My understanding merger still need to submit to SEC and then get approval with the board.

Q. So has the -- has the proposed merger been -- change of place of incorporation been submitted to the SEC yet?

A. The newest one -- not the newest. Let me think.

Q. I am asking about the one, the merger and change of incorporation that is reflected in Exhibit 2. Has that been submitted to the SEC yet?

A. I think we have submitted to SEC.

Q. When was it submitted to the SEC? Do you know?

A. I need to find out.

Q. Is it correct that you don't know, sitting here right, without

Page 147

referencing something or --

A. For me -- I am getting preparation for this deposition. I was looking mainly for the proxy agreement.

Q. Okay.

A. And I have -- yes. And I have seen in the page 10 for this proxy agreement it says that.

Q. So my question is very simple, Ms. Yang, is just sitting here, right now, without looking at any additional documents or talking to anybody or reading anything, do you as the corporate designee of Singularity have knowledge about whether or not the merger and change of incorporation from Virginia to BVI has been submitted to the SEC? It's just a "yes" or "no" answer.

A. I think back to my memory is still not submitted at SEC.

Q. Okay. You think it has not been submitted, but you don't know; is that correct?

A. For as my memory, I didn't -- I don't think so.

Page 148

Q. You don't think so. So fair to say that you -- you're not sure one way or the other? Ms. Yang?

A. Yes.

Q. Okay. Has the merger been -- has the board had a vote scheduled on the merger?

A. The board, yes. The board -- the board was -- because our subsidiary company BVI, when we registered it, is all the same board member with SGLY.

Q. Right. I guess what I am trying to understand, though, is has the board -- the board that has to approve the merger and the change of place of incorporation to BVI, have they had a meeting to vote on that yet?

A. Yes. The board -- the board was involved with this issue with the merger.

Q. And when did that meeting take place? Are you -- are you looking at additional materials to answer it, or do you know?

Page 149

A. It's 24 of July.

Q. Okay. And -- and how did you come to know that?

A. The board -- because our board members are Chinese, so it's through WeChat.

Q. But how did you come to know that it was on July 24? Are you reading something, or did you just know that coming into this deposition?

A. I just -- I just look at the -- the history.

Q. When did you look at the history? Just now or during preparation for the deposition?

A. Just now.

Q. Okay. So coming into the deposition, you didn't know when the board meeting was to approve the merger and change the place of incorporation?

A. I didn't think about we were going to so much details, so I didn't --

Q. Okay. And what are you looking at to get these answers during your deposition?

Page 150

A.   For the merger things, I am looking for the merge -- the proxy agreement.

Q.   Well, where did you just look at to get the answer?

A.   The answer?  You mean the date?

Q.   The date, yes.

A.   I am looking for the WeChat history.

Q.   Okay.  So you're looking through WeChat on your phone to -- you looked at WeChat on your phone to get the date; is that right?

A.   Yes.

Q.   Is anybody sending it to you while we are talking?

A.   No.  My history -- history.

Q.   I understand.  Okay.  Thank you.

So is there a formal -- was there a board resolution?  Like, a written resolution?

A.   Yes.

Q.   On -- that followed on or after July '25 that approved the merger and the change of incorporation to BVI?

Page 151

A.   Yes.

Q.   Okay.  And do you have a copy of that?

A.   Yes.

Q.   Okay.  And when is the change of incorporation going to take effect, if you know?

A.   Taking it back?  What -- what do you mean?

Q.   When -- when will it happen?  When will the company change its place of incorporation?

A.   It's -- we still need to have the -- the meetings, shareholder meetings -- shareholder meetings to get approved.

Q.   Is the shareholder meeting scheduled?

A.   Not yet.

Q.   And is there a proposed date for when it will be scheduled?

A.   Not yet.

Q.   Okay.  Will the company agree to suspend that vote until after the contested amount is paid?

Page 152

MR. HUNTER:  Objection.  This goes beyond the topics.  And her answer is certainly not binding on the company on that basis.

BY MR. DELL'ANGELO:

Q.   Does the merger need to be -- you can answer.

A.   What is your question?

Q.   Whether or not this company will agree to not change its place of incorporation and go through with the merger until it pays the contested amount.

A.   Our proxy agreement was mentioned that -- was mentioned that we will -- we will -- SGLY, we will have the same, like, liabilities and employees so we will take all the liabilities after even we become a BVI company.

Q.   Yeah.  That does not answer the question, right?

A.   So what do you want me to say?

Q.   The question was whether or not the company would agree to not go through with the merger or change the place of incorporation until it actually pays all

Page 153

the contested amount.

A.   Can I have that translated?

Okay.  I cannot make this decision by myself.  I need to ask the board.

Q.   Okay.  Does the merger have to be approved by regulators in the British Virgin Islands?

A.   Yes.  We also have the BVI lawyers is -- is helping us to do that.

Q.   Okay.  But I guess, just so I want to be -- want to be clear.

Does the -- do -- do the authorities or regulators in the British Virgin Airlines also have to approve the merger?

A.   Yes.

Q.   And has the company taken the necessary steps to get that approval?

A.   I mean we are still not submit to SEC, so it's still on the -- on processing.  It's not yet.

Q.   I understand.

What I am asking about, though, is has the company taken the necessary

**Page 154**

steps to get approval from the regulators in the British Virgin Islands?

A. Can I get translate?

I think we are still not in that step yet.

Q. Okay.

A. In the -- yeah. If we need to move to that step, I think the answer is yes, we need to get approval.

Q. Okay. But just so we are clear.

Do you know whether or not the company has taken any steps to get approval from the authorities in the British Virgin Islands?

A. No.

Q. Okay.

A. Not yet.

Q. All right. And I think you indicated there needs to be a shareholder vote to approve the merger?

A. Yes.

Q. Okay. Do you know who the five largest shareholders of Singularity are that would vote on that merger?

A. You mean the five directors?

**Page 155**

Q. No. You -- I think I understood you to say that there would come a time at which the shareholders need to vote on the merger; is that correct?

A. Yes.

Q. Okay. And, at least as of this time, do you know who the five largest shareholders of Singularity are?

A. The shareholders, I don't -- I don't know. I just know it's a lot of shareholders.

Q. Okay. Is there -- is there from -- as far as Singularity is concerned, is there any specific date by which the merger needs -- or change of place of incorporation needs to happen?

A. It's not -- it's not when needs to happen. It depends on when can be happen.

Q. Okay. Is -- is there any reason that the merger or change of place of incorporation can't wait to happen until after the settlement in this case is finally approved and the contested funds are paid and the 6.5 million shares are

**Page 156**

issued?

A. No. I don't think they have too much relevant.

Q. So just so we are clear.

So is it correct that there is no reason why the merger and change of place of incorporation can wait to happen until after all the contested funds are paid and the 6.5 million shares called for by the settlement agreement are issued by the company?

A. No.

Q. There's no reason? Okay.

And other than the Hunter law -- Ms. Wu, the Hunter law firm, are there any other law firms or outside advisors assisting the company with the proposed merger and change of place of incorporation?

A. No.

Q. Is there any investment bank involved?

A. Bank?

Q. Yes.

A. No.

**Page 157**

Q. Okay. Is there a closing agent or an escrow agent involved?

A. No.

Q. All right. And in the -- in the same proxy at Exhibit 2, the company also talked about a $30 million private placement to 18 investors.

How -- how, if at all, does that relate to the merger or change of place of incorporation to British Virgin Islands?

A. Sorry. I need translated.

No. They don't have any, no.

Q. So the -- the $30 million private placement has nothing to do with the merger or the change of place of incorporation?

A. No.

Q. Okay. So is it correct, then, if the -- if the merger or the change of place of incorporation waited until after the settlement in this case was finally approved, to your knowledge, it wouldn't impair or otherwise create a problem for Singularity's $30 million private placement as reflected in the proxy at

Page 158

Exhibit 2?

MR. HUNTER: Objection. It's beyond the topics, so it doesn't bind the company and it calls for speculation.

BY MR. DELL'ANGELO:

Q. You can answer.

MR. HUNTER: You can answer, Sherry. If you can, you can answer.

A. My answer is "no."

Q. Okay.

MR. DELL'ANGELO: Why don't we take a few minutes, go off the record, take a few minute break and we'll come back and see if there's any cleanup that needs to be done?

MR. HUNTER: Sounds good. How long?

MR. DELL'ANGELO: Let's take ten minutes.

MR. HUNTER: All right. Thank you.

THE VIDEOGRAPHER: Okay. Going off the record at 1:52.

(Whereupon, a brief recess was

Page 159

taken.)

THE VIDEOGRAPHER: Going back on the record at 2:01.

BY MR. DELL'ANGELO:

Q. Just a few more questions, Ms. Yang.

When did -- when did Singularity learn about the restrictions for moving money out of its bank accounts in Djibouti?

A. Since we -- since they have this Djibouti bank account.

Q. You broke up on my video at least.

MR. HUNTER: Mine as well.

BY MR. DELL'ANGELO:

Q. Yeah. So can you just repeat your answer? I apologize.

A. Since they have -- they have set up this Djibouti bank account.

Q. Okay. And when -- when was the Djibouti bank account set up?

A. I don't know. I think maybe -- I don't know when. Since I am here, it already have the Djibouti bank account.

Page 160

Q. Right. So if we look at Exhibit 7, page 7, so that's the -- the 10-Q for the period ended December 31, 2024?

A. Yeah.

Q. Okay. I think that does not indicate that the company had a bank account at Djibouti, right?

A. Yes.

Q. And then the next -- the next filing with the SEC as a quarterly or annual statement would be the March 31, 2025 -- for the quarter ending March 31, 2025; is that correct?

A. Yes.

Q. That's what we have at Exhibit 6, right?

And so if we look at page 7 of Exhibit 6, remember this language we were looking at, the company maintains cash at various financial institutions, mainly in the PRC, Hong Kong, the U.S., and Djibouti.

Do you see that language?

A. Yes.

Page 161

Q. So is it fair to say that somewhere between December 31, 2024 and March 31, 2025, the company established a bank account in Djibouti?

A. Yes.

Q. Okay. And so based on your prior testimony, is it also fair to say that somewhere between December 31, 2024 and March 31, 2025, the company learned about the restrictions on moving money out of bank accounts in Djibouti?

You have to answer audibly.

A. Yeah, I am sorry, what?

Q. Just so the court reporter -- you need to say "yes" or "no" or something different, whatever your answer is. I don't think you said your answer out loud. The court reporter is writing everything down, so...

