**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SEN GAO, CONGLI HUO, RUIBIN WANG, LUXIAO XU, Individually and on behalf of all others similarly situated, | Case No.: 1:22-cv-07499-BMC |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| SINGULARITY FUTURE TECHNOLOGY, LTD. F/K/A SINO-GLOBAL SHIPPING AMERICA LTD., YANG JIE, LEI CAO, ZHIKANG HUANG, TUO PAN, XIAOHUAN HUANG, JING SHAN, TIELING LIU, JING WANG, LEI NIE, JOHN LEVY, THOR MINER, INC., and GOLDEN MAINLAND, INC. | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS**

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................. 1

II.     SUMMARY OF CLASS COUNSEL'S LITIGATION EFFORTS ................................. 6

III.    THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE.............. 10

        A.      Application of the *Goldberger* Factors Support Awarding
                One Third of the Settlement Fund Here as Attorneys' Fees. ............................... 12

                1.      Class Counsel Invested Substantial Time, Labor,
                        and Resources in Prosecuting This Action. ............................................. 12

                2.      The Magnitude and Complexity of the Action
                        Favors the Fee Request. ................................................................... 12

                3.      The Fee Request is Warranted Based on the Level of
                        Risk Undertaken by Class Counsel in this Action. ................................. 14

                4.      Class Counsel Provided High-Quality Representation of Class
                        Representatives and the Settlement Class.................................................. 16

                5.      The One Third Fee Request is Reasonable
                        in Relation to the Settlement.................................................................. 17

                6.      Public Policy Supports Approval of the Fee Request............................. 18

        B.      The Lodestar Cross-Check Confirms the Reasonableness
                of the Fee Request................................................................................. 20

IV.     CLASS COUNSEL'S REQUEST FOR AN AWARD OF THEIR LITIGATION
        EXPENSES IS REASONABLE AND SHOULD BE GRANTED................................. 23

V.      SERVICE AWARDS FOR THE CONTRIBUTIONS OF THE
        LEAD PLAINTIFFS ARE APPROPRIATE.................................................................. 24

VI.     CONCLUSION.................................................................................................... 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*,
481 F.2d 1045 (2d Cir. 1973)......................................................................................... 2

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985) ...................................................................................................... 19

*Blum v. Stenson*,
465 U.S. 886 (1984) ...................................................................................................... 20

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ...................................................................................................... 10

*Charles v. Nationwide Mut. Ins. Co., Inc.*,
No. 09-cv-94, 2013 WL 12363613 (E.D.N.Y. June 28, 2013)...................................... 22

*Chavarria v. New York Airport Serv., LLC*,
875 F. Supp. 2d 164 (E.D.N.Y. 2012) .......................................................................... 25

*Christine Asia Co. v. Yun Ma*,
No. 15-md-2631, 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ................................... 12

*City of Providence v. Aeropostale, Inc.*,
No. 11-cv-7132, 2014 WL 1883494 (S.D.N.Y. May 9, 2014) ...................................... 10

*Dial Corp. v. News Corp.*,
317 F.R.D. 426 (S.D.N.Y. 2016) .................................................................................. 23

*E.F. ex rel. N.R. v. New York City Dep't of Educ.*,
No. 11-cv-5243, 2012 WL 5462602 (S.D.N.Y. Nov. 8, 2012)...................................... 21

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
62 F.4th 704 (2d Cir. 2023) .......................................................................................... 11

*Garcia v. Pancho Villa's of Huntington Vill., Inc.*,
No. 09-cv-486, 2012 WL 5305694 (E.D.N.Y. Oct. 4, 2012) ....................................... 25

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000)...................................................................................... passim

*Grice v. Pepsi Beverages Co.*,
363 F. Supp. 3d 401 (S.D.N.Y. 2019)...................................................................... 10, 17

*Gruber v. Gilbertson*,
647 F. Supp. 3d 100 (S.D.N.Y. 2022)............................................................................ 22

ii

*Guevoura Fund Ltd. v. Sillerman*,
No. 15-cv-07192, 2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ................................ 18, 22, 23

*In re 3D Sys. Sec. Litig.*,
No. 21-cv-1920, 2024 WL 50909 (E.D.N.Y. Jan. 4, 2024) ...................................................... 16

*In re Ashanti Goldfields Sec. Litig.*,
No. 00-cv-717, 2005 WL 3050284 (E.D.N.Y. Nov. 15, 2005) ................................................. 19

*In re Colgate-Palmolive Co. ERISA Litig.*,
36 F. Supp. 3d 344 (S.D.N.Y. 2014) .................................................................................. 19, 20

*In re Credit Default Swaps Antitrust Litig.*,
No. 13-md-2476, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) ............................................. 10

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
No. 13-cv-7789, 2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ................................................ 21

*In re Grana y Montero S.A.A. Sec. Litig.*,
No. 17-cv-01105, 2021 WL 4173684 (E.D.N.Y. Aug. 13, 2021),
report and recommendation adopted, 2021 WL 4173170 (E.D.N.Y. Sept. 14, 2021).. 14, 15, 23

*In re Holocaust Victim Assets Litig.*,
No. 06-cv-0983, 2007 WL 805768 (E.D.N.Y. Mar. 15, 2007) ................................................ 13

*In re IMAX Sec. Litig.*,
283 F.R.D. 178 (S.D.N.Y. 2012) ............................................................................................... 4

*In re Initial Pub. Offering Sec. Litig.*,
671 F. Supp. 2d 467 (S.D.N.Y. 2009) ................................................................................ 14, 22

*In re Merrill Lynch Tyco Rsch. Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. 2008) ............................................................................................. 16

*In re N. Dynasty Mins. Ltd. Sec. Litig.*,
No. 20-cv-5917, 2024 WL 308242 (E.D.N.Y. Jan. 26, 2024) ............................................ 24, 25

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ..................................................................................... 12, 13, 15

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
991 F. Supp. 2d 437 (E.D.N.Y. 2014) ............................................................................... 14, 18

*In re PPDAI Grp. Inc. Sec. Litig.*,
No. 18-cv-6716, 2022 WL 198491 (E.D.N.Y. Jan. 21, 2022) ........................................... 18, 22

*In re Tenaris S.A. Sec. Litig.*,
No. 18-cv-7059, 2024 WL 1719632 (E.D.N.Y. Apr. 22, 2024) ............................. 12, 17, 21, 23

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) ................................................................. 23

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) .............................................................. 10, 19

*Karic v. Major Auto. Companies, Inc.*,
   No. 09-cv-5708, 2016 WL 1745037 (E.D.N.Y. Apr. 27, 2016) ............................... 18

*Kindle v. Dejana*,
   308 F. Supp. 3d 698 (E.D.N.Y. 2018) ................................................................. 25

*LeBlanc-Sternberg v. Fletcher*,
   143 F.3d 748 (2d Cir. 1998) .............................................................................. 20

*Maley v. Del Glob. Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) .............................................................. 14, 18

*Massiah v. MetroPlus Health Plan, Inc.*,
   No. 11-cv-05669, 2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012) ............................ 25