A. Okay. Yes, the answer is "yes."

Q. Thank you.

Okay. And other than the bank accounts that we testified about -- you testified about and PRC, Hong Kong, U.S., Djibouti, possibly Australia, does the

## Page 162

company maintain any digital wallets?

A.   No.

Q.   Does the company have any crypto currency?

A.   No.

MR. DELL'ANGELO:  Subject to any follow-up, I don't think we have any further questions at this time.

THE WITNESS:  I am sorry.  I didn't hear.

MR. DELL'ANGELO:  We don't have any further questions for you at this time.

THE WITNESS:  Okay.

MR. DELL'ANGELO:  Unless your counsel asks you questions and we have what we call "redirect."

MR. HUNTER:  I don't think I have anything.  Thank you.

MR. DELL'ANGELO:  Thank you for your time, Ms. Yang.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  All right.  Then if there's no further questions, the deposition is concluded at 2:06.

## Page 163

COURT REPORTER:  Before everybody hangs up, Michael, you guys get the daily copy tomorrow?

MR. DELL'ANGELO:  Yes, please.

COURT REPORTER:  Mark, you want regular or you want daily?

MR. HUNTER:  Daily as well, please.  Thank you.

(Time noted:  2:06 p.m.)

_____

JIA YANG

Subscribed and sworn to before me this __ day of _____, 2025.

_____

Notary Public

## Page 164

I N D E X

WITNESS        EXAMINATION BY        PAGE

JIA YANG        MR. DELL'ANGELO        6

E X H I B I T S

EXHIBIT    DESCRIPTION                PAGE

Exhibit 1  Minute Order dated August       31
   28, 2025
Exhibit 2  Singularity SEC Schedule        39
   14A, Preliminary Proxy
   Statement
Exhibit 3  Letter from Dell'Angelo         41
   to Hunter, dated August
   29, 2025
Exhibit 4  Stipulation and Agreement       47
   of Settlement
Exhibit 5  Singularity Settlement          56
   Fund Escrow Agreement
Exhibit 6  Singularity SEC Form 10-Q       69
   for quarterly period
   ended March 31, 2025
Exhibit 7  SEC Form 10-Q for period        136
   ending December 31, 2024

R E Q U E S T S

DESCRIPTION                PAGE

instruction not to answer          95

## Page 165

C E R T I F I C A T I O N

STATE OF NEW YORK )
            ) SS
COUNTY OF SUFFOLK )

I, Monique Cabrera, a Notary Public and for and within the State of New York do hereby certify:

That the testimony in the within proceeding was held before me at the aforesaid time and place; that said witness was duly sworn or affirmed before the commencement of the testimony; and that the testimony was taken stenographically by me, then transcribed under my supervision, and that the within transcript is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am not interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the counsel.

IN WITNESS WHEREOF, I have Hereunto set my hand this September 4th, 2025.  _____

Monique Cabrera

## $

**$10,000** 103:18 104:2

**$14** 67:16 114:23

**$14,404,000** 67:16

**$14,873,924** 75:23 78:11

**$17.9** 77:4,7

**$200,000** 103:17 104:2

**$210,000** 103:13 104:3

**$3** 48:15 50:10 51:22 100:9 111:17 112:11,24 113:21 114:3 127:21 128:9,23 129:2,7,13 130:9 131:6,16 132:14 133:15,19 135:25 136:12

**$3,048,227** 76:9,14

**$3.25** 49:18,21 50:11 111:23 112:6,9 113:4 133:12,22 134:6,9,22 135:5,11

**$30** 157:6,13,24

**$300,000** 101:22,25 102:4 103:14, 15,24 104:3

**$6.25** 50:11 99:23 102:14 111:21 128:24

**$65,997** 88:11

**$66,344** 88:11

**$73,519** 84:8

**$90,000** 103:20 104:4

**$900** 124:7,10

## (

**(14)** 49:7

**(e)** 48:6 77:21

**(s)** 48:20,25 49:19

## -

**--we'll** 37:24

## 1

**1** 31:5,7 43:7,23 45:8,15 46:1,5 55:22, 25 75:4,6,9 76:18 78:12

**1,000** 122:11

**10** 147:7

**10,000** 103:11 104:3

**10-K** 69:8

**10-Q** 69:15 70:4 76:4 79:9 89:13 136:23 137:3 138:4 139:4,17 141:14

**10-qs** 117:17

**100** 90:16

**100,000** 104:6,7

**10:06** 4:6

**12:05** 93:19

**12:16** 93:23

**12:58** 123:12

**13** 29:7 31:4 47:20

**1350** 74:6

**13a-14(a)/15d-14(a)** 72:3

**14** 40:24 47:21 50:19,22 55:10,11 56:22 58:11 67:15 77:9 99:14

**14,404,000** 68:18

**14,873,924** 77:3

**14A** 38:14,25 39:9,24 40:12 141:23 142:8,10

**14k** 67:14

**14th** 51:6 53:8,18 55:5 66:3,15 67:9 98:15 112:21

**15** 70:13

**15th** 74:20

**17** 78:10 138:13,16

**18** 74:6 136:21 137:2,22 138:10 157:7

**19** 43:10,23 69:7,12

**1:04** 123:16

**1:52** 158:24

**1st** 55:9,12,14 90:20,24 100:17,18 118:10,13

## 2

**2** 38:22 39:8,23 40:7,12,17 43:8 72:18 74:15 141:18 142:4,7 146:17 157:5 158:1

**20** 38:24 43:25 44:5 99:14 128:15 142:5

**200,000** 103:9 104:2,6,8

**2002** 72:5 74:8

**2023** 141:22

**2024** 15:23 88:11 136:24 137:4 138:5 139:6 140:3

**2025** 4:5 29:8 31:8 38:18,19 40:24 41:13,18 47:20 50:21,22 51:1,6 53:8, 18 55:5,15 56:3 58:11 62:11 66:3 67:10,21 68:17 69:10,16 70:13 74:21 75:22 76:9,15,21 78:25 80:2 88:5,10 90:11 96:22 97:3 98:15 99:14 118:7, 9,13,20 122:22 123:24 125:10 128:7 139:18 141:22,23 144:23,24,25

**21** 119:14

**23** 141:23

**23rd** 38:17,19

**24** 149:1,8

**24th** 51:1,5

**25** 70:15 119:14 150:24

**250** 46:10

**26** 44:1,5 45:8 128:11

**26th** 112:17,20 113:1 127:23 128:7 130:17 133:7,13 136:12

**28** 31:8 118:24

**28th** 29:8 131:11,12 133:5,8

**29** 40:24 41:13,17 56:21 144:25 145:5

**29th** 56:3 118:20 125:10 145:8

## 3

**3** 40:23 41:4,6,11,17 43:1,23,25 45:8, 12 46:10,15 48:11 51:17,19 58:1 73:6 76:23 77:10 110:1,4 128:1,3 130:19, 22 133:4,8 136:1

**3,250,000** 49:3

**3,480,000** 77:3

**3.25** 46:15 133:24

**30** 88:10 101:1 128:15

**30(b)(6)** 4:11 29:20 30:13

**300** 122:4

**300,000** 101:20

**302** 72:4

**30th** 101:2

**31** 69:16 75:22 76:9,15,20 136:23 137:4 138:5 139:6

**31.1** 72:2,9

**31st** 68:17 69:9 70:5 78:25 80:2 88:5, 10 90:11 96:22 97:3 139:17 140:2

**32** 16:16

**32.1** 74:2,4

**38** 70:9,17,18,19,20 71:23

---

**4**

**4** 44:1 47:3,4,6,8,9,14,16,22 48:4,21 49:1,20,21 50:13 52:7 57:20

**4429** 8:10 11:19

**48** 12:14

**4th** 4:4 67:20

---

**5**

**5** 49:1 55:21,25 56:1,4,16 57:18 118:15

---

**6**

**6** 69:7,13,14,20 73:22 76:19 84:12 87:24 96:13,14,17 139:16 140:15,16 144:23,24

**6.5** 155:25 156:9

**60** 83:20,21

**65** 89:24

**66** 89:24

**6th** 144:22

---

**7**

**7** 77:17 78:18 84:14 87:24 88:1,2 96:17 136:22 137:15,19,24 138:3,8, 18,23 139:13,14,16 140:16,20

**73.519,000** 83:21

---

**8**

**8** 136:20 137:11,15 138:2

**8/28/25** 30:12

**89081** 8:12

---

**9**

**9,000** 121:22

---

**9/4/2025** 30:14

**900** 124:3,6

**906** 74:7

---

**A**

**A-L-L-I-A-N-C-E** 63:7

**A-T-I** 103:5

**a.m.** 4:6

**ABA** 49:12

**access** 83:23

**account** 36:23 49:5,12 51:23 58:17, 22,24 59:1,11,14,17,23 60:7,16 61:12,18 62:3 63:13 67:11 68:25 79:6 80:5,13,17 82:9 84:6,15,18,25 85:3, 12,16 86:6,10 87:3,8,20 90:13,23 91:11,17 92:8,10 98:11,14 100:9 101:6,7,24 102:6,10 106:6 107:8,11, 16,21,25 108:6,7,19,24 109:15,21,22 110:16,20,24,25 111:3,6 113:8 114:25 117:5,7,10 118:4,12 119:4,11, 14,15,22 120:5,24 121:9,16,20,24 122:3 124:17,20,22 125:2 127:22,23 128:10 129:7,13 131:16,17 132:6

**accounted** 104:1

**accounts** 30:18 49:10 59:20 62:4,9 65:10 79:1 80:4,5,8 84:9,14,16 90:18 92:5,13 96:23 97:1,11,15,23 98:7,22, 25 99:4,9,16 101:19,25 104:14 105:6 106:17 107:3 110:4 111:10 116:14,20 117:22 118:25 119:3 120:8,10,11 121:11 122:6,17,20 123:1,5,9,22 124:1,13,24,25 125:13,17,18,22 126:6,13,17 127:2

**accurate** 73:4

**accurately** 5:6

**Act** 72:5 74:8

**action** 6:4 105:21 107:22

**addition** 34:23 40:6,16 121:8

**additional** 112:5 147:11 148:24

**address** 5:15,17,18,19,20 8:7,22 9:9, 10,12,13,15 11:19,24 63:20,23 64:1, 19

**addresses** 28:18

**adopted** 72:4 74:7

**advance** 6:12 29:6

**advice** 93:11

---

**advise** 92:19

**advising** 92:21 93:5 95:9,18,21

**advisors** 156:16

**affiliate** 77:15

**afraid** 64:6

**agent** 49:4 157:1,2

**agree** 77:2 151:23 152:10,23

**agreed** 58:3

**agreement** 12:1 15:1 46:17,22 47:10,17 51:24 52:6 53:19,22 54:1 55:4,7,9,18 56:6 57:7,19 100:14,17, 20 102:15 104:12 142:15,18 143:8 145:24 147:4,8 150:3 152:13 156:10