*McDaniel v. Cty. of Schenectady*,
   595 F.3d 411 (2d Cir. 2010) ............................................................................. 10

*Mikhlin v. Oasmia Pharm. AB,*
   No. 19-cv-4349, 2021 WL 1259559 (E.D.N.Y. Jan. 6, 2021) ................................. 18

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) ........................................................................................ 20

*Pearlstein v. BlackBerry Ltd.*,
   No. 13-cv-7060, 2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022) ............................. 18

*Pillsbury Co. v. Conboy*,
   459 U.S. 248 (1983) .................................................................................... 10, 18

*Reiter v. MTA New York City Transit Auth.*,
   457 F.3d 224 (2d Cir. 2006) ............................................................................. 21

*Rodriguez v. CPI Aerostructures, Inc.*,
   No. 20-cv-982, 2023 WL 2184496 (E.D.N.Y. Feb. 16, 2023) .................................. 12, 16, 23

*Schutter v. Tarena Int'l, Inc.*,
   No. 21-cv-3502, 2024 WL 4118465 (E.D.N.Y. Sept. 9, 2024) ............................... 18

*Spann v. AOL Time Warner Inc.*,
   No. 02-cv-8238, 2005 WL 1330937 (S.D.N.Y. June 7, 2005) ............................... 24

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011) ................................................................................. 24

*Yang v. Focus Media Holding Ltd.*,
  No. 11-cv-9051, 2014 WL 4401280 (S.D.N.Y. Sept. 4, 2014) ................................................ 23

**Rules**

FED .R. CIV. P. 23(e) ............................................................................................... 1
FED. R. EVID. 502(d) ............................................................................................... 7

**Other Authorities**

5 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS §§ 17:1 (6th ed. 2022) ............................ 24, 25
MANUAL FOR COMPLEX LITIGATION  §14.121 (4th ed. 2004) ........................................... 10

Lead Counsel for Lead Plaintiffs Ruibin Wang, Sen Gao, Luxiao Xu, and Congli Huo (collectively, "Lead Plaintiffs") respectfully submit this Memorandum of Law in support of their Motion for Award of Attorneys' Fees, Litigation Expenses, and Service Awards, pursuant to Federal Rule of Civil Procedure Rule 23(e).[1]

## I.    INTRODUCTION

After more than three years litigating this complex securities class action, Lead Plaintiffs reached the proposed settlement (the "Settlement") with Defendants. This excellent result reflects the skill, expertise, and hard work of Class Counsel. The benefit to the Settlement Class is substantial and concrete compared to the significant risks of continued litigation. Indeed, this Court observed that from the outset of the litigation the case appeared to the Court to present a "blood-out-of-a-stone problem."[2] Through Class Counsel's efforts and perseverance, the Settlement Class's financial losses caused by Singularity's conduct will be offset by substantial and meaningful compensation. The Second Circuit's acknowledgment's that class action plaintiffs' counsel play an important role in protecting consumers in the antitrust field applies equally in the securities fraud context:

> [O]ne whose labors produce a favorable result deserves adequate recompense. Such a notion is particularly applicable in the area of the antitrust class action, which depends heavily on the notion of the private attorney general as the vindicator of the public policy. In the absence of adequate attorneys' fee awards, many antitrust actions

---

[1] "Lead Counsel" refers to Berger Montague PC. "Class Counsel" refers to Lead Counsel and Kirby McInerney LLP, who served as local counsel on behalf of the Settlement Class. Citations to the "Dell'Angelo Decl." are to the Declaration of Michael C. Dell'Angelo in Support of Motion for Final Approval of the Settlement and for an Award of Attorneys' Fees, Litigation Expenses, and Service Awards for the Class Representatives, filed herewith. All capitalized terms used herein have the same meanings as set forth in the Settlement Agreement (ECF No. 119-3) or the Court's July 30, 2025 Order preliminarily approving the Settlement (ECF No. 120), unless otherwise noted.

[2] Transcript of Hearing, August 28, 2025, at pp. 12-13.

> would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation.

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir. 1973) (citation omitted).

The Settlement was reached through experienced counsel's arm's-length negotiations with the assistance of a knowledgeable mediator, Robert D. Herschman, Esq. of FINRA Dispute Resolution Services, who has more than three decades of experience mediating complex financial matters, including securities fraud. The Settlement is comprised of three primary components that will generate a cash settlement fund for the Settlement Class. The Settlement Agreement requires Singularity to: (1) provide $3,000,000 in cash (the "Cash Settlement Amount") (SA ¶¶ 1(e), 10); (2) provide 6,500,000 freely tradable shares (pursuant to Section 3(a)(10) of the Securities Act of 1933) of Singularity common stock ("Settlement Shares"), which will be sold by Lead Counsel to generate cash to be distributed to the Settlement Class (SA ¶¶ 1(tt), 1(uu), 11, 14, 16); and (3) maintain a cash balance of $3,250,000 in a dedicated escrow account for the benefit of the Settlement Class (the "Escrow Component") (SA ¶ 15) as a safeguard against the value of the Settlement Shares when sold by Lead Counsel.

The Escrow Component mitigates market and other risks associated with the receipt and sale of the Settlement Shares. If the market price of the shares falls below $0.85 prior to Lead Counsel's sale of the shares on the open market, the Put Option (backed by the Escrow Component) ensures that the Settlement Class will receive at least $3,250,000 from the sale of the Settlement Shares. If Lead Counsel sells the shares at a price above $0.85 per share, the Settlement Class will receive more for the shares (in *addition* to the $3,000,000 Cash Settlement Amount),

2

which will add to the total settlement amount. Dell'Angelo Decl. at ¶¶ 76-77.[3]

Taken together, the Settlement terms Lead Counsel negotiated will provide benefits to the Settlement Class totaling at a minimum $6,250,000 (the $3 million Cash Settlement Amount + the $3.25 million Escrow Amount) and potentially more if Singularity's stock price exceeds $0.85 per share at the time of sale. *Id*. at ¶ 73. This carefully tailored Settlement is the result of Lead Counsel's zealous advocacy on behalf of the Settlement Class over three years of litigation and intensive discovery efforts that were hotly contested by Defendants at every stage of the case. Lead Counsel's initial case investigation and discovery efforts—which included private investigators in the United States and China, and important non-party discovery, including successful efforts to obtain tens of thousands of pages of documents from Singularity's Board's Special Committee that investigated Singularity's misconduct—informed counsel on the strengths of and challenges posed by Lead Plaintiffs' claims. *See id.* ¶¶ 5, 11, 25-62. There are also the important factors of Singularity's limited financial resources (at the time the Settlement was reached, the company reported total assets of just $18 million and that it also lacks insurance coverage to contribute to a settlement, *see id.* ¶¶ 67-68), its inability to easily access its funds (*see* ECF No. 122), and its attempt to reincorporate in the British Virgin Islands to seek to avoid the jurisdiction of courts in the United States may complicate a litigant's ability to enforce a judgment (*see id.*).