**Airlines** 153:15

**Allen** 5:4 6:24 7:15 115:9

**America** 58:24 80:1,6,9,12,15,17 81:7 82:3,13 83:14 84:6 85:14 88:25 89:2 104:20 105:5,10,12 107:13,15, 18,20 108:19,24 109:1 111:11,14 112:13,25 114:5 117:8 118:4,12 119:5,13 120:21 121:9,24 122:16,17 123:9,23 124:13,15,20,24 125:5 127:23 128:9 129:8,14 130:10 131:17 132:16 133:20 134:23 135:6

**America's** 83:5

**amount** 48:11 49:2,16 99:23 101:12, 17 102:14,18,24 109:25 117:18 120:6 124:3 128:2 130:20 135:4 151:25 152:12 153:1

**annual** 62:18

**answers** 5:8 6:16 57:11 94:2 97:22 128:21 149:24

**anticipating** 137:19

**anytime** 21:16

**apartment** 11:22 12:21,25 20:20 22:21

**apologize** 31:12 32:1 77:1 91:8 97:20 98:1 104:5 113:25 130:3 137:20

**Appearance** 30:12

**appears** 39:7

**approval** 108:11 109:4,7,24 110:1,6, 8 128:2 146:1,2,8 153:19 154:1,9,13

**approve** 85:7 106:8,10,12 108:13 115:19 134:9 148:15 149:19 153:16 154:20

---

**approved** 58:14 71:18 130:21 132:15 133:19 134:5,23 136:14 145:23 150:24 151:16 153:7 155:24 157:22

**approving** 132:4

**approximately** 4:5 15:22 65:23 68:18 84:8 87:9

**apps** 13:10

**arrive** 129:19

**artificial** 142:19 145:8

**assets** 75:11,12,18,19 98:18,25 105:15,19 117:15

**assist** 7:15 37:10 129:24

**assistance** 7:14

**assistant** 19:4

**assisting** 156:17

**assume** 32:9 110:10

**assuming** 110:10

**assuring** 52:10

**attempt** 111:2 127:24 144:1

**attempted** 100:8 112:5,12 114:4 116:8,10,15 127:20 128:22

**attempting** 78:10

**attention** 88:6

**attorney** 32:15 33:4

**audit** 62:6,17,18,20 63:6

**auditing** 65:13

**auditor** 62:21,23 63:1 64:10 65:16 82:23 83:4

**auditors** 65:20 66:1

**August** 29:8 31:8 40:24 41:13,17 50:19,22 51:1,5,6 53:8,18 55:5,9,11, 12,14 58:11 62:11 63:12 64:14 66:3, 15 67:9 68:17 90:20,24 98:15 99:14 101:1,2 112:17,20,21 113:1 127:23 128:7 136:12

**Australia** 98:22,25 99:4 139:23 140:4,8,11

**authorities** 153:14 154:13

**authority** 52:22,24 53:1 87:2 91:10

**authorization** 128:8

**authorized** 129:1,6,12 130:8,13,22 131:7,15

**automatic** 28:2

**aware** 45:7 99:15 110:13 143:12

## B

**B-E-I-J-I-N-G** 17:10

**back** 25:12,15 84:12 87:23 93:22 118:15 123:15 140:16 147:19 151:8 158:15

**background** 19:18 24:21

**bag** 11:3

**balance** 67:10,14,15 68:7,9,10,11, 12,13,17 83:12,13,18,22,24 85:15 86:9,15 89:23 90:22 117:19,20 121:19,21 122:2,11

**balances** 88:11 123:7,25

**bank** 26:12,13,17,19 36:5,7,9,11 49:11 51:18 52:1 53:10 58:2,12,14, 17,22,24,25 59:1,3,4,5,6,7,10,11,14, 17,19,20,23 60:3,7 61:7,11,12,18 62:2,3,4 63:13 65:10 66:7 67:11,12 68:24 77:10,11 79:6,24 80:1,3,5,9,12, 15,17 81:3,6 82:3,13 83:5,13,17,19 84:1,6,9,14,15,16,18,20,21,25 85:3,7, 8,11,14,16 86:6,22 87:14,15,20 88:24 89:2 90:21 91:5,16 92:7,10,13 96:23 97:1,11,23 98:7,11,14,22,25 99:3,9, 16,25 100:2 101:7 102:5,10 104:14, 18,20 105:4,5,10,11,16 106:8,9,11,17 107:2,7,11,13,15,18,20 108:10,13,19, 21,24 109:1,4,6,7,24 110:5,8,19 111:11,12,14 112:1,13,22,25 113:12, 23,24 114:5,9,12,13,15,25 115:2,5, 14,18,21 116:3,6,14,19,24 117:5,7,8, 10 118:3,12,25 119:1,5,11,13,15,22 120:8,11,21,24 121:8,9,11,15,24 122:8,10,16,17 123:1,2,5,9,22,23 124:4,5,13,14,19,20,22,23 125:5,13, 17 126:6,12,16 127:1,4,9,22 128:2,7, 9,12 129:1,6,8,14,17,22 130:7,9,15, 17,24 131:5,13,17,19,21,22,23 132:2, 12,16 133:11,14,20 134:4,5,9,14,22 135:6 136:9 140:11 156:21,23

**banks** 78:4 104:19,21,22 105:4,9,11 122:13

**based** 63:9 72:18 73:7

**basis** 68:8 82:25 83:1 152:4

**Becker** 5:2

**beginning** 43:2 59:2

**begins** 30:5 48:25 49:20 88:4 140:22

**behalf** 4:19,23 5:3 12:12 14:8,16 21:1,7 22:24 23:4 35:1 38:25 135:10 144:13

**Beijing** 17:4,9,10 36:19

**benefit** 49:5

**Berger** 4:19 41:1

**beverage** 18:3

**big** 102:17,18,24

**bills** 116:19,23,25 117:5

**bind** 158:3

**binding** 94:4,11 152:4

**bit** 37:25

**blue** 30:4,8 75:17

**board** 16:10 25:17 34:16 81:5,18,19, 21 145:23 146:3,8 148:7,9,10,12,14, 15,19 149:4,18 150:20 153:5

**bottom** 75:4

**branch** 80:11,14

**break** 91:22 93:15 94:16,18 95:16 96:3,13 158:14

**Brian** 30:11

**briefly** 71:11,13,15,20

**bring** 13:18,21 20:23 70:16

**British** 30:20 153:7,15 154:2,14 157:10

**business** 11:24 12:8,11 36:18 142:24

**BVI** 15:1 142:16,20,24 143:1,3,9,12, 15,16,21,23 144:2,9,10,16,21 145:6 147:16 148:11,17 150:25 152:18 153:9

## C

**C-A-R-D-E-N-A-L-E-S** 24:1

**C-H-E-E** 127:17

**C-H-E-M-I-C-A-L-S** 103:6

**C-H-E-N-S-H-E-N-G** 17:12

**calendar** 49:7 55:10

**California** 81:13,14,22

**call** 27:19,25 53:9 62:25 96:6,8 133:2,4,8,9 135:14

**called** 5:4 17:4,10 19:9 23:20 24:8 35:5 51:23 62:25 63:6 71:24 103:3

132:25 156:9

**calling** 138:23

**calls** 31:24 158:4

**camera** 11:10

**canceled** 84:19,24

**capacity** 14:5 15:14 18:18 21:1,7,22 71:6

**card** 8:25 10:1,12

**Cardenales** 23:20

**case** 46:18 58:18 106:2 145:5,18 155:23 157:21

**cash** 48:11,12 49:3 73:12 75:18,24 76:8,14,17,18,21 77:9,11,22 78:2,3,4, 10,11,18,19 79:2,9,16,21 88:1,11,22 89:7 90:10 98:18 110:4 114:25 139:20,21 140:4,23 141:1,12

**catch** 97:13 115:11

**caused** 107:3

**Cayman** 144:5,7

**CCP** 9:22

**cell** 13:6

**center** 116:5

**central** 36:9 60:21

**CEO** 12:15 15:16,18,19,21 16:4,6,8, 18,22 17:1 19:20,25 20:8,11,14 21:2, 8,22 144:3

**Certification** 72:2 74:5

**CFO** 71:17,21 127:13,15

**change** 68:13 144:10 146:10,16 147:15 148:16 149:20 150:25 151:5, 11 152:10,24 155:15,21 156:6,18 157:9,15,19

**changed** 68:19

**charge** 16:11

**charging** 123:3

**Chase** 119:7,15,22 120:5,19 121:15 124:17

**chat** 13:9

**check** 23:19 27:20 54:6,21 65:3 90:12 92:1 103:4 139:10

**checking** 27:21,22 54:25

**Chee** 71:24 127:15

**Cheng** 9:14

**Chensheng** 17:11

**chief** 70:11 71:6

**China** 7:24 8:1 9:22 16:24 19:14 20:5 28:15 35:21 36:15,16 61:25 64:3 96:20,24 97:2 98:11,14,18 99:7

**Chinese** 5:20 7:24 8:23,24 9:2,3,6, 25 115:7 149:5

**chose** 19:23

**circumstances** 72:23

**Citibank** 108:2,8 109:3,22 110:15

**citizen** 7:23

**City** 9:14 19:13 21:25

**clarification** 7:8,11 32:17

**clarify** 7:13

**Clark** 8:14,17,18

**class** 4:21 6:5 49:6

**cleanup** 158:15

**clear** 6:21 7:3 12:6 26:16 31:25 32:22 44:24 45:6 51:12 52:3 57:15 64:11 77:2 78:14 84:5 87:18 94:8 125:9 126:4 128:5,18 153:12 154:10 156:4

**click** 47:16

**close** 85:2,3 87:11 122:19 124:2,4

**closed** 84:24 85:1,8,11,16,24 86:1,2, 5,10,16,18,20 87:8,21 90:20,21,23 91:17 97:18 122:18,20,24 123:10,23 124:1 140:11