In sum, the Settlement reflects Lead Counsel's informed judgment that the Settlement will provide the Settlement Class a meaningful and immediate recovery against the real risks of years of difficult and costly litigation to obtain a judgment followed by the risks associated with enforcing that judgment against a company with limited financial capabilities and which is seeking

---

[3] The Settlement Agreement also includes a "Put Option" by which Lead Plaintiffs may sell the Settlement Shares back to Singularity, under certain specified conditions, at a price of $0.85 per share for a total amount of $5,525,000 (6.5 million shares x $0.85). SA ¶ 14.

to relocate to a foreign jurisdiction. *See In re IMAX Sec. Litig.*, 283 F.R.D. 178, 189 (S.D.N.Y. 2012) ("great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation") (citation omitted).

For their efforts on behalf of the Settlement Class, Lead Counsel respectfully submit that a request of one third of the full cash value of the Settlement Amount (plus any accrued interest) ultimately obtained is fair and reasonable. The full cash value of the Settlement, when and if funded, is the total of three components should Singularity comply with all of its obligations under the Settlement Agreement (*see* SA ¶¶ 10-15): (1) the $3,000,000 Cash Settlement Amount plus (2) the cash generated from the sale of the Settlement Shares (which will amount to at least the $3.25 million Escrow Amount, as discussed above) plus (3) the interest accrued by the Settlement Fund. Because the sale of the Settlement Shares cannot occur until after the Court grants final approval of the Settlement (*see* SA ¶ 11), the total cash value of the Settlement is not yet known. To date, Singularity has funded $2,000,000 of the Cash Settlement Amount. Thus, the minimum value of the Settlement is at least $2,000,000. Therefore, Lead Counsel provide examples to illustrate the range of the requested attorneys' fees. Using as an example the minimum total Settlement Amount of $6,250,000 ($3 million Cash Settlement Amount + $3.25 million Escrow Amount), the requested fee amount would be $2,083,333 ($6.25 million / 3). Using a higher estimate for the total Settlement Amount of $8,525,000 ($3 million Cash Settlement Amount + $5,525,000 Put Option), the requested fee amount would be $2,841,667 ($8.525 million / 3).

At the time of filing, Singularity has only transferred $2 million of the $6.25 million required under the Settlement Agreement. While Lead Plaintiffs are working diligently to secure the remaining transfers from Singularity, should the full Settlement Amount be $2 million, then the requested one third fee amount would be $666,667 ($2 million / 3).

All the above fee awards are well supported by the Second Circuit's standards for evaluating fee applications and are consistent with fee awards used in other complex securities litigation with comparable recoveries. Class Counsel's fee request is also strongly supported by the lodestar "cross-check." Class Counsel's attorneys and professional support staff collectively spent approximately 3,283.7 hours litigating the Action from its inception in the Summer of 2022 through October 31, 2025, producing a total lodestar amount of $3,090,498.50. Dell'Angelo Decl. ¶ 120. The proposed fee award represents a *negative* "multiplier" of approximately 0.22 for a $2,000,000 Settlement Amount, 0.67 for a $6,250,000 Settlement Amount, or 0.92 for a $8,525,000 Settlement Amount, respectively, compared to Class Counsel's total lodestar, which means Lead Counsel are requesting less than Class Counsel's fee investment in litigating this Action over three years.

In addition, Lead Counsel respectfully request payment of unreimbursed litigation expenses in an amount of $103,764.16, as set forth in the declarations from each of Class Counsel firm.[4] These litigation expenses are of the type that attorneys normally bill to paying clients and were reasonably incurred to advance the case, and should be reimbursed.

Finally, Lead Counsel seek service awards for each of the four Lead Plaintiffs in the amount of $5,000 ($20,000 total) to compensate them for the time they devoted to this case and in recognition of the results they helped obtain.

---

[4] In addition to the Dell'Angelo Declaration describing the efforts of Class Counsel in prosecuting the case over the course of the Action, each Class Counsel firm has submitted a declaration that details its respective hours, billing rates, and litigation expenses. Dell'Angelo Decl. Exs. 1-2.

## II.     SUMMARY OF CLASS COUNSEL'S LITIGATION EFFORTS

Class counsel initiated their pre-filing investigation of Singularity's alleged scheme to manipulate investors in the Summer of 2022. Dell'Angelo Decl. ¶ 5. Over the next year, Class Counsel continued to investigate the claims, including the filing of the first complaint on December 9, 2022, and an amended complaint on August 30, 2023. *See id.* ¶¶ 6-14. These efforts also involved Lead Counsel's retention of private investigators in both the United States and China to investigate Singularity's conduct. *See id.*

On October 6, 2023, Lead Plaintiffs filed the operative Second Amended Complaint ("SAC"). *See id.* ¶¶ 15-17. Defendants filed their motions to dismiss on November 20, 2023, which Lead Counsel opposed with an omnibus brief on January 5, 2024, and Defendants submitted their reply briefs on January 26, 2024. *Id.* ¶¶ 18-20. Altogether, the parties submitted over 200 pages of briefing on issues of falsity, scienter, and loss causation, among other issues. *See id.* On December 17, 2024, the Court upheld Lead Plaintiffs' claims against Defendants Singularity, Yang Jie, Thor Minor and Golden Mainland. *Id.* ¶ 21.

Following the resolution of the motions to dismiss, Lead Plaintiffs aggressively pursued discovery during the pendency of the seven (7) month fact discovery window. *See id.* ¶¶ 23, 25. This program proved to be challenging as Defendants vigorously opposed Lead Plaintiffs' discovery requests. For example, for more than 40 of Lead Plaintiffs' 75 document requests, Singularity responded that it did not possess any responsive documents. *Id.* ¶ 30. Defendant Jie similarly responded that he lacked access to many of the requested documents. *Id.* ¶ 31. Lead Counsel doggedly pursued meet and confers with both Defendants on both document requests, and for their numerous objections to Lead Plaintiffs' interrogatories, but both Defendants ultimately produced a small number of documents: Singularity produced 519 pages and Jie produced 64

pages. *Id.* ¶¶ 30-34. Lead Counsel continued to press Defendants to supplement their productions, which discussions were ongoing when the Settlement was reached. *Id.* ¶ 35.

Among the objections Defendants interposed against providing a complete responsive production was that many of the relevant documents were held by non-parties, such as Singularity's Board of Directors' Special Committee or other governmental regulatory bodies investigating Singularity's conduct. *Id.* ¶ 30. Lead Counsel therefore developed a plan to obtain these critical documents and issued fifteen subpoenas to non-parties. *Id.* ¶ 40. Through the non-parties, Lead Counsel discovered the existence of a document depository, maintained by non-party Gravity Stack, that held documents from the Special Committee's investigation of Singularity's conduct. *Id.* ¶ 41. Neither Singularity, Jie, nor Blank Rome (the law firm representing the Special Committee, which had created the repository) had disclosed the existence of the repository. *Id.* At the time of settlement, the non-parties collectively produced almost 115,000 additional documents, of which over 78,500 were from the concealed document depository. *See id.* ¶¶ 40-54. Lead Counsel organized a document review process to carefully and expeditiously examine the documents produced by all Defendants and non-parties. *Id.* ¶ 54. Lead Counsel was also preparing to serve additional non-party discovery based on their analysis of these documents when the case settled. *Id.* ¶ 55.