**closing** 91:5 157:1

**cloud** 60:22

**code** 8:11

**Cogan** 30:11

**collect** 61:2

**column** 75:22 76:9

**Commission** 25:21,23 26:2,7

**communicate** 13:15 96:2 131:14

**communication** 13:5 65:20 132:3

**communications** 33:2 66:7

**companies** 16:19 102:2 103:4 104:23 117:11,16 125:15,23

**companies'** 117:16

**company** 14:17 15:11,12 16:11 17:4,5,9,23 18:8,22 19:7 21:14 22:15 24:7 33:11 37:1 53:17,24 63:1 74:19

75:23 77:7 78:12,19 79:16 81:17 89:7 94:5,8,11 98:14,17,21,24 99:3 100:8 101:14,18,21 102:13,22 114:23 116:18 117:3,17 118:22 120:10 121:10 139:21 140:10,23 141:11 142:21,25 143:2,10,13,14,21,25 144:4,6,9,11,13,14,21 145:3,4,7,9 148:11 151:11,23 152:4,9,18,23 153:18,25 154:12 156:11,17 157:5 158:4

**company's** 24:23 27:13,14 33:13 53:6 55:2,16 60:20 82:8 98:6 106:14 109:17 120:3 144:1

**completed** 145:1,12

**completely** 31:2

**comprehend** 6:15

**computer** 21:12,15 67:5

**concerned** 155:14

**condition** 73:11

**conditions** 74:18

**conduct** 12:11 30:13 42:8 45:7

**conducting** 36:8

**confidential** 33:5

**confirm** 54:22 91:9

**confirmation** 132:13 136:8,13

**connect** 16:10

**connection** 14:21 31:13 42:4,10 43:17 44:6 45:2,9 52:6

**considered** 94:4

**consists** 78:3

**consulting** 17:4,5,13,24 18:1,8,21

**contained** 74:16

**contested** 30:16 45:19,24 46:4,14, 23 48:16 49:23 50:3,9,17,25 51:5,9, 14 52:5,11,23 53:2,7,17,23,24 55:3, 17 57:24 58:9 99:22 102:14 106:5,20 107:6 108:1,5,23 109:19 110:15 111:4,17,20 112:6 113:5,11,22 116:9 117:2,18 120:6 127:25 132:14 135:4 151:25 152:12 153:1 155:24 156:8

**continue** 44:17 93:25 94:12

**controlled** 125:15,23

**controls** 115:17

**convenience** 142:5

**copies** 26:12 29:4 65:9,24 81:2

Gao vs
Singularity Future Technology

Document 128-6    Filed 09/18/25    Page 48 of 58 PageID #:
3016

Jia Yang
September 04, 2025

**copy** 23:9 82:12 135:18 136:5 151:2

**corner** 72:1,10 74:1

**corporate** 14:11 58:8 147:13

**correct** 11:15 14:17,18 15:23 18:16 20:8 22:2,3 23:15 24:11 28:21 31:17 32:11,15 34:3 35:2 40:13,14 47:23 50:23 52:3 58:5 59:8,9 61:13 63:14 65:22 66:8 67:21 68:21,22 74:24 75:14,15 76:3,13 78:6 79:6 80:21 81:23 83:24 84:10 96:21 100:10,19, 25 101:2,15 102:3 103:14 104:9 105:18,23,24,25 107:22 108:25 112:3 116:16 118:25 129:5 133:23 135:20 136:6,10,14,17 140:3 146:24 147:23 155:4 156:5 157:18

**correctly** 12:21 23:12 55:14 61:11 68:16

**counsel** 4:13 6:13,18,23 29:5 31:21, 23 33:13 94:18 95:3,16 96:3 101:9,10 104:12,15,17 105:7,14 106:1 118:1,5, 11 138:2 143:17,22 144:8 146:5

**counsel's** 93:11

**count** 88:2

**countries** 99:10

**country** 7:23 141:9

**County** 8:14,17,18 82:1

**couple** 28:23 31:24

**court** 4:15 5:14,21 8:21 14:20 17:6, 14 27:12 45:17

**court's** 29:7 31:3 46:1,5

**covered** 72:25 74:20 88:14 125:3

**create** 157:23

**Crosstalk** 122:14

**currency** 114:18,20 115:1

**current** 75:11,18 83:12,13

**customer** 131:23

---

**D**

**daily** 68:8

**date** 4:4 10:19 54:19,20,22 55:1 86:8 111:21 145:3,13 150:6,7,12 151:20 155:14

**dated** 29:8 31:8 41:12 47:18,20 56:3 74:20 118:20

**David** 4:23 96:11

**day** 24:25 55:10

**days** 49:7 55:10 56:22 111:15 118:24

**deadline** 112:20

**deal** 16:9

**dealing** 86:22 146:6

**December** 136:23 137:4 138:5 139:6,11 140:2

**decide** 55:6

**decision** 143:20,25 144:10,15,20 153:4

**Defendant** 4:24

**Defendants** 49:7

**Dell'angelo** 4:17,18 5:24 6:1,3 17:17 20:6 25:1,11 31:11 32:20 38:21 39:4, 13 40:22,25 41:5,12,15 42:18,24 44:11,22 47:2,13 55:23 56:8 69:6,18 85:22 91:23 92:3 93:9,14 94:15,25 95:11,13 96:1,7 97:8 115:9 123:17 126:23 127:6 136:19,25 137:5,17,21 138:1,7,20 142:3 152:5 158:6,12,19

**denominated** 115:15

**depends** 106:7,11 155:18

**deponent** 4:10

**deposit** 51:4

**deposited** 49:16 51:9,23 52:5

**deposition** 4:7 6:6,12,15 8:20 13:3, 16,19 14:21 24:19 25:18,25 31:6,15, 16,20 32:11,24 34:8,14 35:24 36:3 37:5,11 38:5,23 39:23 42:5 43:18 44:6 45:3,10 46:6 47:3,7 50:7,13 55:21,24 56:10,17 93:1 137:1,23 138:13,22 147:3 149:10,15,18,25

**designated** 94:3

**designee** 58:8 147:13

**details** 38:10 54:20 149:22

**devices** 13:5

**difference** 102:18 103:21,22

**digging** 24:22

**digit** 92:1

**digits** 91:16

**direct** 52:22 53:2 88:5

**directly** 36:10 108:7 109:20 110:15 111:6 131:19 134:12

**director** 17:21 18:7,11,20 37:1,2

**directors** 154:25

**disclosed** 6:23

**disconnect** 142:2

**discuss** 36:1

**discussed** 94:22 95:7,15

**discusses** 46:22

**discussing** 78:2,6

**discussion** 95:20

**distinct** 57:18

**District** 44:12,13

**Djibouti** 36:9 37:22 59:5,8,11,15,19, 20,24 60:7 62:4 63:14 68:24 77:10 78:22 79:2,18 97:12,16,24 98:7 99:7, 24 100:6 105:16,19 106:6 107:10 108:21 109:8,21 110:18 111:7 112:13 113:12 114:12,18,20,21,25 115:14, 18,21 116:4,9,11,14,15,24 117:4 120:5 140:25 141:3,13

**docket** 30:2,5

**document** 29:4,7,9,13,14,18 30:4 37:13 38:23 39:15,22,25 40:4,7,9,16, 23 41:10,21 47:4,6,25 55:22,25 56:9, 24 57:2,18 60:23 69:7,12,25 70:7,10 71:2,4 72:9,15 73:18 74:3,12 75:3 77:18 86:15 90:25 136:20 137:2,7,22 138:3,11 139:1,9 143:5

**documentary** 42:16

**documents** 13:19,22 25:3 27:12,14 29:5 37:6,8,10,14,18,19,23 38:4,6,8, 11,13 39:20 40:6,16 42:4,9,16 43:14, 17,20 44:5,9,19 45:8 61:3,5 64:5 68:2 91:2,6 92:8,21,22 93:6 111:25 114:9 133:24 134:11,17 147:12

**dollar** 115:3

**dollars** 67:18,19 83:21 115:15,18,23 121:22 122:4

**double-check** 54:22

**driver's** 9:7 10:13,15,18

**duly** 5:5,10

**duties** 16:7 19:25 20:11,14

---

**E**

**e-mail** 13:5,9 23:10,14 27:22,23 54:21,25 60:4,10 61:1,17,19,22 63:18,20,21,22 64:1,6,15,17,19 81:4 114:10 132:5 135:14,15 136:1,2,3,4,7

**e-mailed** 24:16 81:1

**e-mails** 24:14 61:11 64:7

**e-statement** 26:14,20 80:19

**e-statements** 60:19

**earlier** 34:19 52:14 82:20 91:12 92:25 100:7 125:1 126:11 127:1 134:3

**easier** 64:4

**easily** 83:16

**East** 77:11 122:8,10 123:8 124:21

**Eastern** 4:6 44:13

**effect** 151:6

**effectuate** 49:9 106:19 107:5

**electrical** 26:14 60:19

**electronic** 13:4 80:21

**employed** 15:7,9,15 24:2,4 33:10 35:13

**employee** 15:10 24:9 117:9

**employees** 152:16

**encouraging** 93:2

**end** 55:11 62:10,11 63:12 64:13 68:12 70:5 112:2 119:12 128:16 129:20 131:1 133:25

**ended** 69:16 138:5

**ending** 69:9 136:23 137:3 139:17

**Energy** 77:12,13 117:13 119:8,20,21 121:15 122:7 124:21

**Energy's** 120:5 124:17

**English** 5:8,9 6:16 36:24 67:1

**entered** 118:23 120:3

**entry** 30:5,9 31:4

**escrow** 46:10 49:2,4,5,10 51:23 56:5 107:25 108:3,7 109:2,21 110:16,23 157:2

**et al** 4:8,10

**everybody's** 142:5

**evidence** 132:17,21

**exact** 145:3,12

**EXAMINATION** 5:25

**examined** 5:11

**Excel** 92:8,12

**exchange** 25:21,23 26:2,7 108:12 109:25 114:11 115:16,19,20,24 116:2

**excuse** 5:17 31:12 38:2 47:22

**execute** 130:24

**executive** 18:24 19:2 70:12 71:6

**Exhibit** 31:5,7 38:22,24 39:8,23 40:7, 12,17,23 41:4,6,11,17 43:1 45:8,15 46:1,5 47:3,8,9,14,16,21,22 48:4 49:1,21 50:13 52:7 55:21 56:1,4,16 57:18,20 69:7,13,14,20 70:17 72:2,9 73:22 74:2 76:19 84:12 87:24 96:13, 14,17 136:20,22 137:11,24 138:2,3,8, 13,18 139:16 140:15,16 141:18 142:4,7 146:17 157:5 158:1