During this time, Lead Counsel negotiated with Defendants to reach necessary discovery stipulations, including a protective order, an order governing the production of electronically stored information, and an order applying Federal Rule of Evidence 502(d), which orders were approved by the Court. *Id.* ¶ 28.

Class Counsel also worked closely with the Lead Plaintiffs to respond to Defendants discovery. With the assistance of a translator, Lead Counsel helped each Lead Plaintiff to respond

7

to Defendants' interrogatories and requests for admission, and to identify and produce documents responsive to Defendants' requests. *Id.* ¶¶ 36-37. Lead Counsel helped to prepare each Lead Plaintiff to sit for the depositions. *Id.* ¶ 38. Because the Lead Plaintiffs reside in China, Lead Counsel assisted them to collect and complete substantial paperwork for their visa submissions from a United States Consulate in China. *Id.* ¶¶ 38-39. This process required Lead Counsel to retain immigration counsel to facilitate the visa process which was ongoing at the time of Settlement. *See id.*

Lead Counsel noticed several critical depositions and was preparing witness folders and outlines from the careful review and analysis by Class Counsel of the documents obtained to date. *See id.* ¶¶ 54, 61-62. When the parties reached a settlement on May 29, 2025, Lead Counsel was prepared to depose Singularity's corporate counsel scheduled for the next day. That deposition would have probed Singularity's assertions that it possessed few relevant documents and explore material facts concerning conduct by Singularity and Jie. Several other important depositions were scheduled for the first week of June 2025, including Jie, Singularity's former director (John Levy), and Singularity's former COO (Jing Shan). *See id.* Depositions for each the Lead Plaintiffs were also noticed for mid-July 2025. *Id.* ¶ 62.

Concurrent with these intensive discovery efforts, Class Counsel also pursued settlement negotiations with Defendants. *See id.* ¶¶ 63-72. There were negotiations in December 2024, prior to the motions to dismiss practice, where the parties did not reach a resolution. *Id.* ¶ 63. The parties later engaged a highly experienced mediator, Robert D. Herschman, Esq. of FINRA Dispute Resolution Services, who has more than three decades of experience mediating complex financial matters, including securities fraud matters. *Id.* ¶ 64. In advance of the first mediation session, held on March 3, 2025, Lead Counsel prepared a detailed mediation statement, which addressed all

aspects of liability and damages, that was provided to Mr. Herschman and Singularity. *Id.* ¶ 65. A resolution was not reached at the March 3 session, but the parties continued their negotiations. *Id.* ¶ 66. Among the major obstacles was the fact of Singularity's limited financial resources—the company had total unrestricted cash of approximately $15 million[5] and no insurance coverage to contribute when the Settlement was reached. *See id.* ¶ 67-68. Additionally, after executing the Settlement, Lead Counsel learned that virtually all the company's unrestricted cash is held at a bank in Djibouti, a small East African country that maintains currency export restrictions, which Singularity claims has impeded its access its own money. *See* ECF Nos. 130-1, 139. Singularity is also subject to several judgments[6] and it is seeking to reincorporate in the British Virgin Islands, which may impede Lead Plaintiffs' ability to enforce a judgment (ECF No. 122).

Singularity's limited financial resources, as well as its other litigation troubles, required the parties to creatively consider how to structure a settlement with meaningful relief for the Settlement Class. Continuing the negotiations, and with assistance from the mediator, the parties reached an agreement in principle on March 29, 2025. Dell'Angelo Decl. ¶ 72. The parties worked on the terms of the Settlement Agreement that sets forth Settlement considerations discussed in detail in the preceding section, which was executed on July 13, 2025. *Id.*

---

[5] Singularity reported to the SEC having $3 million in restricted funds.

[6] *See, e.g.*, ECF No. 113 (discussing *Zhikang Huang v. Singularity Future Technology Ltd.*, Index No. 51748/2025 (Supreme Court of N.Y., Westchester Co.) where there is a $468,957 judgment against Singularity and the plaintiff has garnished Singularity's domestic bank accounts); *Jing Shan v. Singularity Future Tech. Ltd.*, Index No. 655309/2025 (Sup. Ct. N.Y. Cty. Sept. 12, 2025) (court entered a temporary restraining order against Singularity pending a hearing concerning Singularity's failure to satisfy a judgment). Lead Counsel understands that other litigation is pending and scheduled for trial shortly. Singularity's legal affairs and exposure to multiple judgments appears to be the primary reason why, as described herein, Singularity is seeking to restructure into a newly created subsidiary in the British Virgin Islands (*see* ECF No. 122).

## III.    THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE

In common fund cases, attorneys that secure a recovery for a class are "entitled to a reasonable attorney's fee from the fund as a whole." *City of Providence v. Aeropostale, Inc.*, No. 11-cv-7132, 2014 WL 1883494, at \*10 (S.D.N.Y. May 9, 2014) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)). This principle applies to class action settlements. *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 406 (S.D.N.Y. 2019) ("In Rule 23 class actions, the 'attorneys whose efforts created the fund are entitled to a reasonable fee—set by the court—to be taken from the fund.'" (quoting *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000))). Awarding reasonable attorneys' fees from the common fund recognizes and compensates class counsel for their efforts in bringing and prosecuting this case. Attorneys' fee awards also advance the purpose of the securities laws, which rely on private actions like this one to further important public policy goals. *See, e.g.*, *Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983).

Courts "may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method," although "the trend in this Circuit is toward the percentage method." *In re Credit Default Swaps Antitrust Litig.*, No. 13-md-2476, 2016 WL 2731524, at \*16 (S.D.N.Y. Apr. 26, 2016) ("*CDS*") (quoting *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010)).

The percentage of the fund method is preferred for class actions because it provides "appropriate financial incentives" necessary "to attract well-qualified plaintiffs' counsel who are able to take a case to trial," while also "directly align[ing] interests of the class and its counsel" by providing "a powerful incentive for the efficient prosecution and early resolution of litigation." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355, 359 (S.D.N.Y. 2005); MANUAL FOR COMPLEX LITIGATION §14.121 (4th ed. 2004) ("Indeed, one purpose of the percentage method is

10

to encourage early settlements by not penalizing efficient counsel, thus ensuring that competent counsel continue to be willing to undertake risky, complex, and novel litigation.").

Courts evaluating whether a fee is "reasonable" under the percentage of the fund method must consider: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation … ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50 (citation omitted); *see also Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 723 (2d Cir. 2023) (citing the *Goldberger* factors).

Class Counsel seek a fee award of one third of the full cash value of the Settlement Amount (plus any accrued interest) ultimately obtained. Upon compliance by Singularity with the terms of the Settlement Agreement (*see* SA ¶¶ 10-15), the Settlement Amount would range from $6,250,000 to $8,525,000, or potentially more depending on the sale of the Settlement Shares. Using these two figures, the requested fee amount would be $2,083,333 to $2,841,667. At the time of filing, Singularity has only met $2 million of its minimum $6.25 million funding requirement under the Settlement Agreement (*i.e.*, the $3 million Cash Settlement Amount + $3,250,000 Escrow Amount). Using this amount, the requested fee award would be $666,667. As explained in detail below, the application of the *Goldberger* factors confirms the reasonableness of each of these three fee award benchmarks. To the extent the Court performs a lodestar cross-check, the requested fee represents a *negative* multiplier (*i.e.*, the award is less than Class Counsel's lodestar) of 0.22 for a $2,000,000 Settlement Amount, 0.67 for a $6,250,000 Settlement Amount, or 0.92 for a $8,525,000 Settlement Amount, which also supports the reasonableness of the requested fee.