**Exhibits** 118:15

**existence** 99:15

**expect** 68:19

**explain** 14:25 78:10 113:22 114:6

**explaining** 38:9,10

---

**F**

**fact** 21:20 72:20,21 92:21 130:20 132:11

**fair** 148:2

**fairly** 73:10 74:17

**faithfully** 5:6

**familiar** 46:21 70:7 143:7

**fee** 123:3

**Fei** 5:4 6:24

**Feng** 25:16 34:17,18 81:5 83:3 84:7

**filed** 38:14,25 72:15 74:13 75:13 76:4 141:24

**files** 142:1

**filing** 89:22 90:1

**filings** 26:23

**finally** 155:24 157:21

**finance** 34:25 36:22

**financial** 27:5 36:25 37:2 73:8,11,21 74:18 76:19 78:20 79:10,12,17,21,22 88:12,16,20 89:5,11,14,20 90:2,5,8 96:14 139:22 140:7,24

**financing** 28:3,4 31:22 35:15 52:12 59:25 71:16,19 86:21,23 127:10

**find** 37:13 65:4 83:10 85:17 86:3,11

90:15 103:2,10 146:23

**fine** 5:22 11:12

**finish** 19:1 22:13

**finished** 144:24 145:9

**firm** 4:19 33:10,12,14 34:3 156:15

**firms** 156:16

**first-party** 111:6

**Fischer** 41:2

**flows** 73:12

**food** 18:3

**foreign** 115:16,19,20,23 116:1

**forgot** 25:9 33:21

**form** 26:3,18 28:4 44:14 69:8,15 136:22 137:3 138:4

**formal** 36:21 114:10 150:19

**found** 38:23

**foundation** 25:2

**fourth** 75:3 139:3

**freeze** 105:15 106:1

**front** 41:17 137:9 138:9,14 140:19 141:19

**froze** 118:11 121:4,5

**frozen** 58:17,24 105:20 107:8,12,16 108:19 110:3 112:22 117:21,23,25 118:4,25 119:1,3,4,5,7,12,14,16 120:19 121:2

**full** 6:7,9 33:17

**fund** 49:15 56:5 112:9

**funds** 30:16 43:4 45:19,24 46:4,11, 14,23 48:16 49:9,23 50:9,17 51:1,5, 10,14 52:5,11,23 53:3,7,17,25 55:3, 17 57:24 58:10 69:2 99:22,24 100:6 102:11 104:16 106:5,20 107:6 108:1, 5,22,23 109:14,19 110:15,22 111:5, 18,20 112:6 113:5,12,22 114:17,18 116:9 125:19 127:25 132:14 135:4 155:24 156:8

**Future** 4:9,12,24 15:13

---

**G**

**Gao** 4:8

**gave** 82:20 114:15 128:2,7 130:25

**general** 54:18

**generally** 44:15 45:1,4 66:18 70:6 71:14 75:9 92:15 141:22

**give** 51:18 63:4 82:14 85:20 108:11 114:14 128:3 132:25 133:2,7,9 135:17 136:5 138:22

**good** 4:17,22 5:1 6:2 86:12 158:17

**Gorgeous** 117:14 120:20,21 121:2, 23 124:19

**government** 116:5

**ground** 95:22

**Group** 76:24

**guess** 87:17 123:18 143:24 148:13 153:11

**guidance** 44:18

**guys** 91:20

---

**H**

**H-U-N-T-E-R** 33:23

**half** 48:5

**hand** 78:3 132:7

**handle** 64:22

**happen** 82:24 151:10 155:16,18,19, 22 156:7

**hear** 97:21 98:1

**heard** 25:22 86:18,19 115:7

**hearing** 29:19 30:10,14 131:9

**HEI** 103:17 104:8

**held** 4:7 16:12 30:11 49:5 76:21 78:12 79:2,10,21 90:10 114:19 115:1, 22 141:1

**helpful** 93:1 131:3

**helping** 153:10

**history** 68:3 149:12,14 150:9,17

**hold** 11:9

**holding** 83:20 84:1 90:18 140:4

**home** 11:21

**Hong** 78:21 79:18 84:15,17,19,25 85:4,11 86:5 87:20 88:13,22 89:2,8, 16,21 90:6,9 91:11,16 97:12,17 99:7 139:23 140:25 141:2,13

**honor** 93:16

**hospitality** 18:16,19

---

**hotel** 18:2,4,15,19 19:3,4,7,10

**hours** 91:21

**house** 81:25

**how's** 129:21

**HSBC** 84:22,24 85:3,10,14,15 86:5,9, 15 87:3,8,9,19 89:8,11,12,18 90:6,13, 17,23 91:11,17 92:5

**Huang** 100:13,16,22 101:9,10,18,22, 25 102:4,16 103:1,14,24 104:11,16 105:3,21 106:18 107:4,22 110:12 118:11

**Huang's** 102:3 104:12,15 105:2,7, 14,25 106:2 117:25 118:4

**hung** 130:12

**Hunter** 4:22,23 24:17 25:7 28:22 32:10 33:2,17,19,22 34:6,12,23 41:1, 2,12 42:12,20 44:7,17 85:19 91:19,24 92:17 93:17,24 94:20 95:5,18 96:4,11 97:4 137:12,14,25 138:18 152:1 156:14,15 158:2,8,17,21

**Hunter's** 34:3

---

**I**

**ID** 5:20 9:2,4,6 10:25 11:1 16:13

**identification** 8:23,25 10:1,8,12,14 31:9 39:11 41:14 47:12 49:14 56:7 69:17 136:24

**identified** 20:21 28:20

**identifies** 43:14

**identify** 4:13 39:17

**impair** 157:23

**impediments** 113:11

**important** 27:12 71:15

**imposed** 113:13

**include** 26:11 49:11 65:19 88:24

**included** 73:9,22

**including** 49:10 120:9 125:4

**incorporate** 142:25

**incorporation** 143:15 144:2,16 145:2 146:11,16 147:16 148:16 149:20 150:25 151:6,12 152:11,25 155:16,22 156:7,19 157:10,16,20

**incorrect** 89:22

**independent** 54:9

---

**indicating** 132:4

**indulgence** 94:14

**industry** 18:4,16,20

**inform** 55:12

**information** 36:12 49:8 54:17 73:9, 22 74:16 75:9 76:19 78:1 92:7,16 98:6 100:25 129:11 132:24 133:1,3

**informed** 53:5,16 55:2,15

**informing** 53:23

**lng** 115:6

**inquired** 6:13

**installment** 130:18

**institution** 79:10 88:21 90:6,9

**institutions** 78:20 79:12,17,21,22 88:13,16 89:5,11,15,20 90:2 96:15 139:22 140:7,24

**instructed** 25:6 42:15

**instruction** 95:25

**instructions** 49:11

**insurance** 88:14

**intelligence** 142:19 145:8

**intends** 94:9

**internal** 114:14

**International** 103:6

**interpreter** 5:4,12 17:7,8,15 25:9 115:12 126:21

**interrupt** 19:1 22:12 33:25 54:7 120:16

**interrupting** 114:1

**investment** 156:21

**investors** 157:7

**involve** 140:12

**involved** 143:19 148:20 156:22 157:2

**irrelevant** 44:9

**Island** 144:6,7

**Islands** 30:20 153:8 154:2,14 157:10

**issue** 130:3 148:20

**issued** 9:21 10:17 156:1,10

**issues** 108:16

**items** 44:5

---

Gao vs. Singularity Future Technology                    Document 128-6    Filed 09/18/25    Page 51 of 58 PageID #: 3019

Jia Yang
September 04, 2025

**J**

**J-I-A** 6:11

**J-I-E** 35:8

**J-I-O-N-G** 127:18

**J-O-A-N** 32:18

**Jia** 5:10,16 6:9 70:11

**Jie** 5:3 35:6 52:12

**Jiong** 71:24 127:15,17

**Joan** 31:23 32:18

**job** 16:25 17:19 18:4,6

**jobs** 16:1,21

**Judge** 30:11

**July** 47:20 149:1,8 150:24

**June** 38:17,19 88:10 122:25 123:24 124:3 141:22,23

**K**

**kind** 9:6 10:12

**knowledge** 26:21 61:20 72:19 73:7 76:3 99:2,5 106:14 147:14 157:22

**knowledgeable** 45:23

**Kong** 78:21 79:18 84:15,17,19,25 85:4,11 86:6 87:20 88:13,22 89:2,8, 16,21 90:6,9 91:11,16 97:12,17 99:7 139:23 140:25 141:2,13

**L**

**L-I-A-N-G** 35:8

**language** 7:20 50:12 66:24 84:13 140:15

**laptop** 13:7,8 20:23 61:3,4,22,23,24

**largest** 154:23 155:7

**Las** 8:3,14,15 11:14,18

**latitude** 94:7

**law** 4:19 33:10,12,14 34:3 156:14,15, 16

**Lawrence** 8:10 11:19

**laws** 142:25

**lawyer** 34:2 105:2 146:5

**lawyers** 32:7 153:10

**laying** 25:2

**learn** 132:24

**lease** 12:1

**leaves** 103:20 104:3

**legal** 6:8,9 83:25 84:2 111:8 124:5

**Lesser** 5:1,2

**letter** 40:25 41:11,18 42:3,10 43:13 48:6,20,25 49:19 77:21 104:17,18 111:13 132:5

**letters** 105:4,8

**Lexitas** 4:3

**Li** 41:2

**liabilities** 116:19 152:16,17

**Liang** 35:6,9,10,12,13,19,23 36:2 37:5,9 52:12,13,18,21 53:5,16,22 55:2,16 59:25 60:6,14 61:11,21 63:11 64:12 65:10,17,18 66:19 86:25 87:5 91:13 113:2,6 127:11,19 131:18,19, 20,24 132:25 134:12 135:12,24 136:17

**Liang's** 61:1,17

**license** 9:7 10:13,16,18

**lift** 104:13

**light** 72:22

**limitations** 106:16 107:2 113:7,10

**Limited** 4:10,12,25

**lines** 88:1,2

**list** 126:14 127:1,5 137:19

**listed** 42:9 45:8 117:16 137:20

**lists** 92:12

**litigation** 27:13 47:18 56:3 57:4

**live** 19:19 81:21

**living** 8:2

**LLP** 63:7

**loan** 102:1,6,13,24,25

**located** 8:4,13,15 11:14,18 19:12 20:2 35:20,21 36:14 78:12 81:8,11

**location** 12:8 20:16,19 21:2,5,25

**locations** 21:6,20 22:23 28:9 29:2

**long** 9:15 15:17 16:13 18:5,6 21:11, 15 85:18 109:5 110:2 118:3 123:2 158:18

**looked** 38:6 40:12,17 43:13,19 45:15 66:12,13,22 76:20 139:16 140:22 150:11

**lost** 123:19 142:1

**lot** 110:6 139:15 155:10

**loud** 48:10

**lower** 143:17

**M**

**made** 51:16 57:25 58:19 72:22,24 76:23 95:25 100:21 103:8 106:18 107:4 127:20 135:24 143:25 144:11, 14

**mail** 23:3,13,18 24:15,23 26:9,22,24 27:1,3,4,8,10,11 28:6,10,15 29:2

**mailed** 24:15 25:16

**mailing** 28:18

**mails** 22:9,15 23:7

**maintain** 11:23 59:10,13 84:16 97:2 98:22,24 99:9

**maintained** 88:12 96:23 98:14 99:3

**maintaining** 88:22 89:7

**maintains** 59:18 78:19 79:16 98:10, 18 99:17 139:21 140:23 141:12

**make** 6:20 23:9 31:25 53:9 66:11 72:22 93:15 94:1 100:24 107:16 108:16 109:10 112:14 113:20 123:4 126:4 127:20 128:18 134:16 135:13, 21 143:9 144:20 153:3