A.    **Application of the *Goldberger* Factors Support Awarding One Third of the Settlement Fund Here as Attorneys' Fees.**

1.    **Class Counsel Invested Substantial Time, Labor, and Resources in Prosecuting This Action.**

As to the first factor, class counsel devoted over 3,283.7 hours of attorney and other legal professional time to prosecute this Action from inception of the case in the Summer of 2022 through October 30, 2025, the date of this motion and Lead Plaintiffs' motion for final approval of the Settlement. Class Counsel provide a detailed description of counsel's efforts from the case's inception through settlement and up to October 30, 2025 in the Dell'Angelo Declaration. Class Counsel's efforts are also summarized at Section II above. The substantial time, labor, and resources counsel invested in the more than a decade they spent litigating this matter demonstrates that the first *Goldberger* factor supports the reasonableness of the fee request.

2.    **The Magnitude and Complexity of the Action Favors the Fee Request.**

"[C]lass actions 'have a well deserved reputation as being most complex,'" *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (citation omitted). "Shareholder actions are notoriously complex and difficult to prove." *Rodriguez v. CPI Aerostructures, Inc.*, No. 20-cv-982, 2023 WL 2184496, at *14 (E.D.N.Y. Feb. 16, 2023) (citation omitted). The "magnitude and complexity of the instant case, which are already heightened given the securities context, also weigh in favor of approval of the requested award of attorneys' fees." *In re Tenaris S.A. Sec. Litig.*, No. 18-cv-7059, 2024 WL 1719632, at *11 (E.D.N.Y. Apr. 22, 2024).

This Action is a prime example of a complex and risky securities case. While Lead Counsel believes the case against Defendants is strong, they also acknowledge that Defendants would vigorously contest liability. Successfully prosecuting this Action through trial, like any securities fraud action, would be both complex and risky. *See, e.g.*, *Christine Asia Co. v. Yun Ma*, No. 15-md-2631, 2019 WL 5257534, at *10 (S.D.N.Y. Oct. 16, 2019) ("In evaluating the settlement of a

12

securities class action, federal courts, including this Court, have long recognized that such litigation is notably difficult and notoriously uncertain."). In addition to the complexity of the issues underlying Lead Plaintiffs' claims, and the fact that much of the company's internal communications and other documents are in Mandarin, there is also the fact of Singularity's difficulty in accessing its funds, its intent and effort to evade justice in the United States by incorporating in the British Virgin Islands, and the company's overall financial weakness and lack of insurance coverage. Even with a successful prosecution of the claims (through trial and any appeals), there is a substantial risk that Lead Plaintiffs would be unable to recover the full amount of a judgment.

There are also the complex issues of law and fact Defendants would likely raise at class certification, and the losing party would likely seek interlocutory review under Rule 23(f). Defendants would have almost certainly brought motions for summary judgment, which the Court could have found meritorious in part or in whole, leading to further briefing or appeals. And even if Lead Plaintiffs overcame these risks and took the case against Defendants to trial, there remains risk that a jury might find that Lead Plaintiffs failed to meet their burden to prove Defendants participated in the alleged fraud, along with the subsequent risk that any verdict could have been vacated or reversed on appeal.

For all these reasons, a fee award that accounts for the prosecution of litigation that was "extraordinary in both complexity and scope" is appropriate. *In re Holocaust Victim Assets Litig.*, No. 06-cv-0983, 2007 WL 805768, at *46 (E.D.N.Y. Mar. 15, 2007); *see also NASDAQ*, 187 F.R.D. at 477 ("There can be no doubt that this class action would be enormously expensive to continue, extraordinarily complex to try, and ultimately uncertain of result.").

13

**3.    The Fee Request is Warranted Based on the Level of Risk Undertaken by Class Counsel in this Action.**

As to the third factor, the "risk of the litigation is often cited as the first, and most important, *Goldberger* factor." *In re Grana y Montero S.A.A. Sec. Litig.*, No. 17-cv-01105, 2021 WL 4173684, at *17 (E.D.N.Y. Aug. 13, 2021)[7] (citation omitted); *Goldberger*, 209 F.3d at 54 ("We have historically labeled the risk of success as 'perhaps the foremost factor' to be considered in determining whether to award an enhancement."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 440 (E.D.N.Y. 2014) ("The most important *Goldberger* factor is often the case's risk." (citation omitted)). The risk of undertaking litigation is "measured as of when the case is filed." *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 509 (S.D.N.Y. 2009) (quoting *Goldberger*, 209 F.3d at 55).

Class Counsel took this difficult and highly risky case on a fully contingent basis and invested significant time, money, and resources to advance Lead Plaintiffs' and the Settlement Class's claims. *See Grana y Montero*, 2021 WL 4173684, at *17 ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation.") (citation omitted). This risk was more significant because this Action was not undertaken with the benefit of a previous government investigation. *See Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (recognizing that plaintiffs' counsel did not "'piggy back' on any prior governmental action" (citation omitted)). Moreover, this case required Class Counsel to litigate against Defendants who tenaciously opposed the litigation from the outset and into discovery. *See generally* Dell'Angelo Decl. ¶¶ 5-62. Indeed, from the day this case was filed, the Court thought this case presented a "blood-out-of-a-stone problem." Transcript of Hearing, August

---

[7] Report and recommendation adopted, No. 17-cv-1105, 2021 WL 4173170 (E.D.N.Y. Sept. 14, 2021).

14

28, 2025, at pp. 12-13.

As discussed in detail in Plaintiffs' Memorandum of Law in Support of Final Approval of the Settlement, submitted herewith, and summarized here, Class Counsel faced significant *ex ante* litigation risks. For example, following the resolution on the motions to dismiss, the parties engaged in hotly contested discovery where Defendants asserted, *inter alia*, there were few relevant documents—without which, Plaintiff may have been unable to prove their case even if the Defendants engaged in significant wrongdoing. *See* Dell'Angelo Decl. ¶¶ 5-35. In fact, Class Counsel pursued third party discovery to obtain important evidence regarding the alleged fraudulent activity. *Id.* ¶¶ 40-55. Even if liability was established, Lead Plaintiffs still faced the risk of proving damages, both in establishing a model for calculating damages for class certification as well as establishing those damages at trial. There is no doubt that at trial the parties would engage in a "battle of experts" regarding proof of damages in which "it is difficult to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad non-actionable factors." *NASDAQ*, 187 F.R.D. at 476 (citation omitted). There is a substantial risk that a jury might accept one or more of Defendants' damages arguments and award far less than the funds secured by the Settlement, or even nothing at all. *See, e.g.*, *Grana y Montero*, 2021 WL 4173684, at \*17 ("even if this case were to overcome all of these potential obstacles and proceed to a jury trial, obtaining a meaningful recovery would be far from a sure thing for Plaintiffs, especially in light of the difficulties of obtaining discovery from foreign defendants and third-parties"). While Lead Counsel believe there would have been sufficient evidence to support a finding of classwide impact and damages, Defendants would have lodged substantial attacks on Lead Plaintiffs' experts.