**making** 112:24 113:4 135:1

**manage** 22:15

**managed** 134:11

**management** 16:9 17:5,12,24,25 18:7,21 19:5 60:23

**manager** 19:4,5

**Mandarin** 5:8,9 6:19,21 7:20

**March** 69:9,16 70:5 75:22 76:9,15,20 78:25 80:2 88:5,10 90:11 96:22 97:3 139:17

**mark** 4:23 31:22 32:9,10 38:22 40:23 41:1 44:11 47:3,7 55:20 56:1 69:6,13 93:14 96:11 136:20 138:12

**marked** 31:5,9 39:11,22 40:7 41:13 47:11 48:24 49:19 56:6,16 69:17 70:17 75:22 136:24 137:23 138:16 139:20

**material** 68:20 72:20,21 73:10 74:17

**materials** 148:24

**matter** 4:8 5:5

**matters** 31:3

**meaning** 88:16 89:15 90:3 130:12

**means** 22:7 46:5 48:11 49:2 103:22 125:4

**meeting** 145:23 148:17,21 149:19 151:17

**meetings** 151:14,15

**member** 148:12

**members** 149:5

**memory** 86:12 147:19,24

**mention** 120:18

**mentioned** 8:22 32:14 34:18 56:22 57:25 101:4 141:9 152:14

**merge** 143:3 150:2

**merger** 15:1 30:19 38:7,9,10 142:15, 18,23 143:11,20 145:21,22,24 146:7, 10,16 147:15 148:6,8,15,20 149:19 150:1,24 152:6,12,24 153:6,16 154:20,24 155:4,15,21 156:6,18 157:9,15,19

**messaging** 13:9

**met** 34:24 37:4

**Michael** 4:18 6:3 40:25 93:25

**middle** 77:20

**million** 46:10,15 48:12,15 49:18,21 50:10,11 51:17,19,22 58:1 67:14,16 76:23 77:4,7,9,10 99:23 100:9 102:14 110:1,4 111:17,21,23 112:6,9,11,24 113:4,21 114:3,23 127:21 128:1,3,9, 23,24 129:2,7,13 130:9,19,22 131:6, 16 132:14 133:4,8,12,15,19,22 134:6, 9,22 135:5,11,25 136:1,12 155:25 156:9 157:6,13,24

**minus** 104:3

**minute** 29:8 30:5,9 31:4,7 45:15 158:14

**minutes** 40:5 94:17 158:13,20

**misleading** 72:24

**missed** 137:16

**misstated** 114:1

**Mister** 35:11

**misunderstand** 85:25 90:14

**misunderstanding** 53:14

**moment** 11:10 50:4 56:11 57:11 128:21

**moments** 39:21 57:16

**Monday** 58:16,20,21 100:14,18,22

**money** 15:1 27:6 37:21 68:24 77:8 85:6,10,14 87:7,10,12,15,18 101:5 106:9 107:17 109:25 114:11,21,22 115:22 116:11,15 117:4 120:4 124:6 130:16 134:13

**Montague** 4:19 41:1

**month** 68:12 85:5,24 86:8 87:9 121:1 128:16 129:19

**month's** 62:10

**monthly** 82:25

**months** 65:13,23 83:2,6 85:5 119:7 120:18

**morning** 4:17,22 5:1 6:2

**move** 116:10,15 129:7 130:8 131:15 143:11,20 144:15 145:2 154:8

**moved** 117:3

**moving** 143:14

**mute** 126:20

**muting** 115:13

## N

**N-G** 127:18

**named** 35:5

**narrow** 43:22

**native** 7:19

**needed** 53:17 59:3,7

**Nevada** 8:3,5,8 10:20,22 11:14,24 19:19,22 20:17 21:3,21 22:22 23:4

**newest** 146:13,14

**Ng** 71:24 127:15

**North** 8:15

**note** 42:14 44:12

**Noted** 25:1

**notes** 13:22,24

**notices** 106:18 107:3

**notification** 131:5

**November** 15:20,22

**number** 38:22 43:7,8,10,25 49:12, 13,14 64:23 67:24 68:4,6 73:6 74:15 75:4 82:19 92:10 138:23 139:13

**numbers** 138:22

## O

**object** 24:18 44:14 92:18,25

**objection** 28:22 42:12 44:8 95:5 97:4 152:1 158:2

**objections** 44:15

**obligation** 53:6 55:3

**obligations** 27:6 55:16

**office** 12:7 21:24 22:4,6,8,9,10,14, 18,19 23:8,12,18 24:5,7 26:11,24 27:4 28:11,19 80:25 81:2

**officer** 70:12 71:6

**offices** 22:22 28:17

**officially** 57:9

**omit** 72:21

**ongoing** 106:16 107:2

**online** 21:12

**open** 13:10,11 23:13 39:5,12 41:7 47:19,22 56:11 69:23 91:6 111:3,9

**opened** 56:14 66:21 116:13 137:10

**opens** 23:17

**operated** 104:23

**operation** 17:21 18:21 73:12

**operations** 18:7,12

**opportunity** 39:16 41:9

**Orange** 81:25

**order** 29:8 30:6,10 31:4,8 45:15 46:1, 5 83:25 84:2 113:18,20 124:5

**ordered** 45:17

**orders** 111:9

**outset** 8:20 31:14

**owed** 27:7

**owes** 27:6

**P**

**P-L-A-T** 103:18

**P-L-A-T-B-U-S** 103:11

**pages** 43:23 74:1

**paid** 46:16 48:12 50:18 51:1,13 58:10 101:21,25 102:5 151:25 155:25 156:9

**paper** 23:3,7

**paragraph** 49:19 72:18 87:25

**parentheses** 48:6,20,25 49:20 77:22

**part** 38:7 48:16 49:23 71:19 79:14 97:10,14,21 101:18 104:10 105:2 109:11 110:5 133:12 140:13

**parties** 4:14 30:13

**parts** 71:16

**party** 110:19,23

**passed** 50:22

**passport** 9:1,5,8,16,17,19,20,21,25

**pay** 53:17 99:22 102:13 103:1 116:18,22,23,24 117:6,17 120:6,24

**paying** 103:17,18

**payment** 51:16 52:11 58:1 100:22 102:4 103:9,23 117:2

**payments** 27:15,17,18 28:1,2,5

**pays** 152:12,25

**PC** 5:3

**pending** 91:25

**people** 31:23 35:15 52:12 59:25 86:22,23 127:10

**percent** 90:16

**perform** 18:1 19:21 20:11,13,15,25 21:6 22:21

**performing** 19:19,25

**period** 69:9,16 70:4 72:25 74:19 99:13 136:23 137:3 138:6 139:6,17

**periodic** 82:25

**periods** 73:13

**permissible** 24:21,24 44:16

**person** 34:20 35:1,4,5 45:22 52:19

**personal** 12:4 63:21,25 64:14,16,18

**perspective** 109:18

**phone** 13:6,12,13,15 27:23 67:4 96:6,8 135:14 150:11,12

**physical** 23:3 24:14 25:2 26:9,18,22 27:3 28:6,10,15 81:2

**physically** 20:2 21:13 34:15

**picture** 91:7

**place** 22:16 47:5 146:10 148:16,22 149:20 151:11 152:10,24 155:16,21 156:7,18 157:9,15,20

**placement** 157:7,14,25

**places** 141:15

**plaintiffs** 4:20 6:4 46:18 57:5 58:4 93:2

**plan** 120:2,3

**planned** 30:19

**planning** 112:1

**Plat** 104:7

**plural** 88:16 89:20

**point** 24:18

**points** 71:15

**policy** 110:17 116:5,6

**portion** 51:14 52:4 113:5,21

**position** 17:20 94:9

**post** 137:1

**posted** 137:23

**PRC** 78:21 79:17 96:15,19 139:23 140:24 141:2,13

**Preliminary** 39:10

**preparation** 34:7 35:23 36:2 37:10 38:5 40:10,18 45:2,9,12 147:3 149:14

**prepare** 31:15,19 32:3,24 34:13 37:5 114:8

**prepared** 14:1 31:1,10,18 111:25

**prepares** 127:7

**preparing** 133:23

**present** 32:10 34:14 35:24 73:10 80:3 90:11 99:15 125:11

**presented** 73:14

**presently** 11:14

**presents** 74:17

**prevent** 110:13

**previous** 144:3

**Previously** 17:8

**prior** 18:6,15 62:19

**private** 157:6,14,24

**privilege** 95:8

**privileged** 33:4 95:23

**problem** 157:23

**procedures** 24:23

**process** 14:25 30:17 53:11 87:15 106:10 109:11,13 113:18 129:21 130:14 145:25

**processing** 52:1 58:2 111:15 114:14 128:13 153:22

**produced** 6:14

**production** 44:10

**productions** 42:17

**programs** 13:10

**propose** 143:20

**proposed** 4:20 6:4 49:6 146:9 151:20 156:17

**propounded** 5:7

**prove** 132:7,18

**provide** 5:19 6:16 14:15 37:9 42:6 82:12,15,16 132:3

**provided** 29:4 42:13 82:22 132:13

**providing** 14:15,22

**Province** 9:13

**proxy** 38:8,11,13,14 39:10,20 40:4 141:24 142:8,11,12,14 147:4,7 150:2 152:13 157:5,25

**purpose** 142:10,13,22

**purposes** 138:21

**pursuant** 46:17 55:4,17 72:4 74:6,7 102:15 143:2

**put** 39:2 41:4 55:24 61:3,4 69:11 92:22

**Q**

**qualified** 49:15

**quarter** 138:5

**quarterly** 69:16

**question** 7:4,7,8,11,13 14:7 25:5,8, 10,12 29:13 42:23 43:16,21 51:3 53:14 54:15 57:1 58:7 77:1 91:20,25 95:10,14,17 106:24 110:8 113:15,19 114:2 123:20 126:3 139:18 147:9 152:8,20,22