**4.      Class Counsel Provided High-Quality Representation of Class Representatives and the Settlement Class.**

As to the fourth factor, "the quality of representation is best measured by results," *Goldberger*, 209 F.3d at 55, which are evaluated considering "the recovery obtained and the backgrounds of the lawyers involved in the lawsuit," *In re Merrill Lynch Tyco Rsch. Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008); *see also Rodriguez*, 2023 WL 2184496, at *14 ("In considering the requested fee, the Court also looks to the quality of the representation of Lead Counsel as well as the quality of opposing counsel"). In appointing Class Counsel at the start of the litigation, the Court made an initial determination of counsel's adequacy. *See* ECF No. 18, at 3 ("Berger Montague and Kirby McInerney are well-qualified to serve as lead counsel and local counsel, respectively, in this action"); *see also* Advisory Committee's Notes to 2018 Amendments to Rule 23 (interim appointment entails an evaluation of counsel's adequacy to represent the class). The Court's initial determination of Lead Counsel's adequacy has been bolstered by Lead Counsel's performance in this case.

Lead Counsel's efforts have negotiated a Settlement Fund with a minimum value of $6.25 million (and which may ultimately reach $8.525 million or higher) that provides the Settlement Class significant and immediate financial relief. To date, $2 million of the $3 million cash component has been funded. The Settlement represents an immediate recovery against a genuine risk that the Settlement Class may recover nothing at all. *See In re 3D Sys. Sec. Litig.*, No. 21-cv-1920, 2024 WL 50909, at *15 (E.D.N.Y. Jan. 4, 2024) (citing counsel's experience litigating complex securities class actions and successfully negotiating a settlement as support for the fee award). Given the many risks and additional years standing between Lead Plaintiffs and a jury verdict, obtaining the Settlement while facing Defendants who have aggressively opposed Lead Plaintiffs' claims every step of the way reflects both the merits of the Settlement and the skill with

which Lead Counsel have prosecuted this case.

The Settlement Class includes numerous investors presumably with the sophistication and resources to object to the Settlement. While the objection period is ongoing for the Settlement, to date, there have been no objections and no valid requests for exclusion.[8] The lack of objections to date following robust notice to the Settlement Class[9] is one indication of the quality of the work performed by Class Counsel on behalf of the Settlement Class. *See Tenaris*, 2024 WL 1719632, at *12 ("Courts recognize that in 'a securities class action, where the class likely contains sophisticated investors ... [plaintiffs] are [ ] in a position to object' such that the absence of objections should be credited as an indication of a successful settlement.") (citation omitted). To the extent objections are filed, Lead Counsel will address them on reply.

### 5.    The One Third Fee Request is Reasonable in Relation to the Settlement.

The fifth *Goldberger* factor, the fee request in relation to the settlement fund, also weighs in favor of Lead Counsel's fee request. "[M]arket rates" are the "ideal proxy" for an attorney's compensation. *Goldberger*, 209 F.3d at 50. Thus, comparable cases serve as guideposts against which a court may determine whether a fee request is reasonable. *Grice*, 363 F. Supp. 3d at 407

---

[8] Within the past day, the claims administrator informed Lead Counsel that it has received an opt out request from a purported shareholder. The individual had not been included in the administrator's shareholder data and provided no supporting documents to establish membership in the Settlement Class. The claims administrator is making efforts to determine if the opt-out is valid.

[9] The Court-approved notice informed all Class Members that Lead Counsel would seek an award of attorneys' fees in an amount not to exceed 33-1/3% of the Settlement Fund (plus one third of any accrued interest) and no more than $300,000 in litigation expenses and that the Court would ultimately determine the award. *See generally* ECF No. 119-6. The notice also apprised Class Members that Lead Counsel would ask the Court to approve service awards for Lead Plaintiffs. Class Members were also informed that this Motion will be posted on the case website, www.singularitysecuritiessettlement.com (the "Settlement Website"). Finally, Class Members were notified of their right to object to any aspect of the Settlement, including the fee, expense, and service award requests.

17

("Courts often look to empirical evidence of attorney's fees awarded in similar cases as a starting point for the baseline reasonable fee inquiry." (citation omitted)).

Complex securities cases present considerable risk and require extensive work. Thus, courts regularly award attorneys' fees in an amount of one third of the settlement fund. *See, e.g.*, *In re PPDAI Grp. Inc. Sec. Litig.*, No. 18-cv-6716, 2022 WL 198491, at *16 (E.D.N.Y. Jan. 21, 2022) (one-third fee "constitutes a proportion routinely approved as reasonable"); *Mikhlin v. Oasmia Pharm. AB*, No. 19-cv-4349, 2021 WL 1259559, at *7 (E.D.N.Y. Jan. 6, 2021) ("Courts in this Circuit routinely find that requests for attorney's fees totaling one-third of the settlement fund are "'well within the range of reasonableness.'") (citing cases); *Karic v. Major Auto. Companies, Inc.*, No. 09-cv-5708, 2016 WL 1745037, at *8 (E.D.N.Y. Apr. 27, 2016) ("Courts in this Circuit have often approved requests for attorneys' fees amounting to 33.3% of a settlement fund."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 445 (E.D.N.Y. 2014) ("it is very common to see 33% contingency fees in cases with funds of less than $10 million").[10]

Lead Counsel's request falls in line with the observed attorneys' fees in this Circuit and in other similarly complex securities cases, further confirming the reasonableness.

### 6.     Public Policy Supports Approval of the Fee Request.

Public policy also supports the requested fee award. Public policy encourages enforcement of the securities laws through private civil suits to deter infringing conduct in the future. *See Conboy*, 459 U.S. at 262-63 ("[Supreme] Court has emphasized the importance of the private

---

[10] *See also Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060, 2022 WL 4554858, at *10 (S.D.N.Y. Sept. 29, 2022) ("Class Counsel's request for one-third of the gross settlement fund is reasonable within this circuit."); *Guevoura Fund Ltd. v. Sillerman*, No. 15-cv-07192, 2019 WL 6889901, at *15 (S.D.N.Y. Dec. 18, 2019) (approving one-third fee and citing cases where courts have awarded same); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (one-third fee "falls comfortably within the range of fees typically awarded in securities class actions").

action as a means of furthering the policy goals of certain federal regulatory statutes"); *Schutter v. Tarena Int'l, Inc.*, No. 21-cv-3502, 2024 WL 4118465, at \*17 (E.D.N.Y. Sept. 9, 2024) ("A strong public policy concern exists for rewarding firms for bringing successful securities litigation.") (quoting *In re Ashanti Goldfields Sec. Litig.*, No. 00-cv-717, 2005 WL 3050284, at \*5 (E.D.N.Y. Nov. 15, 2005)). Awarding a reasonable percentage of the common fund "provid[es] lawyers with sufficient incentive to bring common fund cases that serve the public interest." *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 352 (S.D.N.Y. 2014) (quoting *Goldberger*, 209 F.3d at 51). If attorneys' fees are routinely set too low, particularly in instances where counsel effectively and efficiently litigate a matter, they will be deterred from bringing meritorious cases in the future. *See id.* ([S]etting fees too low … will create poor incentives to bringing large class action cases.").