**questions** 5:7 6:16 13:23 14:2 19:18 24:21 25:4,19 32:2,23 45:12

**quick** 24:8,10,13 118:17

**Quickbooks** 28:3

**quickly** 11:6

**quota** 115:19,20,24 116:2

---

**R**

**re-ask** 106:22

**read** 25:12,14 48:9,23 50:12 75:21 89:6

**reading** 67:4 143:4 147:12 149:8

**ready** 5:23

**real** 118:17

**reason** 58:12 102:12,21 107:24 109:19 128:22 155:20 156:6,13

**reasons** 110:3

**recall** 45:14,20 57:12 96:16

**receive** 22:8 23:2,8 26:14,17,19,22 27:3,11 28:5,14 29:2 41:25 60:1,13 65:9,24 80:16 82:4 114:13 129:11 131:4

**received** 27:10 49:8 58:5,6 66:10,16 104:16 111:13 115:2

**receives** 26:10 28:10 59:22 60:6 80:20,23 82:3

**recess** 93:20 123:13 158:25

**recognize** 29:12 56:15 69:24 70:2 137:11 139:2

**recollection** 54:4,10

**record** 4:2 5:15 6:8 25:14 42:14 67:7 90:20 93:19,23 94:1,8,13 123:12,16, 19 128:18 158:13,24

**records** 60:20 68:3

**refer** 26:1,3,5 79:13 92:22

**reference** 93:6

**referenced** 9:17 49:18 80:6 126:12

**referencing** 147:1

**referred** 39:19,20 40:4 59:3 89:6

**referring** 9:11 26:6 27:17 37:20 38:13 40:1,6 50:10 57:17 59:4 61:6 62:20,24 71:22 84:3 86:24 91:2 101:14 107:12 109:7

**refers** 79:8,9 84:14 90:2 96:14 115:20

**reflected** 31:3 45:25 76:18 146:17 157:25

**reflecting** 49:13

**refresh** 54:11

**regeneration** 142:20

**register** 144:22 145:6

**registered** 148:11

**registrant** 73:13

**registration** 145:2,10,12

**regularly** 65:8

**regulators** 153:7,14 154:1

**relate** 25:20 157:9

**related** 27:5,11,14,20 43:22 54:19 57:7 108:12 116:4

**relating** 26:22

**relevant** 156:3

**remainder** 133:12 135:3

**remember** 41:24 67:13 86:7

**remind** 81:16

**remote** 4:3

**remotely** 4:8 20:23 81:10

**rent** 117:6

**repeat** 97:25 126:21

**replied** 130:17

**reply** 53:10

**report** 72:19,25 73:9,14 74:16,20 75:13

**reporter** 4:16 5:14,21 8:21 17:6,14 25:12 32:17

**repost** 142:4

**represent** 4:15 6:3

**representative** 4:11 14:11 24:14 29:21

**representatives** 30:15

**request** 37:17,22 51:17 58:13 93:16

**referred** 95:24 106:9 107:9,17 108:10 112:14 113:1 114:6,10,11,13 115:10,17 128:11 129:17 130:15,17 133:11,15, 18,21 134:16,19,21 135:1,3,8,10,14, 21,24,25 136:11,14

**requested** 6:19 43:15 111:25

**requesting** 42:3

**required** 6:17 14:21 15:3 72:3 92:24

**reside** 7:25 8:2 60:25

**residence** 12:4

**resigned** 144:4,5

**resolution** 150:20,21

**respect** 72:24 112:8,11 114:3

**respectfully** 88:12

**respects** 73:11 74:17

**response** 42:13 114:16

**responsible** 52:10 71:17 112:23 113:3 134:13

**rest** 50:7 133:22 134:24

**restate** 44:7

**restraining** 106:17 107:3

**restrict** 106:2

**restricted** 76:8,14,17 77:11 105:20

**restriction** 110:12

**restrictions** 104:13

**results** 73:11 74:18

**return** 87:14 124:6

**review** 71:9,11,13 72:14 73:20 74:12

**reviewed** 73:24

**right-hand** 72:1,10 74:1

**Ritz-carlton** 19:9

**room** 12:17

**roughly** 77:4,6

**routing** 49:12

**Rule** 30:13 72:3

**runs** 49:1

---

**S**

**S-H-E-N-G-L-U-N-G** 17:16

**S-H-E-N-G-W-E-N** 17:11

**salary** 117:6,9 120:24

**sales** 18:23 19:2

**Samantha** 5:2

**Sarbanes-oxley** 72:5 74:8

**Saturday** 100:21 101:2

**save** 61:21,23

**saved** 60:21

**scan** 23:14

**Schedule** 38:14,25 39:9,24 40:12 141:23

**scheduled** 148:7 151:18,21

**scope** 24:19,24

**screen** 6:25 47:15

**screenshot** 83:16

**search** 42:9 45:7

**searched** 68:3

**season** 65:12

**sec** 26:4,5,23 27:1 38:15,17 39:1,9 63:4 69:15 72:15 74:13 76:5 89:22 90:1 136:22 146:7,11,18,20,22 147:17,20 153:21

**secretary** 25:17 34:16 81:5,18,19,21

**section** 72:4 74:6,7 76:19 78:2,5,9, 17 139:20

**Securities** 25:20,22 26:2,6

**send** 23:9 53:21 62:15,16 63:16,18, 19 64:4,12 65:5 104:17 105:4,8 107:17 114:10

**sending** 150:15

**sends** 65:15 66:20

**sense** 123:4

**sentence** 30:8 78:18 79:15 88:4,6,8 89:6 139:21 140:21

**separate** 34:9 133:21

**separately** 34:7,13

**September** 4:4 67:20 100:17,18 128:15 129:20 131:1

**serve** 19:20

**server** 60:22

**service** 123:3 131:23

**serving** 14:11

**settle** 145:5,18

**settlement** 4:21 6:5 43:3 46:17,22 47:11,17 48:11 49:6,15,16 51:24 52:6 53:19,22 54:1 55:4,7,18 56:2,5,15 57:4,7,9,20 58:19 100:14,17 101:4,19 102:4,15 103:1 104:11 105:3 109:14 155:23 156:10 157:21

**SG** 122:15,16 123:8,21 124:2,12,14, 23

**SGLY** 142:19 143:3 148:12 152:15

**Shaanxi** 9:13

**shaded** 75:17

**share** 29:6

**shareholder** 151:14,15,17 154:19

**shareholders** 154:23 155:3,8,9,11

**shares** 155:25 156:9

**sheet** 55:7 56:2,16 57:3,12,14,17 92:14,16 118:16,24 120:4 145:4,16

**Shengwen** 17:11

**Sherry** 25:7,16 28:24 34:17 42:21 81:5 84:7 85:19 92:20 94:21 95:9 96:5 97:6 138:19 158:9

**Sherryyang001@gmail.com.** 64:20

**Shipping** 122:16 123:8,21 124:2,12, 14,23

**short** 26:3

**show** 29:3 30:10

**showed** 83:25

**showing** 86:15 127:16

**sic** 34:6 62:17 69:9 138:13

**side** 110:5

**sides** 30:12

**sign** 55:6 57:9 71:1 72:14 74:11,12 100:13,20

**signatory** 82:8 84:7 87:2

**signature** 91:10

**Signatures** 70:22

**signed** 49:13 54:2 55:9 70:11 71:3,5, 10 73:4,18,23 74:25 79:9 89:14 90:2 100:16,23 101:1 118:23 139:9,10 141:14 145:4,15

**signer** 81:6 82:7

**Silkroad** 59:5,7,11,14,18 60:7 61:11, 13 62:4,9 63:13 64:13 65:9,25 66:7 67:11 77:10 79:6 100:1,4,9 105:15

106:1,6 107:17 108:6 109:21 110:22 112:15,25 113:12 114:5 117:4 127:21 128:7 129:1,6,8,14 130:7,9 131:5,13, 16 132:2,12,16 133:11,20 134:4,9,22 135:6 136:9

**Silkroad's** 129:11

**similar** 140:15

**simple** 147:9

**Sing** 126:8

**Singapore** 63:1,9

**Singul-** 110:24

**Singularity** 4:9,12,24 12:13,15 14:8, 12 15:13,18,22 16:4,8,19,23 17:2 19:20,21 20:1,8,11,14 21:1,7,22,24 22:19,20,24 23:4 24:3 26:10,17,22 27:3 28:10,14 29:21 30:15 35:1,17,18 36:21 39:1,9 43:15 45:23 46:19 48:13 49:3 51:4,9,13 52:10,19 53:1 56:5 57:5,23 58:9,23 59:10,13,18,19,23 60:13 63:20,22 66:8 69:15 70:12 71:7 76:22 77:15 79:2 80:3,9,12,16 84:8, 16 86:5 87:19 88:21 90:10,18 96:23 97:2 98:10 99:8,16,20,21 101:15 102:5 106:3,18 107:4 108:4 110:14, 19,25 111:2,21 112:4,12,14,19 113:20 114:4,6 116:8,13 118:23 119:6 121:8 125:5,14,22 126:7 127:19 128:8,22 129:2,6,11,12 131:4, 14,15 133:10 135:11 139:6 140:3,7 141:24 147:14 154:23 155:8,13

**Singularity's** 23:13,17 30:19 50:16 60:6 61:12 62:3,8 63:13 65:9,24 66:1 67:11 69:8 76:13 82:3,13 83:4,5,13 84:24,25 85:3,11 87:3,8 92:13 104:14 105:5,15,19 106:17 107:2 109:20 113:8 114:17 118:12 119:13 123:21 127:22 134:21 138:4 157:24

**sit** 22:10,16 51:8 52:3 54:8,15,24 86:4 98:5

**sitting** 10:9 51:15 135:19 146:25 147:10

**small** 77:21

**Solarlink** 76:24

**solution** 119:1

**sounds** 108:15 158:17

**Southern** 44:12

**Space** 24:8,10,13

**speak** 34:6 94:17 95:3 131:20

**speaking** 14:16 44:15

**specific** 22:9 41:24 54:19 86:8 130:23 155:14

**specifically** 11:17

**speculation** 158:5

**spell** 6:10 17:6 23:21,24 33:23 35:7 63:3

**spoke** 34:10,11 35:22 131:24

**spreadsheet** 92:12 126:12,14,15, 16,25 127:8

**staff** 131:23

**stake** 118:16

**start** 101:6

**starting** 43:25 58:22 104:17 144:21

**state** 5:14,20 6:7 10:17,20,21 21:25 72:21 134:11

**state-issued** 10:13

**statement** 26:13 39:10 60:8 61:8,12 62:3,8,14,16 63:12 64:10,13 65:2,14 66:16,22 72:20 73:3 76:13 81:3 92:5, 6 115:3 142:8,11,13,14