Here, Class Counsel's work advanced the interest of the securities laws and protected investors who might otherwise be without recourse all in the face of exceptional risks of proof and recovery. *See Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (Supreme Court has "repeatedly [ ] emphasized that implied private actions provide 'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to Commission action.'") (citations omitted). Awarding a reasonable fee will encourage other counsel to investigate future misconduct in financial markets, which will promote more scrupulous industry practices, increased supervision to prevent misconduct, and ultimately lead to a fairer and more efficient market for all participants. *Cf. WorldCom*, 388 F. Supp. 2d at 359 ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives."). Accordingly, public policy supports the requested fee.

19

### B.       The Lodestar Cross-Check Confirms the Reasonableness of the Fee Request.

When using the percentage method, courts may elect to perform a "'cross check' on the reasonableness of the requested percentage" based on counsels' hours multiplied by their billing rates. *Goldberger*, 209 F.3d at 50 (citation omitted). This "lodestar cross check," when used, is meant to be "as a sanity check to ensure that an otherwise reasonable percentage fee would not lead to a windfall." *Colgate-Palmolive*, 36 F. Supp. 3d at 353. To perform the lodestar cross-check, the Court "multiplies the reasonable hours billed by a reasonable hourly rate." *Id.* at 347 (citing *Goldberger*, 209 F.3d at 47). The lodestar calculation "should be based on 'prevailing market rates,' … and current rates, rather than historical rates, should be applied in order to compensate for the delay in payment." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984) and citing *Missouri v. Jenkins*, 491 U.S. 274, 283–84 (1989)). When used as a cross-check, "the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.

As shown below, undertaking this lodestar cross-check confirms the reasonableness of Lead Counsel's request. Class Counsel's attorneys and professional support staff collectively spent approximately 3,283.7 hours litigating the Action from its inception in the Summer of 2022 through October 31, 2025, producing a total lodestar amount of $3,090,498.50. Dell'Angelo Decl. ¶ 120. The number of hours spent on this Action during this time are reasonable, particularly considering the level of independent investigation conducted by Lead Counsel to understand Defendants' conduct, prepare and amend the complaint, respond to motions to dismiss and other motions, and engage in substantial, complex negotiations with Defendants concerning expansive discovery. *See id.* ¶¶ 5-62. In addition, Lead Counsel have expended many hours on the settlement, notice and approval process, and efforts to enforce the Settlement after Singularity's breach of its funding obligations, including extensive efforts to secure the Settlement payments, after the

20

Settlement terms were executed by the parties on July 13, 2025. Lead Counsel will continue to devote significant attorney time to administer the Settlement in the near term and even after the Settlement is approved, including by submitting reply briefs in support of the pending motions, continuing to ensure enforcement of the Settlement terms and the payment of the Settlement consideration, appearing at the final Settlement Hearing, supervising notice and claims administration, overseeing the sale of the Settlement Shares, monitoring the investment of the Settlement Fund, communicating with claimants, and moving for and overseeing the distribution of settlement proceeds to Settlement Class Members.

The hourly billing rates for attorneys and professional support staff working on this case ranged from $300 to $1,360 using 2025 rates.[11] *See* Dell'Angelo Decl. Exs. 1-2. Billing rates in the same range have been previously approved as reflective of market rates in New York for litigations of comparable size and complexity. *See, e.g.*, *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, 2018 WL 5839691, at *5 (S.D.N.Y. Nov. 8, 2018) (granting fee award using partner rates up to $1,375 and associate rates of $350 to $700, *see* ECF No. 939 and exhibits); *Steamship Trade Ass'n of Baltimore-Int'l Longshoremen's Ass'n Pension Fund v. Olo Inc.*, Case No. 22-cv-8228, ECF No. 128 (S.D.N.Y. June 11, 2024) (order granting fee award using partner rates up to $1,975 and associate rates of $560 to $775, *see* ECF No. 123-2); *Tenaris*, 2024 WL 1719632, at *10 (granting fee award using $675 to $1,100 for partners, and $395 to $725 for non-partners).

As explained in more detail in Section I above, the full value of the Settlement Amount

---

[11] *See, e.g.*, *Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006) (lodestar should be calculated using "current rather than historic hourly rates" (citation omitted)); *E.F. ex rel. N.R. v. New York City Dep't of Educ.*, No. 11-cv-5243, 2012 WL 5462602, at *2 (S.D.N.Y. Nov. 8, 2012) ("Because a party is entitled to be compensated for the delay in payment, the appropriate rate to apply is counsel's current rate, rather than historical rates.").

21

will not be known until the Settlement Shares are sold. Should Singularity comply with its obligations to fund the Settlement (*see* SA ¶¶ 10-15), then the Settlement Amount may range between $6.25 million and $8.525 million, or potentially more. At present, however, Singularity has only funded $2 million of the $6.25 million required by the Settlement Agreement. Using these three figures yields multipliers of 0.22 for a $2,000,000 Settlement Amount, 0.67 for a $6,250,000 Settlement Amount, and 0.92 for a $8,525,000 Settlement Amount. A multiplier below 1.0, like those here, is referred to as a negative multiplier because the requested fee awarded is less than the total lodestar Class Counsel expended in bringing and litigating the action.

"Courts have repeatedly recognized that the reasonableness of the fee request under the percentage method is reinforced where, as here, 'the percentage fee would represent a negative multiplier of the lodestar.'" *Guevoura Fund Ltd. v. Sillerman*, No. 15-cv-07192, 2019 WL 6889901, at *18 (S.D.N.Y. Dec. 18, 2019) (citing cases); *see also In re PPDAI Grp. Inc. Sec. Litig.*, 2022 WL 198491, at *16 ("This results in a negative lodestar multiplier of 0.755, which is 'well below the parameters used throughout district courts in the Second Circuit, [and] affords additional evidence that the requested fee is reasonable.'") (citation omitted); *Charles v. Nationwide Mut. Ins. Co., Inc.*, No. 09-cv-94, 2013 WL 12363613, at *8 (E.D.N.Y. June 28, 2013) (awarding one-third fee where "the 33.3% fees requested by Class Counsel represent approximately one-third of Class Counsel's total lodestar calculation"); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009) (finding negative multiplier supported one-third fee and noting there was "no real danger of overcompensation"); *Gruber v. Gilbertson*, 647 F. Supp. 3d 100, 128 (S.D.N.Y. 2022) (awarding one-third fee where counsel had a negative multiplier which "would not constitute anything approaching a windfall"). Accordingly, Class Counsel's requested fee award of one third of the full value of the Settlement Amount (plus accrued

22

interest) is well within accepted ranges and is further supported by the lodestar cross-check.