**statements** 26:12,17 28:5 59:22 60:2,13,17 61:18 65:16,25 66:5,6,25 67:3 72:22,23 73:8,21 80:17,21,24 82:4,13 83:5,9 115:14

**States** 11:25 12:8,12 22:1,25 25:20, 22 26:1,6 30:18 79:11 80:4,18 84:9 109:15 111:4 118:13 119:25 121:10, 13,16

**stating** 130:18

**status** 30:16 43:3 45:18,24 100:6 145:20

**stay** 19:23

**step** 154:5,8

**steps** 111:22 153:19 154:1,12

**stipulation** 47:10,17 57:19

**stored** 60:17,18 61:18

**Street** 8:10 11:20 12:14

**stuffs** 16:11

**subject** 31:3 115:16,23

**subjects** 29:24

**submit** 37:22 38:16 51:17 100:15 106:8 107:9 108:10 112:1 128:11 129:17 130:15 133:7,25 135:8 146:4, 7 153:20

**submitted** 130:16 133:10,15 146:11, 18,19,21 147:17,20,22

**submitting** 135:10

**subparagraph** 48:24

**subsection** 43:22

**subsections** 43:24

**subsidiaries** 121:10 125:14 126:8

**subsidiary** 30:20 77:14 104:22 117:10,11,22 119:19 120:10 123:21 125:23 142:21 143:1,10 145:7 148:10

**subsidiary's** 119:15

**substance** 32:6 33:1 95:7,12,20

**successfully** 106:5 128:14

**sufficient** 99:22

**suggests** 143:18,23 144:9

**supposed** 105:3 108:2 109:12 128:14

**surname** 23:24

**suspend** 151:24

**swear** 4:16 5:13

**sworn** 5:5,10

**SY11240908** 64:25

**system** 60:23

---

**T**

---

**T-A-N-Y-A** 23:23

**TA** 27:19,25

**tab** 29:7 31:4 38:24 40:24 47:4,6 55:22,25 69:7,12 136:21 137:2,22 138:10 142:5

**taking** 6:5 93:10 151:8

**talk** 36:4 37:24 100:5 109:3 115:6 134:14

**talked** 31:21,22 32:7,8 45:16 99:6 111:16 124:16 126:17 131:18,19 134:3 157:6

**talking** 36:11 60:3 147:12 150:16

**Tanya** 23:20 24:9

**Taubman** 33:22 41:2

**tax** 143:16,17

**taxpayer** 49:14

**team** 16:10

**technology** 4:9,12,25 15:13 117:13 119:20,21 142:20

**ten** 94:17 158:19

**term** 55:6 56:2,16 57:3,12,14,17 118:16,24 120:4 145:4,15

**test** 40:11

**testified** 5:11 28:12,20 31:14 34:23 46:16,24 48:15 49:22 52:14 79:3 91:12,18 99:10,17 100:7 125:16,24 126:9,25 127:3

**testify** 15:3 29:22 30:16 31:1 33:1 85:20 92:20 94:21 95:1

**testifying** 14:5 29:25 30:24 48:17 49:24 109:13 144:13

**testimony** 14:15,22 34:19 39:21 40:5,11,18 42:5,11 43:18 45:17 52:2 82:21 85:23 93:6 95:4,15,19

**text** 30:4,5 48:23

**thing** 58:15 109:23 110:9

**things** 18:3 19:5 36:5,7 43:13 108:12 120:25 143:16 144:8 150:1

**thinking** 45:11 119:10 120:11,20

**thought** 22:12

**Thursday** 131:8

**time** 4:5 8:5 20:5 21:11 41:25 51:15, 20,22 55:15 57:8 58:13,14 59:4,7 73:4,17,23 74:25 75:13 76:4 85:18 87:16 90:10 106:10 109:5 110:2,6 115:13 116:7,10 117:3 118:22 119:3 120:3 123:1,2,6 129:6 130:23 140:9 144:4 155:2,7

**timeline** 130:25

**timely** 52:11

**times** 28:23 34:11 108:14

**title** 16:3 17:20 36:21,22 81:16

**titled** 78:9

**today** 6:6 13:20 14:6,22 15:4 25:18 28:12 29:25 30:24 31:16,20 32:11 34:8 36:3 37:6,11,16 38:5 40:11,19 42:6,11 43:18 44:6 45:3,10,17 46:6 48:17 49:24 51:8,15 52:4,8 54:9,24 57:23 67:16,17 68:6 79:1,3 83:17 98:5,11 99:11,18,21 109:13 112:4 126:18 127:3

**today's** 4:4 45:11

**told**  90:4 129:17 136:2,17

**Tony**  4:2

**tools**  28:3

**top**  48:5 70:21 72:1

**topics**  24:25 45:16 93:4 94:3,10 152:2 158:3

**total**  50:11 103:15

**totally**  120:8 125:5

**totals**  77:3

**Trading**  117:14 120:21 121:23 124:19

**transaction**  130:8

**transfer**  14:25 36:5,7 37:21 49:4,9 52:22 53:2,6,23 55:3,17 85:6,10,13 100:8 101:5 106:4,9,19 107:5,9 108:5,22 110:18,22 111:22 112:5,12, 14,24 113:4,21 114:4,7 115:17 116:8 117:2 120:4 127:20,21,24 128:8,23 129:2,13 130:16,25 131:6 132:5 133:11,21 134:5,10,21 135:3,11,25 136:11 144:1,15

**transferred**  30:18 51:13,19 53:24 57:23 109:14,20 111:5 128:14 132:15 135:5

**transferring**  101:13,18 110:14 111:17 113:11 134:13

**translate**  5:6 14:23 20:4 46:7 54:12 106:21 126:19 154:3

**translated**  153:2 157:11

**translation**  7:9,14,16 21:9 115:10 130:2

**translator**  6:17,20,22 129:24

**trip**  36:18

**true**  73:3,17 74:24 76:3,12

**truthfully**  31:2

**Tuesday**  58:21 100:15 112:16

**turn**  48:3 73:25 77:17 139:12

**type**  17:25 27:16

---

**U**

**U.S.**  10:11 58:17 67:18 78:21 79:18, 22 89:2 97:12,16,24 98:7 99:7 102:11 103:18 114:12 115:15,18,22 120:9 122:6,10 139:24 140:25 141:13

**U.S.C.**  74:6

**unable**  106:4,19 107:4 111:9

**understand**  7:7,10,17,18 8:17 12:21 14:3,10,14 15:3 21:17 24:20 32:8 33:6 35:13 42:2,23 45:25 53:12,15 54:13 56:19,23,25 57:2,6,10 61:10 66:10,19 67:8 68:14 77:1 88:19 89:13 90:8 94:6 97:19 102:20 104:24 105:1 107:25 108:17 109:10,17 110:7,9,11 113:17 123:22 125:7,21 133:18 134:2,18 148:14 150:18 153:23

**understanding**  7:6 14:4,20,24 23:11 26:4 29:17,23 30:23 46:4,9,13 50:2,5,8,17 55:1,13 60:5 68:16 78:1, 7,15 90:17 126:3 128:19 146:6

**understood**  6:18 7:6 33:3 85:23 128:20 155:1

**undertook**  31:15

**unfreeze**  58:22 59:1 83:18 101:6,19 104:18 105:5 111:11,13

**unfrozen**  83:18 107:21 108:25

**United**  11:25 12:8,12 22:1,25 25:20, 22 26:1,6 30:18 79:11 80:4,18 84:9 109:15 111:4 118:13 119:25 121:10, 13,16

**unrestricted**  114:24

**untrue**  72:20

**upper**  72:10 74:1

**USA**  104:8

**USD**  67:19 83:21 115:3 121:22 122:4

---

**V**

**valid**  49:14

**Vegas**  8:3,14,15 11:14,18

**versus**  4:9 128:23

**video**  32:10

**Virgin**  30:20 153:8,15 154:2,14 157:10

**Virginia**  144:16 147:16

**virtual**  22:3,6,7,14,19 23:8,12,18 24:5,6 26:10,24 27:4 28:11,19 80:25 81:2

**virtually**  34:15

**virtue**  102:6

**vote**  148:7,17 151:24 154:20,24 155:3

---

**W**

**W-9**  49:13

**W-U**  32:19

**wait**  112:20 114:15 129:16 155:22 156:7

**waited**  157:20

**waiting**  145:25 146:2

**walk**  113:17

**Wall**  12:14

**Wang**  58:18 84:4

**wanted**  57:15 93:15

**Wechat**  64:3,4,10,14,16,22,23 65:4 68:3 82:18,19 149:6 150:8,11,12

**week**  29:20 58:16,20 112:2 134:1

**Weilan**  9:14

**West**  77:11 122:8,10 124:21

**whatsoever**  52:4

**wholly-owned**  143:1

**Wicks**  4:2

**wiring**  49:10

**withdraw**  14:7 29:13 50:3 52:20 56:25 66:4 89:3 112:10 113:9,18

**withdrawn**  136:9

**word**  50:9 57:12 75:18 130:12

**words**  50:6 57:17 115:8

**work**  18:19 19:19,21,22 20:22,25 21:6,10,12,15,21 22:10,21 24:8,10,13 33:9,10,12,15,16

**worked**  18:15

**working**  17:3,9 18:4,23 120:25

**works**  22:23

**write**  92:9

**writing**  135:14

**written**  132:3,13 136:8,13 150:20

**Wu**  31:23 32:14 33:2,8,9,14,16 34:2, 6,12,24 143:18,22 144:8 156:15

---

**X**

**Xi'an**  19:10,13

## Y

**Y-A-N-G** 6:11

**Yang** 5:3,10,17 6:2,9 29:10 39:5 41:6,16 43:1 47:14 56:9 69:19 70:11 94:16 123:18 137:6 138:8 147:10 148:4

**Yang's** 94:2

**year** 15:19 50:20

**years** 18:9,10,12 19:6

**York** 5:3 12:14 21:25 22:1,20 23:12, 18 24:10,15 26:11,25 27:4 28:7,11,19 29:6 39:2 41:3 44:13,14 47:5 55:23 69:11 136:25 142:3

## Z

**zip** 8:11

**Zoom** 13:2