## IV.   CLASS COUNSEL'S REQUEST FOR AN AWARD OF THEIR LITIGATION EXPENSES IS REASONABLE AND SHOULD BE GRANTED.

"Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." *Rodriguez*, 2023 WL 2184496, at *14 (citing cases); *Tenaris*, 2024 WL 1719632, at *12 ("In addition to an award of attorneys' fee, courts within the Second Circuit 'normally grant expense requests' for 'reasonable out-of-pocket expenses' in common fund cases as a matter of course") (citation omitted); *Grana y Montero*, 2021 WL 4173684, at *19 ("Courts routinely note that counsel is entitled to reimbursement ... for reasonable litigation expenses.") (citing cases). Such costs are "compensable if they are of the type normally billed by attorneys to paying clients." *Guevoura Fund*, 2019 WL 6889901, at *22.

As detailed in the individual declarations filed concurrently herewith, Class Counsel advanced litigation expenses from the inception of this Action through October 31, 2025 totaling $103,764.16. *See* Dell'Angelo Decl. ¶¶ 125-27 & Exs. 1 & 2. The expenses advanced covered filing fees, computer research, court reporting and other transcripts, printing, travel and accommodations, e-discovery and vendor database hosting fees, subpoena services, mediation fees and costs, and investigation costs, and certain other expenses related to the litigation. *Id.* ¶ 125. These are all the type of expenses that are normally billed to paying clients and routinely reimbursed from common funds. *See, e.g.*, *Tenaris*, 2024 WL 1719632, at *12 (approving expenses for mediator, legal research, filing fees, and document review platform); *Yang v. Focus Media Holding Ltd.*, No. 11-cv-9051, 2014 WL 4401280, at *19 (S.D.N.Y. Sept. 4, 2014) (finding computer research, photocopying, postage, meals, and court filing fees "necessary for Lead counsel to successfully prosecute this case"). Under these circumstances, there is no reason to "depart from the common practice in this circuit of granting expense requests." *Dial Corp. v. News*

23

*Corp.*, 317 F.R.D. 426, 438 (S.D.N.Y. 2016) (quoting *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003)).

## V.    SERVICE AWARDS FOR THE CONTRIBUTIONS OF THE LEAD PLAINTIFFS ARE APPROPRIATE

Finally, Lead Counsel seek service awards for Lead Plaintiffs to compensate them for the significant time they devoted to this case and in recognition of the results they were crucial to obtaining. Service "awards are common in class action cases and are important to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by plaintiffs." *In re N. Dynasty Mins. Ltd. Sec. Litig.*, No. 20-cv-5917, 2024 WL 308242, at *17 (E.D.N.Y. Jan. 26, 2024) (citation omitted). Service awards also compensate for and recognize contributions to the advancement of policy goals and classwide benefits. *See Spann v. AOL Time Warner Inc.*, No. 02-cv-8238, 2005 WL 1330937, at *9 (S.D.N.Y. June 7, 2005) ("[A]n incentive award may be given to compensate named plaintiffs 'for efforts expended for the benefit of the lawsuit.'" (citation omitted)); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) (affirming service awards in antitrust case and noting they "reward the public service of contributing to the enforcement" of laws (citation omitted)). Discretionary service awards are routinely made in class actions. *See* 5 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS §§ 17:1 (6th ed. 2022) ("Empirical evidence shows that incentive awards are now paid in most class suits").

Here, the named Lead Plaintiffs have been involved in throughout the three years of the litigation, subjected themselves to discovery obligations, produced documents, provided responses to Defendants' written discovery, and prepared both for depositions and to obtain Visas for travel to the United States to sit for them. Dell'Angelo Decl. ¶¶ 36-39.

24

The amounts sought for the Lead Plaintiffs' service—$5,000 for each Lead Plaintiff, or 0.08% of the $6.25 million low-end of the anticipated Settlement Fund—are eminently reasonable and well in line with awards made in other cases. *See N. Dynasty Mins.*, 2024 WL 308242, at \*17 (awarding service awards of $20,000 to lead plaintiff and $5,000 to named plaintiff); *Chavarria v. New York Airport Serv., LLC*, 875 F. Supp. 2d 164, 177 (E.D.N.Y. 2012) (awarding reasonable service award of $5,000 to the class representative); *Massiah v. MetroPlus Health Plan, Inc.*, No. 11-cv-05669, 2012 WL 5874655, at \*8 (E.D.N.Y. Nov. 20, 2012) (same); *Garcia v. Pancho Villa's of Huntington Vill., Inc.*, No. 09-cv-486, 2012 WL 5305694, at \*6 (E.D.N.Y. Oct. 4, 2012) (same); *Perks v. TD Bank, N.A.*, No. 18-cv-11176, ECF No. 127 at 10 (S.D.N.Y. May 9, 2022) ("$7,500 awards sought are within the range awarded in this Circuit."); *Kindle v. Dejana*, 308 F. Supp. 3d 698, 717-18 (E.D.N.Y. 2018) (approving a $10,000 service award and collecting cases approving the same); *see also* 5 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 17:1 (6th ed. 2022) (finding that service awards "average between $10,000 to $15,000 per class representative").

## VI.    CONCLUSION

For the reasons set forth above, Lead Counsel respectfully request that this Court award attorneys' fees in the amount of one-third of the total cash value of the Settlement Amount plus accrued interest, litigation expenses in the amount of $103,764.16, and service awards of $5,000 to each Lead Plaintiff (totaling $20,000). Lead Counsel also respectfully request that the Court authorize Lead Counsel to distribute the attorneys' fees in a manner that, in Lead Counsel's judgment, fairly compensates each firm in view of its contribution to the prosecution of Lead Plaintiffs' claims.

Dated: October 31, 2025

Respectfully submitted,

**BERGER MONTAGUE PC**

*/s/ Michael Dell'Angelo*
Michael Dell'Angelo (*pro hac vice*)
Joel M. Sweet (*pro hac vice*)
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bergermontague.com
       jsweet@bergermontague.com

*Lead Counsel for Lead Plaintiffs*

**KIRBY McINERNEY LLP**
Ira M. Press
Sarah E. Flohr
250 Park Avenue, Suite 820
New York, NY 10177
Tel: (212) 371-6600
Email: ipress@kmllp.com
       sflohr@kmllp.com

*Local Counsel for Lead Plaintiffs*

26

## CERTIFICATE OF WORD COUNT COMPLIANCE

I, Joel M. Sweet, an attorney admitted to practice *pro hac vice* before this Court, hereby certify pursuant to Local Civil Rule 7.1(c), and Rule III.C of Judge Brian M. Cogan's Individual Practices, that the foregoing Memorandum of Law in Support of Lead Plaintiffs' Motion For Award of Attorneys' Fees, Litigation Expenses, And Service Awards was prepared in Microsoft Word and contains 8,153 words. In making this calculation, I have relied on the word count of the word-processing program used to prepare the document.

Dated: October 31, 2025                                      */s/  Joel M. Sweet*
                                                                        Joel M. Sweet